# EXHIBIT C

DEPOSITION OF AMY BUCHANAN,

JANUARY 31, 2020.

```
 1              UNITED STATES DISTRICT COURT

 2                  DISTRICT OF NEVADA

 3  _____

 4  AMY BUCHANAN,                )

 5               Plaintiff,  )

 6        vs.                )CASE NO.:

 7  WATKINS & LETOFSKY, LLP, a )2:19-cv-00226-GMN-VCF

 8  Nevada Limited Liability   )

 9  Partnership; and DOES I -  )

10  X, inclusive,              )

11               Defendants. )

12  _____)

13

14

15

16            DEPOSITION OF AMY BUCHANAN

17           FRIDAY, JANUARY 31, 2020

18                  9:38 A.M.

19       AT 8215 SOUTH EASTERN AVENUE, SUITE 265

20                LAS VEGAS, NEVADA

21

22

23  REPORTED BY:  MICHELLE R. FERREYRA, CCR No. 876

24              JOB NO. 3856457

25  PAGES 1 - 272
```

Veritext Legal Solutions
877-955-3855

1        Q.    The First Amended Complaint?

2        A.    Yes.

3        Q.    When did you review the First Amended

4    Complaint?

5        A.    Last night.

6        Q.    How long did you spend reviewing that?

7        A.    Not that long.

8        Q.    Okay.  Can you give me an estimate of time,

9    15 minutes and two hours?

10        A.    Fifteen minutes to half an hour, tops.

11        Q.    Have you seen the First Amended Complaint

12    prior to last night?

13        A.    Yes.  It's been a while.

14        Q.    Say it again?

15        A.    It's been a while.

16        Q.    Okay.  And I apologize.  I'm not very -- I've

17    got kind of a head cold going, and so I'm having a hard

18    time hearing you, if you can just speak up.  I want to

19    make sure she hears you too.

20        A.    Okay.

21        Q.    In your review of the First Amended Complaint

22    last night, was there anything that jumped out to you

23    and you said, Wait.  This is inaccurate.

24        A.    There was one incident or one provision that

25    mentions Watkins & Letofsky failing to provide

Page  8

1    accommodations before I resigned in September of 2016.

2    And I want to make it clear that I had voluntarily

3    resigned in September 2016.

4         Q.   So to the extent that the First Amended

5    Complaint infers that you were not voluntarily

6    terminating your employment in September of 2016, the

7    First Amended Complaint would be inaccurate; is that

8    correct?

9         A.   For that purpose, yes.

10        Q.   And I believe you said you reviewed e-mails

11   in Watkins & Letofsky?

12        A.   Yes.

13        Q.   How long did you spend with that?

14        A.   Maybe an hour.

15        Q.   Was there anything in those e-mails that you

16   didn't recall previously seeing?

17        A.   Yes.

18        Q.   Can you describe briefly for me what that

19   was?

20        A.   There were e-mails exchanged between you and

21   Susan in terms of, terms of employment.  I believe

22   Brian might have been copied on them.

23             There was e-mails exchanged internally after

24   receiving notice of the complaint filed with the labor

25   commissioner.  And there was e-mails exchanged

Page  9

1        Q.    Anything else that you can think of that are

2   part of those documents?

3        A.    No.  I think that was it.

4        Q.    The copy of the employee staff list that you

5   referenced, how did you come into be in possession of

6   that?

7        A.    It was sent to me.

8        Q.    By whom?

9        A.    I believe that was sent out to everybody by

10  Susan.

11       Q.    And do you recall the date of that?

12       A.    No.

13       Q.    When you say "sent out by Susan," does that

14  mean you received it by e-mail?

15       A.    Yes.

16       Q.    Do you happen to have the e-mail that the

17  list was attached to?

18       A.    No.

19       Q.    Do you recall how many employees -- strike

20  that.

21             Do you recall how many people were listed on

22  that list that you understood to be employees?

23       A.    I don't recall how many are on that paper,

24  no.

25       Q.    Was Eran Forster on that, if you recall?

                                          Page 13

1      A.    No.  He had not been hired yet.

2      Q.    I thought -- and correct me if I'm wrong, the

3  copy of the employee staff list, did you say that had

4  been received by you at the time of your resignation?

5      A.    Yeah.  I believe it got sent out when

6  I -- like right before I had left.

7      Q.    And that would be September of 2016?

8      A.    Yes.

9      Q.    Okay.

10           Based on your memory, do you know when Eran

11  Forster started?

12      A.    Approximately October 2016.

13      Q.    The Watkins & Letofsky SOP and procedures

14  that you forwarded to your attorneys, was that provided

15  to you by Watkins & Letofsky?

16      A.    Yes.

17      Q.    Okay.

18           And the photos from the websites, what

19  websites did you find photos on of Watkins & Letofsky?

20      A.    I don't recall which website it came from.

21  But I believe it was a social media website, most

22  likely Facebook.

23      Q.    Do you recall when you found those photos?

24      A.    No.

25      Q.    Can you give me an estimate in terms of time?

Page 14

1    Was it this year, previous year?

2        A.    I recall that the photos were taken in 2018.

3        Q.    So the -- couple things going on here.  So is

4    it your understanding that the photos that were posted

5    on the social media site were taken in 2018?

6        A.    The date associated to the photos is 2018.

7        Q.    When did you pull them down from the website?

8        A.    I don't recall what date I did.

9        Q.    Was it this year, 2020?

10       A.    No.

11       Q.    2019?

12       A.    I don't recall which year.

13       Q.    After your -- you received -- was it after

14   November of 2017?

15       A.    After November 2017, yes.

16       Q.    Why did you pull photographs from the

17   website?

18       A.    To try to ascertain how many employees are at

19   Watkins & Letofsky.

20       Q.    When you say "Watkins & Letofsky," which

21   Watkins & Letofsky are you referring to?

22       A.    I only know of one Watkins & Letofsky.

23       Q.    Okay.  The First Amended Complaint, I will

24   have you take a look at it for your reference.  In the

25   caption it lists Watkins & Letofsky LLP, a Nevada

1    Limited Liability Partnership as the defendant.

2        Do you see that?

3    A.    Yes.

4    Q.    Is that the Watkins & Letofsky that you know

5    of when you say you "only know of only one Watkins &

6    Letofsky"?

7    A.    I know of Watkins & Letofsky, LLP with

8    businesses in Nevada and California.

9    Q.    Okay.  Do you understand that those

10   businesses, one is a Nevada LLP and one is a California

11   LLP?

12   A.    I do not know how Watkins & Letofsky is set

13   up.

14   Q.    At any time during your employment or after

15   did you research how Watkins & Letofsky, LLP operating

16   out of California was organized?

17   A.    No.

18   Q.    So you presumed that the people that were

19   listed on the Watkins & Letofsky website were employees

20   of one Watkins & Letofsky?

21   A.    Yes.

22   Q.    How many people did you see in those

23   photographs, different people?

24   A.    I don't know the exact number.

25   Q.    Who did you recognize -- had you met anybody

Page 16

1    that were in those photographs?

2        A.    Yes.

3        Q.    How many people in those photographs had you

4    met?

5        A.    Not many.  One, at most three.

6        Q.    Did you ever speak to anybody about those

7    photographs to confirm that the individuals listed

8    were, in fact, employees?

9        A.    No.

10       Q.    Outside of the fact that they were on the

11   website, the photographs, do you have any information

12   at all that anybody in the photographs was actually an

13   employee of Watkins & Letofsky?

14       A.    Can you clarify as to information?

15       Q.    Anything that you have from any outside

16   source that helps you know that the individuals in that

17   photograph were not employees or were employees?

18       A.    They were -- they were listed on the Watkins

19   & Letofsky website as an employee.

20       Q.    Who is "they"?

21       A.    The persons that were associates.

22       Q.    Okay.  But those aren't -- so are those the

23   photographs that you are talking about, associate

24   pictures that were taken --

25       A.    No.

Veritext Legal Solutions
877-955-3855

1    Q.    Okay.  So the associates listed on the

2    website, those are different from the people on the

3    photographs; right?

4    A.    Some associates are in the group photos.

5    Q.    Okay.  I guess, well, take a look when we see

6    them.

7          The text message from Eran that you produced,

8    when -- did you receive that from Eran?

9    A.    Yes.

10    Q.    And did you send him a text message in

11    advance of that, receiving that from Eran?

12    A.    No.

13    Q.    So that text message that came to you from

14    Eran was unsolicited?

15    A.    Yes.

16    Q.    When did you receive that?

17    A.    I don't remember the exact time.  My best

18    recollection was fall 2018.

19    Q.    Is the text message dated?

20    A.    Yeah.  I still have it preserved on my phone.

21    Q.    Okay.  So did you screen shot that text

22    message?

23    A.    Uh-huh.

24    Q.    Do you have any other text messages between

25    you and Eran?

Page 18

1        A.    No.

2        Q.    The only text message between you and Eran is

3    the one he sent to you in full of 2018?

4        A.    I have the conversation that led to that

5    text, yes.

6        Q.    Okay.

7        A.    Otherwise I have not spoken him.

8        Q.    Okay.  So let me back up.  I understand in

9    fall of 2018 you received a text message from Eran.

10    And did you respond to that in text?

11        A.    I did.

12        Q.    Okay.  And a conversation and text messaging

13    went back and forth and at some point ended?

14        A.    The entire conversation in regards to that

15    text is captioned in that screen shot.

16        Q.    Okay.  Was that exchange all in one day?

17        A.    Yes.

18        Q.    Now, other than that exchange over one day in

19    fall of 2018, did you ever exchange any other text

20    messages with Eran --

21        A.    No.

22        Q.    -- Forster?

23              What did the text message from Eran to you

24    say?

25        A.    When he initially text me?

Veritext Legal Solutions
877-955-3855

```
 1    what.   I said I was doing family law.   He said was it a
 2    big firm, small firm?   I said big.   I kept it very
 3    brief.
 4         Q.    When you said "big," how big is big?
 5         A.    There's almost 150 employees at legal aid.
 6         Q.    Are you still employed there?
 7         A.    Yes.
 8         Q.    When did you start?
 9         A.    February 2018.
10         Q.    And when you started, did you start as an
11    associate attorney?
12         A.    Yes.
13         Q.    What was your starting pay?
14         A.    It was just over $63,000.
15         Q.    Per year?
16         A.    Yes.
17         Q.    Were you paid on a salary basis?
18         A.    Yes.
19         Q.    And by that -- well, let me ask you this:
20    When I asked you if you received a salary, what do you
21    understand salary to mean?
22         A.    That you are paid an annual amount and not an
23    amount -- or a specific amount per hour of work.
24         Q.    Do you also understand that when you are a
25    salaried employee, you are paid the same amount on a
```

Page 29

1    regular basis through the year to total that sum,

2    whatever that salary amount is?

3          A.    Typically, yes.

4          Q.    Are you an exempt employee with Legal Aide

5    Center?

6          A.    Yes.

7          Q.    What does "exempt employee" mean to you?

8          A.    That you are not an hourly employee.

9          Q.    Can you receive overtime pay as an exempt

10   employee, as you understand it?

11         A.    No.

12         Q.    And have you been an exempt employee the

13   entire time you were with Legal Aid Center?

14         A.    Yes.

15         Q.    Did Legal Aid Center tell you at any time,

16   did any representative from Legal Aid Center tell you

17   that you were an exempt employee, using those words?

18         A.    Using those words?

19         Q.    Yes.

20         A.    Verbally say it to me?

21         Q.    Yes.

22         A.    No.

23         Q.    Did they communicate to you, using the words

24   "exempt employee" in any fashion in writing?

25         A.    Yes.

Veritext Legal Solutions
877-955-3855

1    as it relates, I assume, to pain management, and the

2    headaches might also have been contributing to the

3    fatigue and issues with concentration?

4        A.    I actually requested to be taken off the

5    Topamax.

6        Q.    Okay.  And did you say the answer to that was

7    yes, first, and then --

8        A.    Yes.

9        Q.    Okay.

10           I know nothing about fibromyalgia; so please

11    bear with me.  I'm not trying to be rude by asking

12    this.

13           Did anybody, in your reviews with your

14    doctors or healthcare providers, give you any

15    information about the cause of fibromyalgia, etiology,

16    how it develops, anything like that?

17        A.    I haven't been given, like.  Pamphlets or

18    anything, but information given is that it could result

19    from trauma or injury.

20        Q.    Any specific type of trauma that might be the

21    cause of fibromyalgia, head injury, orthopedic injury,

22    anything like that?

23        A.    I believe it could have initiated from the

24    accident; so it definitely -- I have experienced all

25    the symptoms thereof following that second back

Page 70

1    surgery.

2         Q.   Okay.

3         A.   But a definitive cause of it, there's no way

4    of determining that.

5         Q.   Understood.  Okay.  Thank you.

6              So going into your search for work in spring

7    of 2016, you I assume started to look on different

8    types of postings and trying -- I don't know what we

9    call it.  I don't know what words, but you went out and

10   tried to see what jobs were available in some respect?

11        A.   I looked online, and I really hadn't been

12   looking that long when my TIP mentor had said "Hey, I

13   met a guy named Dan.  He's looking to hire an

14   associate.  Here's his number you should call him".

15        Q.   Who was that, your --

16        A.   My tip mentor, Leah Martin.  And by -- TIP is

17   an acronym, but they are mentors that were assigned

18   when we pass the Nevada State Bar.  And, specifically,

19   it was, He's looking to add family law to his practice,

20   and I know you've been looking and wanting to do family

21   law.

22        Q.   Did you understand that, at least from

23   speaking with Leah Martin, that we were looking for a

24   full time associate?

25        A.   Not from Leah, no.  But I learned that in

Page 71

1    talking to you.

2         Q.    In addition to conversation with Ms. Martin,

3    did you do anything else to look into potential

4    employment in the spring of 2016?  And the reason I

5    asked is that you mentioned earlier that you have yet

6    to see any postings asking for a part-time associate?

7         A.    (Witness nods.)

8         Q.    So now with that backdrop, did you look at

9    any postings or at any other advertisements about the

10   need for associates in the spring of 2016 other than

11   talking to Ms. Martin?

12        A.    I'm sure I did look at postings versus things

13   for associate positions.

14        Q.    And as you sit here today in looking for jobs

15   then and throughout your career, do you have any

16   recollection of ever seeing a posting asking for a

17   part-time associate?

18        A.    No.

19        Q.    Now, when you were searching for employment

20   in spring of 2016, were you considering work as an

21   independent contractor as well?

22        A.    I suppose, since I'd already done different

23   kinds of contract work.  But that's not really

24   sustainable when you are looking for consistent income.

25        Q.    And by "consistent income," do you mean a

                                              Page 72

1    salary?

2         A.    No.

3         Q.    What do you mean?

4         A.    Meaning a consistent paycheck.

5         Q.    Let's clean this little area, up and then we

6    will take a quick break.  So you -- from November of

7    2017 -- let's back it up even more.  From May of 2017,

8    until you started with Legal Aid Center in February of

9    2018 --

10        A.    (Witness nods.)

11        Q.    -- did you work as a lawyer in an associate

12   or independent contractor status or any status for

13   anybody other than Watkins & Letofsky and Legal Aid

14   Center?

15        A.    As a lawyer, no.

16        Q.    Okay.  Did you submit any applications or

17   send any e-mails inquiring about potential employment

18   with any law office or any individual lawyer from

19   May of 2017 until you started with the Legal Aid Center

20   in February of 2018?

21        A.    Are you asking -- sorry.  Can you reword that

22   or restate that question?

23        Q.    Yeah.  I can make it simpler.  Did you look

24   for any other employment in any capacity from May of

25   2017 until February of 2018?

Page 73

1        A.    I did.

2        Q.    And what did you do in that pursuit?

3        A.    I had looked online, and that was about it in

4    my pursuit.

5        Q.    You looked online where?

6        A.    It would be either job postings through the

7    Bar, through the law schools, or people would refer me.

8        Q.    Did you submit any resumés or applications to

9    any location other than Legal Aid Center from May 2017

10   until February 2018?

11       A.    I had submitted a resumé to Ford and Freeman.

12   I was referred to Attorney Ernest -- it's pronounced

13   Bushe or Bushe.

14       Q.    Do you know how to spell that?

15       A.    B-u-c-h-e.

16       Q.    B-u-c-h-e?

17       A.    Uh-huh.

18       Q.    Thank you.

19       A.    I had applied for an advocate position with

20   the City of Henderson, and I had applied for a

21   mediation position through Clark County.  And then

22   friends of mine who was closing -- or wrapping up his

23   business as an attorney ended up asking me to help him

24   closeout his files, but not in an attorney capacity.

25       Q.    And who was that?

Page 74

1  to your new phone, did all of the data get transferred,

2  the text messages and e-mails and everything?

3      A.   I'm thinking so; so that's why I haven't even

4  bothered to look at the old one.

5      Q.   Do you have a habit of deleting text messages

6  just as they accumulate so they don't be too much in

7  your text message box?

8      A.   No.  I'm not deleting stuff regularly.

9      Q.   Okay.  So, yeah, if you would take at look at

10  that old phone and let your attorneys know if you find

11  anything and they can give it to us, that would be

12  great.  Thank you for that.

13         Now respect to e-mails, you have provided

14  them -- some e-mails in your disclosures?

15      A.   (Witness nods.)

16      Q.   And potentially more from this recent

17  transmission from them.  As we think about it, did

18  we -- have you now provided your attorneys the entire

19  world of e-mails that you have in your possession,

20  custody, and control related to your employment with

21  Watkins & Letofsky in this lawsuit?

22      A.   I don't think I printed off the -- oh, no, I

23  did.  I have given them all the e-mails.

24      Q.   Okay.  As you sit here today, it's your

25  understanding that you have provided your attorneys all

Page 87

1    the e-mails that you have related to your employment

2    with Watkins & Letofsky and this lawsuit; is that

3    correct?

4         A.    Nothing prior to December 2016.

5         Q.    Why is that?

6         A.    Because I wasn't claiming improper

7    termination or failure to accommodate prior to

8    December 2016.

9         Q.    Okay.  I think you'll see if you go

10   back -- and we'll doublecheck to make sure -- but the

11   Request For Production asks for all written

12   communications between Watkins & Letofsky.  And to that

13   end, we would ask you for you to look for those, even

14   if it predates December of 2016.  Can you provide those

15   to your attorney, if you have any of those?  Will you

16   do that?

17        A.    Yeah.

18        Q.    But your initial production of e-mails to

19   your attorneys, as far as you can recall, limits those

20   e-mails to those -- that you have after dated post

21   December 2016; is that right?

22        A.    Dated --

23        Q.    After --

24        A.    November, December 2016 and after.

25        Q.    Now, why did you pick that time period to

Page 88

1     Q.    Have you done any research on your own to
2   determine whether or not principals of the business are
3   considered employees?

4     A.    Some.

5     Q.    What have you found, based on your
6   understanding?

7     A.    It depends.

8     Q.    On what?

9     A.    The tax and responsibilities and size of the
10  business.

11    Q.    Those factors are considered in determining
12  whether a principal may or may not be an employee of
13  the business?

14    A.    Yes.

15    Q.    You have to excuse me.  Sometimes I go astray
16  in my questioning and I get ahead of myself and I can't
17  remember if I asked you and I don't want to be
18  repetitive.  So previously we talked about exempt
19  employees, and you agreed that exempt employees are not
20  entitled to overtime.

21          Do you recall that?

22    A.    Yes.

23    Q.    Would you agree that you were an exempt
24  employee while you were at Watkins & Letofsky?

25    A.    By profession, yes.

Page 93

1      Q.    By that do you mean you were a professional

2  exception?

3      A.    Yes.

4      Q.    And you are referring to the -- to what to

5  come to that conclusion?

6      A.    Being an attorney.

7      Q.    So your licensure as an attorney, the fact

8  that you are working as a member of the Bar in the

9  profession of law, these are some factors you looked at

10  and determined you are a professionally exempted

11  employee while you were at Watkins & Letofsky?

12      A.    Correct.

13      Q.    So I want to go over not in any great, great

14  detail, but I do want to kind of review medical

15  history.  We are going to probably start right around

16  that first accident.  I know you are providing it with

17  respect to your response to discovery, but I kind of

18  want to get an overview of who you seen and for what

19  and how that has gone along.  So bear with me through

20  that.  At the time, let's say of the accident -- the

21  first accident was April of 2015, so in March of 2015,

22  did you have a designated primary care physician?

23      A.    No.

24      Q.    In March of 2015, were you seeing any

25  physician or other healthcare provider on a regular

Page 94

1  come to.

2      Q.   So other than yourself and myself, Dan

3  Watkins, do you know of anyone else who worked for

4  Watkins & Letofsky utilizing the Sean Sullivan space?

5      A.   I was not present with anyone else who was

6  working for Watkins & Letofsky utilizing that space; so

7  I do not know.

8      Q.   And then when Watkins & Letofsky opened up at

9  the 8215 South Eastern Avenue location, throughout the

10  entire time that you worked at that location, how many

11  employees also worked at that location?

12     A.   Occasionally you worked at this location.

13  Brian Letofsky worked at this location and Eran Forster

14  worked at this location.

15     Q.   Anyone else?

16     A.   There was no other employees present during

17  the time that I was physically there.  And

18  occasionally, Susan would accompany you on trips to

19  this location.

20     Q.   What information do you have, if any, that

21  Susan Watkins was an employee of Watkins & Letofsky,

22  LLP at any time?

23     A.   That she presented herself as an employee of

24  Watkins & Letofsky, she had a work e-mail address with

25  this law firm, and she held a position and title with

                                        Page 131

1          Q.    So how long do you think the phone call
2    lasted?
3          A.    I would have to look at my phone records to
4    give you an estimate.  I really don't know.
5          Q.    But not hours?
6          A.    No.
7          Q.    More than a half an hour?
8          A.    I have no idea.
9          Q.    And what information did you provide her?
10         A.    The information she needed to get the work
11    done on the cases that had previously been mine.
12         Q.    Do you recall how many cases you discussed?
13         A.    I don't recall.
14         Q.    The work that needed to be done, do you
15    recall what that work consisted of?
16         A.    I do not remember.
17         Q.    Did you take any notes or make any kinds of
18    digital records of that phone call?
19         A.    I did not.
20         Q.    So we have talked about Brian Letofsky, Dan
21    Watkins, Eran Forster, yourself, Susan Watkins,
22    Teresa -- an associate who called you, and then
23    possibly Farrah.  Anyone else that you know of that's
24    affiliated with Watkins & Letofsky out of -- that
25    worked out of the Eastern Avenue address prior to

                                              Page 133

1  November of 2017?

2      A.   Well, now that I know Joseph is affiliated

3  with this office being part of this action.

4      Q.   Prior to November of 2017?

5      A.   Oh, I do not know when he started; so

6  I -- no.

7      Q.   So let me circle back.  I went to focus on

8  prior to November of 2017, do you know of anyone other

9  than Brian Letofsky, Dan Watkins, Eran Forster, Susan

10  Watkins, yourself, someone you understand to be Farrah,

11  and then an associate that worked out of the Watkins &

12  Letofsky Eastern Avenue location prior to November of

13  2017?

14      A.   No.

15      Q.   At the end of Paragraph 2 it says, "Defendant

16  Watkins & Letofsky met the statutory requirements of

17  having 15 or more employees based on plaintiff's count

18  from her personal knowledge and memory."

19          Do you see that?

20      A.   Uh-huh -- yes.

21      Q.   Did you provide to your attorneys a count

22  based on your personal knowledge or memory of 15 or

23  more employees?

24      A.   I provided my attorney with the knowledge

25  that I recall staffing of approximately nine attorneys,

Page 134

1    Americans with Disabilities Act."

2         And then it goes on to cite a couple

3    statutes.  Did you do any research associated with

4    those statutes to confirm on whether you thought that

5    that was a true statement?

6         A.   I did not research this, no.

7         Q.   Okay.

8         Paragraph 6 on Page 3, it indicates that, "On

9    or about November 16, 2017, the Defendants terminated

10   Plaintiff's employment and discharged her."

11        Do you see that?

12        A.   Yes.

13        Q.   Do you believe that's an accurate statement?

14        A.   I don't recall this date, but I believe the

15   dates affiliated with the last e-mail I received from

16   you notifying me when my health -- that my health

17   insurance had been canceled as of the end of November .

18        Q.   Okay.  So the information you're relying on

19   to conclude that your employment was terminated and you

20   were discharged is an e-mail you received from me, Dan

21   Watkins, indicating your health insurance had been

22   canceled; is that correct?

23        A.   Well, at first you notified me that you

24   received my complaints and that you would respond by

25   the deadline date, followed by your health insurance

Page 138

1    has been canceled as of the end of this month.

2        Q.    And the wording from that e-mail that you

3    relied on to conclude that your employment was

4    terminated, was that related to the information that

5    your health insurance was being canceled at the end of

6    the month?

7        A.    Correct.  Because that was followed by "you

8    will receive options to maintain your health

9    insurance."

10        Q.    Okay.

11            Do you have any other written information,

12    any other documentation that supports the statement

13    that the defendants terminated plaintiff's employment

14    and discharged her, other than the e-mail you are

15    referencing?

16        A.    The text message from Eran.

17        Q.    The text message from who?

18        A.    Eran Forster.

19        Q.    Oh, from Eran Forster.  That's the one in the

20    fall of 2018?

21        A.    Correct.

22        Q.    Okay.  What about that text message indicates

23    to you that you had been terminated?

24        A.    So it said something along the lines of,

25    "Overall, are you glad that Dan terminated you"?

1       Q.    What was your response to that?

2       A.    I said I don't want to talk about Dan.

3       Q.    Was there anything -- this is the fall 2018;

4   correct?

5       A.    Correct.

6       Q.    Okay.

7             So you received an e-mail regarding

8   healthcare cancellation and a text message from

9   Mr. Forster, which you interpreted to indicate that you

10  were terminated from Watkins & Letofsky in

11  approximately November of 2017; correct?

12      A.    Correct.

13      Q.    And anything else other than those two

14  documents that you have in writing or digital form that

15  relates to defendants terminating your employment in

16  November of 2017?  Do you have anything else?

17      A.    In written form?  No.

18      Q.    Okay.

19            On Page 3, Paragraph 7, Line 12 -- starting

20  at Line 12 at the end it says, "Plaintiff was eligible

21  for performance-based bonuses at $50 per hour for each

22  billable hour worked in excess of 160 billable hours in

23  one month."

24            Do you see that?

25      A.    Yes.

                                        Page 140

1        Q.    Then it says, "In this full-time role,

2    Plaintiff worked between 40 and 60 hours per week."

3          Do you see that?

4        A.    Yes.

5        Q.    Wondering if as you read this, does --

6        A.    Actually, before going on from that --

7        Q.    Sure.

8        A.    -- can I actually correct this?  Because I

9    will state from this April 2016 period through

10   September 2016 period, this was not the bonus

11   structure.  I was under no bonus structure during that

12   time.

13       Q.    Okay.  From what time were you not under

14   bonus structure?

15       A.    Because it says here from April 2016 through

16   September 2016.  So I'm assuming that this

17   bonus -- performance-based bonuses was for that time

18   frame.  And that bonus structure was when I was rehired

19   back to Watkins & Letofsky.  That was not during

20   April 2016 through September 2016.

21       Q.    Okay.  So to be clear, then, it's your

22   understanding that the bonus structure that provided

23   $50 per hour for each billable hour in excess of

24   160 billable hours in a month only applied to you after

25   you returned to Watkins & Letofsky in approximately

Page 141

1    November of 2015; is that correct?

2        A.    I wasn't at Watkins & Letofsky in 2015.

3            MR. ORTUNO:  '16.

4    BY MR. WATKINS:

5        Q.    Oh, '16.  My apologies.  Let me restate it.

6            So you had voluntarily resigned in

7    September of 2016, I think you said earlier; is that

8    correct?

9        A.    Correct.

10        Q.    You returned in approximately November of

11    2016; correct?

12        A.    Returned December 5, 2016.

13        Q.    Okay.  And so it's your position that the

14    bonus structure referenced at Lines 13 through 16

15    applied only during the time after you returned on

16    December 5, 2016; is that correct?

17        A.    Correct.  It was stated that associates who

18    billed in excess of 160 billable hours per month is

19    eligible for bonus pay of $50 per hour after the 160.

20            However, during my employee evaluation, we

21    had discussed that you would apply a lower bonus number

22    to Eran and I because of our work situation and that

23    our requirements in the office having no support staff,

24    et cetera, that ours would be closer to 150.

25        Q.    Do you have anything in writing that follows

Page 142

1    that information you are providing?

2         A.    I had referenced and stated that in my

3    e-mails to you requesting monies owed.

4         Q.    After November of 2017?

5         A.    No.

6         Q.    Or excuse me, after May of 2017?

7         A.    Correct.

8         Q.    Do you have anything prior to May of 2017

9    that references a lower bonus requirement for you at

10   any time?

11        A.    I could not find anything in written form.

12        Q.    And it's your memory that those statements

13   about a lower bonus requirement applied to both you and

14   Eran?

15        A.    Correct.

16        Q.    Have you had any conversations with

17   Mr. Forster about that since May of 2017?

18        A.    No.

19        Q.    When you came back to work at Watkins &

20   Letofsky in 2016, December 5, 2016, did you start back

21   full-time or on some type of part-time basis?

22        A.    When I came back to Watkins & Letofsky in

23   December of 2016?

24        Q.    Yes.

25        A.    I came back with an agreement to work

Page 143

1     Q.    So is it your position that those different

2   documents formed a contract, a written contract?

3     A.    Combination of documentation and actions by

4   myself would inference the terms of the contract.

5     Q.    Well, okay.  So that's a little different

6   than what I'm asking.  What I want to know is do you

7   have evidence in the form of documentation, written

8   documentation of a written contract --

9     A.    Yes.

10    Q.    -- for employment?

11    A.    So initially we had --

12    Q.    So the answer to that is yes?

13    A.    Yes, uh-huh.

14    Q.    Well, what document -- well, let me ask it

15  this way.  Everything that you have that's in document

16  format that might be interpreted by you to be a

17  contract you have given to your attorneys; correct?

18    A.    Yes.

19    Q.    Okay.

20          Have you reviewed the plaintiff's disclosures

21  at any time?  You can thumb through if you want.  If

22  you don't recognize them and you can't say, don't

23  guess.  I'm just curious.

24    A.    I mean, I provided most of the stuff at the

25  beginning of the case; so I haven't reviewed these

Veritext Legal Solutions
877-955-3855

1   constitute disabilities under the ADA."

2        Do you see that?

3    A.   Yes.

4    Q.   Did you -- were you experiencing each of

5   these symptoms in some form or another during your

6   employment at Watkins & Letofsky.  Both up to

7   May -- from December 2016 through May 2017, and then

8   the time period before that?

9    A.   These things were experienced at

10  different -- either both those time periods or at

11  different time periods and varying degrees because my

12  condition changed.  My condition was worse when I

13  returned, and it worsened after I returned.

14   Q.   Okay.  And so that's kind of where I'm

15  driving at.  So I know it's a little bit broad, and so

16  that's why I'm trying to get to when it applied.

17   A.   Yeah.

18   Q.   So is it your memory that during the first

19  time that you were employed by Watkins & Letofsky from

20  April of 2016 --

21   A.   '16.

22   Q.   -- until -- what was it?

23   A.   September.

24   Q.   September of 2016, during that initial time

25  period, that you experienced the symptoms listed in

Page 147

1          A.    No.

2          Q.    Did anyone ever tell you you couldn't leave

3     because you -- even though you were throwing up in the

4     office from a migraine?

5          A.    No.

6          Q.    Did anyone ever tell you that can't take a

7     nap in the office to help with the migraine?

8          A.    No.

9          Q.    Did anyone ever prohibit you from going to a

10    doctor to seek medical attention associated with

11    migraines or any other disability?

12         A.    No.

13         Q.    You requested a modified workweek upon your

14    return; is that correct?

15         A.    Correct.

16         Q.    And you were the one who had actually

17    requested the four hours a day at 20 hours a week;

18    correct?

19         A.    Correct.

20         Q.    And when you requested that Watkins &

21    Letofsky accommodated that request when you returned in

22    December of 2016; correct?

23         A.    No.

24         Q.    They didn't?

25         A.    You said you would.

Page 151

1        Q.    Okay.  So you were able to come back with a

2    four-hour a day work schedule.  That was the plan;

3    correct?

4        A.    Correct.

5        Q.    Do you have anything in writing at any point

6    in time to me or Brian Letofsky or anybody at Watkins &

7    Letofsky where you complained that the workload was

8    keeping you from sticking to the accommodation of four

9    hours a day?

10       A.    No.  Everything was verbal discussions.

11       Q.    In Paragraph 13, Page 4, Line 18, it says,

12   "Defendant told plaintiff to submit a resignation

13   letter, which plaintiff did, on or about September 2,

14   2016."

15             Do you see that?

16       A.    Yeah.

17       Q.    Could that be the resignation that you are

18   saying it was actually voluntary?

19       A.    Correct.  And it was Nancy who followed up

20   and asked me to send a formal resignation.

21       Q.    And that request to send a formal resignation

22   followed an e-mail that you had sent previously saying,

23   "I don't think I can keep working anymore.  It's just

24   too much with my medical condition."  Correct?

25       A.    No.  That was me saying, "Hey, I now have to

                                              Page 152

```
1   have a second surgery; so I'm going to have to leave."
2        Q.   Okay.
3        A.   And then Nancy asked me to send a letter.
4        Q.   More specific -- you are more specific.
5   Surgery was around the corner, you needed to attend to
6   that, and you actually told Watkins & Letofsky you
7   needed to leave employment; correct?
8        A.   Correct.
9        Q.   So the request for resignation letter was
10  just a follow-up on that statement; correct?
11       A.   Yes.
12       Q.   You indicated earlier that in December of
13  2016 when you returned to Watkins & Letofsky, you were
14  the one who made the request to return on a four-hour
15  workday; correct?
16       A.   Say that again?
17       Q.   Yeah.  I'm not looking at the document.  I'm
18  going back to your testimony.  You had indicated that
19  the return to work at Watkins & Letofsky, you were the
20  one who requested the four-hour days; correct?
21       A.   I remember it was 20 hours a week.  Whether
22  that was four hours, five days a week, or it was four
23  days, five hours a day, but I believe it was four
24  hours, five days a week.
25       Q.   How did you come up with that timeline or
```

Veritext Legal Solutions
877-955-3855

1    that amount of time to have on a reduced schedule?

2         A.    I knew what I was capable of doing leading up

3    to then and what was being recommended by doctors.

4         Q.    Okay.  So the doctors had recommended that

5    you keep your work to 20 hours a week; correct?

6         A.    Well, I wasn't even working at the time; so I

7    was not able to do a whole lot.  So I needed to start

8    out slow and then see what I could be capable of doing.

9         Q.    Looking at Page 5, Paragraph 16, starting at

10   the ends of Line 5 it says, "It," meaning Watkins &

11   Letofsky, "instead piled work onto plaintiff and told

12   her to, open quote, 'sink or swim,' closed quote."

13        The quotations there, is that intended to

14   refer to an actual accurate statement made by somebody

15   at Watkins & Letofsky?

16        A.    Yes.

17        Q.    Who said that?

18        A.    Eran.

19        Q.    Did Eran have anything to do with your

20   assignments at Watkins & Letofsky?

21        A.    What do you mean by that?

22        Q.    Did he assign you work at Watkins & Letofsky

23   or were you responsible for your own files?

24        A.    He did not assign me work.

25        Q.    You --

Page 154

1    correct?

2         A.    An employee can be staff or associate

3    attorney.

4         Q.    Well, staff can't perform legal work, can

5    they?

6         A.    Staff can't do legal work, but staff can help

7    with the workload.

8         Q.    Can a staff member go to a deposition?

9         A.    No.

10        Q.    Can a staff member go to a mediation?

11        A.    I was --

12        Q.    Can a staff member go to a mediation?

13        A.    They could attend, but they can't conduct it.

14        Q.    Right.  But they can't represent a client;

15    correct?

16        A.    Yeah.

17        Q.    Can they summarize any type of record and

18    place any type of legal opinion associated with that

19    summary?

20        A.    They can help prepare a summary, but it has

21    to be under the supervision of the attorney.

22        Q.    Very good.

23              So the reasonable accommodations, from your

24    perspective, included hiring an independent contractor

25    or hiring a part-time associate to cover the work that

                                              Page 165

1  you couldn't cover in the workday; correct?

2       A.    Correct.

3             And it was also asked for support staff in

4  the Nevada office.

5       Q.    Okay.

6             Did you ever do any type of fiscal analysis

7  associated with either of those options?

8       A.    No.

9       Q.    Did you ever talk to anybody at all about the

10 operational expenses or fiscal analysis associated with

11 those accommodations that you are recommending?

12      A.    I didn't research or do an analysis, but it

13 was already discussed, and you said you were hiring

14 staff office assistant for the Nevada office.

15      Q.    Did you talk to anybody as part of an

16 investigation into the operational expense or fiscal

17 analysis associated with those accommodations that you

18 were recommending?

19      A.    No.

20      Q.    Okay.

21            Well, not withstanding all of what you said,

22 and what we just discussed, would you agree that

23 another reasonable accommodation when an associate who

24 can only work 20 hours a week and cannot complete all

25 the work assigned would be to place that associate on a

Veritext Legal Solutions
877-955-3855

1              After your employment and your showing up at

2    the office in May of 2017 occurred, you continued to

3    receive contributions towards your health insurance

4    until November of 2017; correct?

5        A.   Correct.

6        Q.   Did you ever pay any contribution toward your

7    health insurance from May 2017 to November 2017?

8        A.   My responsibility towards my health plan was

9    taken directly from my paychecks.

10       Q.   Did you personally contribute money from

11   May 2017 to November 2017 toward your healthcare?

12       A.   I did not personally pay out of pocket

13   towards my healthcare --

14       Q.   Now at the time that you left --

15       A.   -- after I left.

16       Q.   Okay.

17            At the time you left Watkins & Letofsky in

18   May of 2017, you were working 80 percent; is that

19   correct?

20       A.   Approximately 80 percent from March through

21   till I was put on leave.

22       Q.   And while you worked at 80 percent, you

23   received a healthcare contribution for health

24   insurance; correct?

25       A.   Correct.

Page 169

1    for an employer to take away an employee's health

2    insurance when they're on a leave of absence for

3    medical reasons.

4    BY MR. WATKINS:

5        Q.    Did you ever submit a claim to the State for

6    disability income?

7        A.    No.  Because I was still employed to my

8    understanding.

9        Q.    At the point in time when you learned that

10   you were no longer employed, or at least came to that

11   conclusion, did you submit a claim to the State for

12   disability?

13       A.    No.

14       Q.    Why?

15       A.    Because I've only been employed for a short

16   time and have had very little time to accrue or

17   establish a salary that would benefit me for

18   disability.  And I still had the ability to work with

19   accommodations.

20       Q.    Do you believe that Legal Aid Center is

21   required to provide health insurance contributions to

22   you required by law?

23       A.    Yes.

24       Q.    Do you recall ever receiving a paycheck from

25   Watkins & Letofsky prior to May 2017 that was not

Page 172

1    payment on a salary basis?

2        A.    Prior to May 2017?

3        Q.    Correct.

4        A.    No.

5        Q.    Would you agree that --

6        A.    Actually --

7        Q.    Go ahead.

8        A.    Well, I'd say salary basis is open for

9    interpretation.

10       Q.    Well, explain that.  What does that mean?

11       A.    I was consistently getting paychecks in equal

12   amounts every two weeks.

13       Q.    Isn't that the definition of a salary pay?

14       A.    No.  That's the definition of a paycheck

15   every two weeks based on what you're supposed to be

16   paid, allegedly.

17       Q.    Okay.

18       A.    And I actually didn't get the same amount in

19   the beginning when I returned to Watkins & Letofsky at

20   the end of May.  My paychecks were a varied amount.

21            MR. WATKINS:  Okay.  Why don't we take just a

22   five-minute break, we will get some air in here, get

23   the air flowing, and then we will transition to the

24   next subject and hopefully get done here pretty quick.

25                    (A short break was taken.)

                                          Page 173

1              MR. WATKINS:  Go back on the record.

2    BY MR. WATKINS:

3         Q.    Last set of questions on the First Amended

4    Complaint.  I believe in there it reference that is at

5    some point you believe your pay changed from salary to

6    hourly; is that accurate?

7         A.    The discussion was that I would be paid a

8    percentage of my salary pursuant to the hours I was

9    working; so --

10        Q.    Okay.

11              Is there any time when you were working for

12   Watkins & Letofsky where you understood that you would

13   be paid a certain amount per hour?

14        A.    When I did contract work for you after I had

15   resigned that was paid hourly.

16        Q.    That was the September 2000 --

17        A.    '16.

18        Q.    -- 2016 time period.

19              Outside of that, was there any time where

20   there was an agreement that you would be paid a certain

21   amount per hour?

22        A.    Again, there was an agreement that I would be

23   paid a percentage of my salary pursuant to the number

24   of hours that I would be working.

25        Q.    Okay.  I think that is different from what

                                                Page 174

1    I'm asking.  What I'm asking you is:  Was there ever a

2    time, specifically, that you spoke to someone at

3    Watkins & Letofsky where there was an agreement that

4    you would receive a set dollar amount for each hour

5    worked?

6         A.    As in you will receive this number per hour?

7    No.

8         Q.    Okay.  Thank you.

9              MR. WATKINS:  We will go off the record.

10                  (Off the record.)

11   BY MR. WATKINS:

12        Q.    Looking at the Plaintiff's Initial

13   Disclosures -- what happened?

14              MR. ORTUNO:  That's the first sup. which has

15   the initial disclosures.  It's just the boldfaced with

16   all the added stuff.

17              MR. WATKINS:  What was this?  Oh, there's a

18   second disclosure too.  Oh, okay.

19              Let's go back off the record.

20                  (Off the record.)

21              MR. WATKINS:  We will go back on.

22   BY MR. WATKINS:

23        Q.    So for the purpose of the record, we're going

24   to review some of the plaintiff's disclosures.  The

25   document we're going to refer to specifically right now

                                                    Page 175

1    with the Legal Aid Center, you were paid the same

2    amount every two weeks; correct?

3         A.    Yes.

4         Q.    That amount that you're paid every two weeks

5    at Legal Aid Center is greater than the amount you were

6    paid at Watkins & Letofsky every two weeks in 2017;

7    correct?

8         A.    Yes.

9         Q.    There's a reference to a lost bonus and the

10   computation of damages right around Page -- or Line 10.

11              Do you see that?

12        A.    Yes.

13        Q.    Lost bonus.  Do you know how that was

14   calculated?

15        A.    No.

16        Q.    Based on what you know of the bonus program,

17   do you believe you have a claim for lost bonuses at

18   Watkins & Letofsky?

19        A.    Yes.

20        Q.    What is that amount?

21        A.    The actual amount?

22        Q.    Of the bonus that you should have received?

23        A.    Fifty dollars an hour for any billables

24   over -- well, office wide it was 160.  It was discussed

25   in Nevada office for Eran and I to come in lower at

                                        Page 183

1    150.

2         Q.    Okay.

3              And at that 160, do you have any memory of

4    that actually being done on a quarterly basis for a

5    total of 480 per quarter?

6         A.    I have no recollection of how it was being

7    done.  I just have recollection that as of July 2018, I

8    received an e-mail from you saying that you were

9    reviewing all associates's billing for review and

10   correction of pay and bonuses.

11        Q.    Have you done any calculation to determine

12   the amount of bonus money you believe you're entitled

13   to from Watkins & Letofsky that you did not receive?

14        A.    I believe that I put an amount in the initial

15   documentation would be Labor Commissioner --

16        Q.    Okay.

17        A.    -- and or the N-E-R-C.

18        Q.    Other than those documents, do you have any

19   number of computing the amount of bonus that you were

20   not paid by Watkins & Letofsky that you were entitled

21   to?

22        A.    No.  And I actually computed that based on

23   the 160 hours.

24        Q.    When you computed that based on 160 hours,

25   did you include admin time as part of the totals for

Page 184

1    including bonus pay?

2         A.    I did, based on what was submitted on my

3    billing time sheets.

4         Q.    You understood the 160 minimum was

5    160 minimum billable hours; correct?

6         A.    Correct.  And I had not received any

7    deductions from my billables at all while the time I

8    was there at Watkins & Letofsky.

9              And at the time I was there --

10        Q.    Well, let me back that up.  What do you mean

11   you did not receive any deductions?  What do you mean?

12        A.    Well, when I was employed there from

13   April 2016 to September 2016 in which I -- my job

14   duties was associate work duties, plus staff -- support

15   staff work duties or admin, as you would say, plus

16   cleaning, mail, miscellaneous, et cetera, and I

17   received my full salary for everything I did.  And I

18   never received a deduction in my billables submitted

19   during that time.  All of my billables submitted from

20   when I returned December on, I was never informed of

21   any billables being nonbillable from the time I was

22   employed that second time as well.  And I had the same

23   duties as associate attorney, support staff, admin,

24   miscellaneous, mail, cleaning, et cetera.

25        Q.    Well, with that in mind, as you currently

Page 185

1          Q.    And the signature at the bottom, that's

2     yours?

3          A.    Yes.

4          Q.    And the dated entry, that's yours?

5          A.    Yes.

6          Q.    Up at the top, the "X" by backpay says you

7     were paid at a rate of pay $65,000 salary.

8                Do you see that?

9          A.    Yes.

10         Q.    You wrote that; correct?

11         A.    Yes.

12         Q.    The lost bonuses section, $2,820, again, now

13    that you're looking at this, do you have any memory as

14    to how you calculated that number?

15         A.    Number of hours over 160 times $50.

16         Q.    Got it.

17                Total hours; right?

18         A.    Yeah.

19         Q.    Okay.  So just so I'm clear, you came to the

20    conclusion of lost bonuses by taking the total hours

21    worked, dividing that by 160 minimum billable hours,

22    and then multiplying that number by $50; correct?

23         A.    Whatever was on my billables over the 160

24    each month times $50 an hour.

25         Q.    Well, so that's -- I'm not being

                                          Page 206

1    argumentative, but I think I'm hearing you say

2    something different now.  The total -- the hours that

3    you considered as part of being -- let me state it

4    another way.

5          The hours that were considered by you towards

6    your bonus, did that include all of your hours that

7    worked?

8    A.    Yeah.  I just took my total from each month,

9    whatever was the 160, times the $50.

10   Q.    Understood.

11         So if there was a section in the total

12   billables that included admin time, you would have

13   included that as a part of determining bonuses;

14   correct?

15   A.    Yeah.  So whatever was to be deduced is not

16   billable or considered from bonus pay was to be done by

17   Watkins & Letofsky.

18   Q.    The calculation -- when it says "backpay" and

19   then the top line goes across, and then it should say

20   "for a total of $11,068.50," do you see that?

21   A.    Yes.

22   Q.    How did you calculate that number?

23   A.    So --

24   Q.    Let me do this.  Because it has been -- and

25   maybe we can save some time.  Let me see if I can find

Page  207

1    it identify each of the points that support your claim

2    for unpaid wages?

3           A.    No.

4           Q.    All right.  So later on, then, if someone

5    were to take a look at this, we would presume that it's

6    incomplete information; correct?

7           A.    Yes.

8           Q.    But at the time, at the top of this page, you

9    sent this e-mail to try and resolve corrected pay;

10   correct?

11          A.    Yes.

12          Q.    And your hope was to finally resolve

13   everything; correct?

14          A.    Yes.

15          Q.    And at the end said, "To help, I've listed

16   everything out for you."

17                Correct?  That's the last sentence up here at

18   the top; correct?

19          A.    Yes.

20          Q.    All right.  But now as you read it, it's not

21   everything that we would need to know; is that correct?

22          A.    Well, I didn't -- communication was via phone

23   and e-mail.  So this was everything that I had received

24   thus far.  So then I was denoting what I had, what

25   hours I had worked beyond the agreed 20 hours, beyond

                                                Page 239

1    the agreed 9:00 to 5:00 or 80 percent hours.  So it was

2    noted that those were the hours that I was not

3    compensated for, including the discrepancies in the

4    first and last paychecks.

5        Q.   So specifically, then, what claims for unpaid

6    wages do you have that aren't referenced on this page?

7        A.   Specific number amounts of the total wages

8    owed for beyond what was paid in each of these

9    paychecks.

10       Q.   At any point, have you calculated or computed

11   those amounts, at any point in time?

12       A.   I believe that's what was put on my Labor

13   Commissioner complaint.

14       Q.   Okay.

15            So as you sit here today, is the complaint to

16   the Labor Commissioner that you prepared the best

17   summary of what you believe your unpaid wages include?

18       A.   Again, it's been a minute.  So I believe that

19   I took these so-called overtime hours times, what it

20   would have broken down to or the discrepancy from, say,

21   this 135417, but I was actually truly working the full

22   time hours; so that should have been double that.

23       Q.   But what I'm getting at is:  The summary you

24   provided the Labor Commissioner in your complaint to

25   them --

                                        Page 240