# EXHIBIT D

DEPOSITION OF DANIEL R.WATKINS, ESQ.,

FEBRUARY 20, 2020.

**Deposition of:**

Daniel R. Watkins, Esq.

FRCP 30(b)(6) Designee of Watkins & Letofsky, LLP

**Case:**

Amy Buchanan v. Watkins & Letofsky, LLP
2:19-CV-00226-GMN-VCF

**Date:**

02/20/2020



400 South Seventh Street • Suite 400, Box 7 • Las Vegas, NV 89101
702-476-4500 | www.oasisreporting.com | info@oasisreporting.com

COURT REPORTING | NATIONAL SCHEDULING | VIDEOCONFERENCING | VIDEOGRAPHY

Page 209

1          I, the undersigned, a Certified Court

2   Reporter of the State of Nevada, Registered

3   Professional Reporter, and Certified Realtime

4   Reporter, do hereby certify:

5          That the foregoing proceedings were taken

6   before me at the time and place herein set forth; that

7   any witnesses in the foregoing proceedings, prior to

8   testifying, were duly sworn; that a record of the

9   proceedings was made by me using machine shorthand

10   which was thereafter transcribed under my direction;

11   that the foregoing transcript is a true record of the

12   testimony given.

13          Further, that before completion of the

14   proceedings, review of the transcript was requested.

15          I further certify I am neither financially

16   interested in the action nor a relative or employee

17   of any attorney or party to this action.

18          IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20   Dated:  03-02-2020

21

22

23   _____

24   JANET C. TRIMMER, RPR, CRR
     NV CCR No. 864

25

Electronically signed by Janet Trimmer (501-362-839-7812)                    57e45a83-1c46-4198-bc70-0490be9c9af8

1      Q.  6, yes.

2      A.  And so in preparation for that, I would

3   have -- I don't recall specifically, but I assume I

4   talked to Nancy and Susan at some point about it.

5      Q.  You don't recall but you think you did,

6   though?

7      A.  Correct.  It would be normal for me to do

8   that.

9      Q.  Okay.

10     A.  Because there's payroll and that would need

11  to be addressed, as well as Nancy's handling of it, of

12  the personnel file.

13     Q.  Okay.  Do you recall what Amy's compensation

14  package included during this first period between

15  April and September of 2016?

16     A.  Again, not specifically.  That wasn't a

17  subject in the notice.  But I think it was 65,000

18  annual salary, and she would have been available for a

19  bonus program, which was $50 an hour for everything

20  billed over a 480-hour quarter.  The average was 160 a

21  month, what we billed.  The bonus program at that

22  point was based on a quarterly billable of 480 a

23  quarter on calendar in quarters.

24     Q.  Okay, 480 a quarter.  Did it change into 160

25  a month, 160 hours a month or -- maybe I'm not

1    understanding the timeline.

2          Was it 480 per quarter when she started and

3    it changed to 160 per month, or vice versa?

4          A.  No.  So we paid an annual salary back -- back

5    then we paid an annual salary for her of 65,000 a

6    year.  That was paid out biweekly.  And then we had a

7    potential for bonus based on hourly billables, and the

8    billables, the bonus was based on a quarterly

9    production of billable hours at 480.  That makes --

10   creates an average of 3 -- or 160 a month.  So it's

11   just you give them an average of 160 to gauge it by,

12   but 480 was the mark per quarter.

13         And so that was the compensation package that

14   I believe she started with.

15         Q.  Okay.

16         A.  I would have to confirm that because, again,

17   I didn't research that based on the notice, but I

18   would -- I'm pretty sure that's close.

19         Q.  Okay.

20         A.  Because we went back and forth with 160 and

21   165, and I don't remember the timing in terms of a

22   minimum billable that would affect the quarterly.

23         So if it was 165, I think that translates to

24   a 495 quarter, and I just don't remember the timing of

25   how we moved in and out of that over that period.

1    correct.

2        Q.  Okay.  In terms of other compensation, I

3    think there was health insurance; is that right?

4        A.  Yes.  I think of that more as a benefit, but

5    yes.  So we had health insurance that we provided.

6    And she had -- for all the associates, they can take a

7    week, do vacation and do sick leave.  We don't really

8    track that.  So that's available to them.

9            We just want them to meet the minimum

10   billables over that quarter.  So we give them the

11   liberty to take vacations and use sick leave as they

12   need to and schedule as they need to with the idea

13   that you want to be in the office as much as you can,

14   but -- so I call that a benefit even though the bonus

15   still calls for the 480 quarterly or 495, whichever

16   was in place at that time.

17       Q.  And you did mention minimum billables.  What

18   was the minimum?

19       A.  480 -- well, minimum in the sense of bonus is

20   480 quarterly or 495, depending on whatever time

21   period we're talking about, and so that quarterly

22   minimum would translate down to an average of 160 or

23   165.

24       Q.  Okay.  And so that was the threshold to get

25   to the bonus, but you also considered that to be the

 1   minimum that they needed?

 2       A.  Yeah.  I mean, we've called it a minimum for

 3   as long as Brian and I have been together, but to be

 4   honest, I don't know that I've ever gone to an

 5   associate and said your hours aren't good enough, you

 6   are out of here, that I can recall.  That may have

 7   happened, but usually the hours are the result of

 8   other issues, not the other way around.

 9       Q.  So 160, that's roughly 40 hours a week.  It's

10   a little bit less because there is slightly more than

11   four weeks in a month.

12       A.  Yeah, depends on how you look at it, but

13   yeah, generally on the average, 22 billable days a

14   month I think is what it works out to, or 21,

15   something like that.  So however it works out.  It's

16   on average eight billable hours of each workday a

17   month, yeah.

18       Q.  Okay.

19       A.  Which doesn't translate to eight

20   working hours.

21       Q.  Right.  No, I understand it.  That's

22   billable hours they are actually doing work that you

23   could charge your clients for?

24       A.  Correct.

25       Q.  Okay.  All right.  And so Amy goes on --

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

```
 1              (Exhibit 9 was marked for identification.)

 2         MR. KEMP:  Exhibit 9 is two pages.  It's got

 3    defendant's Bates stamp 1362 and 1363.  At the bottom

 4    is the e-mail that we just went over in Exhibit 8.

 5    Sorry for the duplication.  I probably could have

 6    gotten away with just one of these.

 7      Q.  The top e-mails, there's one from you to

 8    Brian Letofsky with a CC to Susan Watkins on

 9    November 30th, 2016, "Tentative

10    Schedule/Availability."  Looks like you forwarded the

11    e-mail from Amy with her proposal.

12         Do you remember doing this and discussing it

13    with Brian and Susan?

14      A.  I don't remember sending the e-mail.  I do

15    remember discussing it with them, but I don't deny

16    that I sent it.  This would be how I would handle

17    things.  I just don't specifically recall.

18      Q.  Okay.  So it says:

19              "Brian, this is Amy's proposal regarding

20         work schedule.  With her proposed schedule,

21         we would have her on half time.  We would set

22         her up with half minimums but no bonus

23         opportunity.  You good with this?  Susan, can

24         you tell me Amy's salary when she left?"

25         Did I read that correctly?
```

1    A.  You did.

2    Q.  It looks like Susan then responded to you on

3  October 4th -- I'm sorry.  This was taken from an

4  archive.  Looks like she responded to you on 30

5  November 2016, to both you and Brian Letofsky, saying

6  $65,000.  Is that right?

7    A.  Yes.

8    Q.  Okay.  So she's going to come back, she's

9  going to work half time, 20 hours a week during a

10  Monday through Thursday, and she's going to be paid

11  half of what she was being paid before.  Is that how

12  it was going to work?

13    A.  Correct.

14    Q.  Okay.  No bonus opportunity, though.  Why

15  would that be?

16    A.  We had just started -- well, actually we had

17  done it in the past, I don't think we had just

18  started, where we had gone to like a half schedule for

19  associates of maybe once or twice per year.  We tried

20  that in California.  The bonus is not provided on the

21  minimum billables going to half because it would be

22  wholly unfair to allow an employee to say they are

23  going to go half time and then bill a regular schedule

24  and get the bonus.  It would be unfair to the other

25  associates.

1          So when we placed employees on reduced

2     schedules, they couldn't satisfy the 480 quarterly

3     requirement.  Therefore, there would be no bonus.  We

4     didn't adjust the bonus requirement of 480 or 495

5     downward because we didn't think that would be fair.

6          Q.  Because she really wasn't expected to work

7     more than 20 hours?

8          A.  Yeah, by virtue of the minimum schedule or

9     the reduced schedule they could never meet the minimum

10    billables.

11         Q.  Okay.  Did you speak with Amy about that,

12    about the fact that there would be no bonus

13    opportunity?

14         A.  I'm sure I did.  That's what I relay to them

15    in the conversation.

16         Q.  Okay.  I mean, I know you are saying you are

17    sure you did, but do you have a specific memory of

18    discussing that with Amy?

19         A.  No.  I don't have a specific memory of

20    discussing her coming back either, but I know she did,

21    and I know how we did things.  So if you are asking

22    me, I would have talked to them, but I don't have a

23    specific memory of that, and I would have talked to

24    her.

25         Q.  Okay.  Just to follow up on that briefly,

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

1       Q.   Okay.  And with the increase to 80 percent,

2   what was going to happen with her pay?

3       A.   It would be a commensurate increase to

4   80 percent.

5       Q.   Okay.  What about the bonuses?  Was she still

6   not going to be eligible for bonuses?

7       A.   Correct.

8       Q.   Did you actually have that discussion with

9   her?

10      A.   That she would still not be eligible for

11  bonus?  No, I don't recall that.

12      Q.   When she first came back, I mean, we saw it

13  in your e-mail in the discussion with Susan, I think

14  it was, that she wasn't going to be eligible for

15  bonus.

16           Did you actually tell her that she wasn't

17  going to be eligible for the bonuses at that time?

18      A.   Which time?

19      Q.   At the time that you had sent the e-mail

20  talking about how there would be no bonus

21  opportunities, back on Exhibit 9, this e-mail from

22  November 30th --

23      A.   Yes.

24      Q.   -- to Brian with a copy, CC to Susan.

25      A.   Yes.

1    Q.  You actually told Amy that she would have no

2    eligibility for bonuses?

3    A.  Yes.

4    Q.  Do you recall there being any kind of

5    discussion about the number of hours necessary to

6    achieve bonus being adjusted because the person or

7    persons working in the Las Vegas office had more

8    administrative duties in that they were basically

9    running the office?

10   A.  No.

11   Q.  No discussion about how it might only be

12   150 hours a month to achieve a bonus?

13   A.  No.

14   Q.  Okay.  So she goes back and -- or not goes

15   back, but she comes up to working 80 percent some time

16   late February or early March of 2017.

17       Did that -- at some point, did that become a

18   problem?  Did she tell you she was having trouble

19   working that much?

20   A.  Did what become a problem?

21   Q.  The fact that she had increased from 50 to

22   80 percent.  Did she raise any issues or make any

23   complaints or express concerns that she wasn't able to

24   keep up with that kind of schedule?

25   A.  No, not in that way.  That it goes back to

1    e-mail account?

2        A.  I don't know.  It just says "Amy Buchanan."

3        Q.  When you responded to her, were you

4    responding to the 11:43 p.m. when sending it to a

5    personal e-mail account, or you were responding to a

6    work e-mail that she sent you?

7        A.  I don't know.  The first e-mail in the chain

8    just says "Amy Buchanan."  So I don't know where that

9    came from.

10       Q.  Do you recall whether or not you were in the

11   habit of sending e-mails to any e-mail other than her

12   work e-mail?

13       A.  Whichever one she sent from I would respond

14   to.

15       Q.  Okay.  All right.  So on Friday, May 12,

16   2017, 10:53:46, she lets you know that she's been

17   having a lot of chronic pain and fatigue, frequent

18   headaches, migraines, cognitive difficulties, etc.,

19   "and still no relief after all the meds and treatment

20   I've tried.  Another surgery has been recommended but

21   I've been insistent this is not the answer.  It was

22   finally realized that I may have something else going

23   on and had some tests done.  One came back positive.

24   I'll be doing follow-up to help get a definitive

25   answer.  All I know at this point is I need to take a

1    step back and focus on my health.  My gut tells me

2    we'll need to look for another attorney, and what I

3    can do" -- wait.  Let me read that again -- "and, what

4    I can do is something to be figured out."

5        A.  Then she says, "I wish I had better news."

6        Q.  Oh, yes, "I wish I had better news.

7    Sincerely, Amy."  Okay.

8            Did you have any other conversations with her

9    about looking for another attorney to work in the

10   office?

11       A.  I don't recall specifically on that subject.

12       Q.  Did you have any conversations with her

13   whether or not she was going to quit or she wanted a

14   leave of absence or what was going to happen with

15   that?

16       A.  Well, we talked about this (indicating),

17   so -- and I think it's clear that she needs time off

18   from work, so that's what we talked about.

19       Q.  Okay.  Did you talk about any other

20   accommodations?  I mean, you had mentioned in your

21   previous e-mail the night before let me know about any

22   accommodation at work.

23       A.  No.  We just talked about -- she didn't bring

24   it up, so I'm assuming we didn't talk about it.  We

25   talked about this e-mail, which was pretty certain to

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

 1    me that she needed to take a step back, and I wasn't

 2    about to try and talk her out of that because she

 3    wanted to focus on her health.

 4        Q.  Was there any discussion about her going back

 5    to maybe just working the 50 percent hours or some

 6    other reduced schedule?

 7        A.  No, I don't recall that at this time.  I

 8    think we had moved past that.  We talked a lot about

 9    different types of configurations of scheduling and

10    such.  I think at this point it was pretty set that

11    she needed to move away from law for a bit, but...

12        Q.  Okay.  Because just the one sentence here

13    "and, what I can do is something to be figured out."

14        A.  Correct.  A complete unknown.

15        Q.  Did you all take any steps or have any

16    discussions on trying to figure that out, what she

17    might be able to do?

18        A.  No, other than confirming that she was going

19    to see healthcare providers who were specialized in

20    that field, there wasn't much I thought I could do to

21    figure that out.  I read that as what she can do is

22    something to be figured out, meaning she needs to go

23    through the medical evaluation process and determine

24    what she can do, and that's the way we discussed it.

25        Q.  So did she go out on a leave of absence?

 1      A.  We called it an indefinite leave of absence;

 2   correct.

 3      Q.  Okay.  And do you recall when that started?

 4      A.  I think there is another e-mail shortly after

 5   this that references that.  So it would have been in

 6   May somewhere.

 7      Q.  Okay.  That may be the next e-mail I have.

 8   Let's make this Exhibit 13.

 9           (Exhibit 13 was marked for identification.)

10   BY MR. KEMP:

11      Q.  Did you consider -- when you asked about

12   accommodations at work, did you consider putting her

13   on a leave of absence, did you consider that to be an

14   accommodation?

15      A.  No.

16      Q.  No?

17      A.  It depends what you mean by "accommodation."

18   She is telling me she needs to step back from work and

19   we need to find a new attorney.  Ms. Buchanan had

20   concerns about medical insurance and needing medical

21   insurance.

22      Q.  Sure.

23      A.  So we left her in a position, we put her into

24   a position where she could continue to receive those

25   medical insurance benefits without having to do any

1  work.  So I guess in that sense, yes, she still was --

2  we left her on payroll so she could get medical

3  insurance, not knowing if she was ever coming back.

4       So I didn't see it in the sense of

5  accommodation with a known adjustment to the work

6  environment and a known return date, which is what you

7  would want with an accommodation.  It was more of a

8  she wanted health insurance and that was the way to

9  get it for her.

10     Q.  Okay.  So you left her -- she maintained her

11  status of an employee of the firm?

12     A.  She stayed on payroll.  So I don't know what

13  that means in terms of an employee versus --

14     Q.  Well, this was -- I'm sorry.  I didn't mean

15  to cut you off.

16     A.  That's all right.  She was on an indefinite

17  leave of absence.  So she was on payroll.  Those are

18  the two things that I know.

19     Q.  Okay.

20     A.  I don't know legally if she was an employee

21  or not, to be honest.

22     Q.  What health insurance plan did you have at

23  that time?

24     A.  Oh, gosh, I don't know.  We had Health Net at

25  one point, but I don't know if that was in California.

1    after when we were talking about it, I think.

2        A.   Yeah, I don't recall when we were talking, to

3    be honest with you.

4        Q.   Okay.   Now, we moved a little bit, but

5    September 2nd, 2017 -- '16 -- I'm sorry.   Now I got

6    myself confused.

7            So it's in May of 2017 that she goes out on

8    this leave.

9        A.   Uh-huh.

10       Q.   And then I understand that there was, in the

11   fall of 2017, I think there was the labor commissioner

12   complaint that she filed, and then we have this Nevada

13   Equal Rights Commission, the formal charge filed

14   September 4th, 2018.   She would have gone to them

15   before that, because it takes a while to meet with

16   them and so forth.

17       A.   So there was a -- some communications in

18   August of '17 as well in which she described her

19   ability to come back at four hours.

20       Q.   Right.

21       A.   And we weren't able to do that.   It was just

22   there wasn't any way to fit that in.   By that time we

23   had a new -- another associate working, if my memory

24   serves, and there just wasn't anyplace to put a

25   part-time associate, because we needed, two reasons,

1    one, there probably wasn't enough work, but two, we

2    wanted them to be able to handle top to bottom on the

3    file, which meant take care of all of the appearances

4    and not be a project or contract type of attorney that

5    didn't fit well with a small office.  We needed full

6    management.

7            So in August we did have that discussion, and

8    I don't remember -- I think we got some doctors' notes

9    back then, and we did discuss that that probably

10   wasn't a good fit at that time.  So I guess we could

11   say that would be a time where her employment ended.

12           So it was never really specifically

13   discussed.  I don't remember hearing from Ms. Buchanan

14   much after August of 2017 on employment and coming

15   back to work.

16       Q.  So based on what you just talked through

17   there, then you would think that her employment ended

18   as of when?

19       A.  Well, I'm trying to figure out, I mean, what

20   she was thinking too, but I could see -- we never made

21   it clear "termination," I never said to her "your

22   employment is terminated."  It was just she kind of

23   didn't come back to work, and that was in August when

24   we talked about her ability to come back was limited

25   to four hours.  There wasn't a fit then.  We had

1    somebody already in place.  There was nowhere to put

2    her, so there wasn't any way to get her back into

3    active employment, so it just sat and nothing happened

4    after that.

5        Q.  When she came back -- going back to the fall

6    of 2016 now, she resigned September 2nd and she comes

7    back in December, and we saw an e-mail here earlier

8    where you talked about putting her back on the E&O

9    insurance.  When did you take her off of the E&O

10   insurance after May of 2017 when she went on the

11   leave?

12       A.  I have no idea.  I did not look that up.

13   We -- that is the reason it came up, that e-mail, that

14   is the one like checklist item that's not on the

15   checklist.

16       Q.  Sure.

17       A.  And people stay off for a long time.  They

18   get added on and we don't do the take-them-off form

19   until the next revolution of applications.  That

20   happens frequently.  So I -- there was never -- that's

21   probably one thing we should work on, but we leave

22   people on there a lot of times until we re-up for

23   another year.

24       Q.  Do you know when your year renews?

25       A.  November, I think it's November each year.

1    Q.  Oh, okay.  So you think by November of 2017,

2    then, you would have probably taken her off because

3    she wasn't working?

4    A.  Well, it makes sense by then.  If we hadn't

5    had her in the office since May and August time frame,

6    when we talked about part-time didn't work and there

7    was no real bubbling up of an opportunity to come back

8    and no discussions, I can see us doing that; I would

9    assume that's what happened.  I don't really handle

10   the E&O side.  That goes through Ms. Letofsky; she

11   does all the add and drop forms.  But that would make

12   sense if that happened in November as well.

13   Q.  Okay.  We made mention of a couple of things.

14   I've got doctors' notes here we're going to look at.

15       One thing, before I forget, because you

16   mentioned that you had another associate working by

17   some point, and I think you were talking about the

18   fall 2017.  Who was the associate that you hired at

19   that point?

20   A.  Theresa Santos, T-h-e-r-e-s-a.  I didn't look

21   up her start time.  It was in that fall period of

22   2017.

23   Q.  Okay.  Does she still work for you today?

24   A.  She does.

25   Q.  I know her husband.

1   calculated to reach it, as I remember.

2       As I remember, it's wrong on the 150.  It's

3   definitely wrong to say that the bonus kicked in on a

4   monthly basis at any hourly rate, because it was not

5   monthly, ever, by anybody.

6       "Medical," I'm not sure what she's referring

7   to there.  "127.29 per month paid," I'm not sure what

8   she's referencing there, so I don't know to dispute it

9   or not.

10      Q.  Okay.  All right.  That's fine.  All right.

11      So, finally, we come to topic number 53,

12  "Defendant is not an employer, quote-unquote, as

13  defined in the Americans With Disabilities Act

14  NRS 613.310," and that's from the 49th affirmative

15  defense?

16      My understanding is that the contention is

17  that you all don't have enough employees to be an

18  employer under the Federal Americans With Disabilities

19  Act or the State statute that deals with employment

20  discrimination on the basis of disabilities.  Do I

21  have that right?

22      A.  I'm not a qualified employer with that

23  specific issue in mind and perhaps others, but

24  certainly with respect to that.

25      Q.  All right.  And can you explain why that is?

1      A.  Well, we've only been -- the most we've ever

2   had employed in Nevada is three people at any given

3   time.  This defendant, Watkins & Letofsky, LLP, A

4   Nevada Limited Liability Partnership, had one employee

5   with Ms. Buchanan, then two while she worked with

6   Mr. Forster, then one while Mr. Forster worked alone

7   until Ms. Santos worked, that made two, and then

8   Ms. Kachermeyer started up; that's three -- actually,

9   let me add in Mr. Ortuno; that makes four, but that

10  was after Ms. Buchanan's employment.

11     Q.  Okay.  And so then your position is that the

12  California employees don't count at all?

13     A.  Correct.  But even if they do, there's not

14  15, there never has been.  I don't believe they are

15  included.

16     Q.  Okay.  Well, I think we have some written

17  discovery requests that would be relevant to that, but

18  just how many employees do you believe that you had

19  between California and Nevada during the time that

20  Ms. Buchanan was employed, I guess, let me say between

21  April of 2016 and November -- let's say December 1st

22  of 2017; how many employees do you believe you had

23  during that time between the two states?

24     A.  It fluctuated quite a bit, but anywhere from

25  9 to 13, maybe 8 at one point between the two, but 9

1   to 13.

2      Q.  All right.  We've got some written discovery

3   requests out there.  I'll look at the responses of

4   that, but I just wanted to know from your testimony

5   today what you think it is.

6      A.  Sure.

7         MR. KEMP:  Okay.  All right.  Give me just

8   one minute to confer, because I think we're all done.

9   Off the record.

10         (Off record.)

11         MR. KEMP:  Let's go back on the record.

12      Q.  I would remind you are still under oath,

13   okay?

14      A.  Yes.

15      Q.  In your calculation of the number of

16   employees, do you count yourself and Mr. Letofsky?

17      A.  No, we do not.

18      Q.  Okay.  If you did include yourself and

19   Mr. Letofsky, would that 13 then be 15?

20      A.  Yes, but not for the period of time required

21   under the ADA.

22      Q.  All right.  Well, I understand your position,

23   and we'll look at that as it comes up.

24         The only other thing, I think there was

25   something at some point, were there other associates