

JAMES P. KEMP, ESQUIRE
Nevada Bar No. 006375
KEMP & KEMP
7435 W. Azure Drive, Suite 110
Las Vegas, NV  89130
(702) 258-1183/ 258-6983(fax)
jp@kemp-attorneys.com
Attorney for Plaintiff AMY BUCHANAN

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

AMY BUCHANAN,                          )
                                       )
            Plaintiff,                 )
                                       )     Case No.:  2:19-cv-00226-GMN-VCF
vs.                                    )
                                       )
                                       )
WATKINS & LETOFSKY, LLP, a Nevada      )     **PLAINTIFF'S OPPOSITION TO**
Limited-Liability Partnership; DOES I-X; ROE )  **DEFENDANT'S MOTION FOR**
BUSINESS ENTITIES I-X,                 )     **SUMMARY JUDGMENT**
                                       )
            Defendants.                )
_____

**POINTS AND AUTHORITIES**

**I.      STATEMENT OF FACTS.**

Ms. Buchanan's Declaration (Ex. 1 hereto) and all exhibits attached to this Opposition supports

all of the facts set forth herein.

**PLAINTIFF'S STATEMENT OF FACTS PURSUANT TO LR 56-1[1]**

It is undisputed that Plaintiff, Amy Buchanan, worked as a full-time salaried Associate

Attorney at Watkins & Letofsky (W&L) from approximately April 2016 through approximately

September 1, 2016.   It is undisputed that her base salary was $65,000 for the entirety of her

employment at W&L. (Exs. 4, 8)  It is undisputed that in September 2016 she resigned in order to

address health concerns related to her disability.  It is undisputed that in November 2016 she agreed

---

[1] Exhibit 1 hereto is the Declaration of Amy Buchanan which is incorporated herein in its entirety by this reference, including those documents that are authenticated and incorporated by reference in the Declaration.

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

to come back to work at W&L and she resumed working as an Associate Attorney on or about December 5, 2016.

It is undisputed that when she came back to work in December 2016 the express and unambiguous agreement of the parties was that she would only work 20 hours per week and that this was consistent with the recommendation of her doctor. (Exs 4, 8, 16, see also doctor's note at Ex. G to Motion pg 8 of 8)  It is undisputed that this reduced 20 hours per week schedule (5 hours per day for 4 days per week) was to accommodate her disability.  It appears to be undisputed that W&L agreed and regarded her as having a disability. (Ex 9) It appears to be undisputed that Amy is a qualified person with a disability under the Americans With Disabilities Act of 1990 (ADA), as Amended by the Americans With Disabilities Act Amendments Act of 2008 (herein also just referred to as ADA) because she has a condition that limits her in her major life activities such as thinking, sleeping, and working.  (Ex. 1 at ¶¶12-13)  Amy is capable of performing all the essential functions of the job of Associate Attorney, with or without an accommodation. (Id.)

Amy began working for W&L in April 2016.  (Ex. 1 at ¶ 10)  At all relevant times she was employed as an Associate Attorney.  (Id.)  From approximately April 2016 through September 1, 2016 Amy was employed on a full-time basis at a salary of $65,000 per year. (Id.) Amy was eligible for performance based bonuses of $50.00 per hour for each billable hour worked in excess of 160 billable hours in one month. (Id.)  In this full-time role Amy worked between 40 and 60 hours per week. (Id.)

By September 1, 2016 Amy's symptoms from her serious medical conditions became such that she was no longer able to work 40-60 hours per week.  (Ex. 1 at ¶11)  She was about to be scheduled for another spine surgery and the recovery period was going to be an unknown length of time between 1-3 months so Amy, at the request of W&L's Office Manager Nancy Letofsky, submitted a resignation letter on September 2, 2016 with the intent to refrain from working and

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

focus on her health. (Id.)

Amy is a qualified person with a disability under the Americans with Disabilities Act (ADA). (Ex. 1 at ¶12)  She has serious medical conditions that impact upon and substantially limit her in the performance of her major life activities including, but not limited to, thinking, sleeping, and working. (Id.)  Her symptoms include constant pain and at various times some or all of the following: problems sleeping, fatigue, difficulty thinking clearly, difficulty performing everyday tasks, stress and anxiety, depression, and migraine headaches. (Id.) She also has disabilities related to a motor vehicle accident that she suffered and these musculoskeletal conditions and limitations also constitute disabilities under the ADA because they limit her abilities to work. (Id.)

Notwithstanding her disabilities Amy was capable of performing the essential functions of her job with W&L, with or without a reasonable accommodation.  (Ex. 1 at ¶13)  She was qualified to work in her position as an Associate Attorney because she had the requisite education, licensure, and experience to perform all of the essential functions of an Associate Attorney. (Id.) She had successfully performed all of the essential functions of the job for several months or more with no complaints or discipline. (Id.)

By September 2016 Amy's symptoms were such that she could no longer continue to work the 40-60 hours per week full-time schedule that she had been working. (Ex. 1 at ¶14)  She was also being scheduled for a surgical procedure. (Id.)

Amy informed W&L's management of her inability to continue to work full-time hours and that she was having surgery and that she would have to stop working. (Ex. 1 at ¶15)  Rather than accommodate Amy with a reduced schedule and leave of absence, W&L's Office Manager, Nancy Letofsky, told Amy to submit a resignation letter, which Amy did on or about September 2, 2016. (Id.) There was no interactive process engaged in by W&L at this time. (Id.)

Amy performed an additional 8 hours of work on an independent contractor basis after

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

September 2, 2016 for which she has never been paid. (Ex. 1 at ¶16)

In December 2016 Amy agreed to return to work with W&L, but only if she could work a reduced part-time 20 hour per week schedule. (Ex. 1 at ¶17) W&L agreed to this accommodation and it was determined that Amy would work 20 hours per week but that her $65,000 salary would be also prorated down to $32,500 which can be further calculated to be $31.25 per hour per the calculation of W&L's Accounting & Billing Coordinator, Susan Watkins. (Id.) But, the reduction of her pay and tying it to the number of hours that she worked means that she was being paid on the basis of time, hourly, rather than truly on a salary basis. (Id.) If, as W&L contends, Amy was truly paid on a salary basis then her salary was at the rate of $65,000 per year. (Ex. 1 at ¶17) Either way, Amy was not properly paid and W&L owes Amy unpaid wages. (Id.)

In each week that Amy worked from December 5, 2016 through May 12, 2017, Amy worked some hours on each Friday, Saturday, and/or Sunday, meaning she worked some hours on each of at least five days per week. (Ex. 1 at ¶18) Amy was never the subject of any disciplinary suspension. (Id.) Amy was told and understood that she could earn performance based bonuses just as any other Associate Attorney working for W&L and she was never told otherwise. During her employment she was informed that she would qualify for bonuses beginning at 150 hours because she worked in the Las Vegas office, while the threshold in the Orange County office was 160 billable hours. This was because Amy was performing administrative functions such as cleaning the office, processing the mail, copying, running documents to court, etc., that the Associates in the California office were not required to do because they had support staff and services for those functions. (Ex. 1 at ¶18)

Although Amy and W&L agreed to a contract of employment and an accommodation under the ADA, W&L never honored and performed the agreement to accommodate Amy with the reduced schedule employment. (Ex. 1 at ¶19) Instead, W&L assigned the same amount of work or more as it did when she was a full time Associate and continued to refuse to hire support staff to

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

perform the administrative functions.  W&L piled work onto Amy and made it known to her through another Associate, Eran Forster, that she had to "sink or swim" with no help or clerical support. (Id.)  Amy was specifically instructed that Eran Forster  could not help her.  (Ex. 1 at ¶19)  W&L expressly or impliedly threatened to terminate her employment if she did not complete a volume of work which W&L knew would violate her work accommodation agreement for her disability, and which her doctor confirmed that she needed, by making her work in excess of the 20 hours per week that was agreed to. (Id.) Indeed Amy had to work a full 40-60 hours per week, only now was being paid only half of her $65,000 annual salary. (Id.) Moreover, Amy learned through a spreadsheet that W&L had produced to the Nevada Labor Commissioner that W&L had engaged in bad faith manipulation of Amy's billable hours and arbitrarily reduced them so as to disqualify Amy from receiving the performance bases bonuses. (Ex. 1 at ¶19)

Amy clearly asked for accommodation to include a reduced schedule and help with processing the volume of work including, but not limited to, asking for support staff for the Las Vegas office, or hiring another attorney either as an employee or as an independent contractor.  (Ex. 1 at ¶20)  Amy also requested job restructuring to utilize her in more of a supportive capacity for intake, research, drafting pleadings and overflow coverage which would allow her to truly work the part-time 20 hour schedule that we had agreed to as an accommodation. (Ex. 1 at ¶20)  Amy suggested that W&L hire some support staff so that Amy could work just the 20 hours per week that W&L had agreed to; this would not have posed an undue hardship because W&L would have money it saved by Amy working part-time. (Id.) Eran Forster was willing to help and assist Amy whenever possible, but he was told specifically by Dan Watkins not to provide any assistance to her and that Amy had to "sink or swim" with her cases and workload. (Id.) W&L repeatedly admitted that it was forcing Amy to work more than the 20 hour per week part-time schedule (which Amy's doctors ultimately prescribed (Ex. 16)) agreed to by W&L as a reasonable accommodation.  After Amy confronted them W&L agreed to compensate

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

her for the extra work that Amy performed (Ex. 15; Ex. 7); however, W&L failed and refused to actually pay the money and it specifically relied upon its own bad faith breach of its promise to pay to attempt to coerce her into accepting less wages than Amy was actually owed. (Ex. 1 at ¶20; Ex. 17) Indeed, when Amy filed a complaint with the Nevada Labor Commissioner for her unpaid wages W&L attempted to deny that it owed her the wages and used that denial to try to force Amy to give W&L a discount on the wages that were outstanding and owed to her. (Id.)

Amy complained about the amount of work that she was being given and her inability to get it done in the 20 hours per week in light of her restrictions. (Ex. 1 at ¶21)   A compromise was reached with Dan Watkins in February 2017 whereby Amy would work 30 hours per week (which became 32 hours) starting on March 1, 2017. (Id.) Rather than 5 hours per day Monday through Thursday, Amy would work 8 hours per day Monday through Thursday, totaling 32 hours per week. Id.)

The new reduced schedule accommodation was also not honored. (Ex. 1 at ¶22)  W&L again breached its agreement to accommodate Amy's disability by continuing to force Amy to work beyond the reduced hours and days that were agreed to by requiring a volume of work that could not be completed in the schedule agreed to.  Amy continued to be forced to work 40-60 hours per week, working at least some hours on Friday, Saturday, and/or Sunday, and was not being properly paid for her work.  (Ex. 1 at ¶¶22, 32)

In May 2017 Amy told W&L that she could not continue to work beyond the hours that they had agreed to and that she needed to focus on her health. (Ex. 1 at ¶23; Exs. 9, 10)   W&L, rather than living up to the accommodation that it promised and agreed to, placed Amy on an involuntary and indefinite medical leave of absence. (Ex. 1 at ¶23)  Amy was told that this leave was so she could have time to sort out her medical situation.  (Id.)  Amy advised W&L that she expected to have some answers in June, about a month or so later, because she was going through some

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

medical testing. (Id.)   Amy did want to continue to work, just with the reduced hours accommodation that she had been promised and to which W&L had agreed. (Ex. 1 at ¶23)  Amy was willing to explore other accommodations as well and she hoped that W&L would continue to discuss accommodations based on what she had been told.  (Id.; Exs. 9 & 10)

In June 2017 Amy provided W&L with additional information about her disability. (Ex. 1 at ¶24)  W&L demanded a letter from Amy's healthcare providers regarding restrictions and how many hours Amy could work. (Id.) Amy provided doctor notes from three providers to W&L in July and August 2017, but W&L ignored the notes and their reflected restrictions.  Amy sent weblinks to all recommended work accommodations provided by the Job Accommodation Network (JAN), but these too were ignored. (Id.)

Instead of providing an accommodation or engaging in a reasonable interactive process to determine appropriate accommodations, as it said in May that it would (Exs. 9 & 10), W&L cancelled Amy's health insurance on August 31, 2017. (Ex. 1 at ¶25) Amy confronted W&L on this and her health insurance was reinstated a week later. (Id.)

Amy continually demanded, both verbally and in writing, that her outstanding wages be paid. (Ex. 1 at ¶26) W&L repeatedly stated that she would be paid her wages, but never fully paid what Amy is owed. (Id.) Amy calculates that she is owed wages from W&L in the approximate amount of $14,486.95. (Id.; Ex. 7)

Amy, after it became apparent that W&L was not going to pay her outstanding wages due, filed a complaint for wages with the Nevada Labor Commissioner in September 2017.  (Ex. 1 at ¶27)  (Note that this complaint was eventually closed after W&L falsely disputed the matter and offered only a fraction of what was due which Amy declined to accept. Ex. 17).  On November 16, 2017 W&L acknowledged to Amy that it had received her Labor Commissioner complaint for wages and that it was cancelling her health insurance as of November 30, 2017 which effectively

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 ● Fax (702) 258-6983

communicated that Amy's employment was terminated as of that date. (Ex. 1 at ¶27)

Amy performed at or above the level that her employer had a reasonable right to expect. (Ex. 1 at ¶28)   She had received good reviews and consistent praise for her job performance. (Id.)

W&L's forcing Amy onto a medical leave of absence rather than accommodating her with a reduced hour part-time schedule as it had promised, and refusing to engage in any further interactive process that would enable Amy to work constituted a continuing violation of the ADA that went on each and every day until approximately November 30, 2017. (Ex. 1 at ¶29)

All of the agreements and contracts set forth herein were agreed to by W&L's management personnel including Dan Watkins and/or Brian Letofsky. (Ex. 1 at ¶30)

W&L operates their two offices in California and Nevada as one law firm. (Ex. 1 at ¶31) Both Limited Liability Partnership (LLP) entities are wholly owned by Dan Watkins, Esq. and Brian Letofsky, Esq. (Ex. 1 at ¶31)   They share an email server, a toll-free telephone number, share certain employees, and hold themselves out as being one entity on their website:

## Serving Southern California And Las Vegas, Nevada

Call 866-439-1295 or contact us online to schedule a free initial consultation. From offices in Santa Ana and Las Vegas, our attorneys handle diverse legal matters throughout California and Nevada.

https://www.wl-llp.com/ (Id.) The two companies' payroll is all handled through one PAYCHEX account. (Ex. J to Motion, ECF 28-10)   They share operational and administrative work by employees providing services for both companies.  (Ex. 2 at 30:19-31:8; Ex. 7 at 1356; ECF 28-12-Susan Watkins Employee of W&L)   There are likely many more operational interrelations, but these are sufficient to

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

raise a genuine issue of material fact.

W&L as an integrated enterprise had 15 or more employees in each of 27 work weeks in 2017. The table below shows dates that fell within each of the weeks in question:

| 1/24/17 | 1/31/17 | 2/21/17 | 2/28/17 | 3/8/17 | 3/15/17 | 5/22/17 | 6/1/17 | 6/8/17 |
| 6/15/17 | 6/23/17 | 6/30/17 | 7/8/17 | 7/15/17 | 7/16/17 | 7/23/17 | 7/30/17 | 8/8/17 |
| 8/15/17 | 8/24/17 | 8/31/17 | 10/8/17 | 10/15/17 | 10/22/17 | 10/31/17 | 11/8/17 | 11/15/17 |

(Ex. J to Motion)

The dates are not exactly one week apart each, even those that are consecutive weeks. The reason is that the data is taken from the PAYCHEX account records for W&L provided at Exhibit J to Defendant's motion and that data is listed for two week long pay periods. Thus, the dates in Exhibit J are two weeks apart, but the intervening weeks between the paydays also had the same number of employees. Also, the PAYCHEX information is incomplete. On each of the weeks set forth above two employees are not listed. These are Nancy Letofsky, the Office Manager and Paralegal, and Susan Watkins, the Accounting & Billing Coordinator. (Ex 2 at 30:19-31:8; ECF 28-12 Susan Watkins identified as an employee of Watkins & Letofsky; Ex 12 Nancy Letofsky identified as "Office Manager & Legal Assistant"; Ex 13 W&L Staff Roster from between 9/1/16 and 12/5/16). Additionally, Amy Buchanan continued to be an employee of the firm, albeit on leave until at least November 16, 2017 (Ex 1 at ¶27), but she does not appear on any PAYCHEX records provided after May 19, 2017, and received less than half of a full check on May 19 (Ex. J to Motion, ECF 28-11 at 29 of 41; Ex I, ECF 28-10 at 3 of 5), and in fact she was placed on a leave of absence by Dan Watkins on or about May 12, 2017. (Ex. 10)  When you add either 2 or 3 employees to the count listed by PAYCHEX for each week listed above  to account for Nancy, Susan, and sometimes Amy, each of those weeks have 15 or more employees. There are more than 20 of those weeks in the calendar year 2017. It is noted that in its Exhibit J W&L did not include all of 2016 or all of 2017,

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

thus the entire two calendar year period that 42 U.S.C. §12111(5)(A) requires to be examined was not included by Defendant.

Amy reviewed her W&L work time records. (Ex. 1 at ¶32)  They show she performed some amount of work on each of the following days which includes, in addition to the Monday-Thursday schedule she was supposed to have, documentation of when she also worked on Saturdays, Sundays, and/or Fridays, which appears to be each of the 27 weeks that she worked at W&L. (Id.) Here is a summary of the voluminous time records Amy reviewed and has personal knowledge of:

December 2016: 5th - 23rd  and 26th- 30th (123.2 hours)

January 2017: 1st - 13th, 16th - 20th, 23rd – 27th and 30th - 31st (189.7 hours)

February 2017: 1st-24th and 26th-28th (174.3 hours)

March 2017: 1st-3rd, 6th -17th  and 20th-31st (155.3 hours)

April 2017: 1st -7th, 9th-21st and 23rd-30th (172.6 hours)

May 2017: 1st-5th, 8th-13th, 15th -19th, 22nd, 25th and 30th-31st (88.1 hours)

June 2017: 5th, 6th, 10th, 12th, 19th, 21st, 22nd, and 27th (2.7 hours)

Amy notes that even after she was involuntarily placed on unpaid medical leave on May 12, 2017, she was still performing work for W&L, but she was not paid on regular payroll after the period ending May 15, 2017. (Id.)

## II.    LEGAL ARGUMENT

### A.   STANDARD FOR DENYING MOTION FOR SUMMARY JUDGMENT.

The court is well aware of the summary judgment standard.  Plaintiff points out just a few important aspects.

> This Court has set a high standard for the granting of summary judgment in employment discrimination cases. Most recently, we explained that " '[w]e require very little evidence to survive summary judgment' in a discrimination case, 'because the ultimate question is one that can only be resolved through a "searching inquiry"- one that is most appropriately conducted by the factfinder, upon a full record.' " *Lam v. University of Hawaii,* 40 F.3d 1551, 1563 (9th Cir.1994) (quoting *Sischo-Nownejad v. Merced Community College Dist.,* 934 F.2d 1104, 1111 (9th Cir.1991)).

*Schindrig v. Columbia Machine, Inc.,* 80 F3d 1406, 1410 (9 Cir.), *cert. denied,* 117 S.Ct. 295 (1996)

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

In the context of employment discrimination, it is paramount to "zealously [] guard an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *McGinest v. GTE Serv., Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004). "We have repeatedly held that it should not take much for a plaintiff in a discrimination case to overcome a summary judgment motion." *France v. Johnson*, 795 F.3d 1170, 1175 (9th Cir. 2015) (string citation omitted).

The Supreme Court has gone so far as to say that when ruling on a motion seeking judgment as a matter of law:

> "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Liberty Lobby, supra,* at 255. Thus, although the court should review the record as a whole, **it must disregard all evidence favorable to the moving party that the jury is not required to believe**. See Wright & Miller 299. That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.,* at 300.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). (Emphasis added)

Finally, "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything. *Nissan Fire,* 210 F.3d at 1102-03.

## B. <u>FIRST CLAIM: BREACH OF CONTRACT</u>

"Employment 'at-will' is a contractual relationship and thus governed by contract law." *Vancheri v. GNLV Corp.,* 105 Nev. 417, 421 (1989) (*citing Smith v. Cladianos,* 104 Nev. 67, 752 P.2d 233). Enforceable employment contracts may be, and in the vast majority of cases are, oral contracts. *See Stone v. Mission Bay Mortg. Co.,* 672 P.2d 629, 99 Nev. 802 (1983); *American Bank*

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

*Stationery v. Farmer*, 799 P.2d 1100, 1102, 106 Nev. 698 (1990).   Accordingly, the Defendant's protestations about there being no written contract is a red herring argument.   Moreover, there is written evidence in this case that sets forth material terms of the contract.  (Exs. 4, 7, 8, 11, 15, 17) The terms were that Amy Buchanan was going to work 20 hours per week for $32,500 per year which was a proration to half of her salary of $65,000.  (Id.) As set forth below, there are at least two ways in which, as a matter of law, W&L breached the contract, violated deeply rooted principles of employment compensation law, and did not pay Amy correctly.   Indeed there are documents in which W&L admits that Amy is owed money that she was not paid for work that she performed.  (Exs. 15, the "text admission" and 3, July 10, 2017 at 10:19 p.m. email from Dan Watkins stating W&L would pay proportional difference for extra time Amy worked[2]), even though the precise amount may be in dispute.  Thus, Ms Buchanan has contractual rights as to the compensation that she had already earned at the time her employment terminated.   In this case that would include the $14,486.95 that she identified in this case (Ex. 7; Ex. 1 at ¶ 26)

This is not a "termination" case and the concept of employment at-will, meaning that either party can end the relationship at any time for any or no reason, is not implicated or relevant in this case.   This case is about unpaid wages and compensation for a contract that potentially could be construed as a unilateral contract:

> . . . [W]e note that the typical employment agreement is unilateral in nature. Generally, the employer makes an offer or promise which the employee accepts by performing the act upon which the promise is expressly or impliedly based. The employer's promise constitutes, in essence, the terms of the employment agreement; the employee's action or forbearance in reliance upon the employer's promise constitutes sufficient consideration to make the promise legally binding. In such circumstances, there is no contractual requirement that the promisee do more than perform the act upon which the promise is predicated in order to legally obligate the promisor.

*Toussaint v. Blue Cross*, 408 Mich. 579, 630-631, 292 NW 2d 880 (1980)

---

[2] Dan Watkins exact statement in Ex. 3 was, "To the extent that you worked more than the 50% or 80% time, whichever may apply, in any given month, we will cover the proportionate balance due." Ex. 3 July 10, 2017 email.

In other words: if you perform the work as requested, you have earned the compensation and the employer is contractually bound to pay the compensation.  *Hoffman-La Roche, Inc. v. Campbell,* 512 So. 2d 725, 731-732 (Ala. 1987).

In this case the terms of the contract were that Amy Buchanan would work 20 hours per week and be paid $32,500.00[3] per year for those 20 hours per week (1,040 hours per year).  This works out to an hourly rate of $31.25 according to W&L's Accounting & Billing Coordinator, Susan Watkins, and its representations to the Nevada Labor Commissioner (Ex. 3; Ex. 17) or by Amy's calculation it was $33.85 per hour (Ex. 7).  Either way, pro-rated salary for less time or just identifying the number of hours that the pay was to cover reduces the matter to an hourly rate employment contract  on top of that Watkins admits that additional pay for additional hours was due in his email of July 10, 2017 where he said, "We initially went with a 50% salary to account for a limited schedule. The adjustment to 80% salary was intended to cover the additional time you were working with the expectation that you would work 4 days a week.  ***To the extent that you worked more than the 50% or 80% time, whichever may apply, in any given month, we will cover the proportionate balance due***." Emphasis added (Ex. 3)  Also, there is the "admission text" at Exhibit 15 where on September 1, 2017 Dan Watkins promised Amy as follows:

> Regarding the pay, we will go through the payroll records in detail this weekend and get you a check for the balance of the difference between the 50% that you were paid and the percentage that you worked.

Watkins admits that Amy is owed money, regardless of how one looks at it.  Any differences in how the amount is calculated constitutes genuine issues of material fact for which a trial is needed.

As mentioned above, there are two ways of analyzing this matter, the Hourly Method and the Salary Method.  Either way there are genuine issues of material fact and the Defendant is not

---

[3] Amy's salary was $65,000, but W&L were prorating it by 50% between December 5, 2016 and February 28, 2017, and by 80% between March 1, 2017 and May 12, 2017.  This was expressly stated by W&L on several occasions (See e.g. Ex. 4, Ex. 17 response to Labor Commissioner)

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

entitled to judgment as a matter of law.  Summary judgment must be denied.

**1.  The Hourly Method.**

A person cannot work "part-time" on a "salary" in a job on a contract that identifies a specific number of hours to be worked each week.  Defining a specific number of hours of work each week, 20 in this case, is inconsistent with the concept of being paid on a salary basis.  W&L argues that just because Amy was never told that she would earn a certain amount of money per hour that she could not be an hourly employee.  That is simply not the case.

The Nevada Labor Commissioner has adopted a regulation that defines "Salary" as follows:

> **NAC 608.080   "Salary" defined. (**NRS 607.160**)**   "Salary" means a wage rate based on a fixed dollar amount for a period of time other than an hour.

In essence, once the parties to this contract tied the compensation to a set number of hours per week, the contract becomes an hourly wage contract.  W&L's Accounting & Billing Coordinator, Susan Watkins, calculates Amy's hourly wage rate to be $31.25 per hour while Amy calculates her hourly rate to be $33.85 per hour.  (Ex. 7)  When Amy worked more than the 20 hours per week during the December 2016 through February 2017 time period, or more than 32 hours per week during the March 1, 2017 through May 12, 2017 time period, which she did, she must be paid for the hours above the number contracted for.  In this case the number of hours are set forth in Exhibit 7 and Exhibit 1, ¶32.  Based on Amy's calculation this would be **$14,486.95.** (Ex. 7)  W&L, while disputing any liability, calculated the unpaid wages to be **$9,375.28** in their response to the Nevada Labor Commissioner.  (Ex. 17)

Defendant argues about Amy being an "exempt" employee.  All that means is that as a licensed professional she is exempt from the overtime premium pay (time and on-half) for hours worked over 40 hours per week.  There is no dispute that as a licensed attorney Amy falls into that exemption.  However, that does not mean that she should not be paid for the hours that she worked

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

in excess of the number called for in the contract.  The Defendant cites no law that allows them to take Amy's labor for free.  If they gave her work that required more than the 20 hours per week to complete, they must pay Amy for the work she did and the time she put in.  Again in Exhibits 15 and 7 Dan Watkins admits this on behalf of W&L.

### 2.  The Salary Method.

Defendant insists that Amy was paid on a salary basis, even when she came back to work on the agreement that she would work part-time, 20 hours per week (which was later increased to 32 hours per week, still considered to be part-time). (Exs. 4, 8)  The salary was identified by W&L to be $65,000.  (Exs. 3, 4, 8, 17)  However, W&L decided that it would prorate Amy's salary to account for her part-time status, 50% proration when she was working 20 hours per week, and 20% proration when she was working 32 hours per week. (Id.) If the court does not accept that this arrangement converted Amy from a salaried employee to an hourly employee, then to be consistent Amy must be paid the proper proration based on the percentage of a 40 hours full time workweek that she did actually work.  W&L actually admit this as set forth herein.  (Exs.7, 15)

The regulations enacted by the U.S. Department of Labor pursuant to the Fair Labor Standards Act are instructive. [4] The "salary basis test" is set forth at 29 C.F.R. §541.602 and states in relevant part as follows:

(a) *General rule.* An employee will be considered to be paid on a "salary basis" within the meaning of this part if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.

(1) Subject to the exceptions provided in paragraph (b) of this section, **_an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked._** Exempt employees need not be paid for any workweek in which they perform no work.

---

[4] Even through attorneys are exempt under the professional exemption whether they are paid hourly or by salary, the regulations are still persuasive in terms of the philosophy and legal underpinnings of compensation systems.

**KEMP & KEMP**
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

…

(b) *Exceptions.* The prohibition against deductions from pay in the salary basis requirement is subject to the following exceptions:

(1) Deductions from pay may be made when an exempt employee is absent from work **<u>for one or more full days for personal reasons, other than sickness or disability.</u>** Thus, if an employee is absent for two full days to handle personal affairs, the employee's salaried status will not be affected if deductions are made from the salary for two full-day absences. However, if an exempt employee is absent for one and a half days for personal reasons, the employer can deduct only for the one full-day absence.

(2) Deductions from pay may be made **<u>for absences of one or more full days occasioned by sickness or disability (including work-related accidents) if the deduction is made in accordance with a bona fide plan, policy or practice of providing compensation for loss of salary occasioned by such sickness or disability.</u>** The employer is not required to pay any portion of the employee's salary for full-day absences for which the employee receives compensation under the plan, policy or practice….5

(c) When calculating the amount of a deduction from pay allowed under paragraph (b) of this section, the employer may use the hourly or daily equivalent of the employee's full weekly salary or any other amount proportional to the time actually missed by the employee. …

(Emphasis added)

Thus, a salaried exempt employee must not have their salary "prorated" to account for partial days of work missed as was applied to Amy Buchanan in this case. She should receive her full salary based on $65,000 per year for every week that she did not miss a full regular Monday-Friday workday due to personal reasons other than sickness or disability, or did not work on at least 5 days per week. There is no question that Amy's salary was identified as $65,000 per year. (Exs. 3, 4, 8, 17) There do not appear to be any weeks in which W&L could have legitimately "prorated" or reduced Amy's salary at the $65,000 rate because she worked at least some on each of five days in every week between December 5, 2016 and May 12, 2017. (Ex. 1 at ¶32) That is a period of 27 weeks. $65,000/52=$1,250 per week. $1,250 X 27 weeks=$33,750. Amy was only paid $17,271.07 during the relevant time period. (Ex. 17 in chart on second to last page). Accordingly under this method of calculation, Amy is actually owed **<u>$16,478.93</u>** ($33,750 less $17,271.07) in salary. To the

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

---

5 There are other permissible deductions such as for the imposition of unpaid discipline suspensions or as penalties for safety violations, for partially worked first and last weeks of employment, and for unpaid time under the Family and Medical Leave Act, None of which are applicable to the present case.

extent that Defendant disputes this, there are genuine issues of material fact and summary judgment must be denied because Defendant has breached the contract in one way or the other.

**C.  SECOND CLAIM: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (Contractual)**

Every contract contains within it an implied covenant of good faith and fair dealing. *Hilton Hotels Corp. v. Butch Lewis Productions*, 808 P.2d 919, 922, 107 Nev. 226 (1991).  While Nevada courts hold that the implied covenant does not exist in the context of the *termination* of an at-will employment relationship, the contractual bad faith claim lies on all other aspects of the contract, especially the failure to pay wages and compensation in good faith.  *See* NRS 608.190.

To establish a breach of the implied covenant of good faith and fair dealing, a party must show: (1) plaintiff and defendant were parties to a contract; (2) defendant owed a duty of good faith the plaintiff; (3) defendant breached that duty by performing in a manner that was unfaithful to the purpose of the contract; and (4) plaintiff's justified expectations were denied. *See Hilton Hotels v. Butch Lewis Prods.,* 107 Nev. 226 (1991). The implied covenant of good faith and fair dealing exists "to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made." *Patriotic Science Corp. v. Korodi,* 504 F. Supp. 2d 952, 963-64 (S.D. Cal. 2007). Where the terms of a contract are technically complied with but one party to the contract deliberately contravenes the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing. *J.A. Jones Cons. Co. v. Leherer McGovern Bovis, Inc.,* 89 P.3d 1009 (Nev. 2004).

Amy and W&L were parties to an employment contract.  As with all contracts in Nevada, W&L owed Amy a duty of good faith and fair dealing as an employer is not permitted to cheat an employee out of compensation by unfairly altering the terms and conditions.  W&L breached the duty of good faith and fair dealing by pushing more work on Amy than she could perform in 20 hours per week (and later 32 hours per week, and saying she had to "sink or swim" even though

they had agreed to the part-time work accommodation.  Amy's justified expectations were denied.

Amy was promised that she would only have to work 20 hours per week (and later 32 hours per

week) as an accommodation for her disability.  She was forced, out of the necessity of the workload

assigned to her, to work far in excess of the agreed to part-time hours.  She was not paid for this

time.  This is a *contractual* breach of the implied covenant of good faith and fair dealing, Amy has

suffered damages (the pay for the extra time and work), and the Motion for Summary Judgment

should be denied.

### D.  THIRD CLAIM: VIOLATION NRS 608.190

NRS 608.190 has been violated in this case.

> **NRS 608.190  Willful failure or refusal to pay wages due prohibited.**  A person
> shall not willfully refuse or neglect to pay the wages due and payable when
> demanded as provided in this chapter, nor falsely deny the amount or validity thereof
> or that the amount is due with intent to secure for the person, the person's employer
> or any other person any discount upon such indebtedness, or with intent to annoy,
> harass, oppress, hinder, delay or defraud the person to whom such indebtedness is
> due.
> [6:71:1919; A 1925, 242; 1931, 246; 1931 NCL § 2780]—(NRS A 1967, 624; 1975,
> 1585; 1985, 581)

Amy asked for her wages to be paid properly based upon her working in excess of the time

periods called for in her employment. (Ex. 7; Ex. 1 at ¶26)  Thus, she made an adequate

demand for wages due under NRS Chapter 608.  *See* NRS 608.016 (payment for each hour

of work required and employer not to require employee to work without wages)  W&L has

falsely denied the amount or validity of the wages demanded by its response to Amy's

September 2017 complaint to the Nevada Labor Commissioner.  (Ex. 17; Ex. 1 at ¶27) This

denial was made with the intent to secure for W&L a discount upon the wages due. (Id.)

Additionally, after W&L had repeatedly agreed that Amy was owed pay for the time that she

worked in excess of the 20 hours (and later 32 hours) per week (Exs. 7 and 15) the failure to

pay those wages for several months and then the false denial to the Labor Commissioner

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

(Ex. 17) was intended to "annoy, harass, oppress, hinder, delay or defraud" Amy, the person to whom the wages are owed. (Ex. 1 at ¶20; Ex.17)   W&L has, to this very day, NOT PAID OR TENDERED even the incorrect amount that it essentially acknowledged to the Labor Commissioner that it owes to Amy. (Id.)   Amy has suffered damages.   Thus, all of the elements of a claim under NRS 608.190 are met and summary judgment must be denied.

### E.   FOURTH CLAIM: WAGES DUE AND OWING WITH STATUTORY PENALTY UNDER NRS 608.040 AND/OR NRS 608.050

W&L is not entitled to summary judgment as a matter of law because Amy is still owed wages for time she worked.  She demanded those wages repeatedly and even filed a complaint with the Nevada Labor Commissioner.  (Ex. 7; Ex. 1 at ¶¶26-27; Ex. 17);

**NRS 608.020  Discharge of employee: Immediate payment.**  Whenever an employer discharges an employee, the wages and compensation earned and unpaid at the time of such discharge shall become due and payable immediately.
[Part 2:71:1919; 1919 RL p. 2776; NCL § 2776]

**NRS 608.040  Penalty for failure to pay discharged or quitting employee.**
    1.  If an employer fails to pay:
        (a) Within 3 days after the wages or compensation of a discharged employee becomes due; or
        (b) On the day the wages or compensation is due to an employee who resigns or quits,
    E the wages or compensation of the employee continues at the same rate from the day the employee resigned, quit or was discharged until paid or for 30 days, whichever is less.
    2.  Any employee who secretes or absents himself or herself to avoid payment of his or her wages or compensation, or refuses to accept them when fully tendered to him or her, is not entitled to receive the payment thereof for the time he or she secretes or absents himself or herself to avoid payment.
        [Part 2:71:1919; 1919 RL p. 2776; NCL § 2776]—(NRS A 1985, 383)

**NRS 608.050  Wages to be paid at termination of service: Penalty; employee's lien.**
    1.    Whenever an employer of labor shall discharge or lay off employees without first paying them the amount of any wages or salary then due them, in cash and lawful money of the United States, or its equivalent, or shall fail, or refuse on demand, to pay them in like money, or its equivalent, the amount of any wages or salary at the time the same becomes due and owing to them under their contract of employment, whether employed by the hour, day, week or month, each of the employees may charge and collect wages in the sum agreed upon in the

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

contract of employment for each day the employer is in default, until the employee is paid in full, without rendering any service therefor; but the employee shall cease to draw such wages or salary 30 days after such default.

2. Every employee shall have a lien as provided in NRS 108.221 to 108.246, inclusive, and all other rights and remedies for the protection and enforcement of such salary or wages as the employee would have been entitled to had the employee rendered services therefor in the manner as last employed.

[1:139:1925; NCL § 2785] + [2:139:1925; NCL § 2786]—(NRS A 1967, 146; 1969, 823)

Well in excess of 30 days has passed since the termination of her employment in November 2017. (Ex. 1 at ¶ 27) Amy has not been paid all of her wages and the penalty of 30 days' wages, which is $249.04 per day X 30 = $7,471.12 is recoverable. Summary Judgment should be denied.

**F. SIXTH CLAIM: DISCRIMINATION UNDER AMERICANS WITH DISABILITIES ACT.**

**1. W&L is a Covered Entity under the ADA**

Defendant W&L contends that it is not an employer and covered entity under the ADA. This is untrue. W&L raises two arguments: 1) that its California affiliated company's employees cannot be counted in determining whether or not it has the requisite number of employees to be covered under the ADA; and 2) even if you count the employees in California there is still not enough. Neither of these arguments have merit, or at least the best W&L does is generate a genuine issue of material fact on this issue.

Defendant W&L and its California sister company, Watkins and Letofsky, LLP, are an integrated enterprise and the employees for both entities are counted for purposes of establishing the requisite 15 employees for coverage under the ADA.

For counting employees under federal anti-discrimination statutes the court has adopted the integrated enterprise test. *Childs v. Electrical Workers, et al.,* 719 F.2d 1379, 1382 (9th Cir.1983); *Kang v. U. Lim Am., Inc.,* 296 F.3d 810, 815 (9th Cir. 2002). This consists of a four-part test to determine whether two employing entities constitute a single employer for purposes of Title VII. *Id.* The

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

factors to be considered are: 1) interrelation of operations; 2) common management; 3) centralized control of labor relations; and 4) common ownership or financial control. *Id.*; *Alberter v. McDonald's Corp.*, 70 F. Supp. 2d 1138, 1143-44 (D. Nev. 1999).  All four of these factors are met in this case.

To satisfy the first part of the test, Plaintiff must demonstrate that there is a genuine issue of material fact as to whether the operations of W&L Nevada and W&L California are interrelated. *See Kang,* 296 F.3d at 815 (examining such factors as whether the two companies shared facilities and conducted separate banking).  The two companies do share facilities.  For example they share an email server and their email templates trumpet the fact that the two offices are interrelated.  (See Ex. 3).  The two companies share a single toll-free telephone number ((866) 439-1295, Id.) and a single website, www.wl-llp.com which heralds the following,

## Serving Southern California And Las Vegas, Nevada

Call 866-439-1295 or contact us online to schedule a free initial consultation. From offices in Santa Ana and Las Vegas, our attorneys handle diverse legal matters throughout California and Nevada.

The two companies' payroll is all handled through one PAYCHEX account. (Ex. J to Motion, ECF 28-10)  They share operational and administrative work by employees providing services for both companies.  (Ex. 2 at 30:19-31:8; Ex. 7 at 1356; ECF 28-12-Susan Watkins Employee of W&L)  There are likely many more operational interrelations, but these are sufficient to raise a genuine issue of material fact.

The second part of the test is common management.  When two companies share management-level officials, it is more than enough to raise a question of common management sufficient to defeat

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

summary judgement. *Vandermeer v. Douglas County*, 15 F. Supp. 2d 970, 977 (D. Nev. 1998). Here, it is undisputed that Dan Watkins, Esq. and Brian Letofsky, Esq. own and manage both W&L entities, both California and Nevada. (Ex. 2 at 13:17-15:5; see also https://www.wl-llp.com/Attorneys.shtml where Messrs. Watkins and Letofsky are the only attorneys listed as partners in the law firm(s)). Because there is no dispute that the two partners manage both the Nevada entity and the California entity, the integrated enterprise test is satisfied and employees of both entities are to be counted in determining if the ADA covers this integrated enterprise.

The third part of the test is centralized control of labor relations. Two companies have "centralized control of labor relations" when one company is involved in decisions concerning the terms and conditions of employment of workers of another company. *See Alberter,* 70 F. Supp. 2d at 1144 (describing the indicia of this element, although finding lack of centralized control of labor relations in that case where the franchisee made final decisions regarding all employment matters). Decisions regarding employment matters include hiring and firing of employees, employee discipline, performance evaluations, awards, promotions and demotions, scheduling, work assignments, training, and compensation. It appears to be without dispute that the only two partner lawyers, Dan Watkins and Brian Letofsky, make these decisions, particularly for the attorneys that work for both firms, like Ms. Buchanan. Certainly we can presume that Watkins and Letofsky are following the law of ethics (NRPC 5.1-5.6 inclusive) and not permitting non-lawyers to run their firm, and further that none of the associates are making the types of decisions set forth above that the court is to consider.

The fourth part of the test is common ownership and financial control. This is beyond dispute. Both Watkins & Letofsky LLP (California) and Watkins & Letofskly LLP (Nevada) are owned by Dan Watkins, Esq. and Brian Letofsky, Esq. Note how even the Nevada DETR unemployment forms list the address of Watkins & Letofsky LLP (Nevada) as 2900 S. Harbor Blvd,

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

1  Suite 240, Santa Ana, CA 92704, the same address as is on the website for the California office. (Ex.

2  H to Motion, ECF 28-9 pp 10-25)

3        There is no reasonable argument that these two Watkins & Letofsky entities are an

4  integrated enterprise for purposes of determining coverage under the ADA.  So next we turn to

5  counting noses.

6        It is undisputed that to be covered as an employer under the ADA, the W&L integrated

7  enterprise must be "engaged in an industry affecting commerce [and have] 15 or more employees

8  for each working day in each of 20 or more calendar weeks in the current or preceding calendar

9  year" 42 U.S.C. §12111(5)(A).  It is undisputed that W&L is engaged in the multi-jurisdictional

10  practice of law across state lines and therefore is in an industry affecting commerce.  W&L had 15 or

11  more employees for each working day in each of the 27 weeks that include following dates:

12

13

| 1/24/17 | 1/31/17 | 2/21/17 | 2/28/17 | 3/8/17 | 3/15/17 | 5/22/17 | 6/1/17 | 6/8/17 |
|---------|---------|---------|---------|--------|---------|---------|--------|--------|
| 6/15/17 | 6/23/17 | 6/30/17 | 7/8/17 | 7/15/17 | 7/16/17 | 7/23/17 | 7/30/17 | 8/8/17 |
| 8/15/17 | 8/24/17 | 8/31/17 | 10/8/17 | 10/15/17 | 10/22/17 | 10/31/17 | 11/8/17 | 11/15/17 |

14

15

16

17

18  This is based upon the records provided by Defendant in its Exhibit J that has payroll information

19  from PAYCHEX.  Except that the PAYCHEX information is incomplete.  On each of the weeks

20  set forth above two employees are not listed.  These are Nancy Letofsky, the Office Manager and

21  Paralegal, and Susan Watkins, the Accounting & Billing Coordinator. (Ex 2 at 30:19-31:8; ECF 28-12

22  Susan Watkins identified as an employee of Watkins & Letofsky; Ex 12 Nancy Letofsky identified as

23  "Office Manager & Legal Assistant; Ex 13 W&L Staff Roster from between 9/1/16 and 12/5/16).

24  Additionally, Amy Buchanan continued to be an employee of the firm, albeit on leave until at least

25  November 16, 2017 (Ex 1 at ¶27), but she does not appear on any PAYCHEX records provided

26  after May 19, 2017, and received less than half of a full check on May 19 (Ex. J to Motion, ECF 28-

27

28

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

11 at 29 of 41; Ex I, ECF 28-10 at 3 of 5), and in fact she was placed on a leave of absence by Dan Watkins on or about May 12, 2017. (Ex. 10)  When you add either 2 or 3 employees to the count listed by PAYCHEX for each week listed above  to account for Nancy, Susan, and sometimes Amy, each of those weeks have 15 or more employees.  There are more than 20 of those weeks in the calendar year 2017.  Accordingly W&L has enough employees to make it a covered employer for purposes of applying the ADA.

Defendant has failed to demonstrate the lack of a genuine issue of material fact as to the question of ADA coverage of the integrated enterprise of W&L.  Accordingly, summary judgment may not be granted on this claim on the basis of lack of coverage.

### 2. Ms. Buchanan is a Qualified Individual With a Disability and W&L Regarded Her as Disabled.

"A qualified individual with a disability is defined as an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. . . ." *Id.* (citation and internal quotation marks omitted).  Amy is a qualified individual with a disability because she has conditions in her musculoskeletal system and fibromyalgia, conditions that interfere with her major activities of daily living including thinking, sleeping, and working (Ex. 1 at ¶12; Ex. 16); yet she is capable of performing all of the essential functions of an Associate Attorney and has the requisite education, licensure, experience, and skills to perform  the job.  (Ex. 1 at ¶13)

The ADA "defines discrimination to include an employer's failure to make [a] reasonable accommodation." *Mendoza v. The Roman Catholic Archbishop of Los Angeles,* 824 F.3d 1148, 1150 (9th Cir. 2016) (citation, alteration, and internal quotation marks omitted).  W&L failed to make Amy a reasonable accommodation in violation of the ADA.

### 3. W&L Discriminated Against Ms. Buchanan and Failed to Accommodate Her.

Ms. Buchanan's ADAAA claim involves not only the termination of her employment, but

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

also the failure of Walmart to engage in good faith in the interactive process and provide her with a reasonable accommodation.

> The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a "qualified individual," the employer receives adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business. 42 U.S.C. § 12112(b)(5)(A) ("[T]he term `discriminate against a qualified individual on the basis of disability' includes — not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]").

*Snapp v. United Transportation Union*, 889 F.3d 1088, 1095 (9th Cir. 2018).

The failure to engage in the interactive process and provide a reasonable accommodation is disability discrimination under the ADAAA. *Id.* There are several reasonable accommodations that Ms. Buchanan sought. She asked for a reduced schedule which is expressly covered as a reasonable accommodation under 42 U.S.C. § 12111(9)(B) which includes:

> job restructuring, ***part-time or modified work schedules***, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

(Emphasis added) She also requested that W&L utilize the money that it would not be paying her to obtain some support that would enable her to stay within her part-time schedule. Not only did W&L not live up to its agreement to provide accommodation, it went out of its way to hinder Amy's success by forbidding Eran Forster to help her with any of the work that W&L piled onto Amy and said that she had to "sink or swim."

To establish a *prima facie* case under the Americans with Disabilities Act ("ADA" or "ADAAA"), a plaintiff must first demonstrate that: "(1) he is disabled within the meaning of the ADA; (2) he is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) he suffered an adverse employment action because of his disability." *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (*citing Allen v.*

*Pac. Bell,* 348 F.3d 1113, 1114 (9th Cir. 2003)). The causal standard for liability for disability discrimination under the ADA is the "motivating factor" standard, and it prohibits adverse employment decisions that are motivated at least in part by ill will toward the employee and the employee's disability. *Head v. Glacier Nw. Inc.,* 413 F.3d 1053, 1065 (9th Cir. 2005).

Reasonable accommodations under the ADA may include part-time work or modified work schedules.  42 U.S.C. § 12111(9)   While an unpaid leave of absence may be a reasonable accommodation, it should only be one where the employee requests it and it should not be forced on an employee if the employee could continue working and earning a living with another type of reasonable accommodation.  *See Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999) (holding that unpaid medical leave may be a reasonable accommodation where requested by an employee).  While there are certainly cases out there that state an employer need not provide the accommodation of the employee's choice, the goal still has to be to first provide an accommodation that permits the employee to keep working and a leave of absence is a reasonable accommodation of last resort and should not be unilaterally imposed by an employer if there is another reasonable that would permit the employee  to work and earn money.

To avoid summary judgment in favor of his or her employer, an employee need only show that an "'accommodation' seems reasonable on its face, i.e., ordinarily or in the run of cases." *U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 401 (2002).  "Once the plaintiff has made this showing, the defendant/employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Id.* at 402. Importantly, the ADA does not require an employee to show that an accommodation is certain or even likely to be successful to prove that it is a reasonable accommodation," and an employee only needs "to satisfy the minimal requirement that a leave of absence could plausibly have enabled [her] adequately to perform her job." *Humphrey,* 239 F.3d at 1136. Amy asked for a reduced part-time schedule.  W&L agreed to the arrangement in

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 ● Fax (702) 258-6983

December 2016. (Exs. 4, 8, 17)  W&L expressly admits that this was to be an accommodation.  (Id.)  However, the agreement to accommodate was in bad faith because Amy was never allowed to keep her hours down to 20 hours per week as agreed.   (Ex. 1 at ¶19)  She asked for a further accommodation in the form of help from Eran Forster, or the hiring of a support staff person (using the money that W&L were supposed to be saving by her pay being reduced) but this was flatly denied and she was told that she would have to "sink or swim" under the heavy workload that was piled on her. (Id. ¶¶19-20)  Amy was capable of performing all of the essential duties of an Associate Attorney at W&L. (Ex. 1 at ¶13)  She was qualified and had all of the requisite education, licensure, and experience to perform the job.  (Id.)  She had performed the job admirably and had no complaints  or discipline.  (Id.)  She needed the accommodation of a part-time reduced schedule of 20 hours per week as recommended by her doctors (See Ex. 16)  This is by definition a reasonable accommodation under the ADA.  42 U.S.C. § 12111(9)(B)  W&L agreed to provide this accommodation and brought Amy back to work in December 2016 only to breach their agreement to accommodate her in bad faith by reducing her pay and then giving her a workload that could not possibly be accomplished in the 20 hours that she was supposed to be working.  (Ex. 1 at ¶¶19-20)  Telling someone to "sink or swim" is inconsistent with acting in good faith in the interactive process and with providing a reasonable accommodation.  W&L violated their duties under the ADA.  Even when Amy agreed to the increase to 32 hours per week as of March 1, 2017 (Ex. 1 at ¶¶21-22) W&L still piled on so much work that Amy had to exceed the agreed to hours. (Id.)  Amy worked over her agreed to accommodation hours every month from December 2016 to May 2017 as follows:  Dec. 2016, 43.2 hrs.; Jan 2017, 99.7 hrs.; Feb 2017, 94.3 hrs.; Mar 2017, 11.3 hrs.; Apr. 2017, 44.6 hrs.; May 2017, 18.8 hrs. (Ex. 7)  W&L agreed to provide a reasonable accommodation and then breached the agreement in bad faith.  This is a violation of the ADA.  A reasonable jury could make this finding of a violation in favor of Amy and against W&L.   Summary judgment would be

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

improper.  But it gets even worse.  In May 2017 Amy was put out on a medical leave of absence which she was forced to take because of the breach of the agreement to accommodate here with the reduced part-time schedule. (Ex. 1 at ¶ 23)  She requested that she be permitted to actually work the part-time schedule without being overloaded with work.  The court can well appreciate that being an Associate Attorney requires the discharge of professional responsibilities to clients and if Amy was not provided with support and overloaded with cases, she would simply be forced to exceed her limits out of a sense of duty.  She continually complained about this lack of accommodation in fact when it had been agreed to.  In June, July, and August she was in regular contact with W&L.  She obtained doctor notes at W&L's request (Ex. 16) clearly identifying her restrictions and supporting her request for a part-time reduced schedule.  Amy continually tried to engage W&L in an interactive process toward the end of providing her with a reasonable accommodation so that she could work. (Ex. 1 at ¶24; Ex. 5)  She was still employed and remained employed, but on leave, through November 2017. (Ex. 1 at ¶27)  Amy's attempts at the interactive process were ignored or barely paid lip service by W&L.  This was a bad faith failure to participate in the interactive process.

The law imposes the duty to engage in the interactive process on the employer.  *Barnett v. US Air, Inc.*, 228 F.3d 1105 (9th Cir. 2000) ("The legislative history makes clear that employers are required to engage in an interactive process with employees in order to identify and implement appropriate reasonable accommodations.")

Under Ninth Circuit precedent the questions of fact as to W&L's good faith participation in the interactive process preclude summary judgment on Amy's ADAAA claim.  *Snapp v. United Transportation Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) *citing Barnett*, 228 F.3d at 1116 ("We hold that employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible. **_We further hold that an employer cannot prevail at the summary judgment stage if there is a_**

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

***genuine dispute as to whether the employer engaged in good faith in the interactive process.")*** (Emphasis added)

The Motion for Summary Judgment should be denied.

### G. SEVENTH CLAIM:  RETALIATION UNDER AMERICANS WITH DISABILITIES ACT.

*The ADA provides: "No person shall discriminate* against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). To establish a prima facie case of retaliation under the ADA, an employee must show that: (1) he or she engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal link between the two. *Brown v. City of Tucson,* 336 F.3d 1181, 1186-87 (9th Cir.2003). If the employee establishes a prima facie case, the employee will avoid summary judgment unless the employer offers legitimate reasons for the adverse employment action, whereupon the burden shifts back to the employee to demonstrate a triable issue of fact as to whether such reasons are pretextual. *See Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir.2000).... Pursuing one's rights under the ADA constitutes a protected activity.

*Pardi v. Kaiser Found. Hosp.,* 389 F.3d 840, 849-850 (9th Cir. 2004).

Amy repeatedly pursued her right to a reasonable accommodation and complained that her accommodation was not being provided..  (Ex. 1 at ¶¶20-21; Ex. 6; Ex. 9)  This was protected oppositional conduct. *Id.*  Amy was placed out on leave which was simply a termination in slow motion and this ultimate termination (Ex. 1 at ¶27) was an adverse employment action that a reasonable jury could find was actually and proximately caused ("but-for" causation) by Amy's protected activity in actively and vigorously pursuing her rights under the ADA.  Amy makes out a prima facie case of ADA retaliaton.

W&L repeatedly denies in its Motion that it ever terminated Amy's employment. (e.g. Ex. B to Motion Decl. of Watkins at ¶16) Having made such a clear denial, W&L cannot raise a legitimate reason for a termination that it claims never happened and that leaves the question open to the jury to decide if they believe that Amy was retaliated against and terminated for her protected activity.

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

Amy was in fact terminated and this is evidenced by the fact that she was no longer listed as an employee in W&L's unemployment insurance filings with DETR as of the 4th quarter of 2017. (Ex. H to Motion, compare WLLP 1385 and 1387 where Theresa Santos replaced Amy Buchanan) Summary judgment should be denied.

## **CONCLUSION**

Based upon the foregoing, the Court should DENY the Defendant's Amended Motion for Summary Judgment.

DATED_____4/29/20_____.

_____/s/ James P. Kemp_____
JAMES P. KEMP, ESQ.
*Attorneys for Plaintiff*

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

## CERTIFICATE OF SERVICE

This is to certify that on the date indicated below the within and foregoing document was served via the court's CM/ECF on the following persons or parties:

Daniel R. Watkins, Esq.
Brian S. Letofsky, Esq.
Eran S. Forster
8215 S. Eastern Avenue, Suite 265
Las Vegas, NV 89118

All Parties Registered
Through the CM/ECF system.

DATED April 29, 2020

_____
/s/ James P. Kemp
An employee of KEMP & KEMP, Attorneys at Law

**KEMP & KEMP**
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983