# EXHIBIT 2
# DEPOSITION OF DAN WATKINS

EXHIBIT 2

**Deposition of:**

Daniel R. Watkins, Esq.

FRCP 30(b)(6) Designee of Watkins & Letofsky, LLP

**Case:**

Amy Buchanan v. Watkins & Letofsky, LLP
2:19-CV-00226-GMN-VCF

**Date:**

02/20/2020



400 South Seventh Street • Suite 400, Box 7 • Las Vegas, NV  89101
702-476-4500 | www.oasisreporting.com | info@oasisreporting.com

COURT REPORTING | NATIONAL SCHEDULING | VIDEOCONFERENCING | VIDEOGRAPHY

**Page 1**

```
 1          UNITED STATES DISTRICT COURT

 2              DISTRICT OF NEVADA

 3

 4   AMY BUCHANAN,          ) Case No.
                            )
 5        Plaintiff,        ) 2:19-cv-00226-GMN-VCF
                            )
 6   vs.                    )
                            )
 7   WATKINS & LETOFSKY, LLP, a  )
     Nevada Limited-Liability    )
 8   Partnership; DOES I-X; ROE  )
     BUSINESS ENTITIES I-X,      )
 9                          )
        Defendants.         )
10   _____)

11

12

13   FRCP 30(b)(6) DEPOSITION OF WATKINS & LETOFSKY, LLP,

14   THROUGH ITS REPRESENTATIVE DANIEL R. WATKINS, ESQ.

15        Taken on February 20, 2020

16        By a Certified Court Reporter

17             At 11:18 a.m.

18        At 7435 West Azure Drive, Suite 110

19             Las Vegas, Nevada

20

21

22

23

24   Reported by:  Janet C. Trimmer, NV CCR 864, RPR, CRR

25   Job No. 39325
```

**Page 2**

```
 1   APPEARANCES:

 2

 3   For the Plaintiff:

 4        KEMP & KEMP
          BY: JAMES P. KEMP, ESQ.
 5        7435 West Azure Drive
          Suite 110
 6        Las Vegas, Nevada  89130

 7

 8   For the Defendant:

 9        WATKINS & LETOFSKY, LLP
          BY: JOSEPH M. ORTUNO, ESQ.
10        8215 South Eastern Avenue
          Suite 265
11        Las Vegas, Nevada  89123

12

13

14   Also Present:

15        AMY BUCHANAN (entered at page 28.)

16

17

18

19

20

21

22

23

24

25
```

**Page 3**

```
 1        I N D E X   O F   E X A M I N A T I O N

 2

 3   WITNESS        EXAMINATION        PAGE

 4   DANIEL R. WATKINS, ESQ.  BY MR. KEMP        5

 5        Afternoon Session    126

 6        I N D E X   O F   E X H I B I T S

 7   NUMBER      PAGE   DESCRIPTION

 8   Exhibit 1    7  "Plaintiff's Notice of
                     Deposition of Defendant Watkins
 9                   & Letofsky, LLP, Pursuant to
                     FRCP Rule 30(b)(6)"
10
     Exhibit 2    8  "First Amended Complaint"
11
     Exhibit 3    8  "Defendant Watkins & Letofsky,
12                   LLP's Answer to Plaintiff's
                     First Amended Complaint"
13
     Exhibit 4   20  E-mail dated 4-29-16, subject:
14                   "Medical Update," WLLLP001299

15   Exhibit 5   25  E-mail dated 6-28-16, subject:
                     "My Resignation," WILLLP001301
16
     Exhibit 6   27  E-mail dated 8-18-16, subject:
17                   "Medical Leave," WLLLP001298

18   Exhibit 7   28  E-mail string, top e-mail dated
                     9-2-16, subject: "RE: Last Day
19                   Checklist,"WLLLP001324 (2
                     pages)
20
     Exhibit 8   44  E-mail dated 11-30-16,
21                   subject: "Tentative
                     Schedule/Availability,"
22                   WLLLP001376

23   Exhibit 9   46  E-mail string, top e-mail
                     dated 11-30-16, subject:
24                   "RE: Tentative
                     Schedule/Availability,"
25                   WLLLP001362 to WLLLP001363
```

**Page 4**

```
 1   EXHIBITS (CONTINUED):

 2   NUMBER        PAGE   DESCRIPTION

 3   Exhibit 10   49  E-mail string, top e-mail dated
                      12-14-16, subject: "RE: Amy
 4                    Buchanan," WLLLP001311 to
                      WLLLP001312
 5
     Exhibit 11   56  E-mail string, top e-mail dated
 6                    2-21-17, subject: "RE: Work
                      Schedule," WLLLP001371
 7
     Exhibit 12   64  E-mail string, top e-mail dated
 8                    5-12-17, subject: "RE: Update
                      for today," WLLLP001364 to
 9                    WLLLP001370

10   Exhibit 13   73  E-mail dated 6-28-17, subject:
                      "Medical Update," WLLLP001300
11
     Exhibit 14   82  "Watkins & Letofsky, LLP Company
12                    Information," Plaintiff's 10129

13   Exhibit 15   90  "Charge of Discrimination"

14   Exhibit 16   96  Notes from Drs. McKinnon, Pfau,
                      and Ziegler
15
     Exhibit 17  105  E-mail string, top e-mail dated
16                    8-17-17, subject: "RE: Medical
                      Update," WLLLP001337 to
17                    WLLLP001339

18   Exhibit 18  163  "New iMessage, to: Dan Watkins"

19   Exhibit 19  168  E-mail string, top e-mail,
                      subject: "Health Insurance and
20                    Outstnding Wages," WLLLP001291
                      to WLLLP001292
21
     Exhibit 20  194  E-mail string, top e-mail dated
22                    9-1-17, subject: "Amy RE:
                      Payroll Correction," WLLLP001285
23                    to WLLLP001286

24   Exhibit 21  202  E-mail dated 7-8-17, subject:
                      "Payroll Correction,"
25                    WLLLP001304 to WLLLP001305
```

Daniel R. Watkins, Esq.                                      Amy Buchanan v. Watkins & Letofsky, LLP

Page 5

P R O C E E D I N G S

1

2

3  Whereupon --

4      (In an off-the-record discussion held prior

5  to the commencement of the proceedings, counsel agreed

6  to waive the court reporter's requirements under Rule

7  30(b)(5)(A) of the Federal Rules of Civil Procedure.)

8

9          DANIEL R. WATKINS, ESQ.

10  having been first duly sworn to testify to the truth,

11  was examined and testified as follows:

12

13              EXAMINATION

14

15  BY MR. KEMP:

16      Q. Good morning. Would you please state your

17  name and spell it for the record?

18      A. Sure. Daniel Watkins, D-a-n-i-e-l

19  W-a-t-k-i-n-s.

20      Q. All right. Mr. Watkins, my name is JP Kemp.

21  I represent Amy Buchanan in a case she has going on

22  against Watkins & Letofsky, LLP.

23      You have, of course -- you are an attorney;

24  right?

25      A. That's correct.

Page 6

1      Q. You are familiar with the deposition process?

2      A. I am.

3      Q. We probably don't need to go through all the

4  rules and admonitions, do we?

5      A. No. But I can't guarantee I won't step on

6  your question with an answer, so you might have to

7  remind me.

8      Q. That's fine. That's natural. That happens.

9  We'll deal with that as we go.

10      A. Sure.

11      Q. Will you want the opportunity to review the

12  transcript to check it for accuracy?

13      A. Yes.

14      Q. Okay. And you understand the rules that if

15  you make changes, those could -- if there were

16  substantive changes, those could reflect on your

17  credibility in the future?

18      A. Sure.

19      Q. Okay. All right. And then, one of the other

20  things is, if you need to take a break, just let me

21  know.

22      A. Will do. Thank you.

23      Q. If we have a question pending, we'll need an

24  answer, but we'll take a break as soon as we can.

25      So we are here today, this has actually been

Page 7

1  noticed as a Rule 30(b)(6) deposition. You've also

2  been identified as somebody that has personal

3  knowledge in the matter.

4      So what I am going to do here in a moment, I

5  will mark the deposition notice that has all of the

6  topics. There are quite a few of them, but I think

7  we'll go through them pretty quickly because they are

8  fairly straightforward. I'll have some documents that

9  we'll look at perhaps along the way or after we get

10  through all the topics as well.

11      We have water here. Again, if you need to

12  take a break, just let me know. I do plan to take a

13  short break around 2:15 to 2:30 to go pick up my son.

14  It will be more like a lunch break at that point.

15      A. Perfect.

16      MR. KEMP: Okay. All right. So let's go

17  ahead and make this Exhibit 1.

18      (Exhibit 1 was marked for identification.)

19      MR. KEMP: So Exhibit 1 is the plaintiff's

20  notice of deposition of defendant, Watkins & Letofsky.

21  I believe -- actually, this was the one that we were

22  starting at 9:30. There may have been an amended one.

23  The only change on it was that it would change to

24  11:00 for the start time; otherwise it's all the same

25  information.

Page 8

1      While we're at it, let's mark Exhibit

2  Number 2.

3      (Exhibit 2 was marked for identification.)

4      MR. KEMP: And Exhibit 2 is the first amended

5  complaint that was filed on March 1st, 2019.

6      And let's go ahead and mark this one as

7  Exhibit 3.

8      (Exhibit 3 was marked for identification.)

9      MR. KEMP: And Exhibit 3 will be the

10  defendant, Watkins & Letofsky, LLP's answer to the

11  plaintiff's first amended complaint that was filed on

12  August 27, 2019.

13      Q. Okay. So, Mr. Watkins, with reference to

14  Exhibit 1, have you had a chance to look through the

15  notice of deposition, all the topics that we're here

16  to talk about today?

17      A. I did.

18      Q. And are you able to answer questions on

19  behalf of the defendant on all of those topics?

20      A. Yes.

21      Q. Okay. Let's more or less go through in the

22  order that we have them. We might skip around a bit,

23  but I'm going to start with number 1.

24      Do you have -- at Watkins & Letofsky, LLP, do

25  you have any specific personnel policies or procedures

Daniel R. Watkins, Esq.                                Amy Buchanan v. Watkins & Letofsky, LLP

Page 9

1 with respect to providing accommodations based on
2 disability?
3   A.  Yes.
4   Q.  Okay.  And what are those policies?  Can you
5 outline for us --
6   A.  Primarily we have posting in the office
7 provided by our payroll company that highlights the
8 laws in the State of Nevada related to discrimination.
9     We also have an employee manual that touches
10 on discrimination in a general sense.  I don't believe
11 it really speaks to accommodations or disability
12 discrimination in any specific way.
13     We have a standard operating procedure that
14 we have for the associates and the staff.  I don't
15 believe that that -- it speaks to policies and
16 procedures and it speaks to addressing issues with
17 supervisors, so to that extent it would deal with it.
18     Those would be the main things that come to
19 mind.
20   Q.  Okay.  And with respect to how you operate
21 under the policies and procedures, if you have
22 someone -- we can use Ms. Buchanan as an example.  If
23 you have someone who comes to you and says that they
24 are having some sort of a problem with a health
25 condition or a disability, what is your standard

Page 10

1 practice in dealing with that?
2   A.  Well, that's two different things, a health
3 condition and a disability.  I should also add,
4 though, that within the phrase "policies and
5 procedures" I would include verbal communications back
6 and forth with the employee regarding whatever issues
7 are presented and addressing it that way.
8   Q.  Okay.
9   A.  But in response to a statement from an
10 employee in a general sense that they have a
11 disability, we would ask if they need an
12 accommodation, and then we would seek to obtain
13 information from a medical provider on the nature and
14 extent of the accommodation necessary and the length
15 of time that it would extend as a starting point.
16   Q.  Okay.  And do you try and stay -- if somebody
17 doesn't use the specific word disability but they say,
18 you know, I'm not feeling well or I'm not able to
19 walk, or give you some information that might indicate
20 they have a disability, do you handle that basically
21 the same way?
22   A.  Sure.  I mean, in a very general sense that's
23 a limited scenario, but yeah, if someone came to me
24 and indicated that their ability to perform work was
25 impacted by some medical condition, or they had

Page 11

1 something that was going on in life that was impacting
2 their ability to work, we would proceed that way.
3   Q.  Okay.  And have these been your policies and
4 procedures, the way that you operate for the time
5 period that's indicated here on the second page,
6 January 1st, 2016, to the present?
7   A.  Yes.
8   Q.  With respect to -- we'll kind of jump ahead a
9 little bit because we're going to talk about
10 Ms. Buchanan specifically.
11     With respect to Ms. Buchanan, at some point
12 did she come to you and say she was having difficulty
13 or she had a disability that was impacting her ability
14 to work?
15   A.  Yes.
16   Q.  Do you remember when that was?
17   A.  Not specifically, but it was as soon as we
18 hire -- I mean, as early as her hire date, initial
19 hire date she had informed me of an automobile
20 accident that had happened previously, several months
21 even, maybe, before, she was receiving treatment for
22 that in follow-up.  So she had indicated right out of
23 the gate that she had issues related to that, medical
24 issues.
25   Q.  And I think it was specifically she was

Page 12

1 having issues with her back, like a back injury from
2 the auto accident; is that right?
3   A.  So back, headaches, migraines, focus,
4 concentration -- what's the word I'm looking for? --
5 fatigue, things like that we discussed early on.
6   Q.  Okay.
7   A.  But it wasn't discussed in any -- well, to
8 answer your question in terms of the disability, we
9 did talk about those things, but there was nothing
10 indicated by her that she needed an accommodation at
11 that time.  She went to work for us initially
12 full-time and performed that role for several months.
13   Q.  And I have it from the complaint here that
14 she started in about April 2016.  Does that sound
15 right?
16   A.  2016, I think so.  I don't have any documents
17 in front of me, but yes.  I'll go from the complaint.
18 That's accurate.
19   Q.  Okay.  I'll have some other documents we can
20 look at.
21   A.  Sure.
22   Q.  All right.  So pretty much from the time that
23 she started -- so had she had -- do you remember, did
24 she have the car accident prior to when you first
25 hired her, when you interviewed her?  Did she let you

Page 13

1  know about that?
2      A. I don't know if it was during the interview.
3  I don't believe it was in that context. I don't
4  recall the specific time when it came up. I just
5  remember that it was an issue for her. She was
6  recovering from that. I'm pretty sure it was before
7  she started for us the first time that we had that
8  discussion that she had the accident.
9      Q. I understand, when she first actually came to
10  work for you, she was kind of working by herself in
11  your office here in Las Vegas. Is that right?
12      A. She was physically here, yes, and then I was
13  working with her. I was here quite a bit during that
14  time. So I was here and then Brian Letofsky was here.
15      Q. Okay. Let's get a little bit more background
16  before we go through the topics any more.
17         So your firm, you started in California; is
18  that right?
19      A. No. The defendant here, Watkins & Letofsky,
20  LLP, A Nevada Limited Liability Partnership, started
21  here.
22      Q. I see. Okay. But did that grow out of your
23  operations in California?
24      A. No. It's an independent office that Brian
25  and I started here after we took the bar and passed

Page 14

1  it.
2      Q. Okay. Is there any -- in terms of the
3  operations of the law firm, do you and Mr. Letofsky
4  actually do work for your Nevada cases from your
5  California office?
6      A. Yes.
7      Q. Okay.
8      A. I mean, we do it remotely from all over the
9  place, so there, my home, if I'm in San Francisco on
10  another case, that, if I'm in Reno. But yes, we work
11  on our Nevada stuff remotely all the time.
12      Q. Okay. Do you have any other limited
13  liability partnerships other than this Nevada limited
14  liability partnership that you practice law through?
15      A. So I'm not trying to play with you, but I'm
16  trying to understand what you are asking me.
17         So as a PMK for this defendant, this
18  defendant is not a limited liability partner in any
19  other limited liability partnerships. Is that what
20  you are asking?
21      Q. I understand. I was asking, you know, if you
22  personally, by way of your background, information, do
23  you have any other entities --
24      A. I do.
25      Q. -- through which you practice law? What

Page 15

1  would those be?
2      A. Watkins & Letofsky, LLP, a California Limited
3  Liability Partnership.
4      Q. Okay. Any others?
5      A. No.
6      Q. Okay. And are you licensed or practice in
7  any states other than California and Nevada?
8      A. No.
9      Q. Okay. When did you open an office here in
10  Nevada with Watkins & Letofsky, LLP, Nevada?
11      A. It wasn't a subject on this (indicating), and
12  I realized this morning as I went through this, I
13  didn't go back and put that timeline together.
14         It would have been right when I passed the
15  bar, shortly after that. And Brian and I passed at
16  the same time. Our bar numbers are 11 -- mine is
17  11881, so we could figure out the specific time from
18  that. But I'm guessing, if I had to piece it
19  together, it's probably been 10 to 15 years.
20         But I don't mean to be vague. Just,
21  honestly, time, it gets super-foggy going back that
22  far. So I'm saying 10 to 15 years, if that's okay.
23  We can get you specifics later, if we need to. It
24  just wasn't on the subject list, so I didn't even
25  focus on it.

Page 16

1      Q. Okay. So you've had an office, though, here
2  in Nevada for that whole period of time?
3      A. We had -- yes, we had a physical location
4  initially subleased from Sean Sullivan PC for a period
5  of time, and I don't know how long that was. And then
6  we moved to our current building in a different suite,
7  and then we moved into our current suite in the same
8  building at 8215 South Eastern.
9      Q. Okay. So other than yourself and
10  Mr. Letofsky passing the bar here, how long have you
11  had employees in Nevada? The whole time you've had
12  employees at various times?
13      A. No, not the whole time. Well, Amy, she can
14  and would have been our first employee. So April of
15  2016. So as I think about that, that would make me
16  think we probably passed the bar about 10 years ago.
17      Q. Okay. All right.
18      A. I'm just making sure of that. I don't mean
19  to be vague, but I didn't really research that. Did
20  we have someone else? I don't think so. Amy Buchanan
21  would have been the first employee.
22      Q. That doesn't surprise me. I mean, she said
23  she was the only -- I think she said in this case she
24  was the only person working in the Las Vegas office
25  when she first started.

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

Page 17

1  A. Right.
2  Q. In terms of being there --
3  A. Physically.
4  Q. -- all the time day to day -- right.
5  A. I was just trying to think, where we were at
6  Mr. Sullivan's office, whether we had anyone that did
7  work for us there. I think we had engaged in having
8  runners go to and from the court and things of that
9  nature, but those would have been outside agencies.
10  So I don't think they were employees.
11  Q. Okay.
12  A. (Document review.) I'm sorry. Mr. Ortuno is
13  showing me that we passed the bar in December of 2010,
14  so that's 10 years, and then it would have taken
15  several months before we were working through
16  Mr. Sullivan. Somewhere in that time frame we would
17  have started.
18  Q. Okay. So going on 10 years, then?
19  A. Right. We had to set up the LLP and register
20  with the State and do all of that stuff.
21  Q. Okay. So could you tell me a little bit of
22  the process you went through to hire Amy as your first
23  employee here. Did you advertise for it? How did she
24  come to meet up with you and go to work with you?
25  A. So I didn't research that because it's not in

Page 18

1  here in the notice, but if memory serves, it would
2  have probably started through a Craig's List ad. I
3  asked Mr. Sullivan, who is very connected in the
4  community. He's born and raised here. His wife is a
5  judge. So I touched base with them. I know another
6  judge, Cedric -- I know him through Mr. Sullivan.
7  Q. Kerns?
8  A. -- Kerns. And Sean Sullivan had reached out
9  to him just to see if we knew of any attorneys that
10  were looking. I didn't have a ton of exposure to
11  attorneys here at that time, but any that I knew on
12  the other side of whatever case we were in, I asked if
13  they knew people.
14      We didn't do any sophisticated Monster, I
15  think that's what it's called, or Zip recruiting,
16  anything like that, because we were just trying to
17  find someone through word of mouth. The market was
18  pretty bare at that time in terms of available
19  attorneys, from what I can recall.
20  Q. Okay. And so how did you end up meeting Amy?
21  Do you remember if somebody referred her to you or did
22  she answer an ad or do you recall?
23  A. I don't. She mentioned somebody at the
24  deposition. I'm embarrassed to say that I didn't
25  remember that. But I'll take her word that it was

Page 19

1  word of mouth as opposed to like responding to Craig's
2  List.
3  Q. Okay. And so did you get a resume from her?
4  Interview her? What was the process?
5  A. I did get a resume; we did interview her,
6  spoke at length.
7  Q. Was that both you and Mr. Letofsky, or just
8  you?
9  A. I don't recall that. Certainly I was
10  involved. I don't remember if Mr. Letofsky was
11  involved. He probably spoke to her at different times
12  on the phone, but I don't -- I was no party to that.
13  Q. Okay. And so what was Amy hired to do? What
14  was the need that you had that she came in to fill?
15  A. Be an associate attorney.
16  Q. All right. And to work on what kind of
17  cases?
18  A. (Telephonic noise interruption.) Sorry.
19  Q. If you need to get that, we can take a break.
20  That's fine.
21  A. No. Thank you, but no.
22      Well, at that point, whatever we could get.
23  We were trying to establish a beachhead. We had some
24  employment law cases that were coming in through
25  Firevaugh (phonetic). We were marketing that way.

Page 20

1  And we wanted to develop a family law practice to the
2  extent that we could find the right fit.
3      So Ms. Buchanan offered an opportunity
4  potentially to grow that because of her background in
5  family law, though it was limited, but she still had
6  exposure and a desire. So it seemed like that might
7  work.
8      So there was initially the thought of
9  establishing kind of ground floor work through
10  employment and through family law.
11  Q. Okay. And so with respect to her -- you said
12  it was soon after she started that she told you she
13  was having like problems with her back and the
14  headaches and concentration, focus, like that; right?
15  A. Yes. It's not in the context of work. Just
16  in the context of life. But yes. That's my memory
17  anyway.
18      MR. KEMP: Okay. Let's make this Exhibit 4.
19      (Exhibit 4 was marked for identification.)
20  BY MR. KEMP:
21  Q. Exhibit 4 has got the defendant's Bates stamp
22  number ending in 1299, appears to be an April 29th,
23  2016, e-mail from Ms. Buchanan to you and
24  Mr. Letofsky, subject "Medical Update."
25      Do you have any recollection of receiving

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

Page 21

1 this e-mail?
2    A. No, not particularly.
3    Q. Okay. But it appears that she's letting you
4 know that she's got medical treatments and
5 appointments coming up; right?
6    A. Right. The subject of this e-mail would be
7 consistent with what I remember about our
8 conversations, which was that she was going to need
9 flexibility in work to be able to attend to those
10 things.
11    Q. Okay. So just to get to the point, early on
12 in the employment relationship she was letting you
13 know that she had these medical issues; right?
14    A. Right. When you say "issues," what do you
15 mean?
16    Q. Well, that she was having issues where she
17 was needing to go for medical treatment and see
18 neurologists and have time off potentially to go
19 and --
20    A. Correct.
21    Q. -- schedule around her medical appointments.
22    A. Correct.
23    Q. Okay. How was Amy's work performance while
24 she worked for your firm? That's kind of a broad --
25 if it's different at different times, I mean, I'm just

Page 22

1 trying to get an overall sense of what you thought of
2 her work performance.
3    A. I don't know that I can answer that question
4 in terms of an overall sense of it because the time
5 varied over a year or more and -- but she was very
6 green, a very young associate, and we knew that going
7 in and she knew that when she started.
8       I didn't think she lacked any desire to be a
9 good attorney. I thought she had quite a bit of drive
10 and desire to do that, and I was impressed by that. I
11 think she had a desire to learn, although she did not
12 know anything about civil litigation really at all.
13       But she did have a desire to learn. She
14 utilizes the resources. We talked a lot. She
15 implemented as best she could the things that we
16 talked about in terms of how to practice law and
17 manage files, and so in that sense, I think that was
18 my general observation out of the gate; that's why we
19 hired her.
20       As time went by she struggled, like most
21 young associates. It's extremely difficult and it's a
22 stressful job. And her progress, being out here
23 alone, you know, in terms of expectations, that she
24 was fine with how she did things. I didn't have any
25 real issues in that regard during this first segment

Page 23

1 of time.
2    Q. What would you define the first segment of
3 time? From April when she started until...
4    A. Whenever she quit the first time.
5    Q. She resigned, I think it was September.
6    A. September, right.
7    Q. 16th.
8    A. Yeah. So during that time, I think she
9 really wanted to work hard and be good and she had a
10 desire to use her degree and she was extremely
11 frustrated by the impact of that accident on her
12 ability to do that, to live life. It was impacting
13 her in terms of medical insurance, medical treatment,
14 and she was extremely frustrated by that.
15       So we talked a lot about that and how to try
16 and manage that in the context of a tough profession
17 and learning in the beginning stages of a tough
18 profession. So we talked a lot about that.
19       But I was always impressed. She wanted to
20 try and be good, and she did try to implement things.
21 She just had limitations. Some days she just couldn't
22 put in a full day. So that's how it went.
23       But the quality of her work was the quality
24 of a very young associate. So we reviewed everything,
25 I went over all of her work product, I reviewed it and

Page 24

1 corrected it, and tried to help her maneuver correctly
2 to become better.
3       But overall I had a good impression of
4 Ms. Buchanan. I never really thought anything
5 negative about her.
6    Q. Okay. I think the court reporter had an
7 issue, she might have missed something.
8       The period of time was April through
9 September of 2016, that's the first period that she
10 worked for you; right?
11    A. Yes.
12       THE REPORTER: It's just more the overlap.
13       THE WITNESS: I'll try to stop.
14 BY MR. KEMP:
15    Q. I'm bad at that too.
16       So was there ever any speaking -- I guess,
17 let's talk about the first time period up until
18 September of 2016 when she did resign because of her
19 health issues. Did you ever have to issue her any
20 warnings or discipline of any kind for anything that
21 she did?
22    A. If you mean by warning -- I don't want to
23 play with words because there's a lot of constructive
24 criticism and feedback on her work product, but if by
25 warnings and discipline you mean did I have to tell

**Page 25**

1 her that she's doing something very wrong and in
2 violation of company policy and that can't be
3 tolerated, I don't recall any of that.
4     Q. Okay. So the first time that she stopped
5 working for you, September of 2016, what do you recall
6 about what happened there?
7     A. She just was extremely frustrated with the
8 impact of her medical condition on her ability to
9 work, and she decided that she needed to address that,
10 the issue, go get care and see what she could do to
11 fix it so she could get back and contribute as an
12 associate, you know, learning. I don't know if it was
13 so much -- I don't know what her motivation was behind
14 that, but she decided she needed to leave work to go
15 and address those issues.
16     MR. KEMP: Okay. We'll make this -- I think
17 this will be Exhibit 5.
18     (Exhibit 5 was marked for identification.)
19     MR. KEMP: Exhibit 5, we have a -- it's a
20 one-page document. It's got defendant's Bates stamp
21 ending in 1301, Tuesday, 28 June 2016, e-mail from
22 Amy Buchanan to Dan Watkins, subject "My Resignation."
23     Q. First of all, do you recall receiving this
24 e-mail?
25     A. No. I don't deny that it came. I just don't

**Page 26**

1 recall it.
2     Q. Okay. Well, I'm not trying to trick you or
3 anything. That's why I wanted to make sure I showed
4 you this, because I know I've seen the -- and we'll
5 look at the resignation letter from -- it's dated, I
6 think, September 2nd. But this is all the way back at
7 the end of June she was talking about needing to
8 resign. I just wanted to see if that jogged your
9 memory about any earlier conversations that you had
10 with her about her needing to resign or wanting to
11 resign.
12     A. No, not specifically with respect to this
13 e-mail, but we did -- like I said, we talked a lot
14 about her frustration with her current medical
15 condition and practicing law and just the strain and
16 stress of practicing law in the midst of dealing with
17 that, but I don't recall this particular e-mail, not
18 from June.
19     Q. Okay. Do you recall there being
20 conversations, communications about her resigning?
21 This would have been a little over two months before
22 she actually did it.
23     A. I don't recall that, no, not in that context,
24 not the word "resigned." I don't recall that.
25     MR. KEMP: Okay. So we catch up, let's go

**Page 27**

1 through these next couple of exhibits also. This will
2 be Exhibit 6.
3     (Exhibit 6 was marked for identification.)
4     MR. KEMP: Exhibit 6 is a one-page document
5 that ends in defendant's Bates stamp 1298 from
6 Amy Buchanan, e-mail to Dan Watkins and Brian Letofsky
7 dated Thursday, August 18th, 2016.
8     Q. Take a look at that and let me know if you
9 remember receiving this.
10     A. I do. I don't recall reading and receiving
11 this e-mail, I don't recall it coming up on my
12 computer, but I recall the subject of the e-mail.
13     Q. Okay. This is talking about having to have
14 another back surgery and...
15     A. Correct. And I remember there were issues
16 with -- and I can't put it together as I'm sitting
17 here, but there were some issues from her perspective
18 of needing to not work to have her insurance in place.
19 I don't know if that -- what that was necessarily
20 related to.
21     But I do recall, as she mentions in that
22 second line, that in order to keep my current
23 insurance coverage, keep out-of-pocket costs to a
24 minimum, and have surgery done in a reasonable time,
25 she needs to go now, between August and September.

**Page 28**

1     So I remember that and the timing was
2 important for her with respect to insurance, but
3 ultimately the goal was to go and have surgery and get
4 better. So I do recall that.
5     MR. KEMP: Okay. All right. The next one,
6 Exhibit 7.
7     (Exhibit 7 was marked for identification.)
8     (Amy Buchanan entered the proceedings.)
9     MR. KEMP: Exhibit 7, we have two pages.
10     Q. And I'll tell you, the second page of the
11 letter doesn't have a Bates stamp on it because I
12 couldn't find the actual copy of the letter that was
13 attached to this Friday, September 2nd, 2016, e-mail.
14     But this second page does appear to be the
15 resignation later that Amy sent you; is that right?
16     A. Yes.
17     Q. Okay. So September 2nd she resigns to go and
18 pursue her medical treatment, particularly apparently
19 a back surgery.
20     What did you do with respect to running the
21 office when she left? Did you have somebody else
22 working there by that time at the Las Vegas office?
23     A. Yeah, if memory serves, Eran Forster.
24     Q. Could you spell the last name?
25     A. F-o-r-s-t-e-r.

Page 29

1   Q. I think it's spelled E-r-a-n, the first name.
2   A. Eran, E-r-a-n, yes.
3   Q. Okay.  And when did Eran Forster come to work
4   for you?
5   A. I don't mean to be evasive, but it wasn't in
6   here, I didn't really focus on this, and so I didn't
7   research his hire date and all that stuff.
8   Q. Okay.
9   A. If he wasn't there when she left, when
10  Ms. Buchanan left, it was shortly after that, and I
11  would have tried to manage things as best I could, but
12  it seems like I remember him being there before that.
13  Q. She was the first person that you hired in
14  April -- I'm just trying to see if we can narrow it
15  down.
16      If she was hired in April and resigns in
17  September, that's just about a five-month period,
18  four- or five-month period.  Does that help you narrow
19  it down when Eran Forster might have come to work?
20  A. No.  I just don't remember a time when we
21  didn't have anybody here working on the files.  I do
22  recall Mr. Forster coming to our attention through
23  Ms. Buchanan, I think that's right, and we were
24  slammed busy.  So if my memory serves, that he was
25  there when she was -- by this time, because I don't

Page 30

1   remember not having anyone.
2   Q. Okay.  Was there anybody besides Mr. Forster
3   and Amy Buchanan working there prior to when she
4   resigns with this letter of September 2nd?
5   A. Myself and Mr. Letofsky.
6   Q. Okay.  No other --
7   A. No other attorneys, no.
8   Q. Any other support staff?
9   A. No, I don't believe so, not by September.
10  Q. Was any of the support staff out of
11  California working on any of the Nevada files?
12  A. I don't think so because it's a federal
13  system out here, and we don't do much in federal court
14  there.  I don't recall that.  Most of the attorneys
15  are dictating or typing, so I don't remember having
16  support that way.  I'm sure there were occasions where
17  depos might have been set through somebody there, but
18  I don't recall that specifically.
19  Q. Okay.  So also in Exhibit 7 there appears to
20  be an e-mail from Nancy Letofsky to Amy Buchanan with
21  a CC to Susan Watkins.  Is Susan Watkins your wife?
22  A. Yes.
23  Q. And does she work for your firm?
24  A. Yes, she currently does, in California.  She
25  does not work for -- well, she does the books for

Page 31

1   Nevada, so she does work for Nevada, not as an
2   employee, but she does do the books here too.
3   Q. Okay.  And Nancy Letofsky, is that
4   Mr. Letofsky's wife?
5   A. Correct.  She performs the role of office
6   manager and paralegal in California and office
7   manager -- well, for a period of time she was the
8   office manager for here in Nevada.
9   Q. Okay.
10  A. She doesn't play that role anymore.
11  Q. Do you have somebody else that plays that
12  role now?
13  A. Yes, Farah Kachermeyer.
14  Q. Okay.  Can you spell --
15  A. K-a-c-h-e-r-m-e-y-e-r.
16  Q. And Farrah, F-a-r-r-a-h?
17  A. F-a-r-a-h, uh-huh.
18  Q. Okay.  All right.  So it looks like the
19  e-mail from Nancy Letofsky is Wednesday, August 31st,
20  2016, and it says:
21      "Hi, Amy.  We will need a letter of
22      resignation from you, see attached
23      information sheet.  We hope your surgery is
24      successful and your recovery goes well.  What
25      day are you having surgery?  Nancy."

Page 32

1       So obviously, there must have been some other
2   communication about the resignation and she was asking
3   you to receive this resignation letter?
4       MR. ORTUNO: Objection. Calls for
5   speculation. Calls for personal knowledge.
6       THE WITNESS:  Yeah, I don't know what you
7   mean by "communication."
8   BY MR. KEMP:
9   Q. Well, I would just indicate that there had
10  been some other discussion.  Well, let me ask you this
11  way:
12      Do you know if there was some other
13  discussion about Amy resigning as of September 2nd
14  that would have led to Nancy sending this e-mail?
15  A. I'm not sure this is the first e-mail of this
16  chain, but -- so I don't know, no.
17  Q. Okay.  Did you have any discussions with
18  Nancy or Susan about Amy's resignation?
19  A. Only that they had resigned.  That's all I
20  recall.
21  Q. Okay.
22  A. And that she was going to resign.  I'm sure
23  we were discussing it as of the lead-in based on this
24  e-mail.  I would have definitely talked to Brian about
25  the e-mail of August 18, Exhibit, is it 6?

Daniel R. Watkins, Esq.                                     Amy Buchanan v. Watkins & Letofsky, LLP

Page 33

1    Q.  6, yes.
2    A.  And so in preparation for that, I would
3  have -- I don't recall specifically, but I assume I
4  talked to Nancy and Susan at some point about it.
5    Q.  You don't recall but you think you did,
6  though?
7    A.  Correct.  It would be normal for me to do
8  that.
9    Q.  Okay.
10   A.  Because there's payroll and that would need
11 to be addressed, as well as Nancy's handling of it, of
12 the personnel file.
13   Q.  Okay.  Do you recall what Amy's compensation
14 package included during this first period between
15 April and September of 2016?
16   A.  Again, not specifically.  That wasn't a
17 subject in the notice.  But I think it was 65,000
18 annual salary, and she would have been available for a
19 bonus program, which was $50 an hour for everything
20 billed over a 480-hour quarter.  The average was 160 a
21 month, what we billed.  The bonus program at that
22 point was based on a quarterly billable of 480 a
23 quarter on calendar in quarters.
24   Q.  Okay, 480 a quarter.  Did it change into 160
25 a month, 160 hours a month or -- maybe I'm not

Page 34

1  understanding the timeline.
2        Was it 480 per quarter when she started and
3  it changed to 160 per month, or vice versa?
4    A.  No.  So we paid an annual salary back -- back
5  then we paid an annual salary for her of 65,000 a
6  year.  That was paid out biweekly.  And then we had a
7  potential for bonus based on hourly billables, and the
8  billables, the bonus was based on a quarterly
9  production of billable hours at 480.  That makes --
10 creates an average of 3 -- or 160 a month.  So it's
11 just you give them an average of 160 to gauge it by,
12 but 480 was the mark per quarter.
13       And so that was the compensation package that
14 I believe she started with.
15   Q.  Okay.
16   A.  I would have to confirm that because, again,
17 I didn't research that based on the notice, but I
18 would -- I'm pretty sure that's close.
19   Q.  Okay.
20   A.  Because we went back and forth with 160 and
21 165, and I don't remember the timing in terms of a
22 minimum billable that would affect the quarterly.
23       So if it was 165, I think that translates to
24 a 495 quarter, and I just don't remember the timing of
25 how we moved in and out of that over that period.

Page 35

1    Q.  Okay.  All right.  So right up until the time
2  that she resigned, did Amy, for lack of a better term,
3  complain to you or let you know there were issues she
4  was struggling to keep up with the workload and work
5  the number of hours that was required to do that?
6    A.  The September resignation?
7    Q.  Yes, before that.
8    A.  So prior to that?  I'm sure -- I don't recall
9  anything specific, but generally that is a discussion
10 I have with every new associate.  So I'm assuming --
11 and I do recall that was a concern, how do I get it
12 done, you know, and we talked at length about managing
13 files, working efficiently, and all those types of
14 things.
15       So I don't know if you -- you used the word
16 "complaint."  I never really perceived it that way in
17 the sense that I have a complaint, but certainly it
18 was an issue and it was part of her overall
19 frustration.
20   Q.  Right.  And back on Exhibit 6, it looked like
21 you were talking about -- or she mentioned that she
22 was -- she would welcome the opportunity to work with
23 you again after she had the surgery, and do you recall
24 any other details of discussions you had with her
25 about whether or not she would be able to come back

Page 36

1  after she had surgery?
2    A.  I'm sure we would entertain it.  Like I said,
3  I didn't have any negative feelings about
4  Ms. Buchanan, and I was always -- you know, for me
5  personally I'm hoping for someone with drive and
6  desire to be better professionally, and I saw that in
7  her.  Just huge -- she just had a huge hurdle.
8        And so, yeah, I would have entertained it.
9  Who knows how long she was going to be out and how the
10 firm was going to move forward and stuff, but we would
11 certainly entertain it, and we did.
12   Q.  Okay.  I just want to note, in topic number 6
13 we did ask for her compensation, any periodic changes
14 thereto.  I don't think it changed.  It was 65,000,
15 based on annual salary of 65,000 all the way up until
16 she resigned on September 2nd.  There wasn't any
17 change in that, was there, during that time period?
18   A.  I apologize.  I read over that.  I was
19 thinking more in terms of duty in scheduling and
20 supervision, and I didn't really see -- I apologize.
21 It is in there, but I think what I told you is right.
22   Q.  I don't think there is any controversy,
23 though, 65,000 is what it was, and it didn't changed
24 up until the time she resigned in September?
25   A.  I mean, I know, salary and the bonus;

Page 37

1  correct.
2      Q. Okay. In terms of other compensation, I
3  think there was health insurance; is that right?
4      A. Yes. I think of that more as a benefit, but
5  yes. So we had health insurance that we provided.
6  And she had -- for all the associates, they can take a
7  week, do vacation and do sick leave. We don't really
8  track that. So that's available to them.
9          We just want them to meet the minimum
10  billables over that quarter. So we give them the
11  liberty to take vacations and use sick leave as they
12  need to and schedule as they need to with the idea
13  that you want to be in the office as much as you can,
14  but -- so I call that a benefit even though the bonus
15  still calls for the 480 quarterly or 495, whichever
16  was in place at that time.
17      Q. And you did mention minimum billables. What
18  was the minimum?
19      A. 480 -- well, minimum in the sense of bonus is
20  480 quarterly or 495, depending on whatever time
21  period we're talking about, and so that quarterly
22  minimum would translate down to an average of 160 or
23  165.
24      Q. Okay. And so that was the threshold to get
25  to the bonus, but you also considered that to be the

Page 38

1  minimum that they needed?
2      A. Yeah. I mean, we've called it a minimum for
3  as long as Brian and I have been together, but to be
4  honest, I don't know that I've ever gone to an
5  associate and said your hours aren't good enough, you
6  are out of here, that I can recall. That may have
7  happened, but usually the hours are the result of
8  other issues, not the other way around.
9      Q. So 160, that's roughly 40 hours a week. It's
10  a little bit less because there is slightly more than
11  four weeks in a month.
12      A. Yeah, depends on how you look at it, but
13  yeah, generally on the average, 22 billable days a
14  month I think is what it works out to, or 21,
15  something like that. So however it works out. It's
16  on average eight billable hours of each workday a
17  month, yeah.
18      Q. Okay.
19      A. Which doesn't translate to eight
20  working hours.
21      Q. Right. No, I understand it. That's
22  billable hours are actually doing work that you
23  could charge your clients for?
24      A. Correct.
25      Q. Okay. All right. And so Amy goes on --

Page 39

1  well, before we get there, anything else about topic 6
2  here, her title, job duties, compensation, work
3  schedule, supervision of her work, identities of her
4  supervisors. I take it you were her supervisor,
5  Mr. Letofsky was also, or was it mostly you?
6      A. I interacted mostly with Ms. Buchanan,
7  although Mr. Letofsky had every authority to supervise
8  her and help her along as he saw fit. My -- I was the
9  one focused primarily on Nevada at that time. We then
10  started a series of cases in Eldorado, against the
11  Eldorado Resorts Corporation, which was a timeshare
12  company. I don't remember the overlap with
13  Ms. Buchanan's employment, but there was a time when
14  Brian was out here quite a bit. The point is, he
15  could supervise her too.
16          For title, just to get back to point 6, was
17  associate attorney, job duties included management of
18  a file and, you know, all the files that we had, which
19  would include summarizing discovery, summarizing
20  records, attending depositions, going to mediations,
21  going to court, going to meetings with clients, having
22  initial client meetings, reviewing case files with me
23  or Mr. Letofsky as a general sense of management of
24  the files.
25          We talked about her -- conversation her work

Page 40

1  schedule was fluid, you work as you need to. She had
2  remote access, at least at some point in time we set
3  that up. So it's just really about getting the work
4  done.
5          We would prefer to not have somebody work
6  from 8:00 in the evening until 7:00 in the morning and
7  never be in the office, so we tried to keep normal
8  working hours, but a very flexible schedule.
9      Q. That was going to be a question I had. You
10  didn't have set -- when she was the only employee, you
11  didn't have set hours that she needed to be there?
12      A. I mean "set" is a vague word. In that
13  context, we wanted them to be there during the workday
14  because that's when I'm working and interaction could
15  occur better then than in the evenings, and that's
16  when meetings would happen and depos and things of
17  that nature, so but there was great flexibility in it.
18      Q. So did you have like a Las Vegas
19  phone number?
20      A. Uh-huh.
21      Q. Is that a "yes"?
22      A. Yes, we did.
23      Q. And so would that phone be answered from
24  California if somebody called the --
25      A. No.

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

Page 41

1    Q. -- Las Vegas number?
2    A. No. It rings direct. And when we were with
3  Mr. Sullivan, it went directly there. As far as I can
4  recall, it's always been set up that way.
5        We have a rollover function. I don't know if
6  that's still in place. We did at one point. But the
7  phones -- we had a separate phone number and it rang
8  direct to the office.
9    Q. I'm just wondering, with only one employee
10 there, Ms. Buchanan, during a particular period of
11 time, and if she's not at the office to answer the
12 phone, who answers it?
13   A. It forwarded to California to pick up and
14 take a message for her and relay the message back.
15   Q. Okay. Well, and also you were practicing
16 here too. So would you get phone calls on your Nevada
17 cases to that number?
18   A. To the local number here?
19   Q. Yes.
20   A. Yes. Most of the time I dealt with my
21 cell phone. On a very rare occasion they would call
22 direct to the office, but most everyone has my cell.
23   Q. So your office was not really one where you
24 would expect members of the public to walk in; right?
25 It would be more by appointment?

Page 42

1    A. Yeah. I mean, I've never had a situation
2  where we had just that type of sidewalk traffic coming
3  in. It's always by appointments for as long as I've
4  practiced.
5    Q. Or like if a runner was bringing you, you
6  know, papers to serve on the office, if she wasn't
7  there, then there wouldn't be anybody to receive it,
8  or is it do you have like an executive office setup?
9  What happens if people show up with papers if nobody
10 is there? Is there like a central reception?
11       MR. ORTUNO: Object to form.
12       THE WITNESS: Yeah, today it's different. So
13 I would be speculating on if that even happened back
14 then. I don't recall that ever being an issue --
15 BY MR. KEMP:
16   Q. Okay.
17   A. -- to be honest. I don't recall that having
18 been an issue, so I don't have an answer for you.
19   Q. Suffice it to say, you didn't tell her she
20 had to be there between 9:00 a.m. and 5:00 p.m. every
21 day?
22   A. She didn't punch a clock, but we wanted her
23 there between 9:00 and 5:00 if she could be there,
24 because that's when the workday is happening for
25 everybody.

Page 43

1    Q. Okay.
2    A. From my experience, you develop better
3  professionally when you are there during the workday
4  handling the things that come into the office during
5  the workday and dealing with me and opposing counsel
6  and so on.
7    Q. Okay. Topic 7, I just want to make sure we
8  button these things up:
9        "General nature, scope and extent of
10       defendant's business and operations and more
11       particularly with respect to plaintiff's
12       employment with defendant."
13       It's a law firm; right? I mean, it's --
14   A. Correct. It's a litigation firm. During
15 Ms. Buchanan's time, I don't think we did much
16 business consultation, although we do some more of
17 that now. We may have, but it was primarily
18 litigation and then primarily in employment. I don't
19 know that we ever got any real traction on family law.
20 We did a little bit here and there, but I don't think
21 we got much traction on that.
22   Q. Okay. So Ms. Buchanan resigned September 2nd
23 to go and deal with her medical issues related to her
24 back injury, I think, and the other items that we
25 talked about; she told you she had headaches and had

Page 44

1  trouble focusing and concentrating, had fatigue, but
2  at some point she comes back to work for you. How did
3  that happen? How did that come about?
4    A. I don't recall specifically. I would assume
5  at some point she had indicated that she had her
6  surgery and she was ready to try and come back, but
7  she had limited -- she was going to have to work on a
8  limited basis. We had a need at that point -- I know
9  Mr. Forster still was with us. We were well into the
10 Eldorado cases and we needed help.
11       So I don't remember -- I can't -- I don't
12 remember who reached out to whom first. I'm assuming
13 she reached out to us and we discussed it and said,
14 well, let's try 50 percent and see if that works, that
15 gets you back in, it gets us some help, and we'll see
16 if it can work.
17       MR. KEMP: Okay. We'll make this Exhibit 8.
18       (Exhibit 8 was marked for identification.)
19       MR. KEMP: So Exhibit 8 is a
20 one-page document, it ends in defendant's Bates stamp
21 1376, e-mail, Wednesday, 30 November 2016, from
22 Amy Buchanan to Dan Watkins, subject "Tentative
23 Schedule/Availability."
24   Q. Do you remember getting this e-mail?
25   A. Again, I don't recall it coming in. I do

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

Page 45

1  recall, as I read this, it reminds me of our
2  conversation that she said she wanted to come back but
3  there were going to be limitations, and I said you
4  need to let me know what they are.  So this would be
5  her responding in that respect, saying this is what I
6  would like to try.
7        So I recall the general gist of the subject
8  of the e-mail.
9     Q.  Okay.  It says specifically:
10          "Hi, Dan.  Per our conversation, I'm
11       proposing a part-time work schedule of
12       20 hours per week Monday through Thursday.  I
13       could start as early as Monday, December 5th.
14       As of now, I'm not available December 9th and
15       have an appointment the morning of
16       December 12th.  I'll be out of town during
17       the last week of December but I'm sure I
18       could get some work done remotely."
19       Did I read that correctly?
20     A.  You did.
21     Q.  Okay.  And so did you agree with this
22  proposed schedule, this 20 hours a week working Monday
23  through Thursday?
24     A.  We did.
25       MR. KEMP:  Okay.  This is Exhibit 9.

Page 46

1        (Exhibit 9 was marked for identification.)
2        MR. KEMP:  Exhibit 9 is two pages.  It's got
3  defendant's Bates stamp 1362 and 1363.  At the bottom
4  is the e-mail that we just went over in Exhibit 8.
5  Sorry for the duplication.  I probably could have
6  gotten away with just one of these.
7     Q.  The top e-mails, there's one from you to
8  Brian Letofsky with a CC to Susan Watkins on
9  November 30th, 2016, "Tentative
10  Schedule/Availability."  Looks like you forwarded the
11  e-mail from Amy with her proposal.
12       Do you remember doing this and discussing it
13  with Brian and Susan?
14     A.  I don't remember sending the e-mail.  I do
15  remember discussing it with them, but I don't deny
16  that I sent it.  This would be how I would handle
17  things.  I just don't specifically recall.
18     Q.  Okay.  So it says:
19          "Brian, this is Amy's proposal regarding
20       work schedule.  With her proposed schedule,
21       we would have her on half time.  We would set
22       her up with half minimums but no bonus
23       opportunity.  You good with this?  Susan, can
24       you tell me Amy's salary when she left?"
25       Did I read that correctly?

Page 47

1     A.  You did.
2     Q.  It looks like Susan then responded to you on
3  October 4th -- I'm sorry.  This was taken from an
4  archive.  Looks like she responded to you on 30
5  November 2016, to both you and Brian Letofsky, saying
6  $65,000.  Is that right?
7     A.  Yes.
8     Q.  Okay.  So she's going to come back, she's
9  going to work half time, 20 hours a week during a
10  Monday through Thursday, and she's going to be paid
11  half of what she was being paid before.  Is that how
12  it was going to work?
13     A.  Correct.
14     Q.  Okay.  No bonus opportunity, though.  Why
15  would that be?
16     A.  We had just started -- well, actually we had
17  done it in the past, I don't think we had just
18  started, where we had gone to like a half schedule for
19  associates of maybe once or twice per year.  We tried
20  that in California.  The bonus is not provided on the
21  minimum billables going to half because it would be
22  wholly unfair to allow an employee to say they are
23  going to go half time and then bill a regular schedule
24  and get the bonus.  It would be unfair to the other
25  associates.

Page 48

1        So when we placed employees on reduced
2  schedules, they couldn't satisfy the 480 quarterly
3  requirement.  Therefore, there would be no bonus.  We
4  didn't adjust the bonus requirement of 480 or 495
5  downward because we didn't think that would be fair.
6     Q.  Because she really wasn't expected to work
7  more than 20 hours?
8     A.  Yeah, by virtue of the minimum schedule or
9  the reduced schedule they could never meet the minimum
10  billables.
11     Q.  Okay.  Did you speak with Amy about that,
12  about the fact that there would be no bonus
13  opportunity?
14     A.  I'm sure I did.  That's what I relay to them
15  in the conversation.
16     Q.  Okay.  I mean, I know you are saying you are
17  sure you did, but do you have a specific memory of
18  discussing that with Amy?
19     A.  No.  I don't have a specific memory of
20  discussing her coming back either, but I know she did,
21  and I know how we did things.  So if you are asking
22  me, I would have talked to them, but I don't have a
23  specific memory of that, and I would have talked to
24  her.
25     Q.  Okay.  Just to follow up on that briefly,

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

Page 49

1  what specifically do you remember about conversations,
2  or do you not remember any conversations specifically
3  at all but just know that they happened because of
4  these e-mails?
5      A.  Are you talking about all conversations?
6      Q.  Specifically about her coming back around the
7  end of November.
8      A.  Yeah, I don't have a specific memory of any
9  of that other than a vague, vague, foggy memory of a
10  phone to my ear and talking to Ms. Buchanan about
11  several issues.  I mean, I know we talked a lot on the
12  phone.  But any specific conversation, I really don't
13  have any on the subject we've talked about so far.
14      MR. KEMP:  Make this Exhibit 10.
15      (Exhibit 10 was marked for identification.)
16      MR. KEMP:  Exhibit 10, we've got two pages
17  ending in defendant's Bates stamp 1311, 1312, e-mails
18  from December 14th, 2016.  The first one in time is at
19  the bottom of the page marked 1311 from Susan Watkins
20  to Dan Watkins, December 14th, 2016.  "Can you tell me
21  the terms of her employment?"  The subject was
22  "Amy Buchanan."  It says, "Can you tell me the terms
23  of her employment?"
24      Q.  Do you recall getting this e-mail from Susan?
25      A.  No, not specifically.

Page 50

1      Q.  Any doubt that you got it from Susan?
2      A.  No.  It's what she usually sends.  It's the
3  type of e-mail I get when somebody starts.
4      Q.  Okay.  And so then it looks like you
5  responded to her, "her" being Susan, you responded to
6  Susan, with a CC to yourself, Brian Letofsky, and
7  Nancy Letofsky, Wednesday, 14 December 2016 at 10:03:
8      "Amy is working at same salary she had
9      before she left.  I can't recall what it was.
10      But she is working at 50 percent, 4 days a
11      week, at 5 hours a day.  Her first day back
12      is 12/5.  We need her back on the E&O
13      insurance if she was taken off.  Thanks,
14      Dan."
15      Did I read that correctly?
16      A.  You did.
17      Q.  Okay.  Do you remember sending that e-mail to
18  Susan, Brian, and Nancy?
19      A.  Not particularly, but I'm sure I did.
20      Q.  Okay.  And that accurately reflects the
21  terms, the agreement with Amy about what she was going
22  to be working coming back, is that right, in terms of
23  the -- that she was going to be working 50 percent,
24  four days a week, five hours a day?
25      A.  It's accurate in terms of her schedule and

Page 51

1  the time, the days that she was going to work; right.
2      MR. KEMP:  Okay.  Tell you what.  We've been
3  going about an hour.  Good time to take about a 5- to
4  10-minute break.  Okay?
5      THE WITNESS:  Okay.
6      MR. KEMP:  Let's go off the record.
7      (Recess taken.)
8      MR. KEMP:  Let's go back on the record.
9      Q.  I'll remind you you are still under oath.
10  Okay?
11      A.  Yes.
12      Q.  All right.  So when Ms. Buchanan came and
13  asked you -- or not when she came and asked you, but
14  when you and she discussed coming back at this
15  50 percent time, that she was going to work the
16  20 hours a week, four days a week, five hours a day,
17  did you and she talk about any other ways in which the
18  firm might be able to accommodate her for her issues
19  she was having?
20      A.  Well, what issues?
21      Q.  With her health, the fact that she had to go
22  out for surgery, that she was having problems with
23  this back injury, headaches, problems focusing,
24  problems concentrating, problems with fatigue.
25      A.  Not that I recall.  The issue for her was

Page 52

1  that she needed less stress that would help with the
2  fatigue, the headaches, the focus, the concentration.
3  So less time created a better product, and less issues
4  with that, with those medical conditions.
5      Q.  And working fewer hours was going to help
6  with that?
7      A.  Yes.
8      Q.  Okay.  But did she tell you she needed
9  anything else to help accommodate that, is my
10  question.
11      A.  No.  Did she ask for additional
12  accommodations, no.
13      Q.  The only accommodations she sought was to
14  work fewer hours?
15      A.  Yes.
16      Q.  Okay.  Going a little bit broader, at any
17  time that she was working for you, did she ever ask
18  for any other accommodations other than a reduced
19  schedule?
20      A.  I'm not sure --
21      Q.  Not just at the time --
22      A.  Not in any formal sense, but there were
23  several occasions where she was in the office and she
24  would have a migraine, so she would take a nap, place
25  her head on the table for an extended period, throw

Page 53

1  up, things like that. So we allowed, obviously, for
2  that process to go she could leave, she didn't have to
3  stay.
4      So in terms of accommodating those symptoms
5  and issues when they came about, we let her take care
6  of them, didn't say stay in the office, it's Thursday
7  and you have to give us five hours. You have a
8  migraine and you are throwing up in the office; you
9  should probably not have to be there. So to that end
10 we accommodated it, but it wasn't a set accommodation
11 because it was a, if you need to leave, you need to
12 leave.
13     Q. Okay. But you also gave her the option of
14 basically taking breaks if she needed to put her head
15 down?
16     A. Sure. Never said don't do that.
17     Q. Okay.
18     A. So we didn't have a formal discussion on
19 accommodations related to rests and migraine breaks
20 and going home if she's sick, can't focus, but we did
21 allow for that.
22     Q. Okay.
23     A. We were trying to find a way to have her be
24 in a productive condition when she was in the office,
25 for her and for us.

Page 54

1      Q. All right. And we did talk a little while
2  ago, talked about the back injury, the headaches,
3  trouble focusing, trouble concentrating, the fatigue.
4  Topic number 9 is asking about the defendant's
5  knowledge of -- "knowledge and understanding of
6  plaintiff's condition or disability and limitations on
7  her ability to perform her daily living activities or
8  job duties." Do you have anything -- let me ask you
9  this way:
10     Are there any other things that you were
11 informed of, given knowledge of before her medical
12 condition, any diagnoses that she received, anything
13 that impacted on her daily living activities and
14 ability to do her job?
15     MR. ORTUNO: I'm going to object as far as it
16 requires any expert medical testimony.
17     But go ahead.
18     MR. KEMP: I'm just asking what he was told
19 or what he was informed of.
20     MR. ORTUNO: Okay.
21     MR. KEMP: Gained knowledge of.
22     THE WITNESS: Sure.
23     It's a little -- it's a little overbroad
24 because her time working there consisted of two
25 different parts, and then within that time there was a

Page 55

1  change in her reduction in hours. But along the way,
2  Ms. Buchanan kept us informed of her condition. She
3  informed us of diagnoses even though I never asked for
4  that, but she would give that to us. So she sent
5  several different e-mails indicating her condition on
6  a particular day involving a migraine or need to go to
7  see a doctor and then, as she went through treatment
8  and sought information and consultation from medical
9  providers, she kept us informed. So there was
10 actually quite a bit of that communication going all
11 the way back to when she informed us about the
12 accident and its impact.
13     So there's a lot there. I can't just give
14 you -- I would not be able to give you a narrative
15 that covered it all.
16     Q. Do you recall her providing you with any
17 doctors' notes?
18     A. Oh, sure.
19     Q. I probably have those and we'll probably come
20 to those.
21     But did she tell you that she had a diagnosis
22 of fibromyalgia, for example?
23     A. So fibromyalgia came up, and I can't recall
24 if that's what was ruled out or that was diagnosed.
25 It was in the e-mail. She was trying to get to the

Page 56

1  root cause. I think in that sense it was the fatigue
2  that was the main focus, but I don't recall. It's in
3  an e-mail that she sent to us.
4      Q. Okay. We'll probably come to that.
5      A. The fibromyalgia was brought up, and I think
6  she was ruling out something else at the time, or
7  vice versa.
8      Q. Something about an autoimmune disease?
9      A. Yes. And I don't know which one was being
10 ruled out and which one was the diagnosis.
11     Q. I'm sure we'll get --
12     A. Yeah, it's in there.
13     Q. We'll come back to that.
14     This will be our next exhibit. Is this 11?
15     THE REPORTER: Yes.
16     (Exhibit 11 was marked for identification.)
17     MR. KEMP: Exhibit 11, a one-page document,
18 defendant's Bates stamp ending in 1371. We have
19 e-mails here regarding "Work Schedule."
20     Q. Do you recall sending the e-mail to
21 Ms. Buchanan dated Monday, February 20th, 2017,
22 with copies to Brian Letofsky and Nancy Letofsky and
23 Susan Watkins?
24     A. No, I don't recall receiving [sic] it
25 specifically.

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

Page 57

1  Q. Okay. It says:
2      "Amy, as we discussed last Friday, I
3  need your proposed work week. I hoped to
4  have it today. Please send me the schedule
5  no later than noon tomorrow. Thank you,
6  Dan."
7  Did I read that correctly?
8  A. Yes.
9  Q. So was this something you were doing week to
10 week, where you were asking her to provide you with a
11 schedule of what her work was going to entail?
12 A. No.
13 Q. What was this about, then? Do you recall?
14 A. It was about adjusting her work schedule to
15 have her do more, to be in the office more.
16 Q. Okay. So more generally, just when she was
17 going to be working?
18 A. Yes.
19 Q. Okay. And so then the e-mail here, where it
20 looks like she responded to you the next day on
21 February 21st, says:
22     "Hi, Dan. Let's go with Monday through
23 Thursday 9:00 to 5:00 p.m. with an hour
24 lunch. Also, my back injection has been
25 rescheduled to March 9th, (out all day) with

Page 58

1  a follow-up doctor's visit March 10th at 3:15
2  p.m. If this does not work I need to notify
3  them ASAP as the only other date currently
4  available is March 23rd.
5      "My physical therapy is supposed to be
6  twice a week but has been put on hold due to
7  insurance reasons. I do not know when it
8  will take place.
9      "There may be changes with a transition
10 in insurance. I will keep you posted once I
11 have answers."
12 Did I read that correctly?
13 A. Yes.
14 Q. All right. So my understanding was that it
15 was around this time, so almost about three months
16 after she came back, that she went from working
17 20 hours a week, 50 percent, to more -- which was
18 five hours a day Monday through Thursday, to actually
19 working a full eight hours a day Monday through
20 Thursday. Is that right?
21 A. There was a transition to an 80 percent
22 schedule, yes, and this appears to be that.
23 Q. What do you recall about that? What were the
24 discussions or how did that come up?
25 A. The frustration Amy had experienced the

Page 59

1  entire time of having enough time to work and do it
2  and develop as an attorney was still there, and she
3  wanted to do more in terms of time to be productive as
4  an associate and to develop professionally.
5      And the four hours -- five hours four days a
6  week wasn't enough time to do the work that we needed
7  to have done, so she was asking to stay with this
8  increased schedule, not that we talked about leaving,
9  but to contribute with this increased schedule to 80
10 percent to better address the workflow.
11 Q. Okay. So it went from 50 percent to
12 80 percent?
13 A. Correct.
14 Q. Okay. And did she approach you to increase
15 it because she felt like she needed more time to get
16 things done, or did you ask her if she could increase
17 it so that she could get more done?
18 A. There wasn't, that I recall, a specific like
19 time when she said, hey, I want to increase it. We
20 talked so much that everything was a general flow. So
21 I don't recall who brought it up for the first time,
22 but she clearly wanted to increase the time, and we
23 clearly needed, if she could, to increase the time,
24 but I never said you need to increase the time. So it
25 would have been her request to do more.

Page 60

1  Q. Okay. And with the increase to 80 percent,
2  what was going to happen with her pay?
3  A. It would be a commensurate increase to
4  80 percent.
5  Q. Okay. What about the bonuses? Was she still
6  not going to be eligible for bonuses?
7  A. Correct.
8  Q. Did you actually have that discussion with
9  her?
10 A. That she would still not be eligible for
11 bonus? No, I don't recall that.
12 Q. When she first came back, I mean, we saw it
13 in your e-mail in the discussion with Susan, I think
14 it was, that she wasn't going to be eligible for
15 bonus.
16     Did you actually tell her that she wasn't
17 going to be eligible for the bonuses at that time?
18 A. Which time?
19 Q. At the time that you had sent the e-mail
20 talking about how there would be no bonus
21 opportunities, back on Exhibit 9, this e-mail from
22 November 30th --
23 A. Yes.
24 Q. -- to Brian with a copy, CC to Susan.
25 A. Yes.

Daniel R. Watkins, Esq.                          Amy Buchanan v. Watkins & Letofsky, LLP

Page 61

1   Q. You actually told Amy that she would have no
2   eligibility for bonuses?
3   A. Yes.
4   Q. Do you recall there being any kind of
5   discussion about the number of hours necessary to
6   achieve bonus being adjusted because the person or
7   persons working in the Las Vegas office had more
8   administrative duties in that they were basically
9   running the office?
10  A. No.
11  Q. No discussion about how it might only be
12  150 hours a month to achieve a bonus?
13  A. No.
14  Q. Okay. So she goes back and -- or not goes
15  back, but she comes up to working 80 percent some time
16  late February or early March of 2017.
17     Did that -- at some point, did that become a
18  problem? Did she tell you she was having trouble
19  working that much?
20  A. Did what become a problem?
21  Q. The fact that she had increased from 50 to
22  80 percent. Did she raise any issues or make any
23  complaints or express concerns that she wasn't able to
24  keep up with that kind of schedule?
25  A. No, not in that way. That it goes back to

Page 62

1   the discussion I had, we talked about earlier where
2   young associates are always talking about time
3   management and efficiency to complete the projects
4   that are before them, and so that was an ongoing
5   discussion with Ms. Buchanan, as it is with every new
6   associate I can recall working with, and as it was for
7   me.
8   Q. Okay. But specifically with respect to her
9   physical condition, her --
10  A. I'm not sure I know what you're -- I don't
11  understand.
12  Q. Well, I'm just asking, you know, after she
13  went to the 80 percent did she come back and say, no,
14  my physical condition is really not allowing me to do
15  this, I'm having trouble with this because of my
16  physical condition? I guess I'm looking more --
17  A. No, I don't recall a connection between
18  medical condition and an increase in hours. They were
19  always -- there was always -- she could leave and come
20  and go as she needed to with those issues, so the
21  flexibility to be there at times when she could be
22  productive was there and it was about managing
23  workflow.
24     So it was never I can't do the work because
25  I'm having a migraine and I have to be in the office

Page 63

1   during a migraine, or I can't be in the office today
2   because I feel sick or whatever. That was never --
3   let me say it -- she never said, you're making me stay
4   and I'm sick, you're making me stay and I have a
5   migraine, you are making me stay and my back's killing
6   me, you're making me stay and I'm throwing up. That
7   was never a discussion, because she always had the
8   flexibility to take whatever time off she needed to
9   address those issues if they came up while she was at
10  work. So I'm not sure I understand.
11  Q. Well, okay. Let me follow up with this:
12     Do you recall her coming to you and
13  expressing a concern that, even at the 80 percent, she
14  wasn't able to keep her hours to just working the
15  80 percent of full-time because of the workload that
16  she had?
17  A. There was a discussion that goes back to --
18  that was similar to the discussion we had in the
19  September time frame, which was she can't do the work
20  and address the medical issues at the same time and
21  she needed -- so there was that how do I do the work
22  and address the medical issues, whether it's
23  50 percent, 80 percent, and that eventually led to her
24  saying that she needed to again go and figure out
25  what's going on medically and we need to find a new

Page 64

1   attorney.
2   Q. Okay.
3   A. So I don't know if I'm answering your
4   question.
5   Q. No, I think this next exhibit will help us
6   explore that a little bit more, Exhibit 12.
7     (Exhibit 12 was marked for identification.)
8     MR. KEMP: Exhibit 12 is -- it goes from
9   defendant's Bates stamp ending in 1364 up through and
10  including 1370.
11  Q. Take a minute and look through that, and let
12  me know when you've had a chance to review it.
13     For the record, these are e-mails from May 11
14  and May 12 of 2017.
15  A. (Document review.) It's just the same
16  chain -- okay.
17  Q. Yeah, there may be some duplication.
18  A. Okay. I've looked at it.
19  Q. Okay. I just saw something that made me --
20  that raised a question I had as I looked through the
21  documents in the case.
22     If you could look at the top of 1368, this --
23  at the very top it says "archived Thursday, October
24  24th, 2019, 11:13:13 a.m.," from Dan Watkins to
25  Amy Buchanan. There's a hole punched there,

Page 65

1  unfortunately. I believe it's a CC to Brian Letofsky,
2  subject "RE: Update for today."
3      Unlike most of the other e-mails, there's no
4  notation of when it was sent. And I noticed in
5  looking through e-mails that have been produced in the
6  case, that there are several like that.
7      Do you have any idea or any explanation as to
8  why that particular e-mail doesn't have a sent
9  line that shows a date and time it was actually sent?
10     A. I don't.
11     Q. I noticed maybe four or five, half a dozen,
12 when going through the e-mails preparing for the
13 deposition, that there were some that were like that,
14 that just didn't say when they were sent.
15     MR. ORTUNO: Let me say this. I did put
16 together the discovery and I did notice that myself,
17 and I'm not really exactly sure. It might have been
18 part of the archiving process. But we could probably
19 dig back and figure out which ones if you have ones
20 that you're concerned with.
21     I assumed, because there's like date stamps
22 on the ones around them, that it would be pretty easy
23 to figure out. But I'm sure we could probably dig up
24 actual e-mails that did have the to and from. My
25 assumption was that it happened within the archiving

Page 66

1  process or something like that.
2      THE WITNESS: Yeah, I don't know the answer
3  to the question.
4  BY MR. KEMP:
5      Q. No, I didn't know if you would or not. I
6  wanted to point it out and see if you had any idea,
7  but apparently not. So okay.
8      All right. Getting back to the main point
9  here, so this e-mail chain appears to be where
10 Ms. Buchanan is telling you that she's had updated
11 news from her doctor's office and now she's concerned
12 about whether or not she's going to be able to
13 continue or continue at the same level or go out on a
14 break.
15     What do you recall about -- first of all, do
16 you recall these e-mails or having these discussions
17 with Ms. Buchanan, and so, you know, what else do you
18 recall other than what's in the e-mails here?
19     MR. ORTUNO: Object to form.
20     THE WITNESS: That's pretty compound, but let
21 me try and break it down for you.
22 BY MR. KEMP:
23     Q. Sure.
24     A. I don't recall specifically receiving and
25 sending the e-mails.

Page 67

1      Q. Okay.
2      A. But I definitely recall the general nature of
3  these conversations because it was an ongoing thing
4  for pretty much the entire time she was there. It
5  wasn't an everyday and sometimes not an every-week
6  thing, but we talked a lot.
7      My concern was for Ms. Buchanan always that
8  she get healthy, so we wanted to help her along in
9  that process as best we could because I wanted her to
10 be a successful litigator and she had her entire
11 career in front of her and it wasn't going to happen
12 in a six-month period of time, she was going to need a
13 career to reach her potential. So we wanted her
14 healthy. So that discussion we had all the time.
15     Specific to the e-mail on page WLLLP 1364,
16 the one at the top, I do recall our discussion at
17 about that time that the accommodations were not
18 really anything that she was interested in at that
19 point because it was frustrating even on a reduced
20 schedule, it just wasn't fitting, the workload was too
21 much and it wasn't a fit and she wanted to go and try
22 and get things taken care of.
23     There was a mystery, and I think if we go
24 back, she received a call of concern about an issue.
25 So we go from the normal way of doing -- you know,

Page 68

1  with her headaches and focus and migraines and things
2  like that, and then she gets this alarming call. And
3  I remember that time period because we were alarmed
4  too. I mean, I wanted her to figure these things out
5  for her.
6      So she gets this call which is alarming to
7  her, and I think it just caused her to say, all right.
8  I got to get to the bottom of what's going on, and she
9  felt it was best to remove herself from the
10 environment, help us find someone else for the time
11 being, and then we can re-connect when she figures
12 things out.
13     Q. So for the record, the call of concern was
14 from her primary care doctor, is what the e-mail says.
15 Right?
16     A. Yes, sir.
17     Q. Thursday, May 11th, 3:44 p.m.
18     A. Yeah, that e-mail, the reference is on WLLLP
19 1365.
20     Q. Yes. Okay.
21     A. So that heightened, I think, her sense of
22 concern about things and a sense of urgency to get to
23 the bottom of it, and that was the precursor to her
24 e-mail.
25     Q. And then you responded that night, it looks

Page 69

1  like:

2       "I am sorry to hear that and I hope you

3  are okay.  Please let me know if we need to

4  make any accommodation at work.  Thank you."

5  Did I read that right?

6  A.  Yes, sir.

7  Q.  And then on May 12 is when --

8  A.  And just so you -- I mean, I think it's

9  important to point out that e-mail was sent out at

10 11:43, so I highlight that to let you know that I did

11 care and I was trying to work and I wanted what was

12 best for her such that I was addressing this stuff way

13 late in the evening so that it didn't get wasted or

14 had to delay.  I knew it was important for her to get

15 to the bottom of it.

16 Q.  Okay.  All right.  So the next morning is

17 Friday, May 12th, and I note that because she was only

18 supposed to be working Monday through Thursday; right?

19 A.  Sure.

20 Q.  But there she is working on Friday, May 12th.

21 A.  She's sending me a personal e-mail updating

22 me on her condition, if that's what you call that

23 work.

24 Q.  Okay.  Were these e-mails received by you

25 from her personal e-mail account or from her work

Page 70

1  e-mail account?

2  A.  I don't know.  It just says "Amy Buchanan."

3  Q.  When you responded to her, were you

4  responding to the 11:43 p.m. when sending it to a

5  personal e-mail account, or you responding to a

6  work e-mail that she sent you?

7  A.  I don't know.  The first e-mail in the chain

8  just says "Amy Buchanan."  So I don't know where that

9  came from.

10 Q.  Do you recall whether or not you were in the

11 habit of sending e-mails to any e-mail other than her

12 work e-mail?

13 A.  Whichever one she sent from I would respond

14 to.

15 Q.  Okay.  All right.  So on Friday, May 12,

16 2017, 10:53:46, she lets you know that she's been

17 having a lot of chronic pain and fatigue, frequent

18 headaches, migraines, cognitive difficulties, etc.,

19 "and still no relief after all the meds and treatment

20 I've tried.  Another surgery has been recommended but

21 I've been insistent this is not the answer.  It was

22 finally realized that I may have something else going

23 on and had some tests done.  One came back positive.

24 I'll be doing follow-up to help get a definitive

25 answer.  All I know at this point is I need to take a

Page 71

1  step back and focus on my health.  My gut tells me

2  we'll need to look for another attorney, and what I

3  can do" -- wait.  Let me read that again -- "and, what

4  I can do is something to be figured out."

5  A.  Then she says, "I wish I had better news."

6  Q.  Oh, yes, "I wish I had better news.

7  Sincerely, Amy."  Okay.

8       Did you have any other conversations with her

9  about looking for another attorney to work in the

10 office?

11 A.  I don't recall specifically on that subject.

12 Q.  Did you have any conversations with her

13 whether or not she was going to quit or she wanted a

14 leave of absence or what was going to happen with

15 that?

16 A.  Well, we talked about this (indicating),

17 so -- and I think it's clear that she needs time off

18 from work, so that's what we talked about.

19 Q.  Okay.  Did you talk about any other

20 accommodations?  I mean, you had mentioned in your

21 previous e-mail the night before let me know about any

22 accommodation at work.

23 A.  No.  We just talked about -- she didn't bring

24 it up, so I'm assuming we didn't talk about it.  We

25 talked about this e-mail, which was pretty certain to

Page 72

1  me that she needed to take a step back, and I wasn't

2  about to try and talk her out of that because she

3  wanted to focus on her health.

4  Q.  Was there any discussion about her going back

5  to maybe just working the 50 percent hours or some

6  other reduced schedule?

7  A.  No, I don't recall that at this time.  I

8  think we had moved past that.  We talked a lot about

9  different types of configurations of scheduling and

10 such.  I think at this point it was pretty set that

11 she needed to move away from law for a bit, but...

12 Q.  Okay.  Because just the one sentence here

13 "and, what I can do is something to be figured out."

14 A.  Correct.  A complete unknown.

15 Q.  Did you all take any steps or have any

16 discussions on trying to figure that out, what she

17 might be able to do?

18 A.  No, other than confirming that she was going

19 to see healthcare providers who were specialized in

20 that field, there wasn't much I thought I could do to

21 figure that out.  I read that as what she can do is

22 something to be figured out, meaning she needs to go

23 through the medical evaluation process and determine

24 what she can do, and that's the way we discussed it.

25 Q.  So did she go out on a leave of absence?

Page 73

1  A. We called it an indefinite leave of absence;
2 correct.
3  Q. Okay. And do you recall when that started?
4  A. I think there is another e-mail shortly after
5 this that references that. So it would have been in
6 May somewhere.
7  Q. Okay. That may be the next e-mail I have.
8 Let's make this Exhibit 13.
9  (Exhibit 13 was marked for identification.)
10 BY MR. KEMP:
11  Q. Did you consider -- when you asked about
12 accommodations at work, did you consider putting her
13 on a leave of absence, did you consider that to be an
14 accommodation?
15  A. No.
16  Q. No?
17  A. It depends what you mean by "accommodation."
18 She is telling me she needs to step back from work and
19 we need to find a new attorney. Ms. Buchanan had
20 concerns about medical insurance and needing medical
21 insurance.
22  Q. Sure.
23  A. So we left her in a position, we put her into
24 a position where she could continue to receive those
25 medical insurance benefits without having to do any

Page 74

1 work. So I guess in that sense, yes, she still was --
2 we left her on payroll so she could get medical
3 insurance, not knowing if she was ever coming back.
4  So I didn't see it in the sense of
5 accommodation with a known adjustment to the work
6 environment and a known return date, which is what you
7 would want with an accommodation. It was more of a
8 she wanted health insurance and that was the way to
9 get it for her.
10  Q. Okay. So you left her -- she maintained her
11 status of an employee of the firm?
12  A. She stayed on payroll. So I don't know what
13 that means in terms of an employee versus --
14  Q. Well, this was -- I'm sorry. I didn't mean
15 to cut you off.
16  A. That's all right. She was on an indefinite
17 leave of absence. So she was on payroll. Those are
18 the two things that I know.
19  Q. Okay.
20  A. I don't know legally if she was an employee
21 or not, to be honest.
22  Q. What health insurance plan did you have at
23 that time?
24  A. Oh, gosh, I don't know. We had Health Net at
25 one point, but I don't know if that was in California.

Page 75

1 Maybe we had Blue Cross Blue Shield out here. We had
2 different health insurance out here. I think it might
3 have been Blue Cross Blue Shield.
4  Q. Did your plan allow you to have persons on
5 the plan who were not employees of the firm?
6  A. I don't know. I don't know how they defined
7 "employee." I don't know how they defined "covered
8 person," because family members can be covered and
9 they are not employees. So I don't know how that was
10 defined.
11  Q. Only family members of employees, though;
12 right?
13  A. I don't know. I've never looked at the plan.
14  Q. Okay. You don't know -- most plans, you
15 would have to have an employee or employee's
16 dependents, you couldn't put your next-door neighbor
17 on your company's insurance plan without them being an
18 employee, but you don't know whether or not that was
19 the case for your insurance plan?
20  MR. ORTUNO: Objection. Asked and answered.
21  THE WITNESS: Yeah, I don't know what you
22 just said and if that is true or not true. To the
23 extent that she needed to be defined however she
24 needed to be defined for the health insurance, that's
25 what we were doing.

Page 76

1 BY MR. KEMP:
2  Q. Okay. Did you consider her to still be an
3 employee of the firm after she went out on this leave
4 of absence?
5  A. To the extent that she needed to be an
6 employee for health insurance, yeah.
7  Q. Okay. At what point did she stop being an
8 employee?
9  A. I don't know. We never terminated her, if
10 that's what you are asking me. It's an interesting
11 question.
12  Q. Okay. All right. I'm sorry. I digressed a
13 little bit.
14  We'll go back to Exhibit 13 now, which is a
15 one-page document that's got defendant's Bates stamp
16 1300, and this was an e-mail from Amy Buchanan to
17 Dan Watkins, Wednesday, 28 June 2017, subject "Medical
18 Update." It says:
19  "Hi, Dan. This past month's been pretty
20  rough between a bad cold/sinus infection,
21  another urgent care visit, and bad
22  side effects from meds and acupuncture. Good
23  news is I don't have an autoimmune disease as
24  suspected. Bad news is I have fibromyalgia
25  and low T3, the culprits behind my chronic

Page 77

1  pain and fatigue.  There's no cure.  It's a
2  matter of trying to manage it.  I see my
3  neurologist and pain management doctors this
4  week, and I'm waiting to see a doctor who
5  practices osteopathic medicine next week.
6       "As for work, I feel I'm at a loss.  I
7  know I can't consistently perform all the
8  firm's requirements/expectations as a
9  full-time associate, and being part-time
10 doesn't seem possible.  Let me know what your
11 thoughts are.  Best, Amy."
12      Did I read that correctly?
13 A.  Yes.
14 Q.  Okay.  I don't recall seeing -- and it might
15 just be that I missed it.  Do you recall, first of
16 all, getting this e-mail from Amy, reading it?
17 A.  Not specifically, but again I don't doubt
18 that she sent it.
19 Q.  Okay.  Do you recall any kind of response to
20 this, whether you spoke with her on the telephone,
21 sent her a text message, sent her another e-mail, any
22 way in which you communicated back to her regarding
23 this subject matter?
24 A.  I don't remember the method of communication.
25 If there is no e-mail, I'm assuming I didn't send one.

Page 78

1  I prefer to call, so that's what I'm assuming I did.
2       I do recall conversations about autoimmune
3  disease versus fibromyalgia because I remember
4  initially, when it was autoimmune disease, that was a
5  possibility that was concerning for her.
6  Q.  There's an e-mail that mentions autoimmune
7  disease.
8  A.  This one here, or previously?
9  Q.  No.  It's subsequent to this where you wrote
10 back saying, well, good news about it not being
11 autoimmune disease.
12 A.  There you go.
13 Q.  I'm sure we'll come to that.
14      But what else do you recall about
15 conversations regarding the subject matter?
16 A.  That it was good in that she was now needing
17 to figure out how to deal with this fibromyalgia and
18 low T and it seemed to have its own complications, and
19 she was in a holding pattern to figure out how she was
20 going to be able to handle it and manage it and
21 whether even law and practicing as a lawyer was going
22 to work in the context of all of that.
23      So we talked about those types of things just
24 in a general sense, not with respect to our firm, but
25 just generally, the demands of law versus where she

Page 79

1  was at and other things to do with a law degree, we
2  had considerations like that on occasion.
3       So I do recall that generally, but not any
4  one conversation in particular.
5  Q.  What about this, sort of toward the end of
6  here, where she says "being part-time doesn't seem
7  possible"?  What do you recall about discussions or
8  communications about further part-time work?
9  A.  I don't recall anything specific other than
10 that's probably an accurate impression that she had.
11 Q.  I'm sorry.  I couldn't tell if you were
12 saying "inaccurate" or "accurate."
13 A.  Accurate.
14 Q.  It is accurate what she was saying about
15 part-time wasn't going to be able to work out?
16 A.  Correct.
17 Q.  Well, what were your feelings about the
18 part-time option?
19 A.  There wasn't much -- by this point we were
20 pretty busy and there was not much of a place for
21 part-time employee or a part-time associate.  There
22 was just too much work.  And a person who can only
23 work four hours a day or five hours a day may not be
24 able to go to a depo because they've got to leave in
25 the middle of the depo or they may not be able to go

Page 80

1  to court or to mediation or to arbitration, so we
2  wanted a situation where the associates managed their
3  files top to bottom.
4       Mr. Forster at this point was working
5  diligently on the Eldorado matters and didn't have
6  much time to do extra and overflow, so we needed
7  someone to manage a file top to bottom.  That included
8  being able to work the files and make appearances and
9  go to places and do things that would sometimes
10 require more than five hours of time a day, and so it
11 was going to be really difficult.
12      When we first started it we were willing to
13 give it a try because I wanted to see Amy succeed, I
14 wanted her to help with us, and if we could help her
15 grow as an attorney, that would be good, and we wanted
16 to see if the part-time thing could work, and it just
17 was really hard to manage that.
18 Q.  So by this point, June of 2017, Mr. Forster
19 was still there; is that right?
20 A.  I'm pretty sure he had started by then.
21 Again, I didn't look that up, but -- yes, he was
22 there -- wait.  She had left in May; right?  Okay,
23 yes, he was there.
24 Q.  Okay.
25 A.  Yep.

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

Page 81

1    Q.  Was there anybody besides Mr. Forster working
2  there by the summer of 2017?
3    A.  No, no -- well, myself and Mr. Letofsky, we
4  were there very frequently during that time frame.
5    Q.  All right.  But had the firm hired
6  anyone else?
7    A.  Attorney-wise, no.
8    Q.  Or what about support staff-wise, to work in
9  the Las Vegas office specifically?
10   A.  I don't recall when Ms. Kachermeyer started.
11 It might have been around this time frame.
12   Q.  Okay.
13   A.  It was probably shortly after Ms. Buchanan
14 left in May.  It might have been -- is this June --
15 yeah, she might have been on, working then.
16   Q.  Okay.
17   A.  I think as a stopgap we found someone who was
18 a paralegal that could be trained pretty quickly.  So
19 I think Ms. Kachermeyer started around that time.  We
20 had handed a bunch of the files to Ms. Naleway to
21 transition and sit in the California office, but
22 Ms. Naleway couldn't perform any work on those because
23 she's not licensed in Nevada.
24   Q.  Ms. Naleway, would you spell that?
25   A.  N-a-l-e-w-a-y.

Page 82

1    Q.  Do you have a first name for her?
2    A.  Nicole.
3    Q.  Nicole, okay.
4    A.  So we needed somebody to be able to help
5  process, file documents and things of that nature.  So
6  it would have been around this time that
7  Ms. Kachermeyer started, I'm pretty sure.
8    Q.  So before we go any further, then, I want to
9  just -- we kind of started talking about the topics
10 that are roughly numbers 2 through 5 in the deposition
11 notice.
12      So at this second period, after she comes
13 back in December of 2016, she works up through into
14 May of 2017, and then goes on this what you have
15 termed an indefinite leave of absence because of her
16 health.
17      When did you stop reporting her as being an
18 employee of the firm?
19   A.  What do you mean by "reporting"?
20   Q.  Well, I mean -- make this Exhibit 14.
21      (Exhibit 14 was marked for identification.)
22 BY MR. KEMP:
23   Q.  Exhibit 14 is plaintiff's number 10129.  I
24 did see this, I think, in your disclosures as well.
25 It's "Watkins & Letofsky, LLP Company Information,"

Page 83

1  and it shows, I believe, people that are, you know,
2  working, looks like a company roster; right?  And then
3  it mentions former staff members at the bottom, and
4  Amy Buchanan is listed among those former.  There's no
5  date on it, so I'm not sure what the...
6      MR. ORTUNO:  Yeah, I want to object just to
7  say that I don't believe this is in our disclosures, I
8  don't think I've ever seen this document before.  I
9  could be mistaken, but I --
10     THE WITNESS:  I don't see a date.
11     MR. ORTUNO:  -- just wanted to put that out
12 there.
13     THE WITNESS:  Yeah, I don't know, in terms of
14 dating.
15     MR. KEMP:  I have to go back because I think
16 there was, in the supplemental initial disclosures
17 that came on November 5th, a mention of this document
18 and the date, but I'd have to go back and look for
19 sure.
20   Q.  But -- so I was just wondering, based on your
21 recollection and knowledge, at what point did
22 Amy Buchanan become a former staff member?
23   A.  Well, as I'm looking at this, it refers to
24 Amy reassigned as of 9/1, those are her files, "due to
25 medical reasons, refer calls to Dan."  My guess is

Page 84

1  this talks about the Sean Sullivan office, so at least
2  until June of 2016.
3      So my guess is this is in reference to that
4  time period when she left in September of 2016.  Some
5  of these names go way back.
6    Q.  Okay.  So you think this would have been
7  after -- okay.  So after she resigned on 9/1?
8    A.  Yeah.
9    Q.  Okay.  But before she would have come back?
10   A.  Correct.
11   Q.  Okay.  All right.  That explains that.
12      But do you have a similar list now that shows
13 her as being a former employee?
14   A.  No.  I haven't seen an updated roster in a
15 long time, and I don't think -- I'm surprised that we
16 had former employees listed there.  I'm not sure why
17 we would have done that.
18      But this isn't something I prepared.  I think
19 this is more of a sheet that Susan Watkins prepares
20 for her own reference related to payroll and some of
21 the payments that we had been making, things of that
22 nature.  So I don't know that we have a current one
23 like this, I don't think we do, where it references
24 former employees.
25   Q.  Okay.  So you --

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

Page 85

1    A.  That wouldn't serve any purpose for me, so I
2  don't have one.
3    Q.  Okay.  Do you know why these -- on the former
4  employees it's got initials.  I believe "DRW" is you,
5  "BSL" is Mr. Letofsky, and I don't know who "ED" is,
6  but there's like -- it just mentions these.
7        Is that who the primary supervisor was of
8  these people?  That's what it seemed like to me.
9    A.  Yeah, that's how we generally did it.  I'm
10  trying to see if there is anyone that's not --
11  (Document review.)  Oh, that's Evie.
12        Yes, that's what it generally refers to.
13  There were two non-attorneys in here.  Evie doesn't
14  have one listed, so she would have been supervised by
15  both Brian and myself, Mr. Letofsky, and then Katrina
16  McIntosh was Mr. Letofsky's secretary.
17        So yes, that's who their direct supervisor
18  was.  I use that loosely, though, because in the
19  context of working with associates, Mr. Letofsky can
20  and does talk to associates working on my files to
21  assist them in roundtables and things like that and I
22  do the same to his, so...
23    Q.  Sure.  It makes sense.
24    A.  But, yeah, in terms of who they are going to
25  go to for the immediate question, that would be

Page 86

1  probably a correct assignment.
2    Q.  Okay.  Of the people that are listed in the,
3  for lack of a better term, the chart or the box up
4  here --
5    A.  Right.
6    Q.  -- are any of those people no longer working
7  with you now?
8    A.  Mr. Mousmoules, Ms. Hagerty, Ms. Askander,
9  Ms. Dilts, Ms. DiVincenzo, Ms. Gallardo, those have
10  all moved on.
11    Q.  Okay.  For the record I'm going to ask, do
12  you remember when those people moved on?
13    A.  No, I don't.
14    Q.  Any of the former staff members, do you
15  recall when any of those people left the firm?
16    A.  Sometime after Ms. Buchanan went out in
17  September 2016, is about the best I can tell you.
18    Q.  All right.  Okay.  So the people that are in
19  the box up here (indicating), they would have been
20  after September 1st -- 2nd, 2016, actually, her
21  resignation date.
22    A.  Okay.
23    Q.  But the people at the bottom that are listed
24  as former staff members, do you remember when any of
25  those people left?  I don't expect you to have --

Page 87

1    A.  No, I don't.  I'm surprised.  I'm looking at
2  these.  I don't remember Ms. Habibi or Everson or
3  Mr. Na leaving before Ms. Buchanan.  That's odd.  So I
4  don't know.  I really have no clue.
5    Q.  Okay.  I don't see Eran Forster listed here,
6  so -- and I think my information is Mr. Forster
7  probably started around October of 2016, like shortly
8  after Ms. Buchanan resigned.
9        Does that refresh your recollection?  Do you
10  remember?  Before you said you couldn't remember --
11    A.  Oh, in terms of when he started?
12    Q.  Yes.
13    A.  That makes sense.  If Ms. Buchanan left in
14  September and you are telling me that you have
15  information it's October, I wouldn't dispute that.  I
16  seem to recall that Ms. Buchanan introduced me to
17  Mr. Forster, and that was kind of how that connection
18  was made.  So that would make sense, in her
19  transitioning out, we met and he agreed to work for
20  us.
21    Q.  And since he doesn't appear on the list here,
22  I mean, it might make some sense that this was done
23  sometime in September before he arrived in October?
24    A.  Well, I don't know if this list was intended
25  to capture Nevada, but he's not on the list.  So --

Page 88

1    Q.  But the Las Vegas office is listed and it
2  talks about Amy and it lists Amy as a former staff
3  member, so...
4    A.  That's true.  Like I said, I don't know what
5  the intent was.  I didn't draft this.
6    Q.  Okay.
7    A.  But it would -- wouldn't surprise me if
8  Mr. Forster came on shortly after that.
9    Q.  Okay.  Amy wasn't terminated from her job for
10  any misconduct or poor work performance, was she?
11    A.  Correct.
12    Q.  Okay.  And to the extent that Amy's
13  employment did end, what would you assign as being the
14  reason for that?
15    A.  She needed to go get medical treatment.
16    Q.  All right.  Did you consider that she
17  resigned, or did you terminate her employment?
18    A.  Neither.  We didn't terminate her at that
19  point and I didn't sense that she was resigning.  She
20  was going to go see if she could get some treatment
21  and figure out what was going on and work her way back
22  into practicing law and if that was going to be a good
23  fit going forward.
24    Q.  Okay.
25    A.  There was no -- it was an unknown.  I mean,

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

Page 89

1  her last sentence in that e-mail states very clearly
2  where we were with it, what's left for her in the
3  future remains to be seen; that's how I felt about it
4  when she left.
5     Q.  Right.  That was on --
6     A.  Whichever one it was.
7     Q.  I think it was 12, actually.
8     A.  Yes.  So when she went on leave, that last
9  sentence "and what I can do is something to be figured
10 out" is where we left it.  Very vague.
11    Q.  All right.  So from your perspective, there
12 was no conscious decision to terminate her employment?
13    A.  Right.
14    Q.  Okay.
15    A.  Well, by me.
16    Q.  Okay.
17    A.  I don't know her thinking.
18    Q.  In terms of the firm, though.
19    A.  Yes, that's correct.
20    Q.  The firm never made a conscious decision to
21 end her employment?
22    A.  That's correct.
23    Q.  All right.  Did you have any discussions with
24 Mr. Letofsky or the office manager, Nancy, or your
25 wife, Susan?  I can't remember what her role was

Page 90

1  exactly.
2     A.  Controller, basically.
3     Q.  Controller.
4        Did you have any discussions amongst any of
5  you all about how she is "not an employee here
6  anymore"?
7     A.  No -- well, at any point in time I'm sure
8  that came up after we were sued by her, I assumed it
9  was over, and I'm sure...
10    Q.  Nothing other than that, though?
11    A.  I'm trying to piece together when the -- I
12 don't remember the events and the chronology.  There
13 was a labor board complaint.  She wanted pay.  And
14 then there was, I think, I seem to recall an EEOC
15 complaint, I would assume by the EEOC filing.
16 Basically, the language in that, that it was over;
17 that would probably be when it was crystal-clear.
18    Q.  Okay.
19    A.  I don't have it in front of me, but that
20 would be a point in time when we could have come to
21 that conclusion.
22       MR. KEMP:  All right.  Since it came up,
23 we'll make this as an exhibit now, Exhibit 15.
24       (Exhibit 15 was marked for identification.)
25       MR. KEMP:  So this is a charge of

Page 91

1  discrimination, Nevada Equal Rights Commission had,
2  September 4, 2018.
3     Q.  Is this the charge that you were speaking
4  about?
5     A.  Well, there was additional documents, because
6  the EEOC made a decision on it and sent those things
7  as well.  But yes, this is part of that.
8     Q.  Right.  The EEOC would have done that later.
9  This was dual-filed with the Nevada Rights Commission
10 and the EEOC, is my understanding of it.  It's got --
11    A.  And I was using it interchangeably.  There
12 were additional documents related to this charge, but
13 this is part of that, yes.
14    Q.  Right.  This is the EEOC form 5 that they
15 used for the formal charge of discrimination that they
16 type up and have her sign?
17    A.  Correct.
18    Q.  There would be other documents related to the
19 charge, certainly, but...
20    A.  You were asking me about triggers to the
21 thought that she was no longer employed definitively,
22 and so this would be one of those things that would
23 come to mind.
24    Q.  Okay.  Was there anything before this time?
25 This is September 2018.  So this is like a whole year

Page 92

1  after when we were talking about it, I think.
2     A.  Yeah, I don't recall when we were talking, to
3  be honest with you.
4     Q.  Okay.  Now, we moved a little bit, but
5  September 2nd, 2017 -- '16 -- I'm sorry.  Now I got
6  myself confused.
7        So it's in May of 2017 that she goes out on
8  this leave.
9     A.  Uh-huh.
10    Q.  And then I understand that there was, in the
11 fall of 2017, I think there was the labor commissioner
12 complaint that she filed, and then we have this Nevada
13 Equal Rights Commission, the formal charge filed
14 September 4th, 2018.  She would have gone to them
15 before that, because it takes a while to meet with
16 them and so forth.
17    A.  So there was a -- some communications in
18 August of '17 as well in which she described her
19 ability to come back at four hours.
20    Q.  Right.
21    A.  And we weren't able to do that.  It was just
22 there wasn't any way to fit that in.  By that time we
23 had a new -- another associate working, if my memory
24 serves, and there just wasn't anyplace to put a
25 part-time associate, because we needed, two reasons,

Daniel R. Watkins, Esq.                     Amy Buchanan v. Watkins & Letofsky, LLP

Page 93

1  one, there probably wasn't enough work, but two, we
2  wanted them to be able to handle top to bottom on the
3  file, which meant take care of all of the appearances
4  and not be a project or contract type of attorney that
5  didn't fit well with a small office. We needed full
6  management.
7      So in August we did have that discussion, and
8  I don't remember -- I think we got some doctors' notes
9  back then, and we did discuss that that probably
10 wasn't a good fit at that time. So I guess we could
11 say that would be a time where her employment ended.
12     So it was never really specifically
13 discussed. I don't remember hearing from Ms. Buchanan
14 much after August of 2017 on employment and coming
15 back to work.
16     Q. So based on what you just talked through
17 there, then you would think that her employment ended
18 as of when?
19     A. Well, I'm trying to figure out, I mean, what
20 she was thinking too, but I could see -- we never made
21 it clear "termination," I never said to her "your
22 employment is terminated." It was just she kind of
23 didn't come back to work, and that was in August when
24 we talked about her ability to come back was limited
25 to four hours. There wasn't a fit then. We had

Page 94

1  somebody already in place. There was nowhere to put
2  her, so there wasn't any way to get her back into
3  active employment, so it just sat and nothing happened
4  after that.
5      Q. When she came back -- going back to the fall
6  of 2016 now, she resigned September 2nd and she comes
7  back in December, and we saw an e-mail here earlier
8  where you talked about putting her back on the E&O
9  insurance. When did you take her off of the E&O
10 insurance after May of 2017 when she went on the
11 leave?
12     A. I have no idea. I did not look that up.
13 We -- that is the reason it came up, that e-mail, that
14 is the one like checklist item that's not on the
15 checklist.
16     Q. Sure.
17     A. And people stay off for a long time. They
18 get added on and we don't do the take-them-off form
19 until the next revolution of applications. That
20 happens frequently. So I -- there was never -- that's
21 probably one thing we should work on, but we leave
22 people on there a lot of times until we re-up for
23 another year.
24     Q. Do you know when your year renews?
25     A. November, I think it's November each year.

Page 95

1      Q. Oh, okay. So you think by November of 2017,
2  then, you would have probably taken her off because
3  she wasn't working?
4      A. Well, it makes sense by then. If we hadn't
5  had her in the office since May and August time frame,
6  when we talked about part-time didn't work and there
7  was no real bubbling up of an opportunity to come back
8  and no discussions, I can see us doing that; I would
9  assume that's what happened. I don't really handle
10 the E&O side. That goes through Ms. Letofsky; she
11 does all the add and drop forms. But that would make
12 sense if that happened in November as well.
13     Q. Okay. We made mention of a couple of things.
14 I've got doctors' notes here we're going to look at.
15     One thing, before I forget, because you
16 mentioned that you had another associate working by
17 some point, and I think you were talking about the
18 fall 2017. Who was the associate that you hired at
19 that point?
20     A. Theresa Santos, T-h-e-r-e-s-a. I didn't look
21 up her start time. It was in that fall period of
22 2017.
23     Q. Okay. Does she still work for you today?
24     A. She does.
25     Q. I know her husband.

Page 96

1      A. Cory. He's a good guy.
2      MR. KEMP: Make that 16.
3      (Exhibit 16 was marked for identification.)
4      MR. KEMP: So Exhibit 16, we've got three
5  pages. There's a note from Dr. McKinnon dated
6  July 12th, 2017; there's a note from Dr. Pfau,
7  P-f-a-u, dated July 17th, 2017; and on a prescription
8  pad, a note from Dr. Jeffrey Ziegler dated
9  August 21st, 2017.
10     Q. Do you recall receiving these before?
11     A. I do.
12     Q. Okay. Were these notes that Ms. Buchanan
13 gave you regarding her physical condition?
14     A. Yes.
15     Q. Dr. Pfau, on the second page of this, says
16 that she should be working no more than four hours per
17 day and that they expected that to continue for the
18 next six months.
19     So it does indicate that as of July 17th she
20 was able to work but just only able to work a reduced
21 schedule?
22     A. Right.
23     Q. And at that point you didn't feel that you
24 could accommodate her with a reduced schedule?
25     A. No, because it says she is unable to work,

Page 97

1 unable to work more than four hours a day, which means
2 at four days a day to me it's over, if we're going to
3 go by this and we're going to be able to really
4 accommodate it on a part-time basis and there's just
5 too many things that that gets in the way of in the
6 practice of law as an associate managing a file, on
7 top of the workload itself just in the file
8 number that we had.
9    Q. Okay.
10    A. That's not to say that at some point in time
11 in the future there might be a place for that, but it
12 was going to always be a challenge to have somebody
13 manage a file who may not be able to stay somewhere
14 more than four hours. I mean, you can't walk out of a
15 federal court ENE at the four-hour mark.
16    Q. Okay. Now, the next note from Dr. Ziegler,
17 which was about a month later on August 21st, it says
18 she would do well to limit her work to 20 hours, her
19 workweek to 20 hours. Excuse me.
20    So that's a little bit different. It's not
21 just 4 hours a day, but it's 20 hours a week, but by
22 that point what was your position on being able to
23 accommodate 20 hours per week?
24    A. Now we're in conflicting accommodations.
25 I've got Dr. Pfau saying six months of four hours a

Page 98

1 day and Dr. Ziegler saying 20 hours a week. To me,
2 the only way to reconcile that is to keep it -- they
3 are the same only if you keep it to four hours a day.
4    I don't recall -- I recall receiving these,
5 because we had talked and she was -- you know, again,
6 it goes back. Ms. Buchanan has a desire to practice
7 law and to be -- and her drive is there, and I'm very
8 happy that she found a place that works. We didn't
9 have a model as a small office that would allow for
10 this, but she wanted to try and that's why she sent
11 these, and where I was going is I can't remember if
12 these came all in one e-mail or if they came
13 separately, but it was somewhere in here -- it may
14 have been by this August 1 that Ms. Santos had
15 started. I don't recall if she had started in July.
16    So I know it came with an e-mail. I just
17 don't recall without that e-mail when they came in,
18 but this is the more -- Dr. Pfau's accommodations the
19 more restrictive, which would be the one that would
20 control, from my speculative.
21    Q. Even though the other one is later in time?
22    A. It's later in time, but it's not consistent
23 with Dr. Pfau, who says four hours a day.
24    Q. Right. Okay. Did you ever ask for any
25 clarification with these?

Page 99

1    A. Not from the doctors, and I didn't ask
2 Ms. Buchanan to get it from the doctors.
3    Q. Okay. Would that be because you just didn't
4 feel like you could support a 20-hour-per-week
5 part-time schedule at that point?
6    A. I lost you. I'm sorry. I don't understand.
7    Q. Well, my question kind of assumes that you
8 gave it any consideration, and you might not have, but
9 would it have made any difference? Because at this
10 point it seems like you felt you couldn't accommodate
11 the part-time schedule anyway, whether it was 20 hours
12 or 4 hours a day, you know.
13    MR. ORTUNO: Object to form.
14    THE WITNESS: Yes, my thinking at this point
15 was that we weren't able to do it, it wasn't a fit
16 before, it wasn't going to be a fit at this time
17 because it was even busier. So I didn't -- it didn't
18 seem that that was going to work.
19 BY MR. KEMP:
20    Q. It was just there was so much work, she
21 didn't work out before, having to work the reduced
22 schedule, so it wasn't going to work going forward?
23    A. Right. The volume of work and then the tasks
24 that were required, having many of those exceed
25 four hours a day, we're going to be in deposition more

Page 100

1 than four hours today, we were in her deposition far
2 in excess of four hours that day, it would be -- I
3 mean, it's really burdensome to ask another associate
4 to pick up those longer events, to dive into a file
5 they have no knowledge of and handle those. And for
6 me, it would be extremely burdensome to just -- you
7 know, running all over the place. So to go to an ENE,
8 take a percipient witness depo was going to be really
9 difficult to manage.
10    Q. Okay. All right. So then, in terms of the
11 actual reason -- assuming that her employment did end
12 with you and assuming that it ended during the time
13 period you talked about, the reason is because she
14 couldn't work full-time and you didn't have any
15 part-time schedule that you could give her; is that
16 fair to say that that was the reason why it ended?
17    A. I think that summarizes it well. There's
18 probably more particulars to it, but yeah. I mean,
19 we're always trying to -- you know, when we say an
20 indefinite leave, that leaves open the idea that
21 things change and the situation develops.
22    So I never viewed her time with us as
23 concretely over until -- well, I never viewed it until
24 the later actions, but this is when I recognized at
25 least for six months we weren't going to be able to do

1 anything.
2   Whether something after six months could
3 develop, I would be happy to talk to her.  And I was
4 always direct with her, like I always told her that.
5 That's why she came back and we tried it initially.
6 So we get the letter in July, and for me, my thinking
7 is she's not going to work for at least six months,
8 we'll see where we're at when that happens.
9  Q.  And in terms of number 5, the identity
10 of the people participating in this decision-making
11 process, to the extent it was one, it seems like it
12 was mostly you, or did Mr. Letofsky play any role?  If
13 so, what was that?
14  A.  No.  All decisions --
15  Q.  A lot of questions all in one but...
16  A.  The simple answer is Mr. Letofsky and I
17 discuss all employment-related decisions like how to
18 handle this.  We would discuss whether there was a way
19 to handle the workflow under the reduced schedule.  We
20 talked about that.  But yes, so he's involved, but I'm
21 the one ultimately who said we can't do it.
22  Q.  Okay.
23  A.  Because I had my hands on the files.  I'm
24 trying to remember.  This was an intensely busy time
25 because the Eldorado files were cranking and we were

1 both out here a lot and it was a very busy time.
2 Mr. Forster was pushed to the max.  It was just the
3 way to try and get the office going.
4  Q.  Okay.  Number 10 on the list talks about the
5 facts and circumstances surrounding defendant's
6 knowledge and understanding of plaintiff's work
7 restrictions given by her doctors at any time during
8 her employment.
9  Other than these notes here, were you ever
10 provided with any other doctors' notes that you can
11 recall?
12  A.  No.
13  Q.  Do these notes here pretty much summarize
14 what knowledge you had of her restrictions?
15  A.  No.  Only for that point in time.
16 Ms. Buchanan and I talked at length throughout her
17 employment on her restrictions.  She was the one
18 relaying what she needed in terms of time at work.  I
19 didn't need to verify it from an employer until she
20 was away because she went away to try and
21 figure things out.  At that point it felt like, well,
22 let's see what the doctors are saying.  So that's the
23 first time we asked for notes, but I pretty much
24 relied on her to relay to me what she wanted to do.
25  Q.  Okay.  Did you have any reason to doubt what

1 she was telling you?
2  A.  Oh, no, no.  I mean, we saw it, Mr. Forster
3 saw it firsthand frequently.
4  Q.  Okay.  So you had discussions with
5 Mr. Forster about what he saw her experiencing?
6  A.  Not in depth, but certainly he reported to me
7 she's not doing well today, she's sick.  We talked
8 about that a lot, sure.
9  Q.  Okay.
10  A.  A lot in the sense that when it happened, but
11 I didn't go into detail with him on anything like
12 that.  He didn't supervise her, had no -- didn't
13 supervise her at all.
14  Q.  Okay.  So the extent of your knowledge was
15 what she told you up until this point and then what
16 you got from the doctors.  Anything else?  Any
17 other --
18  A.  On her medical conditions?
19  Q.  Yes.
20  A.  Correct.
21  MR. KEMP:  Okay.  All right.  Let's go off
22 the record.
23  (Recess taken.)
24  MR. KEMP:  Go back on the record.
25  Q.  I would remind you you are still under oath.

1 Okay?
2  A.  Yes.
3  Q.  All right.  The -- with respect to the time
4 period in summer of 2017 when she was providing you
5 with the doctors' notes, and I believe there was some
6 discussion about whether or not she could come back to
7 work four hours a day.  Is that...
8  A.  I don't specifically recall that.  I
9 generally recall that we did and assume that we did.
10  Q.  Do you recall there was any discussions about
11 perhaps hiring some other support staff that would
12 help in basically her ability to come back to work?
13  A.  No, because it wouldn't help her on the
14 four-hour limit.
15  Q.  Okay.  Was there -- did you discuss with her
16 possibly hiring another associate attorney that
17 between the two of them they could kind of work
18 together, like two part-time people, anything like
19 that?
20  A.  No, because they still would manage a file
21 and both would be limited then in their ability to
22 handle four-hour-or-more issues.
23  Q.  But in terms of that, for example, with the
24 Eldorado cases, wasn't it the case that you would have
25 people jump in to help on those that weren't

Daniel R. Watkins, Esq.                                   Amy Buchanan v. Watkins & Letofsky, LLP

Page 105

1   necessarily running the case from top to bottom, that
2   they were just helping out on particular aspects of
3   the Eldorado case?
4        A.  Yes.
5        MR. KEMP:  Let's mark this next one.
6        (Exhibit 17 was marked for identification.)
7        MR. KEMP:  So Exhibit 17 is an e-mail chain.
8   I think some of this we might have seen before.  It
9   picks up from one we looked at before.  Yeah.  So the
10  last one, I think we've seen that one, where she is
11  talking about no autoimmune disease but it's
12  fibromyalgia and low T3.  That's the -- on this
13  Bates stamp page 1339.  And for the record, Exhibit 17
14  is defendant's Bates stamp 1337 through 1339.  And
15  then we mentioned that there were -- there was a
16  response to that, and that we find that here, the
17  June 29th e-mail that's in the middle of 1438.
18       Q.  Looks like you responded to her.  It says:
19            "Hey, Amy.  Thanks for the update.
20       Sorry to hear about the continuing pain.
21       Good news re autoimmune disease not being a
22       problem.  As for work, I would recommend you
23       speak with your healthcare providers over the
24       next visits and ask them what they think
25       would be appropriate in terms of hours and

Page 106

1        the type of work and let me know what
2        restrictions they believe are appropriate and
3        we can go from there.  How does this sound?
4        Thanks, Dan."
5        Did I read that right?
6        A.  Yes.
7        Q.  And she responded on July 8th, 2017, at 2:45
8   p.m.:
9            "Hi, Dan.  I've requested letters to
10       provide for an accommodation request.  I'll
11       provide them to you once I have them."
12       Did I read that right?
13       A.  Yes.
14       Q.  Do you actually remember writing the
15  June 29th e-mail and getting the July 8th response
16  from her?
17       A.  I don't specifically recall that, but I
18  generally recall it.  I don't recall typing it and
19  receiving it and all that, but I recall that it
20  occurred.
21       Q.  You don't have any doubt it's authentic?
22       A.  Oh, no.
23       Q.  Okay.  And so that appears to maybe be what
24  led to the doctor's note that we have in Exhibit 16
25  that you provided?

Page 107

1        A.  Right.
2        Q.  She responds then again on August 14th, 6:55
3   p.m.:
4            "I've attached two letters.  I'm still
5        waiting for letters from my other medical
6        providers despite my multiple requests.
7        Meanwhile here are links to recommended
8        accommodations from the Job Accommodation
9        Network re employees such as myself with
10       chronic pain, fibromyalgia and migraines."
11       So then that that I just read is at the top
12  of 1338.  Did I read that right?
13       A.  Yes.
14       Q.  Do you recall receiving this e-mail with the
15  links that she provided?
16       A.  That I recall, uh-huh.
17       Q.  Did you look at the links?
18       A.  I did.
19       Q.  Did you consider the accommodations that were
20  recommended by the Job Accommodation Network?
21       A.  I reviewed them.  I don't know what you mean
22  by "considered."  They didn't seem to work in the
23  context of what work we needed done.
24       Q.  My question is whether you looked at them,
25  considered them, and apparently rejected them because

Page 108

1   they --
2        A.  Well, it wasn't a doctor's note either.  So I
3   guess, if you are saying did I consider them, did I
4   process the information, I did do that, yes.
5        Q.  Well, there is indication that she had
6   attached some -- these two letters --
7        A.  Right.
8        Q.  -- which I guess might be the July 12th and
9   the July 17th, but of course, by that point, August
10  14th, she didn't have the third one here from
11  Dr. Ziegler --
12       A.  Right.
13       Q.  -- because that was dated the 21st.
14       A.  So the letters would be controlling over the
15  websites, is what I was suggesting.
16       Q.  Okay.  Did you contact her back and speak
17  with her about -- well, it looks like you did, if we
18  go to the next e-mail, August 16th.  It's from you to
19  Amy, August 16th at 5:44 p.m.:
20            "Thank you for the update.  I hope you
21       are doing well.  I reviewed the documents and
22       websites.  Thank you.  Question - are you
23       requesting to return to work at four hours a
24       day?  I recall you indicating in our previous
25       conversations that you did not want to work

Daniel R. Watkins, Esq.                              Amy Buchanan v. Watkins & Letofsky, LLP

Page 109

1  limited hours.  I'm driving out to Vegas
2  tonight.  We can talk tonight if that works.
3  Call me on my cell."  And there is the
4  number.  "Or we can discuss Thursday or
5  Friday.  Let me know what works.  Thanks."
6  Did I read that right?
7  A.  You did.
8  Q.  Okay.  Did you actually speak with her
9  directly after that e-mail?  You were talking about
10 speaking with her that night.
11 A.  I don't recall.
12 Q.  Do you recall what the website suggested
13 after you --
14 A.  No.
15 Q.  Okay.  She then responds -- this is 17
16 August 2017, 16:05:
17      "Hi, Dan.  I sent you a text.  I'm
18  confused as to me not wanting to work
19  limited hours as I've requested a part-time
20  schedule from the time I returned to the firm
21  and I would notify you if my hours could
22  increase health permitting.  I started with
23  Monday through Thursday, 5 hours a day and
24  then agreed to 9:00 a.m. to 5:00 p.m.
25  starting on March 1st.  Unfortunately, my

Page 110

1  health was not improved, and my doctors
2  recommend I work part-time, preferably
3  20 hours per week for the time being.  My
4  concern is whether this is possible as I was
5  consistently working additional hours."
6  Did I read that correctly?
7  A.  Yes.
8  Q.  Okay.  So it looks like she's asking to work
9  the reduced schedule; is that fair to say?
10 MR. ORTUNO:  Objection.  Calls for
11 speculation.
12 MR. KEMP:  Let me rephrase the question.
13 Q.  Did you understand this e-mail from her --
14 let me back up.
15 Did you receive this e-mail from her?
16 A.  Yes.
17 Q.  All right.  When you read the e-mail, was it
18 your understanding that she was asking to work a
19 part-time schedule and that was in response to your
20 questions whether or not she was asking for four hours
21 a day?
22 A.  Yes.
23 Q.  Okay.  She says, "My concern is whether this
24 is possible as I was consistently working
25 additional hours."

Page 111

1  And that goes back to where she was, even
2  though she was on the part-time reduced schedule
3  before, she couldn't get everything done in time and
4  she was ending up working more hours.  Is that your
5  understanding of what she's talking about?
6  MR. ORTUNO:  Objection.  Assumes evidence not
7  in the testimony.
8  THE WITNESS:  Can you read the question back.
9  (Record read by reporter as follows:
10     "QUESTION:  Okay.  She says, 'My concern
11  is whether this is possible as I was
12  consistently working additional hours.'
13     "And that goes back to where she was,
14  even though she was on the part-time reduced
15  schedule before, she couldn't get everything
16  done in time and she was ending up working
17  more hours.  Is that your understanding of
18  what she's talking about?")
19 THE WITNESS:  Her concern, is that what you're
20 talking about?
21 BY MR. KEMP:
22 Q.  Right, her concern.
23 A.  Yes, I think it was her concern.
24 Q.  Okay.  And it was true that she was having to
25 work additional hours because she couldn't get

Page 112

1  everything done and --
2  A.  What do you mean by "having to"?
3  Q.  Well, as an attorney, you have to accomplish
4  the work; right?  You have to get things finished.
5  And she wasn't able to finish it in the time period
6  that was provided.  That would seem to be a problem, a
7  recurring problem, was it not?
8  MR. ORTUNO:  Object to form.
9  THE WITNESS:  I still don't know what you
10 mean by "have to get it done" and when you say "the
11 work" that is pretty broad to the entire working of a
12 file.  So I'm not sure I'm following you.
13 BY MR. KEMP:
14 Q.  Okay.  The work of practicing law, working on
15 a file, representing a client, there are tasks that
16 have to be done.  Are you with me so far?
17 A.  Yes.
18 Q.  Okay.  And the concern was that she was not
19 able to accomplish the tasks that had to be done to
20 represent the client and work the file in the time
21 that she was working.  That was her concern; right?
22 MR. ORTUNO:  Objection.
23 THE WITNESS:  No, it was a general, both of
24 our concerns, yes.
25 //

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

Page 113

1  BY MR. KEMP:
2      Q. Okay.
3      A. The tasks associated with the file
4  management, yes.
5      Q. Because rather than sticking to the time
6  period that she was supposed to be working, the
7  20 hours a week, she was working in excess of that?
8      A. She did do that, yes.
9      Q. Okay. And so that's what she's expressing.
10 It might not be possible to limit it to the 20 hours
11 because when she was trying to do it before, it wasn't
12 working out; right?
13     MR. ORTUNO: Objection. Calls for
14 speculation.
15     THE WITNESS: You mean in trying to do the
16 work within the limited time that she was allowed to
17 work?
18 BY MR. KEMP:
19     Q. Right.
20     A. That's correct.
21     Q. She wasn't able to do that. That was --
22     A. Correct.
23     Q. -- an ongoing concern, that if she came back
24 and agreed to the 20 hours, that she would end up
25 working more time. Was that your understanding of

Page 114

1  what she was talking about here?
2      MR. ORTUNO: Again objection. Calls for
3  speculation.
4      THE WITNESS: No.
5  BY MR. KEMP:
6      Q. No. What was your understanding?
7      A. Her concern was that -- wasn't that she had
8  to work more time. It's that she couldn't fulfill the
9  requirements of the job, which were attending depos,
10 doing those things, working up a file.
11     So when she says, "I'm confused as to what --
12 as to me not wanting to work limited hours," what she
13 had repeatedly stated goes back to her frustration
14 that focus, fatigue, migraines, concentration were
15 limited and that was limiting her ability to do all
16 the things that were necessary on the file.
17     She had to -- supposed to limit it to
18 four hours. She chose not to do that. We never told
19 her to work past those four hours, in an effort
20 through that drive to try and get things done.
21     So the concern wasn't that it was more from a
22 production perspective. She was concerned that in the
23 limited time she wouldn't be able to do all of the
24 tasks necessary on the file as opposed to being
25 concerned that, going back, she would have to work

Page 115

1  extra hours as a requirement from us. I don't know if
2  you understand that distinction, but maybe it's not
3  clear.
4      The conversation I was referring to there was
5  that we had talked a lot about this. The accident
6  leading to these problems when she's trying to start
7  up her career and how to manage that, and she was very
8  frustrated, and she didn't want to work limited hours
9  because she wanted to work full-time hours and
10 limited hours didn't allow her to do all the things
11 she could do if she worked full-time hours. So that's
12 what we were talking about. It was her frustration
13 there.
14     And that's what I'm referring to when she
15 says that she wasn't -- she was frustrated by having
16 to work only four hours a day. So that's what I was
17 referring to. And then -- yeah, so that's what I was
18 referring to in response to her statement, and then
19 where she says she's confused as to not wanting to
20 work.
21     Q. She was requesting it, that's what she says
22 in the next part of that sentence, that she was
23 requesting a part-time schedule.
24     A. Oh, sure. No. That's my point. She was
25 requesting a part-time schedule, but we had previously

Page 116

1  talked about the frustration that that presented for
2  her. In addition to the fact that we couldn't get
3  everything done, it was very frustrating for her to
4  work part-time. We had this conversation a lot,
5  because she wanted to be able to do more, but she
6  couldn't because of the fatigue and all of those
7  things.
8      So I was asking, "Are you asking me to go
9  back to the frustrational situation you were in
10 before? That's what I'm not tracking. Is that what
11 you are asking me to do?" That's how I was thinking
12 about it. Like, she wants to go back to what she
13 knows wasn't workable. I wanted clarification, is
14 that what you are asking me with these doctors' notes?
15 Because she just sent me the notes. She didn't say
16 anything about that at the time.
17     So I was clarifying, "Are you wanting to do
18 what the doctors' notes are saying, which is limited
19 to four hours a day?" The reason I was asking that is
20 because we had talked previously about how that was a
21 frustrating and hard time for her, and it seemed -- I
22 wanted to make sure she really wanted to go back to
23 that because I didn't think she would want to, if that
24 makes sense.
25     Q. Somewhat, but I'm a little confused because

Page 117

1 she clearly seems to be saying the doctor said I can
2 work 20 hours per week, which indicates that she wants
3 to do that, but then she says the concern is whether
4 or not it's possible.
5    A. Right.
6    Q. Because she was consistently working
7 additional hours before.
8    A. Right.
9    Q. So again --
10   A. Hence her frustration. So her concern is her
11 frustration in the situation of having to work
12 additional hours to complete all of the tasks but not
13 being able to accomplish that, and so I was asking for
14 clarification, are you asking to go back to that
15 situation.
16   Q. And we may be talking about the same thing.
17 She's basically saying all of the work that you are
18 going to want me to do I can't accomplish in the time
19 period because I couldn't do it before and ended up
20 working more hours, and so that seems to be the issue,
21 is that what you would have wanted her to do and
22 accomplish couldn't be done in the limited time.
23   A. What the position required was more than she
24 was able to do, and we could learn that through the
25 previous experience, and that's why I was wondering

Page 118

1 why you want to go back to that.
2    Q. Okay.
3    A. That was only half of the equation.
4       The other half was, practically speaking,
5 whether it would even work, and I didn't think it
6 would.
7    Q. Well, and then that comes back to -- I asked
8 you this. I think you said you didn't recall.
9       She I think would -- I'm going to represent
10 to you that I think she would testify that she spoke
11 to you about having another associate and maybe a
12 part-time associate or a support staff person that
13 would help in getting the work done, would permit her
14 to work these reduced hours that her doctors were
15 requesting. I think you said you didn't believe that
16 those conversations took place?
17   A. I don't remember saying that. She just
18 testified to it a few weeks ago or whatever it was. I
19 don't recall saying I don't remember that.
20   Q. I thought, when I asked you just a little bit
21 ago, you said no, she never talked to me about
22 bringing on support staff or another associate.
23   A. I don't know if that's how the question was
24 phrased, but regardless, we can clarify it here.
25   Q. Okay.

Page 119

1    A. So support staff is not going to help her
2 conduct a depo, so that's not a fix. I know the
3 part-time associate doesn't help her when she's at an
4 ENE or a depo or he's she's got a deadline and she
5 can't meet it because she's got to leave, so -- and we
6 can't have a situation where other associates are
7 picking up those pieces of the file management. It's
8 not efficient and congruent at all.
9       So to the extent that we talked, it was
10 probably brief. In my mind, I did not see that as a
11 fix. It wasn't a fix. A paralegal can't draft a
12 pleading, not many, can't evaluate medical records or
13 other records and do summaries and things of that
14 nature.
15      In a purely transactional world maybe
16 four hours a day works, but not in an appearance-based
17 litigation practice, and we couldn't have deadlines
18 get passed off at the last minute because it couldn't
19 get done in the four-hour block allotted that day.
20      So those were the limitations to staff and
21 other part-time employees.
22   Q. Okay. I just want to clarify a couple of
23 things you said.
24      In my experience -- this is my experience in
25 doing ENEs -- they do sometimes and very rarely do

Page 120

1 they go beyond three or four hours, and in terms of
2 depositions, I mean, as an accommodation you could
3 split depositions up into two different sessions. You
4 can do that stuff, can't you? Is there any reason why
5 you couldn't -- I would think that some of the
6 magistrate judges, if you told them, look, because of
7 my disability I can only go this long, that they would
8 accommodate that?
9       MR. ORTUNO: Objection. Calls for
10 speculation.
11 BY MR. KEMP:
12   Q. My question is just whether or not --
13   A. First of all, I don't want to show up and ask
14 a federal judge, based on that, to break it up and
15 have a second session on an ENE, I don't think. But
16 door to door I have a different experience than you do
17 in terms of ENE time. So door to door I'm very rarely
18 back in four hours, and so --
19   Q. In Nevada?
20   A. Oh, sure. I mean, I don't go there and
21 just -- we go there to try and resolve cases. I'm
22 there till noon frequently. And I'm talking door to
23 door. But that's just one experience. Most
24 depositions that I'm involved in in the employment
25 setting of parties, they are in excess of four hours.

Daniel R. Watkins, Esq.                    Amy Buchanan v. Watkins & Letofsky, LLP

Page 121

1  Door to door they are in excess of five or six hours.
2       So -- but beyond that, handing over -- most
3  of the time you don't want to split a depo.  I don't
4  want to take the deposition of a party to end it, to
5  let them go back, reset and come back.  That's not a
6  very good tactical way to do things either, and you
7  can't have another associate do it.
8       And if you are breaking things up like that,
9  then the schedule gets too convoluted and it's very
10 difficult to manage.  We could just not had success
11 with part-time, new associates part-time.
12      Q.  I understand what you are saying.  From a
13 tactical standpoint and from a matter of preference
14 and a matter of what would be ideal or best --
15      A.  No, that's not even that.
16      Q.  -- all of that, all of that what you said,
17 but in terms of, you know, needing to accommodate
18 somebody because they have a disability, you could do
19 some of these things, couldn't you?
20      A.  No, not -- I never couched those solutions as
21 the best result.  That's what's needed.  So four hours
22 a day, four days -- four hours a day is not doable in
23 the litigation practice that we had.  It's just not.
24 I've practiced 28 years.  You may have more years than
25 me and you may have a different type of practice.  But

Page 122

1  I have never seen that type of time/work handled --
2  I'd have to find two people; first of all, I've got to
3  get two part-time people.  Finding a part-time
4  attorney is extremely difficult, someone that just
5  wants to work four hours a day, to back-end that.
6       It's just -- you know, we had one other
7  attorney and a lot of files, and myself and
8  Mr. Letofsky, it's not doable, it's not reasonable.  I
9  can't have depos get kicked out, meetings missed.
10 Just too hard to manage.  We're too small.  We're too
11 small to do it.
12      Q.  And I assume that you never posed any
13 questions to her medical providers or asked her to
14 pose medical questions to the medical providers about
15 whether or not there would be any exceptions so that
16 like if I've got to do a deposition for seven hours,
17 can I do that on one day, if I then kind of reduce my
18 time for the rest of the week, no for lack of a better
19 term interactive process like that took place, did it?
20      A.  I disagree.  With the use of the word
21 interactive process, I think that...
22      Q.  You did ask the doctors whether or not there
23 was flexibility --
24      A.  I don't think that you can ask that and then
25 throw in interactive process as some kind of that's

Page 123

1  expected of it.  The doctor tells me in no uncertain
2  terms it's four hours a day for six months, and we had
3  previously had this discussion with her about what she
4  could do in the day and she had worked a four-hour
5  day.  So --
6       Q.  And the other doctor talks about a workweek
7  of 20 hours, so that begs the question, can the time
8  be split up, does it need to be only four hours a day,
9  and what I gather is you never asked her and you never
10 asked the doctors?
11      A.  I did not ask the doctors, and I relied on
12 Dr. Pfau's letter, which in conjunction with the
13 second letter said four hours per day, which was
14 consistent with previous statements that she had made
15 to me in terms of limiting exposure to concentration,
16 focus on documents, focus in depositions and all of
17 those things, because it triggers the fatigue,
18 headaches, migraines, et cetera.
19      Q.  Okay.  And so Dr. Ziegler's note came in
20 after the discussions that are here in Exhibit 17?
21      A.  I don't know when that came in.  It's not
22 part of the e-mail that was referred to in Exhibit 17,
23 that I can tell.
24      Q.  Right, no, she said she was still waiting for
25 one, and she got this.

Page 124

1       A.  It's attached to your exhibit, but I don't
2  see it attached to an e-mail.
3       Q.  Okay.  I thought you testified earlier that
4  you had seen it.
5       A.  I recall the notes in general.  I don't --
6  I've seen that, and I don't know -- it's not attached
7  here, so I don't know if I saw it as part of the --
8  your disclosures or where I saw it.  I have seen it.
9  I just don't recall in the timeline of things and,
10 according to the e-mails, I don't know when it came
11 in.
12      Q.  You are saying you can't -- you don't know
13 whether or not you saw this in August or September of
14 2017?
15      A.  I don't know.
16      Q.  Dr. Ziegler's note on his prescription pad.
17      A.  I don't know that I saw it in those time
18 periods without referencing this, but it doesn't
19 change my thinking that she's limited to four hours a
20 day for six months.
21      Q.  But my question was -- I think you've
22 answered it -- you never talked to the doctors about
23 it?
24      A.  No.  I wouldn't talk to them.  I don't think
25 I have a right to talk to them.  It would be her job

Page 125

1  to talk to them.
2      Q. You never asked her to talk to her doctors
3  about any flexibility in this?
4      A. Correct.
5      MR. KEMP: All right. What time have we got
6  here? We'll take a break.
7          (Lunch recess at 2:29 p.m.)
8  //
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 126

1          Las Vegas, Nevada; February 20, 2020
2                  3:09 P.M.
3              Afternoon Session
4
5      MR. KEMP: Let's go back on the record.
6
7      EXAMINATION (CONTINUING)
8
9  BY MR. KEMP:
10     Q. Picking back up to where we were at
11 topic number 11, and this has to do with, do you feel
12 that you had an interactive process with Ms. Buchanan
13 about accommodations?
14     A. Yes.
15     Q. Okay. And so what all do you consider to be
16 the communications that were part of the interactive
17 process? I know we've probably talked about a
18 number of them, but did you --
19     A. Probably most of them. We discussed, when
20 she left in September of 2016, the fact that she
21 needed to go, and we discussed even before that the
22 nature of her medical condition as it impacted her
23 work, and then she left to go get some treatment.
24         When she came back, we discussed trying to
25 work her back in on a limited basis to see if that

Page 127

1  would be successful, and the accommodation requested
2  was the limited time, so we engaged in that
3  back-and-forth and what that would look like.
4          We continued to engage in that conversation
5  related to increasing to 80 percent. We continued in
6  that conversation when she indicated that she needed
7  to take a step back and go see about what -- getting
8  things, you know, situated.
9          We had that conversation in August when she
10 indicated that she wanted to kind of go back to the
11 situation which we had already established was not
12 very workable but we talked about it then.
13         We talked about it on a very regular basis
14 with respect to her needing to leave work or having
15 time off from work to accommodate migraines, fatigue,
16 lack of concentration, doctors' appointments, all of
17 those things.
18         So we had a long and many conversations about
19 her medical condition and how to best -- how to put
20 her into the best position to succeed at work.
21     Q. Okay. And --
22     A. And that's a summary. I don't want to be
23 held to that. There's probably others, but that's a
24 summary.
25     Q. That's fine. I think we talked about a lot

Page 128

1  of it. I just kind of wanted to go back. I had
2  gotten ahead of myself in the outline just a little
3  bit.
4      A. Sure.
5      Q. So I just wanted to come back and see if
6  there was anything else about interactive process that
7  you can recall at this point that we haven't
8  discussed, and I think you have kind of --
9      A. I don't know if I -- on this last thing in
10 August, we discussed, you and I here at the end, about
11 what's reasonable in terms of accommodating a short
12 schedule.
13         And we had conversations or at least one
14 conversation, Ms. Buchanan and I, about how previously
15 that hadn't worked and I wasn't sure that going back
16 to that was going to work. We already experienced it
17 and we already realized it was not doable. So that
18 was part of those conversations as well.
19     Q. Okay. And on her end of it she sent you
20 those links from the websites from the Job
21 Accommodation Network. And I can't remember. I think
22 you disputed whether or not she talked to you about
23 additional support staff or some other help that
24 would --
25     A. I think I disputed whether it was reasonable

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

Page 129

1  to bring in support staff as an accommodation, but I
2  don't dispute -- I don't remember talking about it,
3  but I don't dispute that we talked about getting staff
4  that would certainly be part of the progression of
5  establishing an office.
6      Q.  Okay.
7      A.  And we had many conversations about the flow
8  of firm development.  We were new to Nevada and we
9  needed cases, and you can't really control that and
10  it's not like hiring a staff member is just something
11  you do.  You have got to have resources for it and
12  funding and be able to bring in a monthly salary for
13  that person and an income.  All of those things need
14  to be in place before you can do that.
15      Same thing with buying -- getting another
16  associate or what have you.  You have got to have
17  logistics to manage or to push that forward too, and
18  so we talked about that.
19      And her place in developing a new office, it
20  wasn't like she came in with an established firm with
21  a set protocol and set ways of doing things.
22      So in terms of accommodation, we were always
23  talking about managing the office, staffing, things
24  like that too, because we certainly weren't here for
25  the short-term just to have one associate.  So that

Page 130

1  was always part of the discussion.
2      Q.  Okay.  All right.  I think, number 12 we
3  touched on a little bit, but what do you consider to
4  be the essential functions of an associate attorney's
5  position with your firm?
6      MR. ORTUNO:  Objection as it calls for a
7  conclusion of law.
8      But go ahead.
9      THE WITNESS:  Well, the simplest way to say
10  it is you have to manage the files.  That's the way I
11  say it.  Within that comes completing discovery,
12  written and depositions, attending settlement
13  conferences, attending mediations, arbitrations,
14  trials if necessary, pretty much litigating the file
15  front to back.
16      I mean, we encourage our associates to do
17  that.  I think it's the best way to develop as an
18  associate and as a litigator.  So we want associates
19  on front to back, and all the essential tasks would be
20  completing the investigative and discovery process of
21  a file and then settling it and all the steps you've
22  got to do.  So it's not like it's a mechanic, it's got
23  five essential things you do.  I mean, to me, it's a
24  pretty broad thing.
25  //

Page 131

1  BY MR. KEMP:
2      Q.  Pretty much it's office work; right?  It's
3  not like hard physical labor, just for the record.  I
4  think it's pretty obvious but --
5      A.  It's not manual labor, but if you are -- I
6  think physical is an interesting term in litigation.
7  I'm sure you've had many nights where you are just
8  completely physically wiped out, and all you've done
9  is read papers all day.  So I think that there's a
10  blending of physical and mental and emotional
11  exhaustion.
12      Q.  Let me rephrase it.  It's not physical tasks,
13  like there's not heavy lifting, you don't have to be
14  able to run five miles.  That was more of what I was
15  talking about.
16      A.  Correct.
17      Q.  You will get physically tired from the mental
18  aspects of the work, sure.
19      A.  Yes.
20      Q.  Okay.
21      A.  And that was part of the issue with
22  Ms. Buchanan, is -- I don't know -- I've never
23  experienced the things she was experiencing, and so
24  there was, in managing your files and working
25  four hours, if you are in there and you just become

Page 132

1  physically exhausted on top of mentally tired and
2  you're -- so we were trying to figure that out.  I
3  didn't have a formula, by any stretch, and I don't
4  think she did either, and the whole point was to try
5  and see if we could make it work.
6      Q.  Now -- I lost my train of thought.  Give me a
7  second.
8      Oh.  The restrictions that are doctor
9  imposed, none of that said that she couldn't do any of
10  the actual work.  It was just a limitation on the
11  amount of time she could spend doing it.  Do I have
12  that right?
13      A.  I would state it differently.  I think they
14  did put a limitation on the work that she could do.
15  As to the specific tasks, they didn't say she can't
16  ask questions at a deposition or write or type
17  interrogatories or things like that.
18      Q.  I'm talking in terms of essential functions.
19  I mean, doing that particular work, they just limited
20  it to a certain amount of time?
21      A.  The restrictions were time performing the
22  functions, yes.
23      Q.  Okay.
24      A.  Or tasks.
25      Q.  Okay.  And number 13, so I think that kind of

Daniel R. Watkins, Esq.                                                Amy Buchanan v. Watkins & Letofsky, LLP

Page 133

1  covers 13.  It's not that she couldn't perform the
2  functions.  There was a limitation on how long she
3  could perform the functions for.  Do I have that
4  right?
5      A.  See, to me, performing a function of a
6  deposition is start to finish.  So she wasn't limited
7  in the ability to ask questions, but the ability to
8  sit and think through and manage documents and go an
9  extended period, she was limited.  And to me, that's
10  the function of a deposition.
11      Q.  Are you of the position, then, that anyone
12  that has a 4-hour per day or 20-hour per week time
13  limit on their work is not capable of performing the
14  essential functions of an attorney?
15      A.  No.  It was the impact of the work -- it was
16  the impact of her medical condition on her work, the
17  fatigue, the headaches, the inability to concentrate
18  and all those things that limited her ability to
19  complete the tasks start to finish.
20      And the way that they managed it was to say
21  you are limited to four hours a day of that type of
22  mental gymnastics.
23      Q.  Right.  So then would it be your position,
24  then, that she wouldn't be able to perform as an
25  associate attorney anywhere, or just at your firm?

Page 134

1      A.  I don't know what you mean by "perform as an
2  associate."
3      Q.  Well, performing the essential functions.
4  The essential functions from your position is that she
5  has to be able to do something start to finish.  So if
6  she was in federal court, she's got to be able to do
7  one full day of seven hours of deposition, and if she
8  can't do that, then she's not capable of being an
9  attorney at all?
10      A.  No.  She's clearly found a good fit in terms
11  of the requirements of her job duties at her current
12  employer.
13      Q.  Okay.  So it would just be at your -- the job
14  as it existed at your firm?
15      A.  No, I don't think it's limited to my firm at
16  all.
17      Q.  Okay.  How would you say it, then?  What jobs
18  do you think that she wouldn't be able to do?
19      A.  I would be speculating.  I've never done any
20  research or looked into that at all.  Outside of my
21  office?
22      Q.  Yeah.  I thought you just told me that you
23  thought there would be other jobs, and I was asking
24  you what those would be.
25      A.  You mean a specific law firm?  I think a

Page 135

1  similar scenario of a satellite or a new start-up
2  company with one associate and then two, trying to
3  litigate files and having to manage your files on your
4  own start to finish could not be done by a part-time
5  associate at four hours a day five days a week who was
6  very inexperienced as a lawyer in the beginning.
7      So the function of a depo for a new associate
8  is much more difficult than the function of you taking
9  a deposition.  So you can't just say she can't work
10  anywhere, but in that office, with two attorneys,
11  myself and Mr. Letofsky, and having to manage start to
12  finish on her files, it was not doable under -- with
13  her medical conditions, limiting it to four hours a
14  day.
15      Q.  How many cases was she the sole attorney from
16  your firm that was attorney of record in a case?
17      A.  I don't know off the top.  It changed from
18  time to time, but I don't know.
19      Q.  My experience when I look at firms including
20  my own, when you have an associate, you usually put a
21  partner or somebody else, you have two attorneys on
22  the case as attorneys of record.  Was that how you
23  worked it, or was she really by herself on the cases?
24      A.  I don't recall all of the pleadings, but the
25  typical way I recall us doing it was I was with her on

Page 136

1  files.
2      Q.  So there were then at least generally two
3  attorneys assigned to a file, to a case?
4      A.  Depending on what you mean "assigned," but
5  yeah, there was two attorneys on the file.
6      Q.  Okay.
7      A.  Myself and whatever associate was working the
8  file.
9      Q.  Not all depositions are more than four hours,
10  are they?
11      A.  No.
12      Q.  So wouldn't it be possible in the spirit of
13  teamwork that she could do shorter depositions and you
14  could do longer depositions?
15      A.  No.
16      Q.  That's not possible?
17      A.  No, not from start to finish on every file,
18  no.
19      Q.  Okay.
20      A.  We tried that.  I've also got files with
21  Mr. Forster and other files in California, I've only
22  got so much time.  So no.  That's why we wanted to
23  have somebody who could manage the files from start to
24  finish.
25      Q.  Okay.  With respect to 15, it talks about the

Page 137

1 contentions with respect to defendant offering
2 plaintiff to accommodate her doctors' prescribed work
3 limitations related to her medical condition. I think
4 we sort of touched on that.
5      Would you have anything to add about ways in
6 which you attempted to offer her accommodations to
7 meet the work limitations by the doctors, or do you
8 think we've covered all that?
9      A. We've certainly touched on it. I don't want
10 to be limited at some point in time in the future
11 where you say you didn't respond to this question at
12 this time with this specific fact.
13      I think we have touched base on most of those
14 things in my summary in particular, and we've touched
15 on them throughout the e-mails. So nothing comes to
16 mind as I'm reading this question I need to add as I
17 sit here right now.
18      Q. Well, I understand you can only testify about
19 what you can think of and know right now, but I'm just
20 asking you to do your best to think of anything that
21 would be responsive.
22      A. The question is overbroad if you are asking
23 me to talk about multiple -- it's compound because you
24 are asking me to talk about multiple conversations
25 regarding a continuing interactive process. So, but,

Page 138

1 yeah, I've given you the best information I have as
2 I'm sitting here now in response to that general
3 question.
4      Q. Did anybody else at defendant talk with
5 Ms. Buchanan about her doctors' restrictions and the
6 firm's ability to accommodate it or possibly
7 accommodate it?
8      A. I can only speak to myself and what I know,
9 and, no.
10      Q. Okay. You don't know of anybody else at the
11 firm who did that; right?
12      A. I do not.
13      Q. Okay.
14      A. It was just her and me and Mr. Letofsky, so I
15 don't think she ever went to him, and maybe
16 Mr. Forster, she might have talked to him, but I don't
17 recall any conversations with him on that issue.
18      Q. Okay. So 16 speaks about undue hardship, and
19 if I understand your testimony, you would consider it
20 to be an undue hardship for Ms. Buchanan to only work
21 four hours and not be able to do like longer ENEs or
22 longer depositions as part of her job?
23      A. It's not just that. It's the entire
24 management of the file. But yes, that's correct.
25      Q. Okay. So the other accommodations that she

Page 139

1 touched on, possibly additional staff and all that, do
2 you consider that to be an undue hardship as well?
3      A. Which staff are you talking about?
4      Q. If there was some support staff added or
5 there was another associate working with the firm in
6 the office.
7      A. Well, I don't think that administrative staff
8 are related at all to her performing of associate
9 attorney functions. But yes, there would be at that
10 time. We didn't have the funding for an additional
11 person to come in and work full-time or we would have
12 done it.
13      So I can't just make somebody appear in terms
14 of other associates. The question presumes that there
15 were other people willing part-time to come in and fit
16 that role. We didn't find any. I didn't do an
17 exhaustive search. But we had a difficult time
18 finding attorneys just in general on the start. But,
19 yes, so that would be difficult to find that match and
20 an undue hardship. What was the other one?
21      Q. What steps did you take to try and find
22 somebody else to come in and help out so that she
23 would be able to stay on?
24      A. On a part-time basis? I don't think we
25 looked because I didn't see that as an appropriate

Page 140

1 fit.
2      Q. All right. And so I'm clear, with respect to
3 support staff, you don't think that having support
4 staff would assist or help Ms. Buchanan to perform all
5 of her work?
6      A. No. You were talking about the essential
7 tasks of the job. I don't think an administrative
8 staff member helps with that.
9      Q. Well, wouldn't an administrative or support
10 staff person, paralegal, legal assistant, wouldn't
11 that person be able to do some of the more clerical
12 tasks that would free her up to do more of the
13 attorney work?
14      A. What do you mean by "clerical"?
15      Q. Well, you know, it's like a paralegal can
16 certainly pull cases off of Westlaw, Lexis, or some
17 other database. They can certainly prepare the basics
18 of forms, any oppositions to motions, I mean. You
19 usually have stock set up, the standard of -- you know
20 for denying a motion to dismiss.
21      I mean, most people have standard or stock
22 things that they use in terms of assembling the
23 documents so that then she could come in and do the
24 true legal work on it. You could have people in a
25 system like that, couldn't you?

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

Page 141

1    MR. ORTUNO: Objection. Compound. Vague.
2    Calls for speculation.
3    THE WITNESS: We didn't have stock motions to
4    dismiss on the wide variety of employment law cases
5    that we had. I would rather have the associate be the
6    one doing the research or preparing the brief because
7    they are the ones who understand the law and have to
8    do the analysis. So I don't know of a stock motion,
9    opposition to a motion to dismiss. It certainly
10   wasn't available to us when we were first starting.
11   So I don't see, as you have described it,
12   that that's a fit to the overall limitations that
13   Ms. Buchanan had to work under, but beyond that we
14   didn't have the funding. I couldn't just go pay
15   somebody.
16   BY MR. KEMP:
17   Q. In follow-up to that, let me ask you this:
18   Do you employ paralegals, legal assistants, and
19   secretaries in California?
20   A. We have secretaries.
21   Q. Okay. Do you have paralegals?
22   A. We have people who are licensed as
23   paralegals, but they don't really perform the
24   traditional paralegal function that you are thinking
25   of where they are performing form documents and

Page 142

1    things. Our practice isn't set up that way.
2    Q. What do they do that --
3    A. They might prepare shells on discovery or do
4    the filing, putting things together in that respect.
5    They do intake calls. So -- but they don't do the
6    initial intake consultation.
7    Q. Sure.
8    A. So those types of functions are performed.
9    Q. Okay. And when they do that type of work,
10   doesn't it assist you because then you don't have to
11   do that work, they are taking care of that part of it?
12   A. Sure.
13   Q. Any other ways in which any of the
14   accommodations that Ms. Buchanan asked for would
15   impose an undue hardship on the defendant, Watkins &
16   Letofsky, LLP?
17   A. Which accommodations did she request?
18   Q. She requested the part-time hours, she
19   requested to have support staff --
20   A. She did request that. That would be an undue
21   hardship. Sorry. The next one?
22   Q. Well, I'm asking if there are any other --
23   because I think you addressed that.
24   I'm saying, aside from what we've already
25   talked about, the accommodation of providing her with

Page 143

1    a part-time schedule, providing her with support staff
2    or, you know, other, you know, assistance in doing
3    some tasks, any other ways in which those would be an
4    undue hardship other than we have talked about, is the
5    question.
6    A. Well, I think we've covered it. There's --
7    yeah, I think we've covered it in those two.
8    Q. 17, and there's probably not much to this.
9    This is one of the statutory defenses to a disability
10   discrimination case, and that's direct threat to
11   health and safety of the plaintiff or others.
12   Is there any way in which Ms. Buchanan,
13   working in your workplace, would constitute a direct
14   threat, to your understanding?
15   A. No.
16   Q. Number 18, I think you touched on this
17   earlier. You did have a computer system that had
18   remote access so that she could work from home or a
19   remote location. That's the first part of the
20   question. You did have that available; right?
21   A. Correct. But your question when you say we
22   talked about 18, I don't really know that I have a
23   contention that she could only perform her job being
24   physically present, so I don't want to assume that.
25   Q. I'm sure that's the first part of it, I

Page 144

1    guess.
2    A. And then the -- but, yes, she had remote
3    access.
4    Q. Okay. But you did testify before that
5    because, especially when she first started, she was
6    the only person, that you really wanted her to work
7    from the office and be present --
8    A. No, it wasn't based on the fact she was the
9    only person. It was based on the fact that's the best
10   place to do your job.
11   Q. Okay. But remote access is made available to
12   employees at your firm so they can work from remote
13   locations like their homes?
14   A. Only associates.
15   Q. Okay. So 19 has got a lot of different
16   subparts to it. The first one is, do you feel that
17   Ms. Buchanan gave you proper notice that she would
18   need a reasonable accommodation or otherwise give you
19   enough information so you knew she was looking for a
20   reasonable accommodation in her job?
21   MR. ORTUNO: Objection. Compound. Calls for
22   legal conclusions.
23   THE WITNESS: I think -- I don't feel like we
24   were ever caught off guard with the notice. I think
25   we always had open communication on it.

Daniel R. Watkins, Esq.                                      Amy Buchanan v. Watkins & Letofsky, LLP

Page 145

1  BY MR. KEMP:
2      Q.  Okay.  And part B, 19B, certainly she
3  provided you with information that she had a physical
4  condition that limited her activities; right?
5      A.  Yes, we knew there were certainly -- yes.
6      Q.  Okay.  And you testified earlier that she
7  certainly was a new attorney, she was green, but she
8  had the requisite knowledge, experience, and training
9  to perform the job that you hired her to do; is that
10 right?
11     A.  She was a licensed attorney, which gave her
12 access to perform the job.  She needed to learn and
13 gain experience and go through training to perform the
14 job efficiently and manage files in the time allotted.
15 I think that that was part of what was missing.  But
16 she certainly was licensed.  I'm not suggesting that
17 she wasn't an appropriate fit in that regard.
18     Q.  My understanding is that you all knew that
19 going in, that there would be a certain amount of
20 on-the-job training that would take place and that was
21 part of this job; right?
22     A.  That's when we hired her.  That's correct.
23     Q.  Okay.  And do you feel in part -- I think
24 part D we already talked about -- you didn't consider
25 her to be a safety threat in the workplace?

Page 146

1      A.  No, not at all.
2      Q.  And part E, 19E, I don't get a sense that you
3  feel that she didn't participate in discussions or
4  communications with you about her accommodations;
5  right?
6      A.  I think she was open with where she was at
7  and asked her what she wanted.  So I agree that she
8  did those things.
9      Q.  Okay.  Good.  Thanks.
10         20 is the same way, you don't feel that she
11 failed in any way to engage in an interactive process
12 with you talking toward finding an accommodation, do
13 you?
14     A.  No.
15     Q.  Okay.  I think we already talked about 21 at
16 the beginning in terms of policies and procedures,
17 unless there is anything you would like to add about
18 policies or procedures.
19     A.  No, I think the response for those questions
20 would stand.
21     Q.  Okay.  22, was -- Ms. Theresa Santos, was she
22 then a permanent replacement for Ms. Buchanan, or were
23 you going to hire her as an addition anyway?
24     A.  "Hire her," Ms. Santos?
25     Q.  Yes.  Sorry.

Page 147

1      A.  No.  Ms. Santos came in to fill the spot.  In
2  terms of what was going to happen in the future, I had
3  no idea.  We needed somebody to help on the files that
4  were there.  And whether we grew or didn't grow, that
5  would remain to be seen.
6      Q.  So I guess my -- what I'm trying to ask and
7  didn't ask very well, was Ms. Santos a replacement for
8  Ms. Buchanan?
9      A.  Yeah.  I mean, we needed an attorney and
10 Ms. Buchanan wasn't working.  So yes, I guess to that
11 end she was.  But we didn't -- when you say
12 "replacement," it wasn't Santos in and Buchanan out.
13 It was Santos in, Buchanan's figuring out what was
14 going on, and we've got a life for the office and see
15 where it goes.
16     Q.  And I think -- with respect to Ms. Santos
17 under topic 22, how did you go about recruiting,
18 hiring her?  How did she come to you?
19     A.  I didn't research that.  If it was in here, I
20 missed it.
21     Q.  It's not crystal-clear, and I'm just asking
22 you for your memory.
23     A.  Let me see if I can put it together.  I
24 always try to do word of mouth.  I'm just trying to
25 remember if she came to me by way of Mr. Sullivan or

Page 148

1  Cory Santos, her husband, and maybe I met him through
2  Mr. Sullivan.  Could have been Craig's List response,
3  but that doesn't seem like it was.  That doesn't seem
4  to hit home.  So I don't know.  We just needed
5  somebody and she was looking.  So I apologize.  I
6  don't remember.
7      Q.  Okay.  That's all right.  It's not critical.
8      A.  Gosh, I should know that, but it just doesn't
9  come back to my mind.
10     Q.  Okay.  Nothing stands out.  I get it.
11         23 we covered.  Nobody from the defendant
12 that you know of had any interaction with
13 Ms. Buchanan's healthcare providers?
14     A.  Correct.
15     Q.  Okay.  We're going -- these should go pretty
16 quick too.  In terms of -- and when I say "these," the
17 next questions are going to be about affirmative
18 defenses that are raised to the answer.  We have a
19 copy of the answer here if you need to refer to it at
20 all.  But -- yeah, I think it was number 3, Exhibit 3.
21         MR. ORTUNO:  Before we get on this, can I
22 just get a running objection to all this line of
23 questioning regarding the affirmative defenses that it
24 calls for a legal conclusion, it goes to the very
25 nature of the case?

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

Page 149

1  MR. KEMP: Right, well, and that's why I
2  bolded and italicized. I'm going to ask about facts
3  and circumstances.
4  MR. ORTUNO: Okay. As long as you keep it
5  there but just --
6  MR. KEMP: Right. The interesting thing here
7  is that Mr. Watkins is actually an attorney --
8  MR. ORTUNO: The objection is still like -- I
9  think it still holds, you know. If you will allow me
10 the running objection, that way I don't have to
11 interrupt you guys' flow.
12 MR. KEMP: Of course, that will be fine.
13 MR. ORTUNO: I understand he's a lawyer as
14 well.
15 MR. KEMP: In all cases people bring that up.
16 That's why I emphasize that I'm going to ask about the
17 facts that would support that.
18 MR. ORTUNO: Understood, understood.
19 BY MR. KEMP:
20 Q. Okay. So -- and they don't actually go in
21 direct order, so they jump around a little bit.
22 A. Okay.
23 Q. It's from my form, because these come up in
24 almost all cases, and it depends on where you have it
25 in your specific answers.

Page 150

1  So number 24 talks about the 30th affirmative
2  defense, which is talking about the timeliness of the
3  filing of the case in terms of statute of limitations.
4  And I guess, is there some time by which you
5  think Ms. Buchanan should have filed this case for any
6  of her claims? And you can look at the claims too in
7  Exhibit 2, which is the complaint, the amended
8  complaint.
9  I'm just trying to find out if there's a
10 deadline by which you believe that it should have been
11 filed.
12 That's your standing objection.
13 A. What's the charge exhibit number?
14 Q. Exhibit 2 is the complaint. Exhibit 15 is
15 the charge, if you are talking about the charge.
16 A. I don't have the actual complaint to the EEOC
17 or NERC.
18 Q. Number 15 is --
19 A. She had 300 days from the affirmative -- from
20 the adverse employment action to file her complaint
21 with NERC, and 90 days after the right-to-sue letter
22 to file her complaint. And I haven't analyze those,
23 but if those don't match, then we would reserve the
24 right under the statute of limitations defense --
25 Q. Okay.

Page 151

1  A. -- as I understand it. I haven't done that
2  calculation.
3  Q. All right.
4  A. I think the filing dates of those documents
5  would speak for themselves. It would be a question of
6  what constitutes adverse employment actions.
7  Q. Okay.
8  MR. ORTUNO: See how it's hard to stay off
9  the facts and circumstances?
10 MR. KEMP: On that particular one.
11 MR. ORTUNO: You have to apply the law to the
12 facts and circumstances.
13 MR. KEMP: That's more difficult than I
14 think. I'm also leaning on him a little bit harder
15 because I know he should be able to answer those
16 things. I hear you, though, and I understand the
17 objection.
18 Q. So there's a breach of contract claim, breach
19 of the implied covenant of good faith and fair
20 dealing. Those would have at minimum a four-year
21 statute of limitations.
22 I understand there is no question that she
23 filed this case within four years even of when she's
24 been hired. It's been less than four years now since
25 she was hired April 1st; right? So --

Page 152

1  A. But I think there is a significant question
2  whether there is a contract --
3  Q. Well, and --
4  A. -- as a predicate for the statute of
5  limitations to apply. So if somehow in that analysis
6  we would work in the idea that there is no contract,
7  that would be a factor or circumstance. I don't know
8  how it plays out, but that would be my response.
9  Q. I understand, and I know you have that as a
10 defense, but in terms of a statute of limitations --
11 A. You are correct it's four years on the
12 breach, whatever the alleged breach would be.
13 Q. Right. Okay. We have a statutory claim
14 608.190 --
15 A. Just to back it up, so to that end I would be
16 speculating because I don't believe there's a contract
17 and there is no breach that I'm aware of to apply the
18 statute, but I think we agree on the law.
19 Q. Okay. All right. I'm just looking to see if
20 I really -- the rest of them, I don't think there's
21 any -- I don't think there is any real question that
22 the administrative charge and the filing of the --
23 within the 90-day right to sue, so I think we're done
24 with that topic.
25 A. Okay.

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

|  | Page 153 |
|---|---|
| 1 | Q.  Because the other ones are much like the |
| 2 | contract one or something there's going to be -- okay. |
| 3 | So the next one line here is the fourth |
| 4 | affirmative defense, which is a failure to exhaust |
| 5 | administrative remedies. |
| 6 | MR. ORTUNO:  I got to verbally object here |
| 7 | because I think any of this even to discuss the facts |
| 8 | requires a legal analysis that goes beyond just |
| 9 | discussing the facts. |
| 10 | THE WITNESS:  I think my role here is -- |
| 11 | MR. ORTUNO:  Are we going to do a legal |
| 12 | argument?  Should we pull out Westlaw? |
| 13 | MR. KEMP:  Well, wait for my question. |
| 14 | THE WITNESS:  I'm here as the PMK. |
| 15 | MR. KEMP:  Wait for my question. |
| 16 | MR. ORTUNO:  Okay. |
| 17 | BY MR. KEMP: |
| 18 | Q.  Do you have any dispute that Ms. Buchanan did |
| 19 | go to the EEOC and Nevada Equal Rights Commission to |
| 20 | file a charge? |
| 21 | A.  No. |
| 22 | Q.  Do you have any dispute as to whether or not |
| 23 | the agency processed the charge? |
| 24 | A.  No. |
| 25 | Q.  Okay.  I don't know if I'm going to have any |

|  | Page 154 |
|---|---|
| 1 | questions on topic 26.  I think on that particular one |
| 2 | we've sort of covered it.  I mean -- all right.  Let |
| 3 | me just ask this: |
| 4 | This is on -- you've got, on your 6th, 8th, |
| 5 | 9th, and 10th affirmative defenses, they are basically |
| 6 | all talking about that you had legitimate |
| 7 | nondiscriminatory and non-retaliatory business reasons |
| 8 | for whatever took place with Ms. Buchanan. |
| 9 | Along those lines, is there anything -- you |
| 10 | know what?  I don't think I can formulate a question |
| 11 | here that is not something that we've already talked |
| 12 | about and not something that we're not just going to |
| 13 | have a big argument about. |
| 14 | A.  Okay. |
| 15 | Q.  I'm going to just put an asterisk by that.  I |
| 16 | may come back to that. |
| 17 | MR. ORTUNO:  Okay.  I'll be here. |
| 18 | BY MR. KEMP: |
| 19 | Q.  Okay.  27 is talking about the 20th |
| 20 | affirmative defense with respect to failure to |
| 21 | mitigate damages. |
| 22 | Is there any way in which you think |
| 23 | Ms. Buchanan didn't go out and find replacement |
| 24 | employment or do something to earn a living that |
| 25 | would... |

|  | Page 155 |
|---|---|
| 1 | A.  I know of no facts that suggest, from May of |
| 2 | 2017 until at least January 2018, that she engaged in |
| 3 | looking for employment part-time or otherwise other |
| 4 | than what she testified to at her deposition, and I |
| 5 | think most of that was at the end of 2017, beginning |
| 6 | of 2018. |
| 7 | So there would be a period of time where she |
| 8 | believed she could work four hours, and I don't |
| 9 | believe she did anything to really search for a job |
| 10 | until after probably December of 2017. |
| 11 | Q.  Okay.  And during that time frame, do you |
| 12 | have any knowledge -- when I say "you," I mean the |
| 13 | firm, does the firm have any knowledge of any |
| 14 | particular steps that she took to find work or didn't |
| 15 | take?  I mean, do you have any knowledge that would be |
| 16 | relevant to that? |
| 17 | A.  Well, that she didn't take steps would be the |
| 18 | knowledge we had during that time period. |
| 19 | Q.  So the defendant's contention is that she |
| 20 | didn't do anything to look for work during that time? |
| 21 | A.  That's my understanding. |
| 22 | Q.  Okay.  All right.  So the 18th affirmative |
| 23 | defense was the after-acquired evidence doctrine. |
| 24 | Have you learned anything about acts or |
| 25 | omissions that Ms. Buchanan did or failed to do since |

|  | Page 156 |
|---|---|
| 1 | the time that she's not been working with you?  Have |
| 2 | you found anything that would have caused you to |
| 3 | terminate her employment had you known about it at the |
| 4 | time? |
| 5 | A.  So can we do this on this question:  Can we |
| 6 | back after-acquired evidence out of your question and |
| 7 | then ask it based on a fact, because there's a |
| 8 | plethora of cases describing the scope and effect of |
| 9 | after-acquired evidence and what that even means. |
| 10 | Q.  Sure. |
| 11 | A.  So -- |
| 12 | Q.  Let me rephrase the question. |
| 13 | My question is, have you learned anything |
| 14 | since the last time Ms. Buchanan worked for you, have |
| 15 | you learned anything that, had you known about it |
| 16 | while she was working for you, that would have led you |
| 17 | to terminate her employment? |
| 18 | A.  With that one, no, I have not. |
| 19 | Q.  Okay.  Have you learned -- |
| 20 | A.  I'm sorry.  Can I look at that answer real |
| 21 | quick?  (Counsel examined reporter's computer screen.) |
| 22 | No, we're good. |
| 23 | Q.  Since the last time Ms. Buchanan worked for |
| 24 | you, have you learned of anything that she did while |
| 25 | she was employed by your firm that you would have |

Page 157

1  considered to be misconduct?
2     A. No, not in the sense that I think you mean
3  it, no.
4     Q. Like in any sense at all?
5     A. No, the answer is no.
6     Q. Okay. Have you learned of anything since
7  Ms. Buchanan left the employment with your firm that
8  you didn't know at the time that you now think has
9  some impact on her entitlement to recover money from
10  your firm?
11    A. I don't know what you mean by "entitlement."
12    Q. Well, she has a claim for money damages from
13  your firm.
14    A. Correct.
15    Q. Have you learned anything since the time that
16  she left the employment with your firm that you
17  believe should result in her not being able to recover
18  those damages that she's claimed here?
19    MR. ORTUNO: I'm going to object on this
20  again. It goes to the very heart of this lawsuit.
21  That's what we're going to trial to determine.
22    THE WITNESS: The answer is yes. I mean, all
23  the discovery in the case, her deposition adds
24  information. So it would be really, really hard to --
25  there's a lot of information I have today that I

Page 158

1  didn't have back when she was employed and since she
2  left employment that impacts on her right to recover
3  money in the lawsuit.
4  BY MR. KEMP:
5     Q. So these are things that you have learned
6  from your discovery process in the case?
7     A. Yes, yes.
8     Q. All right. Would you share some examples
9  with me?
10    MR. ORTUNO: Objection.
11    THE WITNESS: Examples of what?
12  BY MR. KEMP:
13    Q. Well, what are some of the examples that you
14  think have had this impact that you have learned in
15  discovery?
16    A. With respect to what specific cause of action
17  or claim? There is no contract, so the allegation was
18  that there was a contract. I didn't know anything
19  about that before while she was employed because there
20  never was one. So there's an allegation. I'm
21  learning about that for the first time from her
22  perspective. And then I look at the evidence that
23  doesn't support that. There are a hundred pages of
24  e-mails that go back and forth that don't lay the
25  foundation for an appropriate contract. She was an

Page 159

1  at-will employee. That would apply to the contract
2  allegation. I knew that before, but not in the
3  context of the allegation.
4     I mean, that's just starting on the formation
5  of the contract. I don't believe she's entitled to
6  any damages even under a contract theory based on her
7  testimony at her deposition. That would be added in,
8  her responses to discovery, her initial disclosures.
9     So the question is huge. There is every fact
10  in the case plays into whether or not she's entitled
11  to recover money under her claims that we couldn't
12  even do it in an MSJ. There is still too much past
13  that.
14    Q. Okay.
15    A. So I can't answer your question.
16    Q. Number 29 talks about the second affirmative
17  defense, there is a claim that the defendant -- the
18  claims are -- against defendant are barred by the
19  exclusive remedy provisions of the Nevada Industrial
20  Insurance Act.
21    A. We'll withdraw that affirmative defense.
22    Q. Okay.
23    A. That's not applicable.
24    MR. ORTUNO: Okay. I'll take the blame for
25  that.

Page 160

1     MR. KEMP: Nobody is assigning any blame.
2  Come on, now.
3     THE WITNESS: Did you get that comment from
4  opposing counsel, nobody is assigning any blame?
5     MR. KEMP: With respect to the second
6  affirmative defense, make sure you add that part.
7     THE WITNESS: I just want to make sure I can
8  pull it out when Joe starts screaming.
9  BY MR. KEMP:
10    Q. Okay. So topic 30 is the 24th affirmative
11  defense, saying that plaintiff's employment has not
12  been terminated, nor has been subjected to any adverse
13  action with respect to the employment.
14    I think we at least touched on it. I think
15  we kind of covered it. Do you have anything else to
16  say about the end of her employment? Her contention
17  is that she was essentially terminated when you
18  informed her that her insurance was being cancelled.
19    Do you have any response to that contention
20  by her that would go to this?
21    A. Sure. She was an at-will employee. We had
22  agreed to pay her insurance while she was on leave,
23  which is something we've never done. And she was
24  going to contribute to her insurance. She did not
25  contribute to her insurance. We were paying the full

Page 161

1 amount while she was out not working with no estimated
2 date of return beyond the four-hour limit.
3        And we had been talking -- I talked in the
4 August time frame, when it became clear that she
5 needed six more months and we weren't going to bring
6 her back in and we were paying for insurance and she
7 wasn't contributing, I talked to Susan Watkins about
8 we needed to bring the insurance to an end.
9        We had some discussions in September, but we
10 never got her answer and so it came up again in
11 November.  I believe, actually now that we are
12 talking, it was in conjunction with the E&O, and she
13 has her little ticklers.  So it all came up again at
14 that time, and that's when there was no prospect of
15 her coming back and she hadn't contributed any portion
16 in five or six months, that we ended it.
17    Q.  What was the agreement with respect to
18 contributing?  How did that come about?  How was that
19 discussed?  I haven't seen any e-mails about that.
20    A.  The agreement -- I don't know what you mean
21 by that.  But as we talked about earlier, she went out
22 on an indefinite leave, and I believe right after
23 that, as part of that, Susan Watkins had cancelled her
24 insurance, because that's what we do when people
25 leave.

Page 162

1        And that -- Ms. Buchanan found out about
2 that, became very upset, and I talked to
3 Brian Letofsky and Susan, and we agreed to reinstate
4 it while she was out on leave, because we knew that
5 she needed the insurance and we wanted her to find a
6 way to get healthy if that was possible.
7        As part of that we would continue the
8 insurance, but it would need to continue in accordance
9 with the previous arrangement.  So we contributed X
10 amount and she was supposed to contribute X amount,
11 but that didn't happen, so we were footing the full
12 bill for, I think, if not all the time, everything but
13 one month or two.
14    Q.  So how was it communicated that she was going
15 to be footing the bill for part of it?  I don't recall
16 seeing any communication about that.
17    A.  No.  She called when she was cancelled and we
18 talked on the phone and said we'll reinstate it but we
19 would reinstate it as it was before, can't just take
20 care of all of your insurance, we've never done that.
21 I believe she contributed the first month and didn't
22 after, something to that effect.  It's on the next
23 page you have there.
24        MR. KEMP:  Let me mark this as an exhibit so
25 we're on the same thing.

Page 163

1        THE REPORTER:  Eighteen.
2        (Exhibit 18 was marked for identification.)
3 BY MR. KEMP:
4    Q.  So 18 is an iMessage, a text message,
5 essentially, from September 1st, I believe this was
6 2017, 4:35 p.m.  It's talking about the pay and the
7 insurance.  It's on the second page of it it says,
8 "Regarding insurance, we're going to have to talk
9 about that," is one sentence right like in the middle
10 of the text on that page.
11    A.  Okay.
12    Q.  So was it after this text message on
13 September 1st that you discussed her paying for part
14 of her insurance?
15    A.  No.  I mean, this was after all of that
16 initial discussion.
17    Q.  Okay.
18    A.  This is September.  We talked about it in
19 May, May, June, I think.  I have to look.  There's a
20 sheet that has the reference to the first payments of
21 insurance.  I don't think it took this long to get it
22 reinstated once it was cancelled.  I think it was
23 reinstated pretty quickly.
24    Q.  Do you recall sending this text message to
25 Amy?

Page 164

1    A.  No, not particularly.
2    Q.  Do you have any dispute or doubt that you
3 sent this text message to her?
4    A.  No, not as I'm looking at it here.  I don't
5 know what text came in advance of that, but...
6    Q.  All right.  I'm just going to read here.
7 It's not that long.
8    A.  What I don't understand from the page here is
9 it says "to Dan Watkins" and it says, "Amy, I just
10 spoke."  So it doesn't -- I'm not sure --
11    Q.  Yeah, I don't know why --
12    A.  That's confusing to me, so I can't confirm
13 that this is a text that I sent based on that, but...
14    Q.  Just based on the fact that it says "to Dan
15 Watkins"?
16    A.  Yeah.  It doesn't appear to be from me.
17    Q.  Okay.  Well, the next page, you can see where
18 there's an "okay, thank you."  I think that might be
19 referring to that, where she responded.
20    A.  Okay.  I mean, that's --
21    Q.  I don't know that for sure, but that's --
22    A.  You know as much as I do, apparently.  If you
23 have questions, I can answer them about it.
24    Q.  Right.  So I am going to read it.  It says:
25        "Amy, I just spoke with Susan and she

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

Page 165

1   told me about the miscommunication regarding
2   pay and insurance.  Regarding the pay, we
3   will go through the payroll records in detail
4   this weekend and get you a check for the
5   balance of the difference between the
6   50 percent that you were paid and the
7   percentage that you worked.  We will make
8   sure that you get -- we will make sure to get
9   you paid for the time you worked.  Regarding
10  insurance, we're going to have to" -- and it
11  picks up here in the middle (indicating) --
12  "talk about that."  Let me start with the --
13  "regarding insurance, we're going to have to
14  talk about that.  I'm sure we can fix
15  whatever problems exist.  I cannot talk this
16  evening, but I'm free tomorrow morning up to
17  about 1:00 p.m.  Please call me tomorrow at
18  your convenience.  Thank you, Dan."
19      I sort of read that correctly, didn't I?  Did
20  I say anything that's not there?
21      A.  No, you read it.
22      Q.  So I don't see anywhere in here where you are
23  talking about how she owes you money for the
24  insurance.  There is nothing like that in this
25  particular text message, is there?

Page 166

1       A.  Well, "we'll have to talk about it," so it
2   doesn't say what you just said, but it certainly
3   infers that there's things to talk about.
4       Q.  Okay.  But my question is just about this
5   document.  It doesn't say anything about she owes you
6   money for insurance, does it?
7       A.  When you say "say," I think that's vague.
8   The words "you owe us money for insurance" are not in
9   there.
10      Q.  Correct.
11      A.  But clearly we need to talk about the
12  insurance situation, so it infers that there was
13  something along those lines to talk about.
14      Q.  Okay.  So did you talk with Amy about the
15  insurance after this text message from September 1st
16  at 4:35 p.m.?
17      A.  I do not know if we talked about it after or
18  before.  It would be extremely odd for me to just fire
19  off this text without some precursor, some other
20  information, something from Ms. Buchanan to stimulate
21  the conversation.  So I don't know if it was before or
22  after.
23      Q.  At the end of it, you are asking her to "call
24  you tomorrow to talk about it."  Do you remember if
25  she called you on September 2nd, 2017, to discuss the

Page 167

1   insurance or the pay?
2       A.  Yeah.
3       Q.  Do you recall any other conversations or
4   communications with Amy about the insurance in
5   particular?
6       A.  Other than this text message?
7       Q.  After this, yes.
8       A.  Oh, after?  I couldn't place a date and a
9   time to any conversation without something in writing.
10  I can give you general ideas.  I would assume we
11  talked about it, but I don't recall it.
12      Q.  It would only be an assumption on your part.
13  You don't have personal recollection of it.  Correct?
14      A.  That is correct.
15      Q.  Okay.
16      A.  And I should say, with the caveat that
17  potentially other documentation might refresh my
18  memory that oh, yeah, we did talk.  But as I sit here
19  with this, I don't recall anything specific.
20      Q.  Okay.
21      A.  And I don't know what e-mails or whatever are
22  out there that would refresh my memory off the top of
23  my head.  I'm just saying that could happen.  I just
24  want to leave that opening because --
25      Q.  Okay.

Page 168

1       A.  -- there were a lot of communications with
2   Ms. Buchanan over all of this time, and when one
3   particular conversation occurred versus another I
4   think would be very hard to say.
5           MR. KEMP:  Let's make this next.
6           THE REPORTER:  Nineteen.
7           (Exhibit 19 was marked for identification.)
8           MR. KEMP:  Exhibit 19 is a two-page document.
9   It's got defendant's Bates stamps 1291 and 1292.
10      Q.  These two pages, they were in sequence in the
11  numbering of the Bates stamping.  As I'm looking at
12  them now, I think I might have grabbed the second
13  page thinking it went with the first, but it doesn't
14  because this is from a different date -- well, it's
15  hard to say because we have the problem on the first
16  page of again not having a sent line on that e-mail,
17  so we don't specifically know what date that was sent
18  or what time.  So I think that might have been why I
19  thought they were related.  But when I look at the
20  body of the e-mail on the first page, I don't think it
21  can relate because it's from a later time period.
22          But let's look at the one Friday, 22nd
23  July 2016 from Amy Buchanan to Dan Watkins regarding
24  health insurance.  It says:
25          "Hi, Dan.  Per Jace, he can enroll me in

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

Page 169

1  health insurance at any time, effective on
2  the 1st of the enrollment month, as long as
3  it's approved by you and Brian."
4       Okay.  This is when she first gets insurance.
5  This is part of the problem, the 2016 and 2017
6  time frame, sometimes I get them confused in this
7  case, and that might be why I included this.
8       So this was just when she was just being
9  enrolled in insurance?
10  A.  Correct.
11  Q.  Do you remember this e-mail at all?
12  A.  Oh, gosh, no.  I do recall there was some
13  issue about the timing of our insurance with her
14  previous insurance, but I couldn't be specific on it.
15  And that's why she was saying you can do it now,
16  because when did she start?  April?  I think we have a
17  60-day waiting period.
18  Q.  Right.
19  A.  Which would have put it in June.  But I don't
20  recall the specific e-mail.  I think there was
21  something that had to do with the timing to not
22  interfere with the other insurance that she was on.
23  Q.  Okay.  And then that just got stuck on there
24  because I thought it might have been somehow related.
25  A.  For the clarity of the transcript, should we

Page 170

1  remove it?
2  Q.  We can just -- it could just be left there.
3       MR. ORTUNO:  I'll also note they have
4  different subject lines, so they are probably
5  obviously different time frames or different e-mail
6  chains.
7       MR. KEMP:  I think when I was looking at them
8  the sequence in the numbers is what threw me off.
9       Okay.  So we'll set the second page aside and
10  we'll look at the first page.
11  Q.  Again, there is no sent line on here.
12  However, this is talking about -- I'll just read it,
13  the subject, "Health Insurance and Outstanding Wages."
14       "Hello, Amy.  We received the claim for
15       wages.  I will talk to Brian and we will
16       address this no later than the response
17       deadline of November 29th, 2017.
18       "Also, please be advised that we have
19       paid your health insurance through
20       November 30th, 2017.  We can no longer make
21       payments for the insurance past this date.
22       You will receive notice from the insurance
23       company on your options.  Thank you, Dan."
24       Did I read that correctly?
25  A.  You did.

Page 171

1  Q.  Okay.  So this appears to be going on in
2  November of 2017.  I think I recall it was around
3  November, the labor commissioner issue there, or she
4  complained to the labor commissioner.  Do you remember
5  getting the complaint from the labor commissioner?
6  A.  Yes.
7  Q.  Do you think it was in November or was it
8  October?  When do you think you got it?
9  A.  That I don't know, but the response deadline
10  is in November, so I'm assuming it was probably
11  mid-Novemberish, somewhere in there.
12  Q.  Okay.  I don't see anywhere in this e-mail
13  where you are saying that she owes you money for
14  health insurance either.  It's not in this e-mail, is
15  it?
16  A.  Not in this e-mail.
17  Q.  Okay.  Did you ever send her any bills for a
18  portion of the insurance?
19  A.  Not in the sense of an invoice, no.
20  Q.  Did you ever send any e-mails telling her how
21  much she needed to pay?
22  A.  Yes -- well, not me personally, no.  The
23  business did, though.
24  Q.  Who do you think would have sent those
25  e-mails?

Page 172

1  A.  Well, they might have been copied by me and
2  sent, but Susan would have put them together, Susan
3  Watkins.
4  Q.  I just don't remember seeing them, so I just
5  want to make sure I go looking for the right --
6  A.  Well, in one of the summaries I thought I saw
7  in there.
8  Q.  In the --
9  A.  Isn't that our response, the next one?
10  Q.  Let me see.  These are from July and
11  September.
12  A.  Oh, September.  Yeah, I'd have to look at
13  those.
14  Q.  Okay.  We'll --
15  A.  This e-mail does not say she owes money for
16  insurance.
17  Q.  Right.  You believe that there are e-mails
18  that tell Amy she needs to pay part of the insurance?
19  A.  I believe that it was part of a summary that
20  we prepared, but I don't think there was anything
21  through the -- we didn't send a regular note saying
22  this is the amount accumulated or anything like that.
23  Q.  The only thing I recall ever seeing it on was
24  the response to the labor commissioner, which included
25  a settlement offer, so I don't want to really get into

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

Page 173

1   that. But that's the only time I ever remember seeing
2   something where you were claiming there was some
3   offset for the cost of her insurance.
4      A. I just want to strike "settlement offer" in
5   your question, but if we can do that.
6      Q. I'm just saying there was a settlement. I'm
7   not saying what the --
8      A. I just don't want this read back at trial.
9      Q. I'm not -- well, there would be a motion in
10  limine or whatever, but --
11     A. Change the question, we don't have a problem,
12  that's my point. I don't want to answer a question
13  that says there's a settlement offer.
14     Q. I'll rephrase the question.
15     A. Thank you.
16     Q. The response that was given to the labor
17  commissioner to the complaint is the first and only
18  time that I can recall seeing a reference made to Amy
19  owing your firm money for part of the health
20  insurance. Do you know of any other documents as you
21  sit here --
22     A. Where we sent something that says to her you
23  owe us money?
24     Q. Right.
25     A. No.

Page 174

1      Q. Okay. So as of the time that this e-mail
2   would have been sent in the first page of Exhibit 19,
3   by that point she was no longer an employee of your
4   firm; is that correct?
5      A. No.
6      Q. She was still an employee?
7      A. Well, she had sent the notice to us or the
8   information in October -- excuse me -- August
9   indicating six months under that scenario of
10  four hours a day.
11         Nothing changed between then and this,
12  nothing changed going forward. I mean, she was still
13  within the six-month window, I think, when all of this
14  occurred.
15     Q. Okay. So as of the time of this e-mail that
16  you sent to her regarding the claim for wages sent to
17  the labor commissioner, as of that time, how long had
18  she no longer been an employee of your firm?
19     A. Can you ask the question again? I lost you.
20     Q. Sure. I'm just asking, at the time you sent
21  her this e-mail -- let me back up and start over.
22         As of the time you sent her this e-mail, was
23  she still an employee of your firm?
24     A. Yes. We were paying on her health insurance
25  through that point and we were going to respond to her

Page 175

1   claim for the wages, and yes, I guess she was.
2      Q. So it says here that the firm had paid her
3   health insurance through November 30th, 2017.
4      A. Correct.
5      Q. Was she an employee of the firm after
6   November 30th, 2017? In other words, on December 1st
7   of 2017, was she at that point no longer an employee?
8         MR. ORTUNO: I'm going to object on the fact
9   that a differentiation between what constitutes an
10  employee is a question of law that needs to be --
11  requires a legal analysis.
12         THE WITNESS: I don't think anything changed
13  in terms of her status as a result of not paying the
14  health insurance.
15  BY MR. KEMP:
16     Q. Okay. So what notice was she going to
17  receive from the insurance company about her options?
18     A. I don't know. I understand COBRA sent --
19  insurance companies notify them of COBRA, but I don't
20  know the details.
21     Q. COBRA only kicks in once somebody is no
22  longer an employee; is that right?
23     A. So that's why I said "your options." I don't
24  know what they are or I don't know anything about
25  COBRA. Never explored it. Don't know when it kicks

Page 176

1   in. And that's probably why I didn't use it there.
2      Q. There's a state statute also that I think
3   they call it a mini-COBRA that --
4      A. I know there is Cal-COBRA in California, but
5   I don't know anything about the operations of COBRA.
6   That's why we have an insurance company, or a broker,
7   I should say.
8      Q. Okay. So I think, when we discussed this
9   earlier, that you said pretty much when you got the
10  wage claim from Amy through the labor commissioner,
11  that certainly by that point she wasn't an employee
12  anymore. Is your testimony different now?
13         MR. ORTUNO: Objection. I believe that
14  misstates the evidence.
15         THE WITNESS: It does. I didn't use the word
16  "certainly." I never terminated Ms. Buchanan. I
17  never said, "You're not employed here anymore." It
18  never happened. She came to us in August with an
19  option that wasn't workable. She said she needed
20  six months to let that play out.
21         As I indicated earlier, the firm was growing,
22  and depending on how things worked out with her
23  medically and the firm's growth, I don't know what the
24  options are in terms of her getting back and working
25  day to day.

Daniel R. Watkins, Esq.                           Amy Buchanan v. Watkins & Letofsky, LLP

| Page 177 | Page 179 |
|---|---|
| 1     I left it open. That's why we called it | 1     like eight hours of work or something. |
| 2   indefinite leave of absence. We paid her insurance to | 2     Q. I thought that there was -- I thought part of |
| 3   help her out and to be nice. There was no | 3   her claim was that she had done eight hours of work on |
| 4   contribution. I can't just keep paying. I had no | 4   an independent contractor basis, but that was prior, |
| 5   indication she was coming back any time soon, | 5   after she had resigned in September of 2016. |
| 6   certainly not through January. | 6     A. Could be. I mean, you are asking me |
| 7     So we couldn't keep paying that benefit when | 7   questions about a two-year period of time with a lot |
| 8   there was no production coming from her, but I never | 8   of interaction. There are documents that would help |
| 9   said you are not employed here, you are not welcome | 9   me remember that. That time period after 2016 may |
| 10   back when you get things worked out. That never | 10   have been when that occurred. She called it an |
| 11   happened. That discussion never even crossed my mind. | 11   independent contractor status. I really wasn't sure |
| 12   BY MR. KEMP: | 12   what it was. She wasn't supposed to be working and |
| 13     Q. And any time between May of 2017 and today, | 13   yet she was working. I don't remember it being |
| 14   did she ever tell you that she quit or give you a | 14   September, because she resigned. It makes more sense |
| 15   resignation letter? | 15   to me as I'm sitting here that it was May, but it |
| 16     A. No. | 16   could have been. I don't know. But whatever it was, |
| 17     Q. Okay. | 17   we paid her for that. |
| 18     A. She did not do that, to me, no. | 18     Q. Okay. But that was the point in time when |
| 19     Q. To anybody at the firm that you -- | 19   she was doing that work that you shut off her remote |
| 20     A. Or at the firm, no. | 20   access and her e-mail? |
| 21     Q. Okay. Was Ms. Buchanan's remote access and | 21     A. Whenever she was doing work when she wasn't |
| 22   e-mail account turned off at some point? | 22   supposed to be, yes. |
| 23     A. Yes. | 23     Q. Okay. Did she continue to be an employee |
| 24     Q. When was that done? | 24   after you shut off her remote access? |
| 25     A. I don't know. That's when we realized she | 25     A. Sure. She was off work for her medical |

| Page 178 | Page 180 |
|---|---|
| 1   was continuing to work when she was supposed to be on | 1   reasons to get better, so that was what she should |
| 2   leave of absence, she was working hours she wasn't | 2   have been focusing on. |
| 3   supposed to work. So we shut it off so she wouldn't | 3     Q. Were you aware that when new associates |
| 4   continue to do that, because she wasn't supposed to be | 4   starting -- I think it might have been Ms. Santos, |
| 5   working. | 5   that she -- that people in the firm were actually |
| 6     Q. Okay. Do you know what date that was, | 6   reaching out to her to get information about the |
| 7   approximately? | 7   cases, things that were going on? |
| 8     A. I don't, but we ended up paying her for, I | 8     A. I heard that at Ms. Buchanan's deposition. I |
| 9   think, the time that she worked remotely and finished | 9   don't have independent knowledge of that. I wasn't |
| 10   some projects. So it would be reflected there, I | 10   involved in any of those communications. |
| 11   believe, in the dates. | 11     Q. Number 31, the prayer for relief basically |
| 12     Q. Okay. So -- | 12   says that defendant is going to claim an entitlement |
| 13     A. There was a time where she was no longer | 13   to be awarded its cost of defense, reasonable |
| 14   being paid salary because she wasn't working | 14   attorneys' fees. |
| 15   regularly, wasn't supposed to be, but continued to do | 15     Your firm is defending this case in-house; is |
| 16   work. So we shut it off so she wouldn't continue to | 16   that right? |
| 17   send e-mails, do research, and perform work when she | 17     A. We're defending it, yes. |
| 18   wasn't supposed to be. | 18     Q. You haven't spent any money on attorneys' |
| 19     Q. So approximately when was that? | 19   fees for outside attorneys, have you? |
| 20     A. Whatever -- I don't recall. Based on -- I | 20     A. I disagree. Every second that an attorney is |
| 21   know we did it for that reason, and my assumption | 21   on this is money spent. |
| 22   would be it was after May of 2017. | 22     Q. What I'm saying is, you haven't spent any |
| 23     Q. Okay. What work was it that she did? | 23   cash money, you haven't sent any checks to other |
| 24     A. I couldn't -- just followup projects, and it | 24   attorneys to represent you in this case? |
| 25   seems like there was a brief she worked on. It was | 25     A. No outside firms; correct. |

Page 181

1    Q.  Okay.  The 50th affirmative defense talked
2  about in number 32, this might be another one that I
3  don't think we really have a dispute over anymore, it
4  says the plaintiff never requested a reasonable
5  accommodation under the ADA.  Maybe we do because it
6  says a "reasonable accommodation."  Your contention,
7  as I understand it, is that her request for
8  accommodations were not reasonable.  Is that right?
9    A.  No, not necessarily.  We discovered that the
10  requested accommodation was not workable.  I don't
11  know that it was unreasonable when it was made, but it
12  was -- we did soon learn that it created an undue
13  burden or hardship on the office and on Ms. Buchanan.
14    Q.  So she did request one, then, in terms of
15  maybe this defense --
16    A.  Yeah, I don't know how to read that defense.
17  I don't think it was unreasonable for her to request a
18  reduced schedule.  That's not what we're saying there.
19    I think that it became an undue hardship,
20  though, as the process went along.  So I don't know
21  how to answer the question on the affirmative defense,
22  but those are the facts and circumstances around it.
23    Q.  Okay.  I think your answer is that she
24  requested a reasonable accommodation but you found --
25    MR. ORTUNO:  Objection.  Misstates the

Page 182

1  testimony.
2    THE WITNESS:  Let him finish the question.
3  BY MR. KEMP:
4    Q.  Did she request a reasonable accommodation
5  from you at any point?
6    A.  Yes, at some point, at one point, yes.
7    Q.  That makes this defense not --
8    A.  No, at one point she did.  Remember she
9  requested accommodations across time many times.  So
10  yes, at one point she did.  When we were in August and
11  she was asking to go back to the same miserable
12  condition that she was working in before, for her, not
13  me, but for her, and the fact that she couldn't
14  complete the essential duties on a four-hour-day
15  schedule, then it wasn't reasonable.
16    Q.  Okay.
17    A.  We had tried that and we knew it wasn't.
18  Hence my question about why are you asking to go back
19  to that.
20    Q.  Okay.  And in terms of her request to have
21  support staff help, was that a reasonable
22  accommodation request or unreasonable accommodation
23  request?
24    A.  I don't recall ever discussing support staff
25  as an accommodation.  Support staff was discussed as

Page 183

1  to streamline the office, help with administrative
2  tasks and things of that nature.  I don't ever
3  remember her saying a reasonable accommodation from my
4  medical provider would be to bring in a support staff
5  member; I don't remember that.
6    Q.  Oh, okay.  So in order to be a reasonable
7  accommodation request, it would have to be something
8  that her doctors requested?
9    A.  No.  The doctors' time limit was the
10  accommodation requested.  I don't ever remember her
11  saying, I need as an accommodation a staff member to
12  assist me with performing essential job duties because
13  I have a disability.  I don't remember that happening.
14    We talked about administrative staff all the
15  time because we were trying to grow the office, but
16  never in the context of -- that I recall as an
17  accommodation to her disability.
18    Q.  Okay.
19    A.  I don't remember it ever coming up like that.
20    Q.  Okay.  The fifth affirmative defense, I want
21  to take a look at it.  It appears to be like a
22  personal injury type of thing almost.
23    MR. ORTUNO:  Fifth, you said?
24    MR. KEMP:  Yes, the fifth.
25    Q.  (Reading):

Page 184

1    "Some or all of the plaintiff's claims
2  are barred because plaintiff did not exercise
3  ordinary care, caution or prudence for the
4  protection of her own safety and well-being,
5  and any injuries or damages allegedly
6  sustained or suffered by her were directly
7  and proximately caused or contributed to by
8  her default, failure to act, carelessness,
9  and negligence."
10    Are you actually talking about physical
11  injuries?
12    A.  The first amended complaint?
13    Q.  The first amended complaint is number 2,
14  Exhibit 2.  I mean, we certainly would have had a
15  claim for garden-variety emotional distress.
16    A.  Is there an emotional distress claim on which
17  some kind of comparative fault analysis could be
18  applied?  I don't know.  I mean, I know that she --
19    Q.  And the remedies sought under the ADA.
20    A.  Well, the breach of implied covenant of good
21  faith and fair dealing as well.  I mean, honestly,
22  that's a really difficult question to answer.  It
23  requires a pretty sophisticated legal analysis.
24    Q.  It just struck me as odd, it just struck me
25  as out of place, but -- and if you are talking about

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

Page 185

1  you wanted to apply it to a claim of emotional
2  distress, then it makes more sense.
3     A. I think that's where it's directed.
4     Q. Okay. That's fine. Go past that, then --
5  well, I'm sorry. Just one question:
6        What is it that she did or didn't do that you
7  feel caused her own --
8     A. I never asked her to work past the
9  restrictions. I think she might have testified to
10 that at her deposition. I just didn't. And to the
11 extent that she was driven and she worked hard and
12 wanted to do that, she did that on her own. And so I
13 wasn't compelling her or telling her to do that.
14 Certainly the work needed to be done, but I never said
15 you need to stay and risk your health.
16       On the contrary. We did a lot to try and
17 accommodate her in that, and I think her actions
18 across the board made clear or at least certainly
19 contradict the idea that I was yelling at her and
20 telling her she had to work late.
21       So to the extent that she came in with an
22 accommodation, we granted it and then she worked past
23 that. That would be something that she chose to do,
24 and we realized it wasn't workable because we went
25 even to 80 percent when she felt like she wanted to

Page 186

1  give it a try and work that, that wasn't workable and
2  she had an increase in the symptomatology and decided
3  that it wasn't workable and she had to stand back.
4        So I don't know how that all plays out, but
5  that's where that would be driven from.
6     Q. Okay. Jumping ahead to number 45, the 37th
7  affirmative defense --
8     A. Can you hold on a second? I'm sorry. I'm
9  trying to respond to this (indicating cell phone), an
10 emergency on my depo tomorrow.
11    Q. Sure. Take your time.
12       Topic 45 is talking about the 37th
13 affirmative defense, which says:
14       "Defendant is entitled an offset for all
15       amounts advanced to plaintiff which she has
16       not repaid or amounts she otherwise owes."
17       We talked about the insurance. Is there
18 anything else that you claim that Ms. Buchanan
19 actually owes to your firm?
20    A. I don't believe so.
21    Q. And do you know how much -- I think it's set
22 forth in the labor commissioner response, but as you
23 sit here, do you remember how much it is that you
24 claim that she owes?
25    A. Not without looking at that, no.

Page 187

1     Q. Okay. Do you believe that the information in
2  the labor commissioner response is accurate and
3  correct?
4     A. Yes.
5     Q. Okay. 46, regarding the 40th affirmative
6  defense:
7        "Plaintiff did not have a disability,
8        quote-unquote, as defined by the Americans
9        With Disabilities Act."
10       Is it your contention that she didn't have a
11 disability, she didn't have a condition that impacted
12 on her activities of daily living?
13    A. I believe that kind of contention in question
14 might not be appropriate in the depo setting, but at
15 this point, especially as a PMK, I don't know of any
16 information to suggest otherwise. I think she was
17 qualified as disabled.
18    Q. Okay. So there's a number of contract
19 defenses that are discussed here. I want to start
20 with the 44th affirmative defense, which is discussed
21 at topic 49, "no contract was ever formed between
22 plaintiff and defendant." And you've touched on that
23 before.
24       Is there any other -- any other facts or
25 information that you have to tell me about the lack of

Page 188

1  contract formation that we haven't touched on already?
2     A. Yes. She was always an at-will employee.
3     Q. Okay. So your position is -- and I run into
4  the objection here, I know. But your position is that
5  at-will employment is not a contractual relationship?
6     A. Depends on what you mean by "contractual
7  relationship." Contractual relationship that implies
8  a set term would not be at-will employment, from my
9  understanding.
10    Q. Right, but it is a relationship that is
11 governed by the law of contract in terms of you agree
12 to pay her a certain amount of money, she agrees to
13 work a certain amount of time?
14    A. Am I disagreeing with your statement that it
15 is -- I don't believe that at-will employment supports
16 the bases for your cause of action that's bounded in
17 contract under the breach of implied covenant of good
18 faith and fair dealing. So I think we have a
19 disagreement there.
20    Q. I understand.
21    A. So I don't believe that there was a contract
22 ever formed that discussed a term of employment, nor
23 that set a term -- a pay scale for any term, anything
24 beyond an at-will scenario.
25    Q. All right.

Daniel R. Watkins, Esq.                           Amy Buchanan v. Watkins & Letofsky, LLP

---

Page 189

1    A.  I mean, getting the facts, just because they
2  are so wide-open questions, but there was an
3  employment manual.  She acknowledged at-will
4  employment.  She acknowledged receipt of the employee
5  manual.  That identifies multiple times throughout the
6  manual that her -- that employment is at will and that
7  no contract is formed based on the policies and
8  procedures in the employee manual, and she
9  acknowledged receipt of that and we have no documents
10  to the contrary.
11    Q.  Okay.  Anything else with respect to the
12  formation?
13    A.  Not off the top, no.
14    Q.  Okay.  So topic 51, the 46th affirmative
15  defense:
16        "Plaintiff's claims fail because
17        plaintiff failed to return to work and
18        abandoned her position."
19     Is that how you contend that the employment
20  relationship ended?
21    A.  Again, I think contention questions for pune
22  (phonetic) care are not appropriate because they call
23  for --
24    THE REPORTER:  Pardon?
25    THE WITNESS:  Contention question for pune

---

Page 190

1  (phonetic) care are not appropriate because they call
2  for a legal conclusion, but to the extent that I can
3  elaborate on the abandonment, it goes back to we had a
4  conversation in August she was going to need
5  six months, and she never got back to us.
6  BY MR. KEMP:
7    Q.  Anything else regarding abandonment of her
8  position, any other details?
9    A.  We talked about that one, unless you want to
10  go back over that, that --
11    Q.  Anything that we haven't talked about
12  already.
13    A.  Okay.  Not that I can think of, no.
14    Q.  Okay.  52 I think we covered.  53 I'm going
15  to come back to.  54 we've covered.  56, we've covered
16  the facts, I think, pretty well.  Only questions on 55
17  at this point.
18     47, topic 47 is talking about the 40 --
19  actually, there was some -- I do this all the time, I
20  have this problem -- 43rd affirmative defense, there
21  were like two of them.  So the first 43rd affirmative
22  defense says:
23        "Plaintiff's contractual claims fail by
24        reason of misinterpretation, fraud,
25        unconscionability, impossibility, statute of

---

Page 191

1        frauds, error, impracticability, waiver
2        and/or release."
3     And there's a whole bunch of stuff there.
4     First of all, do you think that Amy Buchanan
5  lied or misrepresented anything to you in this case?
6    A.  You mean during her employment?
7    Q.  Anything related to her employment when she
8  was working for you through the end of when she was no
9  longer working for you, did she --
10    A.  I'm just trying to get the time frame.  Do I
11  think she lied to us -- let me not use the word "lie"
12  because I don't know -- that can have a lot of
13  meanings.  Do I think she misrepresented something to
14  us during her employment?
15    Q.  Yes.
16    A.  No, I don't think so.
17    Q.  All right.  With respect to her claims, do
18  you think she's made misrepresentations about her
19  claims other than --
20    A.  Yes.
21    Q.  Okay.  Other than what we've already talked
22  about, is there anything -- I mean, I think you are
23  saying that she says she's owed money that you think
24  she is not owed.
25    A.  I don't want to be problematic, but that's

---

Page 192

1  very compound and really difficult to answer.  She
2  states in her first amended complaint that we were a
3  qualified employer, when that's not true.
4    Q.  We're going to get to that, yeah.
5    A.  But that's what you are asking me now.  So I
6  don't want to necessarily have to go through the
7  entire complaint.  I mean, I can.  Her deposition
8  testimony is a few hundred pages.  I would have to go
9  through that to identify each misrepresentation that
10  occurred during that.  I don't have my notes from the
11  deposition in front of me to refer to so -- and I
12  don't have the transcript to review it.
13     I think that there were certainly at a
14  minimum misunderstandings by her, but I don't have an
15  itemization for you right now.
16    Q.  Okay.
17    A.  As it relates to contractual claim, if we
18  want to focus on contractual claims --
19    Q.  Well, that's what this talks about.
20    A.  Your question was claims.
21    Q.  It was.  But as I look back at this, it does
22  speak about contractual claims specifically.
23    A.  Right.
24    Q.  And I was just talking about
25  misrepresentation and fraud at this point.  There's

---

Daniel R. Watkins, Esq.                                      Amy Buchanan v. Watkins & Letofsky, LLP

Page 193

1  other parts of that too.  But just misrepresentation
2  or fraud, misrepresentations that she's --
3      A.  Well, any claim that she had an agreement
4  with us to work for a set period of time under a
5  certain pay structure is inaccurate and a
6  misrepresentation, if that occurred, to the extent
7  that she was always at will.
8          The -- to the extent that she has claimed
9  that she's entitled to health insurance as a part of
10  an employee on leave, I think that's a
11  misrepresentation of what we discussed, and I don't
12  think that's legally accurate.  We gave her health
13  insurance to help her out when she was on leave.
14          The idea that she was entitled to a bonus at
15  any time during her employment is a misrepresentation.
16          The idea that we agreed to pay her an hourly
17  rate during her employment is a misrepresentation.
18          And any other fact that would suggest she was
19  not an exempt professional at-will employee, those
20  would be misrepresentations.
21      Q.  Anything else you can think of?
22      A.  No.
23      Q.  Okay.  Well, the last part -- I'm going to
24  skip over some of these other parts, but I do want to
25  ask about waiver and/or release.

Page 194

1          Is there any document that you contend or
2  know of that she signed that would constitute a waiver
3  or release?
4      A.  I can answer the release part, and that's no.
5  And then just to be honest with you, I've never done
6  an analysis on what constitutes a waiver, so I
7  couldn't answer that right now.
8      Q.  Oh, fair enough.
9      A.  But I think I have given you the facts, at
10  least in this context.
11      Q.  Okay.
12      A.  If it -- yeah.  But -- yeah, I don't know of
13  anything on those two issues.
14          MR. KEMP:  Okay.  Let's make this the next
15  exhibit.
16          THE REPORTER:  Twenty.
17          (Exhibit 20 was marked for identification.)
18  BY MR. KEMP:
19      Q.  Pages -- it's defendant Bates stamped 1285,
20  1286.  So these e-mails -- you know what?  There might
21  have been one -- there might have been another one on
22  1287 that I haven't included here, because it looks
23  like there's an e-mail from Amy to you at the bottom
24  of the page, "Payroll Correction."
25          Do you recognize these e-mails?

Page 195

1      A.  On 1286, there appears to be one missing,
2  but --
3      Q.  Right.
4      A.  -- to answer your question, I don't recognize
5  them but I'm assuming that they came from us.  It's
6  with our disclosures, so I'm sure we produced them.  I
7  know I've reviewed them.  I just don't recognize them
8  off the top.
9      Q.  Okay.  So the July 10th, 2017, at 10:19 p.m.
10  e-mail from you to Amy on 1286 with a copy to Susan
11  indicates that you are going to review her time and
12  you would cover proportionate balance due if she
13  worked more than the 50 percent or 80 percent of the
14  time.  You did make that representation to her, didn't
15  you?
16      A.  Regarding billable time?  Yes.
17      Q.  Making up payment.
18      A.  We were going -- yes, whatever balance was
19  due based on the review of billable time.
20      Q.  All right.  And you believe that you have
21  done that?
22      A.  Yes.
23      Q.  Okay.  As you sit here today, you don't think
24  you owe any money to Amy for time that she worked?
25      A.  No.  She was an exempt salaried employee and

Page 196

1  we paid her as such.
2      Q.  Now, you said something a few minutes ago
3  about that there was never any agreement about an
4  hourly rate, yet we have an e-mail from Susan here
5  from September 1st, 2017, that indicates that time was
6  being paid at 31.25 an hour.
7      A.  This is, I believe, for the time over that
8  she was paid when she wasn't being paid under a salary
9  wage.  The only way to come up with it was to
10  establish an hourly rate to reimburse her for that
11  time.  But there was no agreement that she would work
12  for us under an hourly rate, if my memory serves.
13      Q.  So 65,000 a year divided by 2,080 hours would
14  be an eight-hour day of work hours, and that's how she
15  came up with 31.25; is that correct?
16      A.  Yes.
17      Q.  And so your position, as I understand it, is
18  that she was to be paid on a salaried basis for
19  part-time work?
20      A.  Yes.
21      Q.  Okay.  And it was to be 20 hours a week
22  part-time when it was 50 percent and then went to
23  80 percent was eight hours times four days a week,
24  32 hours.  Is that what it would work out to?  Don't
25  trust my math, bu --

Page 197

1  A. It was 80 percent of a 40-hour workweek, so
2  whatever that translates to, yes.
3  Q. Okay. 50 percent of a 40-hour workweek and
4  then 80 percent of a 40-hour workweek, okay, all
5  right, and I think it's 32 hours, but we won't trust
6  my math either. We'll get a calculator at some point.
7  Okay. So this e-mail on September 1st, 2017,
8  basically a check was mailed out to Amy for $1,338.59
9  for the supplemental earnings that were calculated,
10  and you believe that that was the last money that Amy
11  was owed; is that fair to say?
12  A. Oh, I don't know.
13  Q. Okay.
14  A. Did you say owed or paid?
15  Q. Well --
16  A. Let's see. When was this sent out?
17  September 2017.
18  Q. Yeah. So she had not been working since
19  May by that point.
20  A. Yeah, I just don't know. I would assume
21  that's right, but I don't know.
22  Q. All right. 48, which is the second 43rd
23  affirmative defenses, "Plaintiff's claims failed
24  because she was in breach of contract."
25  Clearly, you can plead things in the

Page 198

1  alternative and things that are inconsistent, but in
2  what way do you feel that Amy was not living up to
3  whatever agreement or promises that she made?
4  A. Since we don't -- I don't think there was a
5  contract, I think she could not be in breach. I don't
6  know of any facts to show that she breached a contract
7  that didn't exist.
8  Q. Okay.
9  A. I think we reserved those things for if the
10  trier of fact were to conclude that there was a
11  contract, there might be facts and circumstances that
12  are borne out by the trial process that establish she
13  was in breach.
14  Q. As you sit here today, do you know what any
15  of those would be?
16  A. I don't know the terms of the contract as
17  argued and proved at trial, so, no.
18  Q. Okay. Number 50, plaintiff's -- which is the
19  45th affirmative defense, "Plaintiff's claims fail
20  because defendant performed all contractual
21  obligations in full and did so in good faith."
22  Is your answer the same for that, that you
23  just basically reserve that in case there's a contract
24  found?
25  A. Correct.

Page 199

1  Q. Okay. I'm sorry. I'm jumping around a
2  little bit here.
3  44, which is the 36th affirmative defense,
4  "Plaintiff's claim is barred because there was no
5  meeting of the minds; therefore, no contract was
6  formed with defendant."
7  I guess that might just be a different way of
8  the other one that says there was no contract?
9  A. Correct.
10  Q. Okay. 42, which is the 25th affirmative
11  defense, "Plaintiff's symptoms of mental or emotional
12  distress or injury were the result of a preexisting
13  disorder or alternative cause and not the result of
14  any act or omission of the defendant."
15  Do you know of any preexisting condition of
16  emotional or mental distress that Amy Buchanan had?
17  A. Her entire medical condition.
18  Q. Okay. So you think because of her -- any
19  emotional distress or mental anguish that she had was
20  because of her medical conditions rather than anything
21  that the defendant did?
22  A. The claimed distress and -- mental and
23  emotional distress in this lawsuit, yes.
24  Q. Okay.
25  A. There's no parceling out the difference

Page 200

1  between the frustration and emotional distress
2  associated with trying to work and have those
3  conditions and what she experienced later on, that I
4  can discern.
5  Q. What evidence do you rely on for that?
6  A. Just her own testimony.
7  Q. Nothing but her own testimony?
8  A. Yeah. I mean, I don't have any other
9  information other than what she testified to at her
10  deposition, in terms of how she was handling things
11  from the transition or during the transition.
12  Q. Okay. Just to be clear, you don't have any
13  medical evidence or doctors' opinions that say that;
14  right?
15  A. No. I don't think it's required for that
16  particular affirmative defense either.
17  Q. It might not be, but I'm just making sure
18  that there is nothing I'm missing.
19  A. Yeah. We haven't had a medical analysis
20  done.
21  Q. Okay. Number 39, going back, it's the 16th
22  affirmative defense, "Defendants claim that
23  plaintiff's claims fail because plaintiff paid -- it
24  should say "was paid all wages due and owed."
25  So as you sit here, you don't believe there

Page 201

1 is anything outstanding that Amy Buchanan is owed in
2 terms of wages?
3      A.  Correct.
4      Q.  Let me see if I've got the other documents
5 that we haven't looked at.
6      A.  While you are doing that, can we take a
7 two-minute break, go to the restroom, and get some air
8 circulating in here?
9         (Recess taken.)
10        MR. KEMP:  Back on the record.
11     Q.  You are still under oath.  Okay?
12     A.  Yes.
13     Q.  All right.  Exhibit 20, the first e-mail on
14 1285 says:
15         "Dan, I just realized that this went to
16         her e-mail at WL-LLP.  Please forward her
17         e-mail address and phone number, SW."
18      So this is from Susan to you.
19      That was a problem because she no longer had
20 e-mail access at the firm by September 1st, 2017;
21 right?
22     A.  I would assume, yeah --
23     Q.  Okay.
24     A.  -- yes, that was the in place at that time.
25        MR. KEMP:  Okay.  We'll make this the next.

Page 202

1        THE REPORTER:  Twenty one.
2        (Exhibit 21 was marked for identification.)
3        MR. KEMP:  Exhibit 21, some e-mails, Bates
4 stamp numbers 1304 and 1305, this is from the
5 July 2017 time frame.  It says Saturday, 8 July 2017
6 from Amy Buchanan to Dan Watkins, with a CC to Susan
7 Watkins, subject "Payroll Correction."
8      Q.  My understanding is that this is Amy's
9 summary of what she contended that she was still owed
10 at that time.  Do you recognize that e-mail?  Is that
11 what it says here?
12     A.  Yes, I do.
13     Q.  Do you remember getting this e-mail?
14     A.  No, I don't remember receiving it, but I
15 recognize it.
16     Q.  All right.  You don't have any doubt as to
17 its authenticity, do you, in terms of --
18     A.  That it came from Ms. Buchanan, no.
19     Q.  Okay.  I know you probably dispute the
20 content of it, but is that -- as you look at it --
21     A.  Yes.
22     Q.  -- you do have disputes with the content of
23 it; right?
24     A.  Yes.
25     Q.  And what was some of the issues that you have

Page 203

1 with --
2      A.  She was an exempt professional employee not
3 entitled to overtime, is one or the primary.
4      Q.  So when you say "not entitled," you mean not
5 entitled to overtime premium of time and a half;
6 right?
7      A.  Well, any type of overtime payment, but yes.
8      Q.  Okay.
9      A.  She was salaried.  I see the work performed,
10 September 2016.  That line that goes over and says
11 "contract work," that's a misrepresentation in the
12 sense of what it was or wasn't.  We didn't have a
13 contract for her to perform that work.
14     Q.  Okay.  And --
15     A.  I'm just looking.  There's a lot of entries
16 on here.  I don't know that I can dispute here in
17 front of me the time entries, but I don't think we
18 made that an issue and we ended up paying those.
19     Q.  Okay.
20     A.  Don't reference cases.  I think that was a
21 concern, question we had, but...
22     Q.  On the second page there's a thing on the
23 bonus -- I don't mean to interrupt you.  I'm sorry.
24     A.  That's fine.  Oh, yeah, that -- the bonus is
25 wrong in two regards on the 150 and on the hours

Page 204

1 calculated to reach it, as I remember.
2      As I remember, it's wrong on the 150.  It's
3 definitely wrong to say that the bonus kicked in on a
4 monthly basis at any hourly rate, because it was not
5 monthly, ever, by anybody.
6      "Medical," I'm not sure what she's referring
7 to there.  "127.29 per month paid," I'm not sure what
8 she's referencing there, so I don't know to dispute it
9 or not.
10     Q.  Okay.  All right.  That's fine.  All right.
11     So, finally, we come to topic number 53,
12 "Defendant is not an employer, quote-unquote, as
13 defined in the Americans With Disabilities Act
14 NRS 613.310," and that's from the 49th affirmative
15 defense?
16     My understanding is that the contention is
17 that you all don't have enough employees to be an
18 employer under the Federal Americans With Disabilities
19 Act or the State statute that deals with employment
20 discrimination on the basis of disabilities.  Do I
21 have that right?
22     A.  I'm not a qualified employer with that
23 specific issue in mind and perhaps others, but
24 certainly with respect to that.
25     Q.  All right.  And can you explain why that is?

Daniel R. Watkins, Esq.                                    Amy Buchanan v. Watkins & Letofsky, LLP

Page 205

1   A. Well, we've only been -- the most we've ever
2   had employed in Nevada is three people at any given
3   time. This defendant, Watkins & Letofsky, LLP, A
4   Nevada Limited Liability Partnership, had one employee
5   with Ms. Buchanan, then two while she worked with
6   Mr. Forster, then one while Mr. Forster worked alone
7   until Ms. Santos worked, that made two, and then
8   Ms. Kachermeyer started up; that's three -- actually,
9   let me add in Mr. Ortuno; that makes four, but that
10  was after Ms. Buchanan's employment.
11  Q. Okay. And so then your position is that the
12  California employees don't count at all?
13  A. Correct. But even if they do, there's not
14  15, there never has been. I don't believe they are
15  included.
16  Q. Okay. Well, I think we have some written
17  discovery requests that would be relevant to that, but
18  just how many employees do you believe that you had
19  between California and Nevada during the time that
20  Ms. Buchanan was employed, I guess, let me say between
21  April of 2016 and November -- let's say December 1st
22  of 2017; how many employees do you believe you had
23  during that time between the two states?
24  A. It fluctuated quite a bit, but anywhere from
25  9 to 13, maybe 8 at one point between the two, but 9

Page 206

1   to 13.
2   Q. All right. We've got some written discovery
3   requests out there. I'll look at the responses of
4   that, but I just wanted to know from your testimony
5   today what you think it is.
6   A. Sure.
7   MR. KEMP: Okay. All right. Give me just
8   one minute to confer, because I think we're all done.
9   Off the record.
10  (Off record.)
11  MR. KEMP: Let's go back on the record.
12  Q. I would remind you are still under oath,
13  okay?
14  A. Yes.
15  Q. In your calculation of the number of
16  employees, do you count yourself and Mr. Letofsky?
17  A. No, we do not.
18  Q. Okay. If you did include yourself and
19  Mr. Letofsky, would that 13 then be 15?
20  A. Yes, but not for the period of time required
21  under the ADA.
22  Q. All right. Well, I understand your position,
23  and we'll look at that as it comes up.
24  The only other thing, I think there was
25  something at some point, were there other associates

Page 207

1   that were saying that they didn't feel that they were
2   being paid correctly?
3   A. No.
4   Q. I think I remember seeing somewhere that
5   there was a reference in an e-mail that you said that
6   you were reviewing the records, billable hours, and
7   other records of other -- of other associates to
8   determine whether they were paid correctly. I'm just
9   wondering --
10  A. No, that's inaccurate. I didn't review that,
11  review those -- I didn't review billing for the
12  purposes of determining correct wages. Everybody was
13  on salary.
14  MR. KEMP: Okay. All right. Those are all
15  the questions I have. Thanks.
16  MR. ORTUNO: I've got none.
17  (End of proceedings at 5:24 p.m.)
18
19          *   *   *   *   *
20
21
22
23
24
25

Page 208

1   DECLARATION OF DEPONENT
2   PAGE LINE  CHANGE      REASON
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19      I, DANIEL R. WATKINS, ESQ., deponent herein,
    do hereby certify and declare under penalty of perjury
20  the within and foregoing transcription to be my
    deposition in said action; that I have read, corrected
21  and do hereby affix my signature to said deposition.
22
23  _____
24  DANIEL R. WATKINS, ESQ., Deponent
25  Date:_____

Page 209

1         I, the undersigned, a Certified Court

2    Reporter of the State of Nevada, Registered

3    Professional Reporter, and Certified Realtime

4    Reporter, do hereby certify:

5         That the foregoing proceedings were taken

6    before me at the time and place herein set forth; that

7    any witnesses in the foregoing proceedings, prior to

8    testifying, were duly sworn; that a record of the

9    proceedings was made by me using machine shorthand

10   which was thereafter transcribed under my direction;

11   that the foregoing transcript is a true record of the

12   testimony given.

13        Further, that before completion of the

14   proceedings, review of the transcript was requested.

15        I further certify I am neither financially

16   interested in the action nor a relative or employee

17   of any attorney or party to this action.

18        IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20   Dated:  03-02-2020

21

22

23   _____

24   JANET C. TRIMMER, RPR, CRR
     NV CCR No. 864

25

Electronically signed by Janet Trimmer (501-362-839-7812)   57e45a83-1c46-4198-bc70-0490be9c9af8