# Exhibit L

Deposition Transcript of Amy Buchanan

```
 1              UNITED STATES DISTRICT COURT

 2                  DISTRICT OF NEVADA

 3    _____

 4    AMY BUCHANAN,                )

 5                 Plaintiff,  )

 6          vs.                )CASE NO.:

 7    WATKINS & LETOFSKY, LLP, a )2:19-cv-00226-GMN-VCF

 8    Nevada Limited Liability   )

 9    Partnership; and DOES I -  )

10    X, inclusive,              )

11                 Defendants. )

12    _____)

13

14

15

16              DEPOSITION OF AMY BUCHANAN

17              FRIDAY, JANUARY 31, 2020

18                    9:38 A.M.

19       AT 8215 SOUTH EASTERN AVENUE, SUITE 265

20                 LAS VEGAS, NEVADA

21

22

23    REPORTED BY:  MICHELLE R. FERREYRA, CCR No. 876

24                  JOB NO. 3856457

25    PAGES 1 - 272

                                        Page 1
```

1       Q.    The First Amended Complaint?

2       A.    Yes.

3       Q.    When did you review the First Amended

4   Complaint?

5       A.    Last night.

6       Q.    How long did you spend reviewing that?

7       A.    Not that long.

8       Q.    Okay.  Can you give me an estimate of time,

9   15 minutes and two hours?

10      A.    Fifteen minutes to half an hour, tops.

11      Q.    Have you seen the First Amended Complaint

12  prior to last night?

13      A.    Yes.  It's been a while.

14      Q.    Say it again?

15      A.    It's been a while.

16      Q.    Okay.  And I apologize.  I'm not very -- I've

17  got kind of a head cold going, and so I'm having a hard

18  time hearing you, if you can just speak up.  I want to

19  make sure she hears you too.

20      A.    Okay.

21      Q.    In your review of the First Amended Complaint

22  last night, was there anything that jumped out to you

23  and you said, Wait.  This is inaccurate.

24      A.    There was one incident or one provision that

25  mentions Watkins & Letofsky failing to provide

                                          Page  8

1    accommodations before I resigned in September of 2016.

2    And I want to make it clear that I had voluntarily

3    resigned in September 2016.

4        Q.    So to the extent that the First Amended

5    Complaint infers that you were not voluntarily

6    terminating your employment in September of 2016, the

7    First Amended Complaint would be inaccurate; is that

8    correct?

9        A.    For that purpose, yes.

10       Q.    And I believe you said you reviewed e-mails

11   in Watkins & Letofsky?

12       A.    Yes.

13       Q.    How long did you spend with that?

14       A.    Maybe an hour.

15       Q.    Was there anything in those e-mails that you

16   didn't recall previously seeing?

17       A.    Yes.

18       Q.    Can you describe briefly for me what that

19   was?

20       A.    There were e-mails exchanged between you and

21   Susan in terms of, terms of employment.  I believe

22   Brian might have been copied on them.

23            There was e-mails exchanged internally after

24   receiving notice of the complaint filed with the labor

25   commissioner.  And there was e-mails exchanged

                                                    Page 9

1    Limited Liability Partnership as the defendant.

2            Do you see that?

3        A.   Yes.

4        Q.   Is that the Watkins & Letofsky that you know

5    of when you say you "only know of only one Watkins &

6    Letofsky"?

7        A.   I know of Watkins & Letofsky, LLP with

8    businesses in Nevada and California.

9        Q.   Okay.  Do you understand that those

10   businesses, one is a Nevada LLP and one is a California

11   LLP?

12       A.   I do not know how Watkins & Letofsky is set

13   up.

14       Q.   At any time during your employment or after

15   did you research how Watkins & Letofsky, LLP operating

16   out of California was organized?

17       A.   No.

18       Q.   So you presumed that the people that were

19   listed on the Watkins & Letofsky website were employees

20   of one Watkins & Letofsky?

21       A.   Yes.

22       Q.   How many people did you see in those

23   photographs, different people?

24       A.   I don't know the exact number.

25       Q.   Who did you recognize -- had you met anybody

                                        Page 16

1    that information you are providing?

2          A.    I had referenced and stated that in my

3    e-mails to you requesting monies owed.

4          Q.    After November of 2017?

5          A.    No.

6          Q.    Or excuse me, after May of 2017?

7          A.    Correct.

8          Q.    Do you have anything prior to May of 2017

9    that references a lower bonus requirement for you at

10   any time?

11         A.    I could not find anything in written form.

12         Q.    And it's your memory that those statements

13   about a lower bonus requirement applied to both you and

14   Eran?

15         A.    Correct.

16         Q.    Have you had any conversations with

17   Mr. Forster about that since May of 2017?

18         A.    No.

19         Q.    When you came back to work at Watkins &

20   Letofsky in 2016, December 5, 2016, did you start back

21   full-time or on some type of part-time basis?

22         A.    When I came back to Watkins & Letofsky in

23   December of 2016?

24         Q.    Yes.

25         A.    I came back with an agreement to work

                                        Page 143

1    recently.

2         Q.    Okay.

3              But at least it's your expectation that

4    everything that you have in writing that might

5    reference a contract you have provided to your

6    attorneys at this point?

7         A.    Yes.

8         Q.    Now, looking at Paragraph 10 on Page 3, start

9    at Line 22-ish.  It's like 22, 23, where it says, "She

10   has a serious medical condition."

11             Do you see that?

12        A.    Yeah.

13        Q.    "That impacts upon and substantially limits

14   her in her performance of her major life duties,

15   including, but not limited to, thinking, sleeping, and

16   working.  Her symptoms include constant pain, and at

17   various times, some or all of the following:  Problems

18   sleeping, fatigue, difficulty thinking clearly,

19   difficulty performing every day tasks, stress, and

20   anxiety, depression, and migraine headaches."

21             Do you see that?

22        A.    Yes.

23        Q.    It says, "She also has disabilities related

24   to a motor vehicle accident that she suffered, and

25   these musculoskeletal conditions and limitations also

                                        Page 146

1    constitute disabilities under the ADA."

2              Do you see that?

3        A.   Yes.

4        Q.   Did you -- were you experiencing each of

5    these symptoms in some form or another during your

6    employment at Watkins & Letofsky.  Both up to

7    May -- from December 2016 through May 2017, and then

8    the time period before that?

9        A.   These things were experienced at

10   different -- either both those time periods or at

11   different time periods and varying degrees because my

12   condition changed.  My condition was worse when I

13   returned, and it worsened after I returned.

14       Q.   Okay.  And so that's kind of where I'm

15   driving at.  So I know it's a little bit broad, and so

16   that's why I'm trying to get to when it applied.

17       A.   Yeah.

18       Q.   So is it your memory that during the first

19   time that you were employed by Watkins & Letofsky from

20   April of 2016 --

21       A.   '16.

22       Q.   -- until -- what was it?

23       A.   September.

24       Q.   September of 2016, during that initial time

25   period, that you experienced the symptoms listed in

                                          Page 147

1    Paragraph 10, problems sleeping, fatigue, difficulty

2    thinking clearly, and so on as they roll over onto

3    Page 11 through line 3?

4          A.    I experienced the chronic pain, the

5    migraines, I experienced these -- yeah.  I experienced

6    these things, but to a lesser degree.  It was more so

7    the pain and the migraines that was the primary

8    culprit.

9          Q.    So during the first stent in -- at Watkins &

10   Letofsky from April 2016 to September of 2016, you

11   experienced these symptoms, but to a lesser degree than

12   the symptomology you experienced at Watkins -- while

13   you were with Watkins & Letofsky from May of

14   2017 -- excuse me, from --

15         A.    December.

16         Q.    -- December of 2016 to May of 2017?

17         A.    Correct.

18         Q.    So the second period you had worse conditions

19   and symptoms than the first period?

20         A.    Correct.

21         Q.    Okay.

22                And the impact of those conditions on your

23   ability to complete major life activities was more

24   during the second period of work with Watkins &

25   Letofsky than it was with the first period of work; is

Veritext Legal Solutions
877-955-3855

1    that correct?

2        A.    Yes.

3        Q.    Did you understand that during both periods

4    of time with Watkins & Letofsky that the essential job

5    functions included taking depositions, potentially as

6    your case would demand it?

7        A.    Yeah -- yes.

8        Q.    And attending mediations as needed?

9        A.    Yes.

10       Q.    Attending arbitrations as needed?

11       A.    Yes.

12       Q.    Summarizing records and performing legal

13   research as required by each case?

14       A.    Yes.

15       Q.    Meeting with clients and taking down notes

16   from those meetings and developing those notes into

17   facts that you can use to advance your case?

18       A.    Yes.

19       Q.    Would you agree that just in general,

20   litigation is a tough profession and stressful?

21       A.    Yes.

22       Q.    Would you agree that the development of a

23   file, whether you are a plaintiff or a defendant,

24   develops a lot of focus and concentration -- or

25   requires a lot of focus and concentration from each

Page 149

1    case to each case?

2        A.    Yes.

3        Q.    During that second time that you were working

4    with Watkins & Letofsky from the December 2016 to

5    May 2017 time frame, did you ever throw up in the

6    office from migraines.

7        A.    Yes.

8        Q.    Did you ever leave the work environment

9    because you were experiencing migraines?

10        A.    Yes.

11        Q.    Did you ever have to take a nap during the

12    office time that you were experiencing migraines?

13        A.    Yes.

14        Q.    Did you ever have to leave and go to the

15    doctor because you were experiencing migraines?

16        A.    Yes.

17        Q.    Did you ever have to leave because you were

18    experiencing musculoskeletal conditions that were

19    causing you pain and you couldn't sit and perform

20    anymore job functions that day?

21        A.    I can't answer to that.  I can say that I was

22    experiencing my symptoms of pain.

23        Q.    At any point in time, did anybody from

24    Watkins & Letofsky tell you you couldn't leave because

25    you were having a migraine?

Page 150

1        A.    No.

2        Q.    Did anyone ever tell you you couldn't leave

3    because you -- even though you were throwing up in the

4    office from a migraine?

5        A.    No.

6        Q.    Did anyone ever tell you that can't take a

7    nap in the office to help with the migraine?

8        A.    No.

9        Q.    Did anyone ever prohibit you from going to a

10   doctor to seek medical attention associated with

11   migraines or any other disability?

12       A.    No.

13       Q.    You requested a modified workweek upon your

14   return; is that correct?

15       A.    Correct.

16       Q.    And you were the one who had actually

17   requested the four hours a day at 20 hours a week;

18   correct?

19       A.    Correct.

20       Q.    And when you requested that Watkins &

21   Letofsky accommodated that request when you returned in

22   December of 2016; correct?

23       A.    No.

24       Q.    They didn't?

25       A.    You said you would.

                                            Page 151

1    Q.   Okay.  So you were able to come back with a

2    four-hour a day work schedule.  That was the plan;

3    correct?

4    A.   Correct.

5    Q.   Do you have anything in writing at any point

6    in time to me or Brian Letofsky or anybody at Watkins &

7    Letofsky where you complained that the workload was

8    keeping you from sticking to the accommodation of four

9    hours a day?

10    A.   No.  Everything was verbal discussions.

11    Q.   In Paragraph 13, Page 4, Line 18, it says,

12    "Defendant told plaintiff to submit a resignation

13    letter, which plaintiff did, on or about September 2,

14    2016."

15         Do you see that?

16    A.   Yeah.

17    Q.   Could that be the resignation that you are

18    saying it was actually voluntary?

19    A.   Correct.  And it was Nancy who followed up

20    and asked me to send a formal resignation.

21    Q.   And that request to send a formal resignation

22    followed an e-mail that you had sent previously saying,

23    "I don't think I can keep working anymore.  It's just

24    too much with my medical condition."  Correct?

25    A.   No.  That was me saying, "Hey, I now have to

Page 152

1    have a second surgery; so I'm going to have to leave."

2        Q.    Okay.

3        A.    And then Nancy asked me to send a letter.

4        Q.    More specific -- you are more specific.

5    Surgery was around the corner, you needed to attend to

6    that, and you actually told Watkins & Letofsky you

7    needed to leave employment; correct?

8        A.    Correct.

9        Q.    So the request for resignation letter was

10   just a follow-up on that statement; correct?

11       A.    Yes.

12       Q.    You indicated earlier that in December of

13   2016 when you returned to Watkins & Letofsky, you were

14   the one who made the request to return on a four-hour

15   workday; correct?

16       A.    Say that again?

17       Q.    Yeah.  I'm not looking at the document.  I'm

18   going back to your testimony.  You had indicated that

19   the return to work at Watkins & Letofsky, you were the

20   one who requested the four-hour days; correct?

21       A.    I remember it was 20 hours a week.  Whether

22   that was four hours, five days a week, or it was four

23   days, five hours a day, but I believe it was four

24   hours, five days a week.

25       Q.    How did you come up with that timeline or

Page 153

1    that amount of time to have on a reduced schedule?

2         A.    I knew what I was capable of doing leading up

3    to then and what was being recommended by doctors.

4         Q.    Okay.  So the doctors had recommended that

5    you keep your work to 20 hours a week; correct?

6         A.    Well, I wasn't even working at the time; so I

7    was not able to do a whole lot.  So I needed to start

8    out slow and then see what I could be capable of doing.

9         Q.    Looking at Page 5, Paragraph 16, starting at

10   the ends of Line 5 it says, "It," meaning Watkins &

11   Letofsky, "instead piled work onto plaintiff and told

12   her to, open quote, 'sink or swim,' closed quote."

13         The quotations there, is that intended to

14   refer to an actual accurate statement made by somebody

15   at Watkins & Letofsky?

16         A.    Yes.

17         Q.    Who said that?

18         A.    Eran.

19         Q.    Did Eran have anything to do with your

20   assignments at Watkins & Letofsky?

21         A.    What do you mean by that?

22         Q.    Did he assign you work at Watkins & Letofsky

23   or were you responsible for your own files?

24         A.    He did not assign me work.

25         Q.    You --

                                          Page 154

1      A.    And my files, I was responsible for.

2      Q.    And you were -- your direct supervisor was

3  myself, Dan Watkins, and/or Brian Letofsky, as the case

4  may be?

5      A.    Yes.

6      Q.    Did I ever tell you sink or swim?

7      A.    No.

8      Q.    Did Brian Letofsky ever tell you sink or

9  swim?

10     A.    No.

11     Q.    When Eran Forster told you sink or swim, did

12  you think that he was relaying a directive from me or

13  Brian Letofsky?

14     A.    Eran told me that you directed him that he

15  specifically was not permitted to help me, and you,

16  yourself, told me specifically Eran was not to help me

17  on anything.  And Eran had told me that you had relayed

18  to him that I needed to do my work on my own and that

19  she can sink or swim.

20     Q.    Eran said I said sink or swim?

21     A.    Correct.

22     Q.    Okay.

23           In that conversation, and any of those

24  conversations where we talked about you doing your own

25  work, did we also talk about the fact that you're going

1        A.   The work that was assigned required more than

2    what the hours that I was agreed to be working

3    required.

4        Q.   Okay.  And the agreement for to you work that

5    time was based on the fact that your medical condition

6    prevented you from doing more than four hours a day;

7    correct?

8        A.   It didn't prevent me, it made it extremely

9    difficult.

10        Q.   Well, in order to perform it competently and

11    to complete the essential job functions, you needed to

12    limit your work to four hours a day.  That's what you

13    represented to Watkins & Letofsky; correct?

14        A.   Yes.  Because my health was worsening.

15        Q.   Exactly.  And the work required that was

16    assigned to you was demanding more than four hours a

17    day; correct?

18        A.   Yes.

19        Q.   And you concluded that the amount of work

20    being assigned to the associate position you were in

21    could not be completed by a part time associate;

22    correct?

23        A.   Correct.

24        Q.   And then you were placed on a medical leave

25    of absence; correct?

Page 161

1        A.    Correct.

2        Q.    In that scenario, would you agree that a

3    medical leave of absence was a reasonable

4    accommodation, given that there wasn't enough time in

5    the day that you could give to accomplish all of the

6    tasks?

7              MS. NEAL:  Objection.  Calls for legal

8    conclusion.

9              You can answer.

10             THE WITNESS:  No.  Because there still wasn't

11   any other options offered or explored when that work

12   could have been dispersed amongst other staff.

13   BY MR. WATKINS:

14       Q.    To whom?

15       A.    Other associates.

16       Q.    To whom?

17       A.    In office or in the California office.

18       Q.    You would agree that -- do you have any

19   information on who's licensed to practice law in Nevada

20   that works in our California office?

21             MS. NEAL:  Objection.  Calls for speculation.

22             THE WITNESS:  I know you and Brian are.

23   BY MR. WATKINS:

24       Q.    Right.  Associates.  You would agree that

25   there were no associates in the California office

                                        Page 162

1    licensed to practice law in Nevada at the time that you

2    were working for Watkins & Letofsky, other than Eran

3    Forster, who is licensed in both states?

4         A.    I am not aware, but I do know that all of my

5    cases were assigned to Nicole Naleway who was in the

6    California office, whom I prepared all my cases for and

7    discussed with to handle under the direction of you and

8    Brian --

9         Q.    Okay.

10        A.    -- when I got placed on a medical leave.

11        Q.    "Discussed with and handled," where did you

12   get that specific phrase?

13        A.    Because I directly spoke with her and had to

14   get her up to speed on all of my cases and leave her

15   off on where all of them were and prepared them to hand

16   them off to her.

17        Q.    Okay.

18        A.    And she called me for further follow-up and

19   questions after I got put on leave.

20        Q.    Okay.

21              Did you ever have any further conversations

22   with Ms. Naleway about her workload and how she was

23   going to handle the assignment of transitioning your

24   files?

25        A.    No.

Page 163

```
 1   2017.
 2           Do you see that?
 3      A.   Yes.
 4      Q.   Do you recognize the e-mail?
 5      A.   Yes.
 6      Q.   And first sentence of the e-mail says, "A
 7   check will be mailed today in the amount of $1,338.59."
 8           Do you see that?
 9      A.   Yes.
10      Q.   Did you receive a check from Watkins &
11   Letofsky for that amount following this e-mail?
12      A.   I received a check from Watkins & Letofsky.
13   I don't recall if it was in that amount.
14      Q.   You received a check around the
15   September time frame?
16      A.   I believe it was in September.
17      Q.   And did you cash that check?
18      A.   No.
19      Q.   Why?
20      A.   Because it was incorrect.
21      Q.   Do you still have the check?
22      A.   I do.
23      Q.   If you would look at -- let's see here.  We
24   will start on 1286, WLLLP1286, and then it rolls over
25   to WLLLP1287.  It appears to be an e-mail at the bottom
```

Page 236

1        A.   No.

2        Q.   Do you deposit all of the income checks that

3   you received from Legal Aid into that account, the

4   Wells Fargo account?

5        A.   Yes.

6        Q.   And all the money you earned from Mr. Neeman,

7   those would have been deposited into those accounts?

8        A.   Yes.

9        Q.   And any money you earned after November 2017

10  would have been deposit into those accounts; correct?

11  For income earned?

12       A.   Yes.  I only have one savings and one

13  checking.

14       Q.   At any time that you were working at Watkins

15  & Letofsky, were you ever told that you needed to stay

16  at work and complete any certain project or any amount

17  of work before you could go home?

18       A.   I wasn't directly told that, but I had a

19  fiduciary duty to my clients and to meet my deadlines

20  according to the Court.  Or procedural rule of law.

21            MR. WATKINS:  Okay.  Go off the record for

22  one second.  I'm just going to review my notes, and I

23  think we're done.

24                 (Off the record.)

25            MR. WATKINS:  Back on the record.

Page 262