# Exhibit N

Deposition of Daniel R. Watkins, Esq. February 20, 2020.

**Deposition of:**

Daniel R. Watkins, Esq.

FRCP 30(b)(6) Designee of Watkins & Letofsky, LLP

**Case:**

Amy Buchanan v. Watkins & Letofsky, LLP
2:19-CV-00226-GMN-VCF

**Date:**

02/20/2020



400 South Seventh Street • Suite 400, Box 7 • Las Vegas, NV 89101
702-476-4500 | www.oasisreporting.com | info@oasisreporting.com

COURT REPORTING | NATIONAL SCHEDULING | VIDEOCONFERENCING | VIDEOGRAPHY

Page 209

1     I, the undersigned, a Certified Court
2  Reporter of the State of Nevada, Registered
3  Professional Reporter, and Certified Realtime
4  Reporter, do hereby certify:
5     That the foregoing proceedings were taken
6  before me at the time and place herein set forth; that
7  any witnesses in the foregoing proceedings, prior to
8  testifying, were duly sworn; that a record of the
9  proceedings was made by me using machine shorthand
10 which was thereafter transcribed under my direction;
11 that the foregoing transcript is a true record of the
12 testimony given.
13    Further, that before completion of the
14 proceedings, review of the transcript was requested.
15    I further certify I am neither financially
16 interested in the action nor a relative or employee
17 of any attorney or party to this action.
18    IN WITNESS WHEREOF, I have this date
19 subscribed my name.
20 Dated: 03-02-2020
21
22
23 _____
24      JANET C. TRIMMER, RPR, CRR
         NV CCR No. 864
25

1  was always part of the discussion.

2       Q.  Okay.  All right.  I think, number 12 we

3  touched on a little bit, but what do you consider to

4  be the essential functions of an associate attorney's

5  position with your firm?

6          MR. ORTUNO:  Objection as it calls for a

7  conclusion of law.

8          But go ahead.

9          THE WITNESS:  Well, the simplest way to say

10 it is you have to manage the files.  That's the way I

11 say it.  Within that comes completing discovery,

12 written and depositions, attending settlement

13 conferences, attending mediations, arbitrations,

14 trials if necessary, pretty much litigating the file

15 front to back.

16          I mean, we encourage our associates to do

17 that.  I think it's the best way to develop as an

18 associate and as a litigator.  So we want associates

19 on front to back, and all the essential tasks would be

20 completing the investigative and discovery process of

21 a file and then settling it and all the steps you've

22 got to do.  So it's not like it's a mechanic, it's got

23 five essential things you do.  I mean, to me, it's a

24 pretty broad thing.

25 //

```
 1  BY MR. KEMP:
 2      Q.  Pretty much it's office work; right?  It's
 3  not like hard physical labor, just for the record.  I
 4  think it's pretty obvious but --
 5      A.  It's not manual labor, but if you are -- I
 6  think physical is an interesting term in litigation.
 7  I'm sure you've had many nights where you are just
 8  completely physically wiped out, and all you've done
 9  is read papers all day.  So I think that there's a
10  blending of physical and mental and emotional
11  exhaustion.
12      Q.  Let me rephrase it.  It's not physical tasks,
13  like there's not heavy lifting, you don't have to be
14  able to run five miles.  That was more of what I was
15  talking about.
16      A.  Correct.
17      Q.  You will get physically tired from the mental
18  aspects of the work, sure.
19      A.  Yes.
20      Q.  Okay.
21      A.  And that was part of the issue with
22  Ms. Buchanan, is -- I don't know -- I've never
23  experienced the things she was experiencing, and so
24  there was, in managing your files and working
25  four hours, if you are in there and you just become
```

1   physically exhausted on top of mentally tired and
2   you're -- so we were trying to figure that out.  I
3   didn't have a formula, by any stretch, and I don't
4   think she did either, and the whole point was to try
5   and see if we could make it work.
6       Q.  Now -- I lost my train of thought.  Give me a
7   second.
8           Oh.  The restrictions that are doctor
9   imposed, none of that said that she couldn't do any of
10  the actual work.  It was just a limitation on the
11  amount of time she could spend doing it.  Do I have
12  that right?
13      A.  I would state it differently.  I think they
14  did put a limitation on the work that she could do.
15  As to the specific tasks, they didn't say she can't
16  ask questions at a deposition or write or type
17  interrogatories or things like that.
18      Q.  I'm talking in terms of essential functions.
19  I mean, doing that particular work, they just limited
20  it to a certain amount of time?
21      A.  The restrictions were time performing the
22  functions, yes.
23      Q.  Okay.
24      A.  Or tasks.
25      Q.  Okay.  And number 13, so I think that kind of

1    covers 13.  It's not that she couldn't perform the
2    functions.  There was a limitation on how long she
3    could perform the functions for.  Do I have that
4    right?
5        A.  See, to me, performing a function of a
6    deposition is start to finish.  So she wasn't limited
7    in the ability to ask questions, but the ability to
8    sit and think through and manage documents and go an
9    extended period, she was limited.  And to me, that's
10   the function of a deposition.
11       Q.  Are you of the position, then, that anyone
12   that has a 4-hour per day or 20-hour per week time
13   limit on their work is not capable of performing the
14   essential functions of an attorney?
15       A.  No.  It was the impact of the work -- it was
16   the impact of her medical condition on her work, the
17   fatigue, the headaches, the inability to concentrate
18   and all those things that limited her ability to
19   complete the tasks start to finish.
20           And the way that they managed it was to say
21   you are limited to four hours a day of that type of
22   mental gymnastics.
23       Q.  Right.  So then would it be your position,
24   then, that she wouldn't be able to perform as an
25   associate attorney anywhere, or just at your firm?

1    A.  I don't know what you mean by "perform as an
2    associate."
3    Q.  Well, performing the essential functions.
4    The essential functions from your position is that she
5    has to be able to do something start to finish.  So if
6    she was in federal court, she's got to be able to do
7    one full day of seven hours of deposition, and if she
8    can't do that, then she's not capable of being an
9    attorney at all?
10   A.  No.  She's clearly found a good fit in terms
11   of the requirements of her job duties at her current
12   employer.
13   Q.  Okay.  So it would just be at your -- the job
14   as it existed at your firm?
15   A.  No, I don't think it's limited to my firm at
16   all.
17   Q.  Okay.  How would you say it, then?  What jobs
18   do you think that she wouldn't be able to do?
19   A.  I would be speculating.  I've never done any
20   research or looked into that at all.  Outside of my
21   office?
22   Q.  Yeah.  I thought you just told me that you
23   thought there would be other jobs, and I was asking
24   you what those would be.
25   A.  You mean a specific law firm?  I think a

 1  similar scenario of a satellite or a new start-up

 2  company with one associate and then two, trying to

 3  litigate files and having to manage your files on your

 4  own start to finish could not be done by a part-time

 5  associate at four hours a day five days a week who was

 6  very inexperienced as a lawyer in the beginning.

 7         So the function of a depo for a new associate

 8  is much more difficult than the function of you taking

 9  a deposition.  So you can't just say she can't work

10  anywhere, but in that office, with two attorneys,

11  myself and Mr. Letofsky, and having to manage start to

12  finish on her files, it was not doable under -- with

13  her medical conditions, limiting it to four hours a

14  day.

15     Q.  How many cases was she the sole attorney from

16  your firm that was attorney of record in a case?

17     A.  I don't know off the top.  It changed from

18  time to time, but I don't know.

19     Q.  My experience when I look at firms including

20  my own, when you have an associate, you usually put a

21  partner or somebody else, you have two attorneys on

22  the case as attorneys of record.  Was that how you

23  worked it, or was she really by herself on the cases?

24     A.  I don't recall all of the pleadings, but the

25  typical way I recall us doing it was I was with her on

1   files.

2       Q.  So there were then at least generally two

3   attorneys assigned to a file, to a case?

4       A.  Depending on what you mean "assigned," but

5   yeah, there was two attorneys on the file.

6       Q.  Okay.

7       A.  Myself and whatever associate was working the

8   file.

9       Q.  Not all depositions are more than four hours,

10  are they?

11      A.  No.

12      Q.  So wouldn't it be possible in the spirit of

13  teamwork that she could do shorter depositions and you

14  could do longer depositions?

15      A.  No.

16      Q.  That's not possible?

17      A.  No, not from start to finish on every file,

18  no.

19      Q.  Okay.

20      A.  We tried that.  I've also got files with

21  Mr. Forster and other files in California, I've only

22  got so much time.  So no.  That's why we wanted to

23  have somebody who could manage the files from start to

24  finish.

25      Q.  Okay.  With respect to 15, it talks about the