UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

```
AMY BUCHANAN,                          )
                                       )
          Plaintiff,                   )
                                       )
    vs.                                ) Case No. 2:19-cv-
                                       ) 00226-GMN-VCF
WATKINS & LETOFSKY, LLP, a Nevada      )
Limited-Liability Partnership; DOES    )
I-X; ROE BUSINESS ENTITIES I-X,        )
                                       )
          Defendants.                  )
_____)
```

DEPOSITION OF SUSAN WATKINS

IRVINE, CALIFORNIA

MONDAY, OCTOBER 9, 2023

10:03 A.M.

Stenographically reported by:

Kayla Lotstein
California CSR No. 13916, CRR, RPR, CRC
Job No. 54526, Firm No. 116F



1   scratch that.  Let me strike that.
2           So you were self-employed before that?
3       A   Yes.
4       Q   And self-employed doing what?
5       A   Providing accounting services, logistical
6   assistance, IT assistance for companies.
7       Q   And how long were you -- were you doing that,
8   working for yourself?
9       A   I can't remember how far back, but I've --
10  I've been doing it since I became a stay-home mom,
11  possibly 1998 all the way until 2018.
12      Q   I'm sorry.  Did you say 1998?
13      A   Yes.
14      Q   Through 2018.  Okay.
15          All right.  And to what companies did you
16  provide the accounting services and logistical services,
17  IT services?
18      A   I started off just assisting Dan when he first
19  started his solo practice.  I don't remember what year.
20  Just periodically.  I was raising children, so I didn't
21  have much time.
22          In, I would say, 20- -- 2008 I started
23  assisting other businesses.  One of them, I cannot
24  remember the name of the spa, but I had another attorney
25  that I did work for, provided billing services for his

```
 1  law practice.
 2       Q    Okay.  So there was a -- okay.  So when you
 3  say "Dan," you mean Dan Watkins; right?
 4       A    Yes.
 5       Q    Okay.  So you were helping him when he first
 6  started --
 7       A    Yes.
 8       Q    -- practicing?
 9       A    Yes.
10       Q    Okay.  All right.  And so there was a spa, and
11  then another attorney?
12       A    Yes.
13       Q    Do you remember the name of the spa at all?
14       A    I cannot remember the name at the moment.
15       Q    Where was it located?
16       A    In Newport Beach.  It's gone out of business
17  since then.
18       Q    Okay.  Do you remember who owned it?
19       A    I'm trying to remember her last name.  Kathy.
20       Q    Kathy with a C or a K?
21       A    With a K, and I cannot remember her last name.
22       Q    Approximately where in Newport Beach was it
23  located?
24       A    On Irvine Boulevard near the 73.  I don't know
25  the names of the street.
```

Page 16

 1   Q   All right.  And so during what time frame did
 2   you work with Kathy at the spa in Newport Beach?
 3   A   The latter part of 2008 to the end of 2009.
 4   Q   All right.  Did it go out of business at that
 5   point, or you just stopped working?
 6   A   Yes, it did.
 7   Q   Okay.  All right.  And you said they're --
 8   A   Oh, I remember her last name.
 9   Q   Okay.
10   A   Furlong.
11   Q   Furlong?
12   A   Yes.
13   Q   F-u-r-l-o-n-g?
14   A   I believe so.
15   Q   All right.  And you said there was another
16   attorney that you were helping or working for -- with?
17   A   Yes.
18   Q   Who was that?
19   A   Tom Gourde.
20   Q   Can you spell the last name.
21   A   G-o-r-d-e [sic].
22   Q   All right.  And during what time frame did you
23   work providing these accounting services, logistical
24   services, or IT services for Tom Gourde?
25   A   I'm not certain, but it was around the same

 1   time period.  Maybe an additional year.
 2        Q    So from, say, sometime in 2008 to sometime in
 3   2010?
 4        A    Yes.
 5        Q    Okay.  And why did you stop?
 6        A    I took a break.  My kids -- my
 7   responsibilities with my children were becoming more
 8   demanding, and I only had little time to develop other
 9   relationships, but I did -- I did start to do work for
10   Watkins & Letofsky at that point at a very reduced
11   schedule because of the demands of my children.
12        Q    Okay.  So while you were working at the spa
13   and with Tom Gourde, were you also still working with
14   Dan's firm?
15        A    I don't recall how many hours.  I might have
16   helped here and there.
17        Q    Okay.  But in 2010 when you were no longer
18   with Tom Gourde and the spa, you started around that
19   time working with Dan again?
20        A    I believe so.
21        Q    And by the time -- was it Watkins & Letofsky
22   at that time?
23        A    Yes.
24        Q    Okay.  Between 2010 and 2018, did you do this
25   accounting services, logistical work, or IT services for

Page 18

 1   any other person or business?
 2        A    No.  I didn't have the time.
 3        Q    Okay.  Okay.  So in 2018, did the nature of
 4   your relationship with Watkins & Letofsky change?
 5        MR. WATKINS:  Vague and ambiguous as to time.
 6   Lacks foundation.
 7        MR. KEMP:  Sure.
 8        MR. WATKINS:  Calls for a legal conclusion.
 9   BY MR. KEMP:
10        Q    Let me -- let me rephrase.
11             During 2010 to 2018, did you receive W-2 tax
12   forms from Watkins & Letofsky?
13        A    No.
14        Q    After 2018, did you begin to receive W-2 tax
15   forms from Watkins & Letofsky?
16        MR. WATKINS:  Calls for speculation.  Lacks
17   foundation as to time.
18             You can answer.
19   BY MR. KEMP:
20        Q    Beginning with tax year 2018?
21        MR. WATKINS:  It lacks foundation as to time.  She
22   said she wasn't sure on a start date.
23             But you can answer.
24        THE WITNESS:  Sometime around that time, I did.
25

 1   come in periodically if there was something that I
 2   couldn't figure out myself.
 3   BY MR. KEMP:
 4       Q    Okay.  And where was that individual from?
 5   Was there --
 6       A    He was independent.
 7       Q    Okay.  You talked about audits for workers'
 8   comp insurance.
 9            What -- what did that entail?
10       A    Taking payroll records, breaking it down
11   individually by individual for a certain time period and
12   breaking out every tax breakdown.  It would have to
13   reconcile with -- with tax returns.  Forms like a
14   Form 941.
15       Q    Okay.  So this is just to provide information
16   about Watkins & Letofsky to its workers' compensation
17   carrier?
18       A    Yes.
19       Q    Okay.  Not like workers' compensation carriers
20   for clients or something like that?
21       A    No.
22       Q    Okay.  And audits for clients, you mentioned
23   something about audits for clients.
24            What did that entail?
25       A    One of their main clients is State Farm

 1   Insurance, and there was -- there were a couple of
 2   times, I don't remember what year, where they did a very
 3   thorough audit.
 4           I had to provide copies of deposits regarding
 5   the trust account that we have set up for them and
 6   provide backup for certain -- certain files just to make
 7   sure we were being honest, I guess.
 8       Q   They were just -- they were checking out the
 9   legitimacy of everything, and you would help provide the
10   information?
11       A   Yes, yes.
12       Q   I get it.
13           Okay.  And with respect to the bookkeeping and
14   accounting functions, did -- during the 2010 to 2018
15   time frame, did the firm utilize a CPA, or were you
16   doing all the work?
17       A   They utilized a CPA.
18       Q   Okay.  So did you work with a CPA in terms of
19   providing them with information?
20       A   Yes.
21       Q   I see.  Okay.
22           During that 2010 to 2018 time frame, did you
23   have a supervisor, somebody that you reported to?
24       A   I had to provide reports --
25           MR. WATKINS:  Wait.  Vague and ambiguous as to

 1   "supervisor."  Lacks foundation.
 2              You can answer.
 3         THE WITNESS:  I did not have a supervisor, per se,
 4   but I would provide cash flow reports to Dan and Brian
 5   Letofsky.
 6   BY MR. KEMP:
 7         Q    Okay.
 8         A    And I would provide reports on attorney
 9   revenue per -- per attorney based on the billing program
10   that -- that I used.  I gave them a forecast of the --
11   the next several months what we were required to pay in
12   payables and whether we had enough income to cover that.
13   We would have a shortfall or windfall.
14         Q    Okay.  And were these -- was your providing
15   these reports and so forth to Dan and Brian something
16   you just did on a regular basis, or would they contact
17   you to tell you what they wanted?
18         A    I would just provide it.
19         Q    Okay.  If they wanted other information, would
20   they contact you to give that to them?
21         MR. WATKINS:  Calls for speculation.  Lacks
22   foundation.
23   BY MR. KEMP:
24         Q    You can answer.
25         A    I can answer that?

Page 37

```
 1      Q    Whatever work called for it, you'd go -- you'd
 2   go to the office?
 3          MR. WATKINS:  Wait, wait, wait.  "Whatever work
 4   called for" is completely vague and lacks foundation.
 5   BY MR. KEMP:
 6      Q    Well, whenever it was something you couldn't
 7   do from home and you actually had to go to the office,
 8   that's when you'd go to the office?
 9      A    I can do everything from home.
10      Q    Okay.  And that was true between 2010 and
11   2018?
12      A    Yes.
13      Q    Okay.  At -- during -- during the 2010 to 2018
14   time frame, did you have a desk or an office or work
15   space dedicated to you at Watkins & Letofsky?
16      A    There were several offices available here and
17   there, and wherever there was an open office is where I
18   would sit if I had to come in.
19      Q    Okay.  So -- but you didn't have one that was
20   specifically, you know, this is Susan's office or that's
21   Susan's desk or --
22      A    There was a desk set up for -- with an inbox.
23   I would come in and pick up invoices that need to get
24   billed to clients.  So as I moved around, there was a
25   space that I would occupy if I came in.  People would
```

Page 40

 1            You can answer.
 2        THE WITNESS:  No.
 3   BY MR. KEMP:
 4        Q    Okay.  Do you have a written job description
 5   as to what you're supposed to do?
 6        A    No.
 7        Q    And between 2010 and 2018, how would you be
 8   paid?  Was it by the month?  By the hour?  By the week?
 9   How were you paid?
10        A    I would get paid bimonthly.
11        Q    Bimonthly?
12        MR. WATKINS:  Belated objection that it's vague and
13   ambiguous as to time.  Lacks foundation.
14            You can answer.
15        THE WITNESS:  Actually, no.  I believe it was
16   monthly.
17   BY MR. KEMP:
18        Q    Monthly?
19        A    Yes.
20        Q    Okay.  And so they paid you once a month, but
21   how was your pay measured?  Was it the same amount every
22   month, or did it depend on the number of hours that you
23   worked?
24        A    Whatever hours I worked.
25        Q    Okay.  So you were paid by the hour?

 1   bill that you would send?
 2        A    The total hours for the day -- broken down by
 3   the day.
 4        Q    Okay.  Were you ever reimbursed for any, like,
 5   business expenses?
 6        MR. WATKINS:  Vague and ambiguous as to time.
 7   Lacks foundation.
 8   BY MR. KEMP:
 9        Q    I'm saying just ever.
10        A    No.  I had -- I was independent, so I paid for
11   my own expenses, my own supplies.
12        Q    Okay.  What kind of supplies and equipment and
13   so forth did you buy for yourself?
14        A    I -- I had a laptop.  I had my own utilities
15   that I paid for, paper supplies.  Trying to think of
16   anything else.  Whatever's needed typically to run an
17   office in a smaller scale, of course.
18        Q    Anything else in terms of expenses that you
19   had for supplies, equipment, and anything related to
20   doing your work for Watkins & Letofsky?
21        A    I don't remember, but I probably paid for my
22   accounting software, which was just QuickBooks.
23   Minimal, but I did have that expense sometime during
24   that time period when I was doing work for the other --
25   the other two companies.  Just your typical office