# EXHIBIT 18

Deposition of Dan Watkins 10/9/23

# EXHIBIT 18

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

AMY BUCHANAN,                    )
                                 )
    Plaintiff,               )
                                 )
vs.                              ) Case No. 2:19-cv-
                                 ) 00226-GMN-VCF
WATKINS & LETOFSKY, LLP, a Nevada )
Limited-Liability Partnership; DOES)
I-X; ROE BUSINESS ENTITIES I-X,  )
                                 )
    Defendants.              )
_____)

30(b)(6) FOR WATKINS & LETOFSKY, LLP

DEPOSITION OF DANIEL R. WATKINS

IRVINE, CALIFORNIA

MONDAY, OCTOBER 9, 2023

12:08 P.M.

Stenographically reported by:

Kayla Lotstein
California CSR No. 13916, CRR, RPR, CRC
Job No. 54526, Firm No. 116F



## Page 2

```
 1            UNITED STATES DISTRICT COURT
 2                 DISTRICT OF NEVADA
 3
 4   AMY BUCHANAN,          )
                            )
 5        Plaintiff,        )
                            )
 6   vs.                    ) Case No. 2:19-cv-
                            ) 00226-GMN-VCF
 7   WATKINS & LETOFSKY, LLP, a Nevada )
     Limited-Liability Partnership; DOES)
 8   I-X; ROE BUSINESS ENTITIES I-X,   )
                            )
 9        Defendants.       )
     _____)
10
11
12
13
14      DEPOSITION OF DANIEL R. WATKINS taken on
     behalf of Plaintiff, at 12:08 p.m., Monday,
15   October 9, 2023, at 17752 Skypark Circle,
     Suite 100, Irvine, California, before Kayla
16   Lotstein, Certified Shorthand Reporter No.
     13916 of the State of California, pursuant to
17   Notice.
18
19
20
21
22
23
24
25
```

## Page 3

```
 1   APPEARANCES OF COUNSEL:
 2    FOR PLAINTIFF:
 3      KEMP & KEMP
        BY:  JAMES P. KEMP, ESQ.
 4      7435 West Azure Drive
        Suite 110
 5      Las Vegas, Nevada 89130
        jp@kemp-attorneys.com
 6      (702) 258-1183
 7
 8    FOR DEFENDANTS:
 9      WATKINS & LETOFSKY, LLP
        BY:  DANIEL R. WATKINS, ESQ.
10      IN PROPRIA PERSONA
        8935 South Pecos Road
11      Suite 22A
        Henderson, Nevada 89074
12      DW@wl-llp.com
        (949) 476-9400
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1               INDEX
 2   WITNESS:  DANIEL R. WATKINS
 3             EXAMINATIONS
 4                              Page
 5   By Mr. Kemp                  7
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1               EXHIBITS
 2   No.      Description              Page
 3   23   Plaintiff's Amended Notice of   8
        Deposition of Defendant
 4      Watkins & Letofsky, LLP,
        Pursuant to FRCP Rule
 5      30(b)(6)
 6   24   Employee Earnings Record       9
        (Requested Check Dates
 7      1/21/20 - 02/05/20)
 8   25   Employee Earnings Record       9
        (Requested Check Dates
 9      10/26/20 - 11/05/20)
10   26   Declaration of Daniel R.      18
        Watkins in Support of
11      Defendant's Reply in Support
        of Motion for Summary
12      Judgment
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                        6
 1              INDEX (CONTINUED)
 2
 3          INFORMATION TO BE SUPPLIED
 4              Page    Line
 5                  (None)
 6
 7
 8         QUESTIONS INSTRUCTED NOT TO ANSWER
 9              Page    Line
10                  (None)
```

```
                                        7
 1      IRVINE, CALIFORNIA; MONDAY, OCTOBER 9, 2023
 2                  12:08 P.M.
 3                    * * *
 4           DANIEL R. WATKINS,
 5  the Witness herein, having been first duly sworn,
 6  testified as follows:
 7               EXAMINATION
 8  BY MR. KEMP:
 9      Q   Please state your name and spell it for the
10  record.
11      A   Daniel Watkins, D-a-n-i-e-l, W-a-t-k-i-n-s.
12      Q   All right. Mr. Watkins, you're a partner in
13  the firm of Watkins & Letofsky; right?
14      A   Correct.
15      Q   And you've designated yourself to testify on
16  behalf of the firm under Rule 30(b)(6); is that right?
17      A   Correct.
18      Q   And you understand that your testimony will
19  bind the -- the LLP?
20      A   Yes.
21      Q   Okay. Of course, you're familiar with the
22  deposition process. We don't need to go through all
23  that; right?
24      A   Right.
25      Q   Okay. Just remind you that the oath carries
```

```
                                        8
 1  with it the obligations to tell the truth and penalties
 2  for perjury if you're not to tell the truth; right?
 3      A   Yes.
 4      Q   Okay. All right. Let's make this Exhibit 1.
 5          (Reporter clarification.)
 6      MR. KEMP: I'm sorry. Twenty-three.
 7          (Whereupon Exhibit 23 was marked for
 8          identification.)
 9  BY MR. KEMP:
10      Q   Exhibit 23 that you're looking at is the --
11  the Plaintiff's amended notice of deposition for the
12  30(b)(6) deposition we're here for; correct?
13      A   Yes.
14      Q   Okay. And you've seen this before; right?
15      A   I have.
16      Q   All right. And we attached to it this
17  information from the website we found on the Paycheck
18  Protection Program regarding loans, and my understanding
19  is that you obtained a loan -- I guess it was through
20  TCF Bank that then Huntington National Bank took over
21  TCF Bank.
22          Do you recall applying for that loan?
23      A   Yes.
24      Q   All right. And so we -- we obtained documents
25  from them. I don't know how much we really need to go
```

```
                                        9
 1  through all that.
 2          What I'm really interested in, though, is at
 3  the time that the loan was applied for, it looks like by
 4  this document that there were -- it says 17 jobs were
 5  reported, but other documents I've got, I guess
 6  they're -- well, let's just go ahead and do this.
 7          This one was the first one. This will be
 8  Exhibit 24.
 9          (Whereupon Exhibit 24 was marked for
10          identification.)
11      MR. KEMP: And I guess as long as we're at it,
12  we'll make this Exhibit 25.
13          (Whereupon Exhibit 25 was marked for
14          identification.)
15  BY MR. KEMP:
16      Q   All right. So Exhibit 24 is an employee
17  earnings record for Watkins & Letofsky. It's got some
18  sort of account number there, and it says "Watkins &
19  Letofsky, LLP." It says "Requested check dates 1/21 of
20  '20 through 2/5 of '20." It's then got a list of
21  employee names and ID numbers.
22          Have you seen this document before?
23      A   I've seen documents like this. I don't know
24  that I've seen this -- these exact ones. Which one are
25  you on? Twenty-four?
```

30(b)(6) for Watkins & Letofsky, LLP
Daniel R. Watkins                                   Amy Buchanan v. Watkins & Letofsky, LLP

10
1  Q  Twenty-four.
2  A  I've seen documents like this, but as to this
3  specific one, I don't know that I've seen it.
4  Q  Okay. Well, Huntington National Bank, they've
5  provided me this and said this was part of what was
6  submitted in order to get the Paycheck Protection
7  Program loan and then also have a Paycheck Protection
8  Program loan forgiven under those rules.
9      And when I got it, I saw that Nancy Letofsky
10 and Susan Watkins are listed as employees on here.
11     When did Nancy and Susan become W-2 employees?
12 A  I'm not certain on the time, but it was 20- --
13 I believe 2018 when that transition occurred.
14 Q  Okay.
15 A  It could have been 2019. I haven't looked at
16 the -- the 401(k). That would tell us more specifically
17 when that happened because it was coinciding with that
18 and some other factors.
19 Q  Okay. So in order to get them in the 401(k)
20 program, you started giving them W-2s as employees?
21 A  We designated them as employees, which
22 followed with W-2s being issued, yes.
23 Q  Okay. And what were some of the other factors
24 that went into making Nancy Letofsky and Susan Watkins
25 W-2 employees at that time?

11
1  A  The workload increase in 2018 was significant,
2  and we needed to hire more folks. We were growing, and
3  the work for both Nancy and Susan to do it on their own
4  was just too much.
5      They needed support and couldn't afford it.
6  It didn't make financial sense for them to do it. So we
7  brought them in as employees so the firm could support
8  them in their roles that they were performing before,
9  and then they ended up taking on additional -- some
10 additional roles as well.
11 Q  Starting with Susan, what additional roles did
12 she take on at that point?
13 A  Well -- well, when COVID hit, everybody took
14 on additional roles because we were down to minimum
15 staff. So we were able to stay open, but we were only
16 able to stay open with certain people in the office.
17     So they were employees at that point, so they
18 did additional things, administrative stuff here and
19 there through COVID. When COVID finished, for -- for
20 Susan, the main change really was helping out on the IT
21 side with remote access, because through COVID, we
22 established that for a lot of the workers.
23     And so that changed in terms of her
24 responsibilities there, so we kind of just kept it
25 in-house and gave her those duties.

12
1  Q  Okay. Before I get to Nancy, then, but just
2  on that -- on that IT aspect of it, though, based on
3  what Susan testified to and based on my understanding
4  with the office in Nevada and so forth, you did have the
5  ability to work remotely.
6      Are you saying you just needed more
7  capabilities, and there was more work that needed to be
8  done to increase that? Is that how it worked?
9  A  I'm not sure I understand. When you say "you
10 had the ability to work from home," what do you mean by
11 that?
12 Q  Well, even when Amy Buchanan was there, there
13 was ability to work remotely and there was computer
14 connectivity between, say, Nevada and -- and Orange
15 County; right?
16 A  I didn't -- I didn't consider work out of
17 Nevada remote.
18 Q  Okay.
19 A  Because it was in the office.
20 Q  All right. So they didn't work remotely from
21 home.
22 A  No, no, no. Attorneys could access through --
23 I can't remember what it's called -- their computers to
24 work from home as they needed. But with -- it's we had
25 additional staff members starting to work remotely,

13
1  which was different, so we had to buy them computers and
2  get them outfitted.
3      And we changed our -- we were hacked in, like,
4  2019, 2020, 2018, something like that. It was a
5  nightmare.
6  Q  I've been there.
7  A  Right before COVID. And then so we
8  transitioned from a server that was on-site to a
9  web-based server, which was an absolute nightmare.
10     And changing all of the remote access occurred
11 with going to a web-based server, and that's where Susan
12 got involved, because it was just way too much for me to
13 handle with the new IT company taking over and doing
14 that.
15     So she became the -- kind of the IT liaison in
16 the office to assist in the transfer, to assist as much
17 as she could with the transfer from a -- a server that
18 was on location to a web-based server.
19 Q  Okay. All right.
20 A  It changed all of our remote access. It gave
21 other people the ability to work remotely. Some people
22 went full-time remote that were staff members that
23 previously worked in the office. Everything changed
24 with COVID.
25 Q  Right. Okay. In terms of the time when Nancy



**Page 14**

1  transitioned to a W-2 employee and, you know, obviously,
2  the 401(k) was part of it, what additional factors or
3  additional --
4      A   Yeah.
5      Q   -- workload increase applied with her?
6      A   Her paralegal duties with State Farm just
7  skyrocketed, and the ability to do it from home was not
8  possible much anymore.  She needed to come in -- I mean
9  she needed support as well.
10          So she's doing all prelitigation stuff on the
11 State Farm files and all of the other files that were
12 coming in and subro on the business was increasing
13 dramatically.  So same effect.  She needed to hire
14 people.  That wasn't going to work financially.
15          And so -- oh, and on top of that, just when
16 you expand your business and bring people in, you've got
17 all sorts of other obligations insurance-wise and
18 tax-wise, et cetera.  So we brought them in as employees
19 at that time to try and help with that.
20      Q   In terms -- in terms of getting them under
21 insurance, workers' comp, and so forth?
22      A   No, no, no.  To provide them the support
23 people --
24      Q   Right.
25      A   -- we would take care of those expenses for

**Page 15**

1  them, and they would just supervise the people that they
2  would otherwise have hired.
3      Q   Okay.  Gotcha.
4          All right.  But I want to clarify, because I
5  thought what you said was that during COVID, your -- you
6  went down to -- down in numbers of employees or you --
7      A   No, no, no.  In the office it went down.
8      Q   I see.  Okay.
9      A   Because we couldn't have people on-site.  They
10 had to work remote.
11     Q   Right.  Okay.  So you had -- in order to
12 comply with, you know, state and local requirements, you
13 transitioned them to working remotely?
14     A   Correct.
15     Q   Gotcha.  Okay.
16         Because in 25 -- Exhibit 25, it has -- it goes
17 from 16 persons to 18 persons.  So that's why I was
18 asking, because it seemed like it went -- it went up.
19 You actually had an increase in employees.
20     A   No.  That's -- that's exactly why.  Things
21 were growing.
22         Even through COVID, we were very fortunate
23 that business increased.  We weren't hit by that so much
24 as we were just prohibited from having a certain number
25 of people in the office space that we had.

**Page 16**

1      Q   Right.  Okay.
2      A   And that changed over time.  I mean, it was
3  very fluid.
4          So there were times when we had everybody back
5  in, then everybody had to go home, and then everybody
6  back in.  So it was super fluid during that time, but we
7  were fortunate enough to grow.
8      Q   Okay.  And just for the record, I mentioned
9  Exhibit 25, and that's a similar form to Exhibit 24, but
10 this one is the employee earnings record for requested
11 check dates 10/26 of '20 to 11/5 of 2020.
12     A   Yeah.
13     Q   So that was later when the -- as I understand
14 from the information I got from -- from the bank, that
15 that was part of the loan forgiveness process.
16     A   Right.  They needed to know the number of
17 employees in 2020.
18     Q   Right.  Okay.  Looking back at 24 real quick,
19 I see a name, Jake D. Letofsky.
20         What relationship is he to Nancy and Brian, if
21 any?
22     A   Son.
23     Q   Son.  Okay.
24         What was he doing for the firm?
25     A   I don't know specifically.  My assumption

**Page 17**

1  would be that he was working under Nancy and supporting
2  her in her role as a paralegal with the prelitigation
3  files.
4      Q   Do you know, was he just, like, working just
5  part time?
6      A   I think he's worked full time and part time
7  over time --
8      Q   Okay.
9      A   -- if my memory serves.  I -- but he works --
10 so Nancy's work is independent on my side of the house.
11         I know of her duties and what she did as a
12 paralegal for the State Farm and other files, other
13 subrogation files, but my memory is that Jake worked
14 full time for some time, and then was part time other
15 times as well.
16     Q   Yeah.  The reason I ask is he doesn't show
17 later on, and I don't know if he left or he just -- he
18 was only working --
19     A   Yeah.  They were in and out of school and
20 doing whatever young adults do.
21     Q   Okay.
22     A   I don't know why he wasn't working at
23 different times.
24     Q   Okay.  And then the ID numbers -- so, like,
25 Nancy is 66 and Susan is 67.



18
1  Did -- did those numbers -- if you know, did
2  those numbers run consecutively, so, like, each new
3  employee you get gets the next higher number up, or how
4  does the ID number get assigned?
5       A   That, I have no idea.  I would assume that's a
6  Paychex thing.
7       Q   Okay.
8       A   I have no idea how to do that.
9       Q   Yeah.  Because then Jake's got No. 14, so it's
10 like -- I just was wondering if there was any --
11      A   Oh, yeah.  Sure.  With that, I have no idea.
12      Q   Okay.
13      A   Yeah.
14      Q   All right.  I just wondered if you knew.
15          All right.  The next exhibit is Exhibit 26.
16          (Whereupon Exhibit 26 was marked for
17          identification.)
18 BY MR. KEMP:
19      Q   So Exhibit 26 is a five-page document.  It's
20 declaration, Daniel R. Watkins, 13th of May, 2020.  It's
21 a declaration in support of Defendants' reply in support
22 of motion for summary judgment.
23          You've seen this document before; right?
24      A   Yes.
25      Q   And that's your electronic signature on the

19
1  last page?
2       A   Yes.
3       Q   Okay.  And this is part of what you submitted
4  to the court at ECF No. 34-2.
5       A   Yes, I know.
6       Q   Okay.  So looking at the -- the second page,
7  paragraph No. 5 says "At all times relevant to this
8  matter, Susan Watkins was an independent contractor for
9  W&L, CA [California] and W&L NV [Nevada]."
10          Did I read that right?
11      A   Yes.
12      Q   So by the time you submitted this document
13 declaration, though, she was, in fact, an employee at
14 that time; right?
15      A   Again, I'm not certain on when the W -- or
16 excuse me -- when the 401(k) went into effect, but it
17 seems like it would have by 2020, so she would have been
18 a W-2 employee, yeah.
19      Q   Yeah.  If we refer to her -- Exhibit 24, she's
20 on that, and that's from January 21st to February 5th --
21      A   Yeah.
22      Q   -- so about a little over three months
23 earlier.
24      A   Yeah.  Assuming this is what I submitted to
25 them, then yeah.

20
1       Q   That's where I got it from.  It's --
2       A   I'm just assuming that you're telling me that.
3  I'm not going to accept that as true, but it says that
4  she's an employee.  So if that's from Paychex, then
5  yeah, she was there.
6       Q   Okay.
7       A   We reported her as an employee to the PPP
8  application.
9       Q   Right.  Right.  Well, and she testified
10 earlier that she got a W-2 in 2019, for example.
11      A   I think she said she didn't know about that
12 one.  She just said 2020 moving forward.
13          I'm not disputing that she's on the list and
14 she was an employee.
15      Q   Okay.  My question is why didn't you disclose
16 that in your declaration that, in fact, she was an
17 employee by that time?
18      A   By what time?
19      Q   By the time you did the declaration.
20      A   I don't know.  Why did I need to?
21          I was speaking to her independent contractor
22 status at the time at issue, which is the relevant time
23 period in the case, in 2017 and 2016.
24      Q   Yeah.  I just --
25      A   We weren't trying to establish facts of her

21
1  employment status after that.
2           I was trying to establish facts of her
3  independent contractor status at the time of -- that's
4  relevant to the case.  That's why I said "At times
5  relevant to this matter."
6       Q   Okay.  Any other reasons that you didn't
7  disclose that she was an employee in the declaration
8  here?
9       A   I -- I take offense that I didn't disclose it
10 the way you're phrasing it.  It wasn't even required
11 that I provide the Court information of her employment
12 status in 2020.  That wasn't the relevant time of this
13 case.
14          The question is whether we had 15 employees
15 over 20 weeks in 2017 and 2016.  During that time,
16 Ms. Watkins was an independent contractor, and that's
17 what I was addressing for the Court in terms of count.
18      Q   Okay.
19      A   I don't know how counting employees in 2020
20 helps resolve the issue of number of employees in 2017.
21      Q   I was just asking if there was any other
22 reason why it wasn't mentioned in your declaration.
23      A   Those things and what I just said would
24 probably be it.
25      Q   Okay.  It says further down at lines 19, 20,

                                                                22

1  under paragraph 5, "Susan Watkins does not manage or
2  control --"
3      A   Wait. I'm sorry. Paragraph 5? Okay. Got
4  you.
5      Q   Yeah. It says "Susan Watkins does not manage
6  or control W&L California or W&L Nevada."
7      A   Oh, right. I see what you're saying.
8      Q   She testified a little bit ago that she and
9  you and Brian are the only people that are authorized to
10 sign on that general business account for checks.
11         Is that -- is that true? Is that accurate?
12 Is there anybody else other than the three of you?
13     A   I never really paid much attention to that.
14 I've never been involved in signing checks, and I don't
15 think Brian is much either. But I don't dispute it.
16     Q   Okay.
17     A   I don't know that Nancy -- I thought
18 Ms. Letofsky might have been authorized at some point,
19 but I don't -- apparently not.
20     Q   Well, we'll double-check with her when we talk
21 to her, but --
22     A   Yeah.
23     Q   What about on the client -- well, let me ask
24 you this first.
25         Does the client also have a -- I'm sorry --

                                                                23

1  the firm also have a client trust account?
2      A   We have multiple.
3      Q   Okay. And who are the authorized signers on
4  the client trust accounts?
5      A   That, I don't know. Brian Letofsky is, for
6  sure. I'd assume I am. I don't know if Susan is or
7  not.
8      Q   Okay. And you don't know if Nancy is or not?
9      A   I would assume she's not on the trust
10 accounts.
11     Q   Okay. All right.
12     A   She might -- the only thing -- other thing she
13 might have access to would be the general account --
14     Q   Okay.
15     A   -- but I don't know as to the trust account.
16     Q   So again in paragraph 6, it says "At all times
17 relevant to this matter."
18         So when you were doing this, you weren't
19 considering the fact that Susan was at that point a W-2
20 employee. We're just talking about during the 2016/2017
21 time frame wherein -- when Ms. Buchanan was employed?
22     A   Right.
23     Q   Okay. So in terms of paragraph 7 where it
24 says "Susan Watkins maintains a separate home office.
25 Susan Watkins provides equipment, tools, and supplies

                                                                24

1  necessary to perform her accounting duties," do you
2  agree that she was actually providing the -- the
3  software to do the accounting?
4      A   The QuickBooks that she talked about?
5      Q   Yeah.
6      A   Yeah.
7      Q   She was paying for that out of her own pocket?
8      A   Right. She bought QuickBooks as part of
9  supporting the work she was doing both for my office,
10 the spa, Tom Gourde.
11         I thought she worked for Burdick Ray as well,
12 but maybe not. They were together -- they were
13 independent or separate and then they became partners,
14 and I thought she worked for the partnership, too. But
15 she bought QuickBooks as part of that.
16     Q   Okay. So she testified that she had left
17 working with Attorney Gourde in 2010. So by 2016 and
18 2017, whatever version of QuickBooks was then would not
19 be supported anymore. You'd have to buy an update.
20         Are you familiar with that?
21     A   No --
22     Q   Okay.
23     A   -- I'm not.
24     Q   But you believe that she bought all of the
25 accounting software for your law firm and had control of

                                                                25

1  it --
2      A   Well, that's a compound question. So the
3  first question is --
4      Q   Well, she bought it? Paid for it herself?
5      A   I don't -- if she said that, then yes. I
6  didn't keep track of what she was doing for her business
7  and independent contractor stuff.
8          She needed QuickBooks. I remember her telling
9  me that she needed QuickBooks. She got QuickBooks.
10 What happened with updates and stuff, I have no idea.
11     Q   And to your understanding, the firm never paid
12 for any part of QuickBooks that she used prior to --
13     A   I have --
14     Q   -- 2018?
15     A   I have zero knowledge of that.
16     Q   Okay.
17     A   I just don't know.
18     Q   Okay.
19     A   But my understanding from what she said is she
20 paid for it up until she became an employee.
21     Q   All right. Did you have access to QuickBooks,
22 or did only Susan have access to it?
23     A   What do you mean by "access"?
24     Q   Were you able to get on QuickBooks and look at
25 reports and look at transactions in the ledgers and so



### Page 26

1  forth?
2     A   I have never done that, so I don't know.
3     Q   Okay.  No. 8, it says "W&L California and W&L
4  Nevada are not in the regular business of performing
5  accounting services."
6        But it's true that businesses like law
7  firms -- like your law firm, in particular, needs to
8  account for its finances; right?
9     A   Watkins & Letofsky performs legal services.
10 We have independent contractors and third parties that
11 we work with as part of running the office, but we
12 perform legal services --
13    Q   All right.
14    A   -- so I'm not sure I understand the question.
15    Q   Well, but a business has to -- has to account
16 for its -- for its business transactions and so forth
17 somehow; right?
18       That's all I'm asking.  I'm not saying who did
19 it.
20    A   Well, yes.  In running a business, it's good
21 to have bookkeeping and accounting provided for the
22 business, yes.
23    Q   Okay.  Now, did you have a certified public
24 accountant for the firm at this time in 20- -- let's
25 limit it to the 2016 to 2018 time frame?

### Page 27

1     A   2016 to 2018?
2        I believe we did.  The way I understand it,
3  Susan would prepare everything in terms of the numbers
4  and fill it in and submit it, and the accountant -- and
5  it's changed once or twice over the time -- would review
6  it, sign it, and submit it.
7     Q   Okay.  Do you know who the accountant was
8  during that time frame?
9     A   I don't.  The only name that comes to mind
10 right now is Tushar, T-u-s-h-a-r, and I don't know his
11 last name or if that's his last name, to be honest.
12       And I don't know -- if I needed to get in
13 touch with him, I would contact Ms. Watkins.
14    Q   Okay.  Paragraph 9, "Susan Watkins is free to
15 operate independent businesses and develop
16 entrepreneurial opportunities.  She is not contractually
17 bound to work exclusively for W&L California or W&L
18 Nevada and has the freedom to solicit accounting
19 clientele of her own."
20       Did I read that right?
21    A   Yes.
22    Q   So this is talking in the present sense, but
23 even here you don't -- I disclose that she's an employee
24 at that point; right?
25    A   I don't believe her being an employee

### Page 28

1  precludes her from doing those things independent of the
2  office.
3     Q   Okay.  But as she's testified, she wasn't
4  doing that, was she?
5     A   That is correct --
6     Q   Okay.
7     A   -- that she didn't have other things going on.
8        We've talked at length about separating and
9  doing her own thing.  It just hasn't come to fruition
10 because there's just so much to do at the office.
11    Q   Okay.
12    A   She's exceptionally good, exceptionally good
13 at bookkeeping.  So it's just been one of those things
14 where the needs of the office have kept her as an
15 employee, but there's been lots of talk about her trying
16 to expand and train and grow, do her own thing.
17    Q   Okay.  Ten, it talks about you've never had to
18 issue any discipline to Susan for her work; right?
19    A   None.  It's good timing on that paragraph.
20 She is -- she's exceptionally good.  Very attentive to
21 detail, and no, we've never had to discipline her at
22 all.
23    Q   Okay.  Good.
24    A   She cares more about the money than Brian and
25 I do.

### Page 29

1     Q   Okay.
2     A   By that, I mean the numbers, making sure every
3  single digit is counted for.
4     Q   All right.  No. 11 again doesn't really --
5  it -- it doesn't say -- have that qualifier at "all
6  relevant times to this matter."  It doesn't contain
7  that.
8        It just says "W&L California and W&L Nevada do
9  not direct Susan Watkins when, where, or how to perform
10 her work.  Ms. Watkins set her own hours, determined her
11 own schedule, is free to come and go from her office as
12 she pleases."
13       Did I read that right?
14    A   That is correct.
15    Q   Okay.  But as I said, it -- that qualifier "at
16 all relevant times to this matter" isn't there, and you
17 didn't disclose that she was by the time you did this
18 declaration an actual employee; right?
19    A   That is correct, but she -- those -- that
20 condition still applies.  She can work whenever she
21 wants.
22       She's not tied to a schedule or certain hours
23 or -- she works overtime, she works overtime.  You know,
24 she's just -- we give her that discretion to work
25 whenever she can and as much as she needs to and wants

Page 30

1  to, because she's good and we need her.
2     Q   Okay.
3     A   So that's -- it's true.  However, 2016 and
4  2017, she didn't come in to the office as much then at
5  all, if ever.  She comes in more now -- well, actually,
6  now she doesn't come in at all.  During COVID and all
7  that, she was in the office a lot.  Then she went back
8  to home.
9          But -- so anyway, it's true today as an
10 employee, and it was true then as an independent
11 contractor.
12    Q   Okay.  So the next paragraph, paragraph 12,
13 I'm not going to read the whole thing, but it basically
14 is the whole same information about Nancy Letofsky.
15         What does Nancy do exactly for the firm?
16    A   She -- well, currently, almost exclusively
17 paralegal stuff.  A little bit of human resources here
18 and there to help me as the number of people have
19 increased, and she's helped kind of manage some of the
20 insurance over the last couple, several years as things
21 have grown related to errors and omissions and things of
22 that nature.
23         As we've become more busy, she's taken on some
24 of that role, but she's very busy with paralegal stuff.
25 She does pretty much all prelitigation work on

Page 31

1  subrogation files, and we have a lot of them,
2  fortunately.
3     Q   Okay.  In 2016 to 2018, that time frame, was
4  it -- at that time was she performing primarily
5  paralegal work, or was she doing other things as well?
6     A   Let me put it together in --
7     Q   Just --
8     A   It's over a long period of time.
9     Q   So five to seven years ago.  Right.  It has
10 been a while ago, I know.
11    A   Thinking about it more in the progress of,
12 like, when we started as a partnership.
13         Drawing in on when Ms. Buchanan worked for us,
14 I don't recall Ms. Letofsky doing much in terms of human
15 resources then.  It really picked up when COVID hit,
16 because we had the COVID regulations that we had to
17 employ or implement, and she started to help me more in
18 that regard.  And then the number of employees
19 increased, so she started to help me more in that
20 regard.
21         So since COVID, I think her duties as a human
22 resources have picked up a little bit, but we've become
23 extremely -- well, she has become extremely busy lately,
24 and I think most of her -- I'll let her tell you what
25 she does --

Page 32

1     Q   Sure.
2     A   -- primarily, but most of her work now is
3  paralegal stuff.
4     Q   Okay.  Is that -- I've seen e-mails from -- I
5  can do the -- we have it as Exhibit 7.  I guess I can
6  just show it to you, where she's listed as office
7  manager and legal assistant -- which are you?  Legal
8  assistant/paralegal are sort of the same thing, but --
9     A   Yeah.
10    Q   You can look at it if you want to see it.
11 Okay.  We can use that with her later.
12    A   Okay.  What's the date?
13    Q   At the bottom it's like August 31st of 2016,
14 is the one in particular I'm looking at, "Office manager
15 and legal assistant."
16    A   Right.  We had her -- so depending on the
17 time, she gives employees, like, the initial paperwork
18 when they become an employee, manages some insurance.
19         And I think primarily, if I'm remembering
20 correctly, we called her an office manager as we started
21 to grow to give people a place to go and make reports
22 and as it might relate to things in the office that were
23 going on, right, so it wasn't just me.
24         We wanted to have -- I know that developed
25 over time, and I just don't remember when.  But that was

Page 33

1  part of the reason of calling her an office manager so
2  that people could go and if they had a complaint about
3  discrimination or harassment or whatever, they would
4  know that she was part of that.
5     Q   Okay.
6     A   I mean, she -- I managed the office primarily
7  up until really COVID, and then that's when she really
8  started to take on a little more of a role.
9     Q   Okay.  Now, given that she had this office
10 manager as part of her title according to this e-mail,
11 did she work more in the office than, say, Susan did?
12    A   I think so.  I'm trying to remember what
13 she -- when she started working more from the office.
14 It was -- it's tied to doing the prelitigation work and
15 the increase in that volume.
16         I know before that she was like Susan,
17 raising -- their kids are the same age as ours.  So when
18 was Jake -- oh, that's -- it was before that.
19    Q   Yeah.
20    A   She did take a more -- she did take more --
21 there was more of a presence of her being in the office
22 over the last maybe four to five years, but I don't
23 remember when that really became a permanent thing.
24         Since she was -- we transitioned her to W-2,
25 she's in the office now all the time.  So I can't tell

30(b)(6) for Watkins & Letofsky, LLP
Daniel R. Watkins                                   Amy Buchanan v. Watkins & Letofsky, LLP

34
1  you when that exactly occurred, but for quite a period
2  of time she was in and out of the office just flowing
3  with whatever she could do.
4      Q   Okay.  And I can talk with her more, but I'm
5  just wondering what your recollection was.
6      A   Yeah.  She works primarily with Brian and has
7  always, so I -- it's not someone that I -- I don't
8  supervise her in any way, never have.  I don't think
9  Brian does much of supervising her either.  So I can't
10 really answer.
11     Q   Okay.  Let me have that back so I keep her
12 stuff separate.
13     A   Which one?
14     Q   This -- that one.  There you go.
15     A   Oh, yeah.
16     Q   Thanks.
17         So as best I can tell from some of the
18 documents that you sent to me overnight, it looks like
19 Nancy also was basically paid on an hourly basis; is
20 that right?
21     A   Correct.  They're both paid by the hour -- by
22 the hour.
23     Q   Okay.  So they would report their hours in
24 every -- every -- every paid -- it looks like they're
25 being paid monthly.

35
1      A   Yeah.  I'm just going with -- all I know is
2  what you see in the checks.
3      Q   Okay.
4      A   It makes sense that we did it that way.
5      Q   It looks like they did -- yeah.  They were
6  paid once a month or like somewhere around the middle of
7  the month.
8          Okay.  Was she only paid that hourly?  Do you
9  know, did she get any sort of bonuses or any sort of
10 other compensation other than the hourly rate -- Nancy?
11     A   Well, in terms of bonuses and overtime, I
12 don't believe so.  Other types of compensation, I don't
13 know what that might include, but in terms of pay for
14 work, I mean, it was just the hourly rate.
15     Q   Yeah.  Well, and so I was looking at -- when I
16 asked you the question I was looking at paragraph 13.
17 It said "At all relevant --"
18     A   Oh.
19     Q   "At all times relevant to this matter, W&L
20 California and W&L Nevada did not provide Nancy Letofsky
21 with benefits and did not withhold social security or
22 other taxes on Ms. Letofsky's behalf.  Ms. Letofsky was
23 not on payroll and her pay was received on a Form 1099."
24         So that's -- when I saw benefits, I was
25 thinking, well, what other kinds of benefits were there?

36
1  Bonuses or any kind of incentive pay or anything like
2  that?
3      A   Right.  And just to be clear for the record,
4  it says "her pay was recorded on a Form 1099."  I think
5  you said "received."
6      Q   I'm sorry.  "Recorded."
7      A   Benefits here, I'm talking about like sick
8  leave, vacation leave.
9          So let me -- yeah, and there were no bonuses
10 paid to either Ms. Letofsky or Ms. Watkins during the
11 time -- during this time, 2016/2017 in the time that
12 they were independent contractors, and we didn't
13 withhold any taxes for them or pay on their behalf any
14 taxes.
15     Q   Okay.  I'll say for the record -- because you
16 keep saying that when they were independent contractors,
17 but you understand we have a dispute over that; correct?
18     A   Sure.
19     Q   Okay.  All right.
20     A   Well, to be clear, 2016 and 2017.
21     Q   2016 and 2017, I think, is -- are the years in
22 which we're looking for the head count for --
23     A   Right.
24     Q   -- how many employees; right?
25     A   Right.  Yeah.  To be -- so up until we made

37
1  them W-2s and -- and I frankly don't know about their
2  vacation and sick leave.  They never take it if they
3  have it.
4          But up until then, they didn't have vacation
5  time or sick leave.  There was no PTO.  There was no
6  bonuses paid.  We would pay the other staff an annual
7  bonus.  We didn't pay Ms. Letofsky or Ms. Watkins those
8  bonuses.
9          So I can't think of other benefits that might
10 have applied.  There was no 401(k).  They weren't
11 involved with that.  So --
12     Q   And what about insurance?  Health insurance?
13     A   No.  We had a family plan through my work --
14 or through my partnership.
15     Q   Okay.
16     A   Yeah.  Brian and I had our own family plans.
17     Q   Did the -- did the other -- the W-2 employees
18 in 2016 and 2017, did you have them on a group plan?
19     A   I'm not sure that everybody did.  It depended,
20 I think, on whether they had enough hours, part
21 time/full time.
22     Q   Makes sense.
23     A   But we did provide it for associate attorneys
24 and full-time staff for sure.
25     Q   Okay.



```
                                    38
 1   A   But we didn't pay on behalf of Ms. Letofsky or
 2  Ms. Watkins to any plan.
 3   Q   Okay.  For some reason, it -- the number here
 4  jumps from 14 to 16.
 5   A   That's probably because I dictated it and
 6  typed it.
 7   Q   That's -- I do -- it happens to me all the
 8  time.  But it's noted for the record.
 9       So it goes to 16, it says "Nancy Letofsky is
10  free to operate independent businesses and develop
11  entrepreneurial opportunities.  She's not contractually
12  bound to work exclusively for W&L California or W&L
13  Nevada.  Has the freedom to solicit clientele of her own
14  as a paralegal."
15       Did I read that right?
16   A   Yes.
17   Q   All right.  So do you know whether or not she
18  has ever worked -- during -- well, let me -- let me
19  preface it by saying during the time frame that she's
20  worked for or with Watkins & Letofsky, has she ever done
21  any paralegal work for anybody else?
22   A   Paralegal work?  That, I don't know.
23       I know she had some type of makeup or home
24  product business or a couple of -- three of them going
25  on off and on through the time, but I don't know the
```

```
                                    39
 1  details on that.  But she's free to do anything she
 2  wants in terms of that to even today.
 3   Q   Sure.  Okay.  But you don't know if she ever
 4  did?
 5   A   In terms of paralegal, I don't know.
 6       I am pretty certain that she has had at least
 7  one, if not a couple, three businesses related to home
 8  products and stuff like that.
 9   Q   Okay. Okay.  I understand.
10       Again, Nancy's not had any kind of discipline
11  according to paragraph 17; right?
12   A   No.  She's incredible.
13   Q   Okay.  So even -- sorry.  Going down to
14  paragraph 18, even while she was doing this office --
15  these office manager type tasks, she didn't have any
16  kind of set schedule where she had to be there?
17   A   No.  That's correct.
18   MR. KEMP:  Okay.  Tell you what.  Let's take a
19  break real quick.  I'm going to get another water and
20  look at this and see.  Let's go off the record.
21       (Recess was taken at 12:53 p.m. until
22       1:01 p.m.)
23   MR. KEMP:  Back on the record.
24  BY MR. KEMP:
25   Q   Reminder you're still under oath.
```

```
                                    40
 1       Okay?
 2   A   Right.
 3   Q   Neither Nancy -- Nancy nor Susan -- I don't
 4  know if I'm -- my grammar is correct, but neither one of
 5  them had any signed independent contractor agreement
 6  with your firm, did they?
 7   A   Correct.
 8   Q   Okay.  Do you know whether or not either of
 9  them had business licenses with any state, local, or
10  county government?
11   A   I do not.
12   Q   Did you require them to keep any kind of
13  insurance as independent contractors with your firm?
14   A   I don't believe we required that of them.  I
15  was just trying to think if we had -- no, we did not
16  require that.
17   Q   Besides business licenses, neither of them had
18  any kind of professional license; right?  Like Susan
19  wasn't a CPA or an accountant, and I don't -- there's no
20  licensure for paralegals; right?
21   A   I think there is in California, but to answer
22  your question, I don't know that either of them are.
23       Nancy would have started far beyond -- back in
24  time before that was a requirement where you can become
25  a paralegal on the job.  But I think currently it's
```

```
                                    41
 1  different.
 2   Q   Oh, so she --
 3   A   I believe the answer to your question is
 4  neither of them have an actual license --
 5   Q   Okay.
 6   A   -- professional license.
 7   Q   Okay.  And then it's not disputed neither of
 8  them employed any people to help them with the work that
 9  they did for Watkins & Letofsky; right?
10   A   That, I don't know.  I don't have information
11  that they did, but I don't know that they did or didn't.
12  They would have to tell you that.
13       We employed people.  I know who those people
14  are, but I don't know what they did separate from that.
15   Q   So you have no knowledge of them hiring
16  anybody to work for them as their employees to do work
17  for Watkins & Letofsky?
18   A   Correct.  Well, let me state it this way.
19       I don't have information that either of them
20  did employ people, but I don't know that they did or did
21  not.
22   Q   Okay.
23   A   Does that make sense?
24   Q   Yes, it does.
25   A   Okay.  I mean, as I'm thinking back -- I mean,
```



Page 42

1  Ms. Watkins testified as she testified.  But I thought
2  other than our kids there were times when she had
3  friends helping her, but I can't really speak to that.
4  If she didn't recall it, then I could be wrong.
5      Q   Okay.  And unlike your -- what you testified
6  to in your contentions of -- a rough word, but your
7  contentions that Susan did work outside of the normal,
8  you know, scope of the business of Watkins & Letofsky,
9  that would not be true for Nancy Letofsky; right?
10         Paralegal work is certainly within the
11  scope --
12     A   Paralegal work is legal services for sure.
13  Office manager work is not.
14         There are all sorts of independent agencies
15  that manage offices for businesses, and so they don't
16  fall in under legal services as I see it.
17     Q   Okay.  Do you think that it's uncommon for
18  a -- for law firms to have office managers as employees?
19     A   I have no information on that in terms of
20  whether it's uncommon or not.
21         I know there are countless human resources
22  businesses that offer their services as independent
23  contractors for businesses, and I would assume large
24  firms use them all the time.
25     Q   Yeah.  And those businesses are probably

Page 43

1  licensed and have all the insurances; right?
2      A   For sure, I don't know.
3      Q   Right.
4      A   You'd have to ask them.
5      Q   Okay.  I'm not going to -- I -- we spoke about
6  this a little bit.  The documents that I received from
7  the bank and I've produced to you, I don't see making
8  them an exhibit to the deposition, but I did -- I did
9  want you to look at this one in particular.
10         Again, we're not going to make it an exhibit,
11  but this is the Paycheck Protection Program, PPP loan
12  forgiveness application.  It says it's for Watkins &
13  Letofsky.  Just --
14     A   Yeah.
15     Q   -- take a look at that.  Let me know if that's
16  your -- if -- if you basically electronically signed
17  this on November 1st, 2021.
18         MR. WATKINS:  First let me just object for the
19  record to the entire line of questioning about the PPP,
20  as I don't believe it's within the scope of allowable
21  discovery; therefore, it's not admissible.
22         THE WITNESS:  But I don't -- and then to answer
23  your question, I don't recognize this document, but I
24  certainly have DW on a whole bunch of places, and
25  "Daniel Watkins" is typed in.

Page 44

1         So I'm not -- I don't recognize this.  It was
2  some time ago, but it has my information on there, and
3  I'm assuming that if you got it from them, this is
4  something I filled out.
5  BY MR. KEMP:
6      Q   This is almost two years ago, yeah.  And so I
7  was just wondering if -- did anybody else help you fill
8  this information out for this PPP loan stuff?
9      A   All the numbers would have come from Susan.
10     Q   Okay.
11     A   She runs all that.
12     Q   All right.  So the -- the main thing I just
13  wanted to ask about --
14     A   Let me restate that, if you don't mind.
15     Q   Sure.
16     A   Some of the calculations, I think, are part of
17  the process of completing the form.  So, for example,
18  line 12, forgiveness amount, that probably wasn't given
19  to me by Susan.  That's just simple math and a product
20  of the format.
21         But information regarding money and expenses
22  of the office, that would have come to me from
23  Mrs. Watkins.
24     Q   Okay.  And I wasn't going to ask you about any
25  of the dollar amounts or anything like that.

Page 45

1         What I'm interested in is sort of about
2  probably a quarter of the way down the page it says
3  "Employees at time of loan application, 17.0.  Employees
4  at time of forgiveness application, 20.0."
5      A   Where are you seeing that?
6      Q   On the first page about a quarter of the way
7  down.
8      A   Oh, okay.  Okay.
9      Q   Do you have any reason to doubt or dispute
10  that at the time that the loan was applied for there
11  were 17 employees, and at the time it was forgiven,
12  there were 20?
13     A   Nope, I do not.
14     Q   No dispute over that; right?
15     A   For the covered period of 5/20 -- 5/12/2020 to
16  10/26/2020, correct.
17     Q   Okay.
18     A   As I look at this, I don't know -- I'm
19  confused by at the time of the application versus time
20  of forgiveness.  I probably understood it at the time.
21         I looked at -- oh, and maybe when you sent it
22  to me.  I looked at these, and I was trying to
23  understand, because the covered period was 5/12/2020 to
24  10/26/2020, so I was trying to understand what the time
25  of loan application was.  Maybe it's dated here.

**Page 46**

```
 1        And I was trying to connect them.  But in
 2   terms of the numbers that I have there for whatever time
 3   period it's referenced, those numbers are accurate.
 4   Q   Okay.  Good.  All right.  Thanks.  That's all
 5   I have on that one.
 6        And then these two employee earnings records
 7   periods that we have at 24 and 25, any reason to dispute
 8   that -- you know, that these people were actually
 9   employees at the time?
10   A   Assuming those are from Paychex, no.
11   Q   No dispute over that?
12   A   No.
13   Q   Okay.  Yeah.  And I -- this looks like other
14   documents from Paychex --
15   A   Right.
16   Q   -- that we've received.
17   A   Right.
18   Q   But, again, this came from the bank and was
19   part of the forgiveness --
20   A   Right.
21   Q   -- application.  Okay.
22   A   I mean, I know we definitely reported and
23   provided documentation for the application.  So if this
24   is it, then --
25   Q   Okay.
```

**Page 47**

```
 1   A   -- this is it.
 2   Q   All right.
 3   A   Oh, wait.  You didn't mark that one.
 4   Q   No, we didn't mark it, no.  You can keep it,
 5   though.  That's fine.
 6   A   Thanks.
 7   Q   Did the firm employ any other paralegals
 8   during that 2016 to 2018 time frame other than
 9   Ms. Letofsky?
10        Let me get that one exhibit back out.  It
11   might help.  Looking back at Exhibit 7, I think I gave
12   you --
13   A   Fourteen?
14   Q   Fourteen.  Sorry.
15        Looks like we have a few listed here.
16   A   I don't remember Evie being a paralegal.  Ceci
17   was.  She was a licensed paralegal, I believe, for --
18   she was with us only a short period, but -- I don't
19   remember, actually.
20        I mean, I remember Ceci was a paralegal, but I
21   don't think other than that -- if they called Evie that,
22   she -- she worked at the reception desk, so I'm not sure
23   that she -- if she was called a paralegal that she did
24   paralegal stuff.  She was in reception most of the time
25   that I remember.
```

**Page 48**

```
 1   So other than Ceci, I don't believe so -- or
 2   Ceci.  Excuse me.  C-e-c-i.
 3   Q   Okay.  What about Liz Gallardo down here?
 4   A   Oh, right.  No, she -- she might have had
 5   paralegal background, but she worked primarily as
 6   Brian's secretary, which was a full-time job.  I don't
 7   believe she did paralegal stuff.
 8   Q   All right.  Now, some of the former employees
 9   that are listed down below here -- it says "former staff
10   members" -- were any of those individuals paralegals?
11   A   So what's weird is Evie's listed in both the
12   chart above and below, but --
13   Q   She -- oh, yeah, she --
14   A   Yeah.
15   Q   Oh.
16   A   Erika Vescance.  I can't pronounce it, but
17   it's V-e-s-c-a-n-c-e.  She was also known as Evie, so I
18   don't know why she's up above.  Oh, wait --
19   Q   Well, Evie Dills is the name of this person up
20   above.
21   A   All right.  I'll just be quiet.  I don't know.
22   I don't remember.
23   Q   Oh, she works with -- so this is like -- I
24   believe these are the people that are associated with --
25   A   No.  It says former people, so -- oh.
```

**Page 49**

```
 1   Q   Did you see the -- did Evie have somebody that
 2   worked under her or --
 3   A   Oh, never, no.  I don't know what that means.
 4   That is definitely not -- Evie never supervised
 5   anybody --
 6   Q   Yeah.
 7   A   -- so I don't know what that's about.
 8   Q   Okay.
 9   A   I don't remember Erika, to be honest.  That's
10   probably terrible, but I don't.
11   Q   All right.
12   A   So as for the list below, the first three are
13   attorneys.  Katrina was Brian's secretary full time.
14        Sarah, Zach, they were attorneys.  I don't
15   remember Erika.  George and Amy were attorneys.
16   Q   Okay.  Have you ever had any other
17   paralegals -- and I mean ever -- ever have any other
18   paralegals other than Nancy Letofsky that you consider
19   to be independent contractors or you paid on an
20   independent contractor basis?
21   A   No.
22   Q   All the paralegals you had with the exception
23   of Nancy, then, would have been employees, W-2
24   employees; is that right?
25   A   I'm thinking.  That is probably correct.  I'm
```

**Page 50**

```
 1  thinking that the uptick in the use of paralegals really
 2  started when we started getting busy 2018, 2019, right
 3  before COVID.  So I don't think we had independent
 4  contractors before that.
 5      Q   Okay.
 6          I'm just about done, as you can tell --
 7      A   Sure.
 8      Q   -- so I'm just -- bear with me for a minute.
 9  I'm just making sure there's nothing else I needed to
10  ask you.
11      A   Good.
12      MR. KEMP:  I think we've covered it.
13      THE WITNESS:  Okay.
14      MR. WATKINS:  I don't have any questions.
15      MR. KEMP:  You're going to talk to yourself?
16      THE WITNESS:  Yeah.  I do that enough.  I don't
17  need to do it here.
18      MR. KEMP:  We'll go off the record, then.
19         (A discussion was held off the record.)
20      MR. KEMP:  Wait.  Let's go back on the record, just
21  one thing.
22          Just one point I want to make.  When I say
23  we're going off the record, I'm not going to conclude
24  the deposition, only because we got a bunch of documents
25  overnight tonight that I haven't had a chance to look
```

**Page 51**

```
 1  through, including responses to requests for production
 2  of documents.
 3          And so I would just reserve my right to resume
 4  the deposition if for some reason I need to.  I'm not --
 5  at this point, I don't think that will happen, but I
 6  haven't had a chance to look through them yet, so --
 7      MR. WATKINS:  Okay.
 8      MR. KEMP:  -- that's why we're just adjourning and
 9  not concluding.
10      MR. WATKINS:  Fair enough.  As long as if the
11  question of additional deposition time is related to
12  objections, we meet and confer first in terms of what
13  you asked us to provide and what we can and can't
14  provide and so on.
15      MR. KEMP:  Absolutely.
16      MR. WATKINS:  Yeah.
17      MR. KEMP:  We would meet and confer on that anyway.
18      MR. WATKINS: Yeah.  Okay.  Cool.  Thanks.
19      MR. KEMP:  Yeah.
20         (Proceedings concluded at 1:21 p.m.)
21
22
23
24
25
```

**Page 52**

```
 1  STATE OF CALIFORNIA    )
 2                         ) ss.
 3  COUNTY OF ORANGE       )
 4
 5
 6
 7      I, the undersigned, say that I have read the
 8  foregoing deposition, and I declare, under penalty of
 9  perjury, that the foregoing is a true and correct
10  transcript of my testimony contained therein.
11      EXECUTED this _____ day of _____,
12  2023, at _____, California.
13
14
15
16            _____
                       DANIEL WATKINS
17
18
19
20
21
22
23
24
25
```

**Page 53**

```
 1  BE IT KNOWN that the foregoing proceedings were taken
 2  before me; that the witness before testifying was duly
 3  sworn to testify to the whole truth; that the foregoing
 4  pages are a full, true and accurate record of the
 5  proceedings, all done to the best of my skill and
 6  ability; that the proceedings were taken down by me in
 7  stenographic shorthand and thereafter reduced to print
 8  under my direction.
 9
10      I CERTIFY that I am in no way related to any
11      of the parties hereto, nor am I in any way
12      interested in the outcome thereof.
13
14      ( )  Review and signature requested.
15      ( )  Review and signature waived.
16      (x)  Review and signature neither requested
17      nor waived.
18
19      IN WITNESS WHEREOF, I have subscribed my name
20      this 22nd day of October, 2023.
21
22              /s/ Kayla Lotstein
23
24      Kayla Lotstein, California CSR No. 13916
25
```

# EMPLOYEE EARNINGS RECORD
(Requested Check Dates 01/21/20 - 02/05/20)

Page 1 of 18    0080 A800-4804 Watkins & Letofsky LLP

| EMPLOYEE NAME | ID | EMPLOYEE NAME | ID | EMPLOYEE NAME | ID | EMPLOYEE NAME | ID |
|---|---|---|---|---|---|---|---|
| **\*\*\*\* 1 LEVEL 1** | | | | | | | |
| Albarran, Marilyn | 60 | Kachermeyer, Farah | 50 | Long, Michael F | 75 | Santos, Theresa M | 56 |
| Friel, Molly | 63 | Korinko, Jeffery A | 72 | Mulgrew, Jessica C | 74 | Torbert, Brittany L | 73 |
| Gatewood, Brittany N | 32 | Letofsky, Jake D | 14 | Ortuno, Joseph M | 76 | Walker, Chloe L | 64 |
| High, Shawna | 61 | Letofsky, Nancy | 66 | Salas, Juan A | 37 | Watkins, Susan | 67 |

16 *Person(s)*

EXHIBIT 24

**0080 A800-4804** Watkins & Letofsky LLP

# EMPLOYEE EARNINGS RECORD
(Requested Check Dates 10/26/20 - 11/05/20)

| EMPLOYEE NAME | ID | EMPLOYEE NAME | ID | EMPLOYEE NAME | ID |
|---|---|---|---|---|---|
| **\*\*\*\* 1 LEVEL 1** | | | | | |
| Albarran, Marilyn | 60 | Kachermeyer, Farah | 50 | Long, Michael F | 75 |
| Ehlers, Richard S | 81 | Katz, Jeffrey A | 80 | Lozada, Christina D | 79 |
| Friel, Molly | 63 | Korinko, Jeffery A | 72 | Mulgrew, Jessica C | 74 |
| High, Shawna | 61 | Letofsky, Nancy | 66 | Probst, Kari L | 78 |
| Johnson, Blake | 83 | Loecsey, Jessica | 82 | | |

18 *Person(s)*

| EMPLOYEE NAME | ID |
|---|---|
| Salas, Juan A | 37 |
| Santos, Theresa M | 56 |
| Walker, Chloe L | 64 |
| Watkins, Susan | 67 |

EXHIBIT 25