# EXHIBIT 19

Deposition of Susan Watkins 10/9/23

# EXHIBIT 19

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

AMY BUCHANAN,                )
                             )
          Plaintiff,         )
                             )
   vs.                       ) Case No. 2:19-cv-
                             ) 00226-GMN-VCF
WATKINS & LETOFSKY, LLP, a Nevada )
Limited-Liability Partnership; DOES)
I-X; ROE BUSINESS ENTITIES I-X,    )
                             )
          Defendants.        )
_____)

DEPOSITION OF SUSAN WATKINS

IRVINE, CALIFORNIA

MONDAY, OCTOBER 9, 2023

10:03 A.M.

Stenographically reported by:

Kayla Lotstein
California CSR No. 13916, CRR, RPR, CRC
Job No. 54526, Firm No. 116F



Susan Watkins                                     Amy Buchanan v. Watkins & Letofsky, LLP

**2**

```
 1          UNITED STATES DISTRICT COURT
 2             DISTRICT OF NEVADA
 3
 4  AMY BUCHANAN,              )
                              )
 5      Plaintiff,            )
                              )
 6  vs.                       ) Case No. 2:19-cv-
                              ) 00226-GMN-VCF
 7  WATKINS & LETOFSKY, LLP, a Nevada )
    Limited-Liability Partnership; DOES)
 8  I-X; ROE BUSINESS ENTITIES I-X,   )
                              )
 9      Defendants.           )
    _____)
10
11
12
13      DEPOSITION OF SUSAN WATKINS taken on behalf of
        Plaintiff, at 10:03 a.m., Monday, October 9,
14      2023, at 17752 Skypark Circle, Suite 100,
        Irvine, California, before Kayla Lotstein,
15      Certified Shorthand Reporter No. 13916 of the
        State of California, pursuant to Notice.
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1               INDEX
 2  WITNESS: SUSAN WATKINS
 3           EXAMINATIONS
 4                        Page
 5  By Mr. Kemp              7
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1  APPEARANCES OF COUNSEL:
 2    FOR PLAINTIFF:
 3      KEMP & KEMP
        BY: JAMES P. KEMP, ESQ.
 4      7435 West Azure Drive
        Suite 110
 5      Las Vegas, Nevada 89130
        jp@kemp-attorneys.com
 6      (702) 258-1183
 7
 8    FOR DEFENDANTS:
 9      WATKINS & LETOFSKY, LLP
        BY: DANIEL R. WATKINS, ESQ.
10      8935 South Pecos Road
        Suite 22A
11      Henderson, Nevada 89074
        DW@wl-llp.com
12      (949) 476-9400
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**5**

```
 1               EXHIBITS
 2  No.      Description         Page
 3  22   E-mail correspondence from    63
        Susan Watkins to Amy
 4      Buchanan, sent Friday,
        September 1, 2017 15:44:47;
 5      Bates-stamped WLLLP001306
 6
 7      QUESTIONS INSTRUCTED NOT TO ANSWER
 8        Page    Line
 9        27      10
10        56      5
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Susan Watkins                                   Amy Buchanan v. Watkins & Letofsky, LLP

---

**6**

1              INDEX (CONTINUED)
2
3        INFORMATION TO BE SUPPLIED
4              Page    Line
5              (None)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**7**

1        IRVINE, CALIFORNIA; MONDAY, OCTOBER 9, 2023
2              10:03 A.M.
3              * * *
4              SUSAN WATKINS,
5    the Witness herein, having been first duly sworn,
6    testified as follows:
7              EXAMINATION
8    BY MR. KEMP:
9        Q    Would you please state your name and spell it
10   for the record.
11       A    Susan Watkins, S-u-s-a-n, W-a-t-k-i-n-s.
12       Q    All right. Ms. Watkins, my name is JP Kemp,
13   and I represent Amy Buchanan in a case against Watkins &
14   Letofsky.
15            Have you ever had a deposition taken before?
16       A    When I was 18.
17       Q    So it's been a while?
18       A    Yes.
19       Q    Okay. Well, to be sure we're on the same
20   page, we'll go through the instructions and the way that
21   it's conducted.
22       A    Yeah.
23       Q    So the first thing is the purpose of the
24   deposition is to gather information about our case.
25   We're going to be speaking about your working

**8**

1    relationship with Watkins & Letofsky, in particular,
2    today.
3            The format's going to be that I'm going to be
4    asking you some questions. When I'm finished,
5    Mr. Watkins may have some questions for you, and
6    depending on if he does and what those are, I may have
7    some follow-up for you.
8            Okay?
9        A    All right.
10       Q    Okay. The No. 1 rule of the deposition is the
11   oath.
12            The oath that you've taken is the same oath
13   that you would take if you were testifying in court
14   before a judge and a jury.
15            Do you understand that?
16       A    Yes.
17       Q    It carries with it the same obligations to
18   tell the truth and the same penalties for perjury if you
19   were to not tell the truth.
20            Do you understand that?
21       A    Yes, I do.
22       Q    Okay. The court reporter is taking down
23   everything we say word for word by means of stenography.
24   That means that there's some rules we have to follow.
25            No. 1 among those is I need all of your

**9**

1    answers to be out loud and in words. Nods of the head,
2    shakes of the head, "uh-uhs," "uh-huhs," none of that's
3    going to come out in the record.
4            So if at some point if I say "Is that a yes"
5    or "is that a no," I'm not trying to be rude. I'm
6    trying to make sure we have a clear record.
7            Okay?
8        A    I understand.
9        Q    All right. The second thing with that is we
10   have to try not to talk over one another. The court
11   reporter can only take down one person at a time, and if
12   two people are talking at the same time, it makes her
13   job difficult, if not impossible.
14            So try to wait for me to finish my question
15   before you start your answer, and I'll try to wait for
16   you to finish your answer before I start my next
17   question.
18            Okay?
19       A    Okay.
20       Q    All right. If at any time my questions aren't
21   clear to you, you didn't hear it, you didn't understand
22   it, there's any question in your mind about what's being
23   asked, make sure you stop me and ask me to repeat the
24   question, rephrase the question, give you whatever
25   explanation that you need to clarify it for you to

---



Susan Watkins                                    Amy Buchanan v. Watkins & Letofsky, LLP

10

1  answer it.
2      Okay?
3      A   Okay.
4      Q   If you answer a question and you haven't asked
5  me for that -- you know, to repeat it, rephrase it,
6  clarify it -- I'm going to have to assume that you've
7  understood the question and that you've given me your
8  best answer.
9      All right?
10     A   All right.
11     Q   Okay.  If -- at some point there may be
12  objections.  The rule with objections is that unless
13  you're specifically told not to answer a question, you
14  go ahead answer the question even though the objection's
15  been made.
16         We don't have a judge here to rule on
17  objections, so even though the objection's been made,
18  you go ahead and answer unless you're specifically told
19  not to.
20         Okay?
21     A   Okay.
22     Q   All right.  Is there any reason you can't give
23  me your best and most accurate testimony today?
24     A   No.
25     Q   For example, do you take any medications or

11

1  have any medical conditions that would impact on your
2  ability to understand and answer my questions?
3      A   No.
4      Q   Okay.  If at any time you need to take a
5  break, just let me know.  It's not an endurance contest.
6  We're probably not going to be that long today anyway,
7  but if you need to take a break, just say so, and we'll
8  take a break.
9         The only rule there is that if I have a
10  question pending, I'm going to need you to answer that
11  question, and maybe brief follow-up, and we'll take a
12  break as soon as we can.
13         Okay?
14     A   Okay.
15     Q   All right.  Did you -- did you do anything to
16  prepare for the deposition today?
17     A   No.
18     Q   You didn't review any documents?
19     A   No.
20     Q   Did you -- other than counsel for Watkins &
21  Letofsky, did you speak with anyone about what your
22  testimony would be here today?
23     A   No.
24     Q   All right.  By way of a little bit of
25  background information, what's your highest level of

12

1  education?
2      A   I have two years of junior college.
3      Q   Okay.  And where was that at?
4      A   Mesa College in San Diego.
5      Q   All right.  Where did you go to high school?
6      A   Thomas Jefferson in San Antonio, Texas.
7      THE WITNESS:  I'm sorry.  Am I speaking loud
8  enough?  Okay.
9  BY MR. KEMP:
10     Q   And what year did you graduate from high
11  school?
12     A   1981.
13     Q   Do you have any trade school, like vocational
14  training?  Some people go to bartender school or truck
15  driver school or in Vegas, we have people that go to
16  dealing school.  Any -- any trade schools like that that
17  you've done?
18     A   I received my real estate license in 1988.
19     Q   Any others?
20     A   No.
21     Q   Okay.  The two years in junior college at Mesa
22  College in San Diego, what did you study there?
23     A   I took accounting classes, business
24  communication, economics, some of the higher-level
25  general ed classes.  Basically to learn more with the

13

1  career should I not get a full college degree.
2      Q   Okay.  All right.  And do you work now?  Do
3  you -- you're employed now?
4      A   Yes.
5      Q   Where are you employed now?
6      MR. WATKINS:  Lacks foundation.  Calls for a legal
7  conclusion.
8         But you can -- vague and ambiguous as to
9  "employed," but you can answer.
10     THE WITNESS:  I work for Watkins & Letofsky.
11  BY MR. KEMP:
12     Q   How long have you worked for Watkins &
13  Letofsky?
14     MR. WATKINS:  Vague and ambiguous as to "worked
15  for," but you can answer.
16     THE WITNESS:  Three to four years.
17  BY MR. KEMP:
18     Q   Okay.  So three to four years.  So that would
19  be going back to 2019 or so?  2020?
20     A   2018.  Sometime in 2018.
21     Q   All right.  And where did you work before
22  Watkins & Letofsky?
23     A   I worked for myself.
24     Q   When you say you worked for yourself, what --
25  what -- what were you doing in -- well, hold on.  Let me

Susan Watkins                                    Amy Buchanan v. Watkins & Letofsky, LLP

14

1  scratch that.  Let me strike that.
2      So you were self-employed before that?
3    A   Yes.
4    Q   And self-employed doing what?
5    A   Providing accounting services, logistical
6  assistance, IT assistance for companies.
7    Q   And how long were you -- were you doing that,
8  working for yourself?
9    A   I can't remember how far back, but I've --
10  I've been doing it since I became a stay-home mom,
11  possibly 1998 all the way until 2018.
12    Q   I'm sorry.  Did you say 1998?
13    A   Yes.
14    Q   Through 2018.  Okay.
15      All right.  And to what companies did you
16  provide the accounting services and logistical services,
17  IT services?
18    A   I started off just assisting Dan when he first
19  started his solo practice.  I don't remember what year.
20  Just periodically.  I was raising children, so I didn't
21  have much time.
22      In, I would say, 20- -- 2008 I started
23  assisting other businesses.  One of them, I cannot
24  remember the name of the spa, but I had another attorney
25  that I did work for, provided billing services for his

15

1  law practice.
2    Q   Okay.  So there was a -- okay.  So when you
3  say "Dan," you mean Dan Watkins; right?
4    A   Yes.
5    Q   Okay.  So you were helping him when he first
6  started --
7    A   Yes.
8    Q   -- practicing?
9    A   Yes.
10    Q   Okay.  All right.  And so there was a spa, and
11  then another attorney?
12    A   Yes.
13    Q   Do you remember the name of the spa at all?
14    A   I cannot remember the name at the moment.
15    Q   Where was it located?
16    A   In Newport Beach.  It's gone out of business
17  since then.
18    Q   Okay.  Do you remember who owned it?
19    A   I'm trying to remember her last name.  Kathy.
20    Q   Kathy with a C or a K?
21    A   With a K, and I cannot remember her last name.
22    Q   Approximately where in Newport Beach was it
23  located?
24    A   On Irvine Boulevard near the 73.  I don't know
25  the names of the street.

16

1    Q   All right.  And so during what time frame did
2  you work with Kathy at the spa in Newport Beach?
3    A   The latter part of 2008 to the end of 2009.
4    Q   All right.  Did it go out of business at that
5  point, or you just stopped working?
6    A   Yes, it did.
7    Q   Okay.  All right.  And you said they're --
8    A   Oh, I remember her last name.
9    Q   Okay.
10    A   Furlong.
11    Q   Furlong?
12    A   Yes.
13    Q   F-u-r-l-o-n-g?
14    A   I believe so.
15    Q   All right.  And you said there was another
16  attorney that you were helping or working for -- with?
17    A   Yes.
18    Q   Who was that?
19    A   Tom Gourde.
20    Q   Can you spell the last name.
21    A   G-o-r-d-e [sic].
22    Q   All right.  And during what time frame did you
23  work providing these accounting services, logistical
24  services, or IT services for Tom Gourde?
25    A   I'm not certain, but it was around the same

17

1  time period.  Maybe an additional year.
2    Q   So from, say, sometime in 2008 to sometime in
3  2010?
4    A   Yes.
5    Q   Okay.  And why did you stop?
6    A   I took a break.  My kids -- my
7  responsibilities with my children were becoming more
8  demanding, and I only had little time to develop other
9  relationships, but I did -- I did start to do work for
10  Watkins & Letofsky at that point at a very reduced
11  schedule because of the demands of my children.
12    Q   Okay.  So while you were working at the spa
13  and with Tom Gourde, were you also still working with
14  Dan's firm?
15    A   I don't recall how many hours.  I might have
16  helped here and there.
17    Q   Okay.  But in 2010 when you were no longer
18  with Tom Gourde and the spa, you started around that
19  time working with Dan again?
20    A   I believe so.
21    Q   And by the time -- was it Watkins & Letofsky
22  at that time?
23    A   Yes.
24    Q   Okay.  Between 2010 and 2018, did you do this
25  accounting services, logistical work, or IT services for

Susan Watkins                                    Amy Buchanan v. Watkins & Letofsky, LLP

18

1  any other person or business?
2      A   No.  I didn't have the time.
3      Q   Okay.  Okay.  So in 2018, did the nature of
4  your relationship with Watkins & Letofsky change?
5      MR. WATKINS:  Vague and ambiguous as to time.
6  Lacks foundation.
7      MR. KEMP:  Sure.
8      MR. WATKINS:  Calls for a legal conclusion.
9  BY MR. KEMP:
10     Q   Let me -- let me rephrase.
11         During 2010 to 2018, did you receive W-2 tax
12  forms from Watkins & Letofsky?
13     A   No.
14     Q   After 2018, did you begin to receive W-2 tax
15  forms from Watkins & Letofsky?
16     MR. WATKINS:  Calls for speculation.  Lacks
17  foundation as to time.
18         You can answer.
19  BY MR. KEMP:
20     Q   Beginning with tax year 2018?
21     MR. WATKINS:  It lacks foundation as to time.  She
22  said she wasn't sure on a start date.
23         But you can answer.
24     THE WITNESS:  Sometime around that time, I did.
25

19

1  BY MR. KEMP:
2      Q   Okay.  And you were receiving W-2 -- you're a
3  W-2 employee as of today?
4      MR. WATKINS:  Calls for a legal conclusion.
5         You can answer.
6      THE WITNESS:  Yes.
7  BY MR. KEMP:
8      Q   Okay.  You received W-2 tax forms from
9  Watkins & Letofsky?
10     A   Currently.
11     Q   Okay.  You received one for 2022?
12     A   Yes.
13     Q   You received one for 2021?
14     A   Yes.
15     Q   You receive one for 2020?
16     A   Yes.
17     Q   You receive a W-2 for 2019?
18     A   I don't recall --
19     Q   Okay.
20     A   -- that far back.
21     Q   Okay.  You expect to receive one for 2023?
22     A   Yes.
23     Q   All right.  So I asked you about between 2010
24  and 2018.
25         Since January 1st of 2018, have you worked for

20

1  anyone else?
2      A   No.
3      Q   And that would be as a -- as in your own
4  business or for -- as a W-2 employee.  Any other --
5      A   No.
6      Q   Okay.  So between 2010 and 2018, what were
7  your duties or what -- what tasks were you performing as
8  work for Watkins & Letofsky?
9      MR. WATKINS:  Overbroad.
10         You can answer.
11     THE WITNESS:  I provided billing services for their
12  clients, as I did for Tom Gourde.  I provided accounting
13  services, bookkeeping, in which I worked with a CPA.
14         I developed processes for working remotely
15  with the employees at the office, specifically the
16  attorneys, who would send me their hours, and I would
17  create invoices to the clients from that.  I handled
18  payroll.  As needed, I'd complete audits from clients on
19  billing, as well as insurance company audits,
20  specifically for workers' comp based on payroll records.
21         I also provided IT services, not as far as
22  computer engineering, but troubleshooting if -- if
23  people had issues of submitting e-filings to the court
24  or any kind of IT -- limited IT troubleshooting.  I
25  would call and assist over the telephone.

21

1         I also provided logistical help in setting up
2  offices, the one in Vegas.  If there were computer needs
3  or equipment needs in the office, I would purchase
4  equipment for them, seeking out the best solution for
5  them.
6  BY MR. KEMP:
7      Q   Okay.  With respect to IT services, did -- did
8  the firm have any other, like, vendor for IT services?
9         I mean, there's -- you're there and you're
10  troubleshooting and you're doing that stuff, but what if
11  it was something beyond what you could do?
12     MR. WATKINS:  Vague and ambiguous as to time.
13  Lacks foundation.
14     MR. KEMP:  We're still talking about between 2010
15  and 2018.
16     MR. WATKINS:  Still ambiguous as to time and, it
17  lacks foundation that it occurred during the whole time.
18  BY MR. KEMP:
19     Q   Well, during that time frame, just generally
20  speaking, was there another company that provided IT
21  services, or were you doing it all?
22     MR. WATKINS:  The same objections.  Lacks
23  foundation.
24         You can answer.
25     THE WITNESS:  There was an individual who would



Susan Watkins                                    Amy Buchanan v. Watkins & Letofsky, LLP

22

1   come in periodically if there was something that I
2   couldn't figure out myself.
3   BY MR. KEMP:
4       Q   Okay.  And where was that individual from?
5   Was there --
6       A   He was independent.
7       Q   Okay.  You talked about audits for workers'
8   comp insurance.
9           What -- what did that entail?
10      A   Taking payroll records, breaking it down
11  individually by individual for a certain time period and
12  breaking out every tax breakdown.  It would have to
13  reconcile with -- with tax returns.  Forms like a
14  Form 941.
15      Q   Okay.  So this is just to provide information
16  about Watkins & Letofsky to its workers' compensation
17  carrier?
18      A   Yes.
19      Q   Okay.  Not like workers' compensation carriers
20  for clients or something like that?
21      A   No.
22      Q   Okay.  And audits for clients, you mentioned
23  something about audits for clients.
24          What did that entail?
25      A   One of their main clients is State Farm

23

1   Insurance, and there was -- there were a couple of
2   times, I don't remember what year, where they did a very
3   thorough audit.
4           I had to provide copies of deposits regarding
5   the trust account that we have set up for them and
6   provide backup for certain -- certain files just to make
7   sure we were being honest, I guess.
8       Q   They were just -- they were checking out the
9   legitimacy of everything, and you would help provide the
10  information?
11      A   Yes, yes.
12      Q   I get it.
13          Okay.  And with respect to the bookkeeping and
14  accounting functions, did -- during the 2010 to 2018
15  time frame, did the firm utilize a CPA, or were you
16  doing all the work?
17      A   They utilized a CPA.
18      Q   Okay.  So did you work with a CPA in terms of
19  providing them with information?
20      A   Yes.
21      Q   I see.  Okay.
22          During that 2010 to 2018 time frame, did you
23  have a supervisor, somebody that you reported to?
24      A   I had to provide reports --
25      MR. WATKINS:  Wait.  Vague and ambiguous as to

24

1   "supervisor."  Lacks foundation.
2       You can answer.
3       THE WITNESS:  I did not have a supervisor, per se,
4   but I would provide cash flow reports to Dan and Brian
5   Letofsky.
6   BY MR. KEMP:
7       Q   Okay.
8       A   And I would provide reports on attorney
9   revenue per -- per attorney based on the billing program
10  that -- that I used.  I gave them a forecast of the --
11  the next several months what we were required to pay in
12  payables and whether we had enough income to cover that.
13  We would have a shortfall or windfall.
14      Q   Okay.  And were these -- was your providing
15  these reports and so forth to Dan and Brian something
16  you just did on a regular basis, or would they contact
17  you to tell you what they wanted?
18      A   I would just provide it.
19      Q   Okay.  If they wanted other information, would
20  they contact you to give that to them?
21      MR. WATKINS:  Calls for speculation.  Lacks
22  foundation.
23  BY MR. KEMP:
24      Q   You can answer.
25      A   I can answer that?

25

1       MR. WATKINS:  Well, do you know?
2       THE WITNESS:  Would you repeat --
3   BY MR. KEMP:
4       Q   Sure.
5       A   I'm sorry.  Repeat the question.
6       Q   Sure.  I'll repeat.
7           I'm just -- I'm wondering, you know, so you've
8   got these reports and these things that you're providing
9   to them on a regular basis, but did they -- were there
10  ever times when they would contact you and say we want
11  other information or additional information or some --
12  something else other than what you were regularly
13  providing?
14      MR. WATKINS:  Vague and ambiguous.  Lacks
15  foundation.
16      THE WITNESS:  Can I answer that?
17  BY MR. KEMP:
18      Q   Yeah.
19      MR. WATKINS:  If you know.
20  BY MR. KEMP:
21      Q   You answer anything unless he tells you not
22  to.  Okay?
23      A   Okay.
24      MR. WATKINS:  Or you -- don't guess, so if you
25  know, you can answer.  If you don't know --



26

1    THE WITNESS:  I don't recall asking -- being asked
2  for additional reports.
3  BY MR. KEMP:
4    Q    But beyond reports, just additional
5  information?
6    MR. WATKINS:  Vague and ambiguous as to "additional
7  information."  Lacks foundation.
8    You can answer.
9    THE WITNESS:  If they needed detail on the
10  attorneys' performances as far as for the revenue
11  reports that I created, then I suppose I would provide
12  that.
13  BY MR. KEMP:
14    Q    Okay.  I was looking to see if I have it.  I
15  seem to recall an e-mail -- this has been a long time
16  ago, so you may not remember.
17    But I seem to recall an e-mail where Dan was
18  asking you about how much my client, Amy Buchanan, was
19  making or something regarding her payroll.
20    Do you remember having -- you know, being
21  asked for that type of information?
22    A    Probably, yes.
23    MR. WATKINS:  Wait.  Don't guess.  Do you remember
24  or not?
25    THE WITNESS:  Sure.  Yes.

27

1  BY MR. KEMP:
2    Q    Okay.
3    A    When she -- right.  When she was asking about
4  her hours, of course I would.
5    Q    All right.
6    A    I had access to all that information.
7    Q    Okay.  And you remember providing that
8  information, then?
9    A    Yes.
10    Q    Okay.  So we were talking about between 2010
11  and 2018.
12    After 2018, when you became a W-2 employee,
13  have your duties or -- or responsibilities changed in
14  any way?
15    MR. WATKINS:  Okay.  Now I'm going to need you to
16  lay some foundation of how this falls within the scope
17  of discovery that's allowed in the case, because I think
18  you're beyond it.  This is about -- and I'll read you
19  the court order while we're on the record.
20    I don't want this to be some fishing
21  expedition that goes beyond what the Court has allowed
22  you to inquire.
23    The Court specifically says "Out of an
24  abundance of caution --"
25    (Reporter clarification.)

28

1    MR. WATKINS:  "Out of an abundance of caution and
2  in order to minimize the risk of unnecessary future
3  litigation, the Court will reopen discovery for the
4  limited purpose of determining whether Susan Watkins and
5  Nancy Letofsky were employees or independent contractors
6  during the relevant time period."
7    2018 is after the relevant time period, so the
8  scope of discovery is closed for the purposes of that
9  inquiry, and I'm going to instruct her not to answer.
10    MR. KEMP:  Okay.  Are you instructing the witness
11  not to answer in order to obtain protection from the
12  Court?  Because I'm going to insist that the question is
13  answered, because it is directly relevant.
14    Because if she's doing the same thing between
15  2010 and 2018 that she was doing after 2018, then
16  nothing has changed, and that goes directly to whether
17  or not she's an employee for purposes of the Americans
18  with Disabilities Act prior to 2018.
19    MR. WATKINS:  No, that is not the case at all.  Her
20  taxing changes.  There are other things that are private
21  to her and her income and her retirement and other
22  things that are not part of the relevant time period of
23  whether they were employees or independent contractors
24  in 2017.  They're not just -- it's not even remotely
25  close to that.

29

1    MR. KEMP:  Well, I disagree.
2    So you're instructing the --
3    MR. WATKINS:  You've already determined that she
4  was a W-2 employee after 2018.
5    MR. KEMP:  Right.
6    So I'm wondering what -- how -- if her duties
7  or responsibilities changed, and that's directly
8  relevant.
9    MR. WATKINS:  No.
10    MR. KEMP:  From that, a jury could determine that
11  she was also an employee before then, although not
12  accounted for properly.  Misclassified as an independent
13  contractor.
14    That's exactly the -- that's precisely the
15  issue here, Dan.  It's precisely the issue.
16    MR. WATKINS:  You've already got that she's a W-2.
17    She can answer, but in a very limited scope,
18  and you need to -- well, go ahead.  I'll inquire further
19  if I need to.
20    Go ahead.  You can answer.
21  BY MR. KEMP:
22    Q    Do you need me to repeat it?
23    A    Yes, please.
24    Q    Okay.  So I'm just wondering, we've gone over
25  what you did between 2010 and 2018 with the -- with your



Susan Watkins                                    Amy Buchanan v. Watkins & Letofsky, LLP

---

30

1  duties, you know, working at Watkins & Letofsky.
2  2018 or after, you -- you go -- you become a W-2
3  employee, you start receiving W-2 forms.
4       My question is did your duties, the work you
5  performed, change in any way after you transitioned to a
6  W-2 employee?
7    A   They have increased, and I have hired an
8  individual to work with me at my home. So essentially I
9  may become an independent contractor again, because
10 things have changed.
11      I am hiring individuals without the consent of
12 the partners. In fact, they have not even met the
13 person working with me.
14   Q   Okay. So at this point, you're -- you have
15 hired somebody else to assist you with your duties?
16   A   Yes.
17   Q   Okay. When did you hire that person?
18   A   Seven months ago.
19   Q   Okay. During 2010 to 2018, did you hire any
20 persons to assist you with doing your work?
21   A   I had my children help me periodically. At
22 that time, my responsibilities or the work that I was
23 providing was not as intense as it is now, so it was
24 manageable on my own.
25   Q   Okay. But -- so you had your children help

---

31

1  you.
2       But did you actually hire any employees?
3    A   No.
4    MR. WATKINS: Well, wait. It's vague and ambiguous
5  as to "hire." Lacks foundation.
6  BY MR. KEMP:
7    Q   I'm talking about hire -- I'm sorry. Let me
8  clarify.
9       Did you hire any employees such as this person
10 you've recently hired seven months ago during that 2010
11 to 2018 time period, or was it just your children
12 helping you?
13   A   No, I did not.
14   Q   Okay. All right. So when you say it's
15 increased since 2018 or when you transitioned to be a
16 W-2 employee, were you doing additional types of tasks,
17 or just the volume of work increased?
18   A   The volume has increased.
19   Q   Okay. But in terms of the types of work and
20 the types of tasks, that hasn't really changed?
21   MR. WATKINS: Vague and ambiguous as to time.
22 Lacks foundation. Overbroad.
23 BY MR. KEMP:
24   Q   You can answer.
25      Since 2018, you know, since you started

---

32

1  getting W-2 forms as a W-2 employee, have you added or
2  subtracted any of the tasks, as opposed to just the
3  volume?
4       If you're -- you know, you can have a lot more
5  attorneys that you have to do billing services for.
6  That would be an increase in volume --
7    A   Right.
8    Q   -- but I'm talking about were there any other
9  tasks that were added to your plate, any other types of
10 things other than what we talked about with the IT
11 services, the billing services, the accounting
12 bookkeeping, you know, working with -- helping people
13 work remotely, about those processes, workers' comp
14 audits, audits for clients, purchasing equipment, any
15 additional tasks or -- like that rather than just the
16 volume?
17   MR. WATKINS: Compound.
18   THE WITNESS: Pardon me?
19   MR. WATKINS: Compound.
20      You can answer.
21   THE WITNESS: I do have a 401(k) plan, retirement
22 plan that I have to manage for the employees. That's --
23 that's new.
24 BY MR. KEMP:
25   Q   When did the 401(k) come into effect?

---

33

1    A   2018.
2    Q   Okay. So you added sort of taking care of
3  this 401(k), these issues, when that came on.
4       Any other tasks or projects?
5    A   I also have to manage the -- we have a
6  web-based server, which is a new task in which there --
7  I have to make sure that it -- there's times where
8  there's glitches in the system, files are deleted. I go
9  in and try to rectify those.
10      We have multiple people working remotely, so I
11 have to -- it's still IT services, but I have to make
12 sure that that relationship is smooth because they're
13 not working in the office. We have quite a few people
14 working remotely now.
15      So it's somewhat of an increase, but it's --
16 it's a whole different ballgame now because they're not
17 in the office, and I have had to make sure that I can
18 help them whenever they have issues with syncing with
19 our files with the server --
20   Q   Right.
21   A   -- or they don't have access.
22   Q   So this change, it's still IT, but it's sort
23 of a change in the nature of the IT services that you're
24 doing this --
25   A   Yeah.

---



Susan Watkins                                          Amy Buchanan v. Watkins & Letofsky, LLP

---

34

1    MR. WATKINS:  Misstates testimony.
2  BY MR. KEMP:
3    Q    -- is that fair to say?  Or did I get that
4  wrong?
5    A   I don't -- I didn't hear what --
6    MR. WATKINS:  You can answer if it's a change or
7  not.
8    THE WITNESS:  What?  I'm sorry.
9  BY MR. KEMP:
10   Q    Let me repeat the question.
11   A   Yeah.  I'm sorry.
12   Q    So the things that you're talking about, to
13  me -- I know almost nothing about IT, but to me what it
14  sounds like you're saying is that you still are doing
15  these IT services, but the nature of them has changed
16  somewhat, like, maybe it's even gotten a little more
17  complicated because of the people working remotely?
18   A   Yes.
19   Q    Okay.
20   A   In addition, there are -- well, maybe it's an
21  increase in work.
22       There are -- Dan has clients now that are in
23  the hundreds, and I have to manage all their cost
24  deposits and create new spreadsheets that reconcile --
25  it's accounting.  It's accounting, but it's -- I don't

---

35

1  know.  Maybe it's just an increase in work, but it's --
2  I don't know how to explain it.
3       It's -- it's a very large, like, a management
4  of accounting.  And these are trust accounts, so I have
5  to -- it's -- it's broadened quite a bit.
6  BY MR. KEMP:
7    Q    All right.  That -- yeah.  That sounds like
8  the volume of the work has really increased as more
9  clients, more -- more work to do?
10   A   Yes.
11   Q    Okay.  All right.  So the person that was
12  hired seven months ago, was that person hired by the
13  firm or hired by you directly?
14   A   By the firm.
15   Q    Okay.  So that person's on the firm's payroll?
16   A   Yes.
17   Q    All right.  Is that the first time that you've
18  had somebody other than your -- your children helped
19  you, but first time you've had somebody else, you know,
20  hired on to -- to help you with your work?
21   A   There were people in the office that were
22  hired periodically part time here and there.  No one has
23  worked there consistently assisting me, and during that
24  time period I did not have an assistant.
25   Q    Okay.  The person that was hired seven months

---

36

1  ago, they're full time?
2    A   No.
3    Q    No?  They're still part time?
4    A   Yes.
5    Q    Okay.  What's that person's name, by the way?
6    A   Lisa Harano.
7    Q    Can you spell the last name.
8    A   H-a-r-a-n-o.
9    Q    And so you said that she helps you in your
10  home.
11       Do you work mostly from home?
12   A   I work a hundred percent from home.
13   Q    A hundred percent from home.  Has that always
14  been the case?
15   A   During that time period, yes, and I would go
16  in to the office occasionally to pick up deposits.
17   Q    Okay.  So let's make sure we're clear on the
18  time frame.
19       From 2010 to 2018 before you start getting a
20  W-2 form, during that time frame did you work a hundred
21  percent from home?
22   A   No, not a hundred percent.
23   Q    Okay.
24   A   I don't recall how often I went in, but it was
25  kind of a -- like, I guess I would just go in as needed.

---

37

1    Q    Whatever work called for it, you'd go -- you'd
2  go to the office?
3    MR. WATKINS:  Wait, wait, wait.  "Whatever work
4  called for" is completely vague and lacks foundation.
5  BY MR. KEMP:
6    Q    Well, whenever it was something you couldn't
7  do from home and you actually had to go to the office,
8  that's when you'd go to the office?
9    A   I can do everything from home.
10   Q    Okay.  And that was true between 2010 and
11  2018?
12   A   Yes.
13   Q    Okay.  At -- during -- during the 2010 to 2018
14  time frame, did you have a desk or an office or work
15  space dedicated to you at Watkins & Letofsky?
16   A   There were several offices available here and
17  there, and wherever there was an open office is where I
18  would sit if I had to come in.
19   Q    Okay.  So -- but you didn't have one that was
20  specifically, you know, this is Susan's office or that's
21  Susan's desk or --
22   A   There was a desk set up for -- with an inbox.
23  I would come in and pick up invoices that need to get
24  billed to clients.  So as I moved around, there was a
25  space that I would occupy if I came in.  People would

---



Susan Watkins                                    Amy Buchanan v. Watkins & Letofsky, LLP

---

**38**

1  drop things off there that I needed to pick up.
2      Q    Okay.  During that time frame between 2010 and
3  2018, can you give me a sense of how often you would go
4  to the office?
5          Was it a certain number of days per week or
6  month?  Any way that you can quantify how much you would
7  go to the office?
8      MR. WATKINS:  Assumes facts that it has any
9  consistency over that very long period of time.
10         But you can answer.
11  BY MR. KEMP:
12     Q    Just as a general proposition, as an estimate.
13     MR. WATKINS:  Still lacks foundation.  Assumes
14  facts.
15         You can answer.
16     THE WITNESS:  I don't recall how often I went in.
17  I can't think that far back.
18  BY MR. KEMP:
19     Q    Okay.  Were there any particular things that
20  you needed to do where you'd have to go to the office
21  periodically?
22     A    I think I just said that.  I worked -- I could
23  work from home and do everything from home.  I just went
24  in to pick up deposits for the bank or whatever was in
25  my inbox.

---

**39**

1      Q    Okay.  So how often would you have to go in
2  and get deposits to go to the bank?
3      A    It changes.  For instance, right now I go once
4  a week.
5      Q    Okay.  But --
6      A    There's times where I have to go in two times
7  a week.  It just depends on the volume of checks that
8  are there.
9          Sometimes -- and the time of the month.  If
10  it's toward the end of the month, then I have to make
11  sure that I come in so that we can account for -- for
12  whatever settlements come in for the month and report
13  them to the clients.
14     Q    Okay.  Since you started getting a W-2, has --
15  and we've got the pandemic in there.
16         Since you started getting a W-2, has the
17  frequency in which you go in to the office increased or
18  decreased?  How would you --
19     A    It's decreased.
20     Q    Decreased.
21         Have you ever had any specific written
22  agreement with Watkins & Letofsky as to your working
23  relationship with the firm?
24     MR. WATKINS:  Vague and ambiguous as to
25  "agreement."

---

**40**

1          You can answer.
2      THE WITNESS:  No.
3  BY MR. KEMP:
4      Q    Okay.  Do you have a written job description
5  as to what you're supposed to do?
6      A    No.
7      Q    And between 2010 and 2018, how would you be
8  paid?  Was it by the month?  By the hour?  By the week?
9  How were you paid?
10     A    I would get paid bimonthly.
11     Q    Bimonthly?
12     MR. WATKINS:  Belated objection that it's vague and
13  ambiguous as to time.  Lacks foundation.
14         You can answer.
15     THE WITNESS:  Actually, no.  I believe it was
16  monthly.
17  BY MR. KEMP:
18     Q    Monthly?
19     A    Yes.
20     Q    Okay.  And so they paid you once a month, but
21  how was your pay measured?  Was it the same amount every
22  month, or did it depend on the number of hours that you
23  worked?
24     A    Whatever hours I worked.
25     Q    Okay.  So you were paid by the hour?

---

**41**

1      A    Yes.
2      Q    Okay.  But just once a month?
3      A    Yes.
4      Q    Okay.  And that was in the 2010 to 2018 time
5  frame?
6      MR. WATKINS:  Vague and ambiguous as to time.
7  Overbroad.
8      THE WITNESS:  Yes.  Yeah, I was -- I was paid --
9  what was the question again?
10  BY MR. KEMP:
11     Q    No.  I was just wondering, you were paid once
12  a month during that 2010 to 2018 time period; right?
13     A    Yes.
14     Q    Okay.  And then the next question is after
15  you'd become a W-2 employee, are you still just paid
16  that once a month, or you're paid more frequently?
17     A    Bimonthly.
18     Q    Bimonthly now.
19         Okay.  And did that start when you started
20  getting W-2s?
21     A    Yes.
22     Q    Okay.  And would you -- would you keep time
23  sheets for yourself?
24     A    I would submit a monthly bill to them.
25     Q    All right.  And what would be on the monthly

---



42

1  bill that you would send?
2      A   The total hours for the day -- broken down by
3  the day.
4      Q   Okay.  Were you ever reimbursed for any, like,
5  business expenses?
6      MR. WATKINS:  Vague and ambiguous as to time.
7  Lacks foundation.
8  BY MR. KEMP:
9      Q   I'm saying just ever.
10     A   No.  I had -- I was independent, so I paid for
11 my own expenses, my own supplies.
12     Q   Okay.  What kind of supplies and equipment and
13 so forth did you buy for yourself?
14     A   I -- I had a laptop.  I had my own utilities
15 that I paid for, paper supplies.  Trying to think of
16 anything else.  Whatever's needed typically to run an
17 office in a smaller scale, of course.
18     Q   Anything else in terms of expenses that you
19 had for supplies, equipment, and anything related to
20 doing your work for Watkins & Letofsky?
21     A   I don't remember, but I probably paid for my
22 accounting software, which was just QuickBooks.
23 Minimal, but I did have that expense sometime during
24 that time period when I was doing work for the other --
25 the other two companies.  Just your typical office

43

1  expenses.
2      Q   Okay.  And so I was talking about between 2010
3  and 2018.  It seems like you were through working with
4  that spa in late 2009, and then Attorney Tom Gourde --
5      A   Yes.
6      Q   -- that was sometime in 2010 that you stopped
7  working for him and then took a break?
8      A   Right.
9      Q   Okay.  So when you're working for Watkins &
10 Letofsky because you -- you didn't have work -- you
11 didn't have any other clients or any other people that
12 you worked for after Tom Gourde; right?
13     A   Right.
14     Q   Okay.  So that's the time frame that I was
15 asking about in terms of what expenses that you had,
16 so --
17     A   Whether I got reimbursed?
18     Q   Yeah.  I --
19     A   I did not get reimbursed.
20     Q   Okay.  So the QuickBooks, that was your
21 QuickBooks account, your QuickBooks software?
22     A   Yes.
23     Q   Okay.  And Watkins & Letofsky didn't have its
24 own QuickBooks account or software?
25     MR. WATKINS:  Vague and ambiguous as to time.

44

1  Lacks foundation.
2      THE WITNESS:  I don't believe they did.
3  BY MR. KEMP:
4      Q   Okay.  Did that ever change?
5      A   Any updates since then I probably purchased
6  through -- I've had the firm pay for.
7      Q   Since you became this W-2 employee?
8      A   Employee, yes.
9      Q   Okay.  So before becoming a W-2 employee for
10 Watkins & Letofsky, so that period of 2010 to 2018, did
11 you -- did you have an actual business entity, or were
12 you a sole proprietorship?  Do you know?
13     A   Sole proprietor.
14     Q   Okay.  So you didn't have an LLC or LLP or a
15 corporation?  It was just you as a sole proprietor;
16 right?
17     A   Yes.
18     Q   Did you have a business license with the State
19 of California?
20     A   No.
21     Q   Did you have a business license with any
22 municipality or -- or local government?
23     A   No.
24     Q   With any county?
25     A   No.

45

1      Q   Okay.  Did you file a Schedule C with the IRS?
2      A   Yes, I did.
3      Q   Okay.  Did you have a business insurance
4  policy?
5      A   No.
6      Q   Did you have a workers' compensation policy
7  that covered you?
8      MR. WATKINS:  Lacks foundation.
9      You can answer.
10     THE WITNESS:  No.
11 BY MR. KEMP:
12     Q   Were you covered by Watkins & Letofsky's
13 workers' compensation policy?
14     A   No.
15     Q   Were you covered for insurance -- for health
16 insurance by a group health insurance policy under
17 Watkins & Letofsky?
18     A   No.
19     Q   You have, like, a -- did you have a separate
20 health insurance policy?
21     A   Yes.
22     Q   Okay.  And did that -- did that cover just
23 you, or did it cover your whole family?
24     A   Family.
25     Q   Okay.



46

1    MR. KEMP:  Let's take about a ten-minute break.  I
2  want to reorganize and focus us so we can get done
3  faster.  Okay?
4    MR. WATKINS:  Great.  Thanks.
5    (Recess was taken at 10:58 a.m. until
6    11:14 a.m.)
7  BY MR. KEMP:
8    Q    All right.  So we're back on the record.  A
9  reminder you're still under oath.
10    Okay?
11   A   Yes.
12   Q    All right.  Good.
13    So you're married to Dan Watkins; right?
14   A   Yes.
15   Q    Okay.  How long have y'all been married?
16   A   Twenty-nine years.
17   Q    Great.  Congratulations.
18    And when you did the two years of college at
19  Mesa College, what years were -- did you do those?
20   A   Early '90s.  I don't recall.
21   Q    Okay.  Prior to 2008 when you said you started
22  assisting with Dan's business and then you had the spa
23  in Newport Beach that you were working with and then
24  Attorney Tom Gourde, did you -- did you work before
25  then, or were you just a stay-at-home mom?

47

1   A   Yes, I did.
2   Q    Where did you work during that time frame,
3  like, after you took the -- got the education at Mesa
4  College and 2008?
5   A   I -- my previous job before I became an
6  independent contractor was working for Shea Homes in
7  San Diego.  And I believe I may have quit working there
8  when my son was born in 1996, sometime around that time.
9   Q    And what were you doing at Shea Homes?
10   A   I was an administrative executive assistant to
11  the VP of land acquisitions.
12   Q    So how long would you say you were there
13  altogether with Shea?
14   A   Possibly two to three years.
15   Q    All right.  And so you left when your son was
16  born.
17    When is the next time you worked after that?
18   A   I don't recall.  I was raising the kids.  I
19  may have started working again in a very limited scope.
20  I had my last child in 2000, the year 2000, but I still
21  had children at home for a while that needed my
22  attention --
23   Q    Sure.
24   A   -- so I didn't work very much.
25   Q    Sure.  Do you remember any places, though,

48

1  that you worked, though, '96 and 20- -- 2008?
2    MR. WATKINS:  Other than what she's testified to?
3    THE WITNESS:  No.
4  BY MR. KEMP:
5    Q    Right.  Just any others.
6    No?  Okay.
7    So as the -- the executive assistant to the VP
8  of land acquisitions at Shea, were you doing accounting
9  and bookkeeping-type work there?
10   A   I was doing project work that required a lot
11  of spreadsheets, Excel spreadsheets, assisting in
12  getting permits for building, working with engineers and
13  architects.
14   Q    Okay.  But before you started working with --
15  helping with Dan and then worked with the spa and with
16  the other attorney, what other work experience before
17  that did you have where you were doing accounting and
18  bookkeeping, billing, those kinds of things?
19   A   I wasn't doing billing.  I wasn't working for
20  a law firm.  So there was -- I never had a job that
21  required that type of specialty, I suppose, but I've
22  always been involved in accounting.
23    I took accounting in high school when it was
24  offered.  I worked for companies during high school,
25  shortly after high school where I provided bookkeeping

49

1  services.  I've always worked at a bank, since the age
2  of 18 actually.  I worked for a bank in San Antonio
3  working in commercial lending.
4    Then I worked in Florida for a savings and
5  loan for the president of the savings and loan, and it
6  was there that I learned how to do payroll, some human
7  resources responsibilities.  I helped in accounting
8  there as well.  I just kind of made my way through
9  everything just to learn.
10   Q    Okay.  You testified that, yeah, you're --
11  after you became a W-2 employee in about 2018 that the
12  firm got a 401(k) plan.
13    Are you in the 401(k)?
14   A   Yes.
15   Q    All right.  Did getting the 401(k) have
16  anything to do with you becoming a W-2 employee?
17   A   That was part of the reason.  Another one was
18  that the work was increasing quite a bit, and I -- it
19  was going to -- it just made more sense to become an
20  employee and get more support that I didn't have to pay
21  on my own and have to, you know, provide additional
22  equipment on my own, and perhaps even get a workers'
23  comp policy or any other type of insurance for -- to
24  have my own employee.
25    So it just made more sense to become an



Susan Watkins                                          Amy Buchanan v. Watkins & Letofsky, LLP

---

50

1  employee and have the business, Watkins & Letofsky,
2  cover that expense for me.  It just didn't make sense
3  for me to take a home office deduction.  It just didn't
4  make any sense financially to do that.
5      Q    Okay.  Besides the laptop at home and you said
6  you had some office supplies, what -- what other
7  equipment were you -- or when you say it made sense to
8  have them buy the equipment, so for any other equipment
9  that you're discussing there?
10     A    Well, I --
11     MR. WATKINS:  Wait, wait, wait.  The question
12 misstates testimony.
13         But you can answer.
14     THE WITNESS:  Well, if I would have hired another
15 person to work for me, or more -- I actually need more
16 help than just one person -- I would have had to buy my
17 own additional computers and supplies for that --
18 BY MR. KEMP:
19     Q    I see.  Okay.
20     A    -- such as paper, toner.
21         I would have to have bought more licenses for
22 billing and accounting.  It just didn't make sense to go
23 through all that expense.  And I in addition to that
24 would pay for my own taxes.  So it made more sense to
25 become an employee and have the firm cover those

---

51

1  expenses.
2      Q    Okay.  But if I understand from earlier,
3  this -- this person, Lisa Harano, you hired seven months
4  ago.
5          Prior to that, you didn't hire anybody?
6      A    No.
7      Q    All right.
8      MR. WATKINS:  Well, vague and ambiguous as to
9  "you."  But you can -- that's all.  The question's
10 answered.
11 BY MR. KEMP:
12     Q    Well, what I'm saying is, I mean, clearly by
13 that point you were an employee of the firm, and the
14 firm hires Lisa Harano; right?
15     A    Yes.  Under my direction, basically.  I
16 just -- I -- yeah.  I mean, it's --
17     Q    No.  I understand.  She's a firm employee that
18 you -- that you supervise now; right?
19     A    Yes.
20     Q    Okay.  But prior to 2018 or so when you start
21 getting a W-2 --
22     MR. WATKINS:  Wait.
23 BY MR. KEMP:
24     Q    I'm sorry.  After 2018 -- sorry.  Let me make
25 sure.

---

52

1      If I understood your testimony from before --
2  so correct me if I'm wrong -- you never hired any
3  employees to work under you prior to Lisa Harano in
4  2018?
5      MR. WATKINS:  Well, it calls for a legal conclusion
6  as to "hired," and it's compound.
7          But you can answer.
8      THE WITNESS:  Is it before 2018 did I hire someone
9  to work for me?
10 BY MR. KEMP:
11     Q    Right, that would have been your employee and
12 not the firm's employee?
13     A    No, I didn't need -- the workload wasn't
14 enough.  I was trying to maintain everything on my own
15 without hiring anyone.  So I had just had my children
16 help me with clerical things --
17     Q    Okay.
18     A    -- at home.
19     Q    Okay.  This was previously marked at Dan's
20 deposition as Exhibit 14, so I don't think we need to
21 mark this again, because I'm going to continue in order.
22 There you go.
23         So Exhibit 14 is entitled "Watkins & Letofsky,
24 LLP, Company Information."  Have you seen this document
25 before?

---

53

1      A    Yes.
2      Q    Yes.
3          So you have seen this before?
4      A    I said, "Yes."
5      Q    I'm sorry.  I thought you said, "This?"  And
6  then you were going through -- I'm sorry.  I thought you
7  were --
8      A    No.  I said, "Yes."
9      Q    Okay.  All right.  So I'm not sure exactly --
10 there's no specific date on this, but it does mention my
11 client, Amy, having resigned as of September 1st.  I
12 believe that was September 1st of 2017.
13     A    Say that --
14     MR. WATKINS:  What's the question?
15 BY MR. KEMP:
16     Q    Anyway, but I don't see anywhere else on
17 here -- do you see anywhere else on here that this was
18 dated or we can tell what time frame this was from,
19 other than that reference to Amy resigning as of 9/1?
20     MR. WATKINS:  Yeah.  It lacks foundation.
21     THE WITNESS:  I don't see a date.
22 BY MR. KEMP:
23     Q    Okay.  But -- so in sort of the middle of the
24 page, there's -- there's a chart here or a box with
25 names, initials, titles, e-mails, and extension numbers

---

Susan Watkins                                    Amy Buchanan v. Watkins & Letofsky, LLP

54

1 for people at Watkins & Letofsky, and at the bottom it
2 lists Susan Watkins.
3      A   Yes.
4      Q   And SAW, those are your initials; right?
5      A   Right.
6      Q   Bookkeeping/billing.  That was your title?
7      A   Those were the things I took care of, not my
8 title.
9      Q   Well, according to the form, though, it says
10 it's your title.
11     MR. WATKINS:  It lacks foundation as to the form in
12 its entirety.
13        It's answered.
14 BY MR. KEMP:
15     Q   Right.  The firm -- the -- the title under
16 Watkins & Letofsky firm, your title is
17 bookkeeping/billing on this form; correct?
18        (Reporter interruption and clarification of
19        the record.)
20     MR. WATKINS:  It's vague and ambiguous as to
21 "title" and lacks foundation.
22     MR. KEMP:  I'm just asking what it says on the
23 form.
24     MR. WATKINS:  Well, the document speaks for itself
25 then.

55

1        You're asking her to define a word on the
2 form, and that lacks foundation.
3 BY MR. KEMP:
4      Q   Okay.  Your title on this form is
5 bookkeeping/billing; correct?  True?
6      MR. WATKINS:  Document speaks for itself.
7 BY MR. KEMP:
8      Q   Is that true?
9      MR. WATKINS:  You can answer what the document
10 says.
11 BY MR. KEMP:
12     Q   Is that true that that's what this document
13 says?
14     A   That's not a title, per se.
15     MR. WATKINS:  Is this -- is that what the document
16 says?
17     THE WITNESS:  The -- yeah, the document has the
18 title of that column as "Title," but my title is not
19 bookkeeping, as your title would not be attorney,
20 legal --
21     MR. WATKINS:  It's okay.  You've answered the
22 question.  Let it go.
23     THE WITNESS:  Okay.
24 BY MR. KEMP:
25     Q   Okay.

56

1      A   I don't know the point.  I don't know the --
2      MR. WATKINS:  Wait.  Just -- you've answered the
3 question.
4 BY MR. KEMP:
5      Q   So you dispute that you had a title of
6 bookkeeping/billing?
7      MR. WATKINS:  No.  That's argumentative.  Don't
8 answer the question.
9      MR. KEMP:  You're instructing --
10     MR. WATKINS:  Yes, I am instructing her not to
11 answer the question.
12     MR. KEMP:  Are you going to seek a court order?
13     MR. WATKINS:  She -- no.
14        (Reporter interruption and clarification of
15        the record.)
16     MR. WATKINS:  The document lacks foundation.  It
17 says what it says.  She's agreed that it says what it
18 says.
19        That's all that you've asked her about.
20 She -- there's no foundation to this document.  Just
21 because she recognized it doesn't mean she agrees to
22 what's in there or anything on it.
23     MR. KEMP:  Well, let's talk about foundation.
24 BY MR. KEMP:
25     Q   Did you create this document?

57

1      A   Nancy Letofsky and I both assisted in putting
2 it together.
3      Q   Okay.  So you created the document --
4      MR. WATKINS:  No.  That misstates testimony --
5      MR. KEMP:  -- in part?
6      MR. WATKINS:  -- and it's argumentative.
7 BY MR. KEMP:
8      Q   You, in part -- you assisted in the creation
9 of this document?
10        Was that your testimony a moment ago?
11     A   Yes, as far as formatting --
12     Q   Okay.
13     A   -- reviewing it.  Yes.
14     Q   Where did the information come from?
15     MR. WATKINS:  Lacks foundation.
16 BY MR. KEMP:
17     Q   Do you know where the information came from?
18     A   It's a well-known fact.  I mean, Nancy has the
19 information.  Nancy Letofsky --
20     Q   All right.
21     A   -- has the information.
22     Q   All right.
23     A   I have the information.  I -- I don't know at
24 the moment that it was created where it was pulled from.
25 It's -- I mean, it's on every business card, most of it.



Susan Watkins                                    Amy Buchanan v. Watkins & Letofsky, LLP

---

58

1    Q   Well, did you --
2    MR. WATKINS:  Okay.  Let's -- before you ask a new
3  question, I'm going to ask for a break.
4        You have a question asked and answered.  I
5  need a break.  I need to speak with my client.
6    MR. KEMP:  Okay.  Well, you're familiar with the
7  law in the District of Nevada.
8    MR. WATKINS:  Which is?
9    MR. KEMP:  I would be able to inquire as to what
10  you talk about on your break.
11    MR. WATKINS:  Okay.  Fine.
12    THE STENOGRAPHER:  Off the record?
13    MR. KEMP:  Yeah.
14    MR. WATKINS:  Yeah.
15    (Recess was taken at 11:30 a.m. until
16    11:31 a.m.)
17  BY MR. KEMP:
18    Q   All right.  So we'll be back on the record.
19        A reminder you're still under oath.  Okay?
20    A   Yep.
21    Q   All right.  What did you and Dan talk about on
22  that break?
23    A   He told me to just answer the question without
24  arguing.
25    Q   Okay.  Did you provide any of the information

---

59

1  that went into this form?
2    MR. WATKINS:  Lacks foundation.  Calls for
3  speculation.
4    THE WITNESS:  Yes.
5  BY MR. KEMP:
6    Q   What parts did you provide?  What information
7  would you have provided?
8    A   I fine-tuned it for Nancy.
9    Q   So Nancy did an initial draft of it, and then
10  you fine-tuned it?
11    A   Yes.
12    Q   Okay.  All right.  So where it says next to
13  your name and your initials "bookkeeping/billing," who
14  put that into this form?
15    A   I don't recall if she put that in there or if
16  I did, but I --
17    MR. WATKINS:  If you don't recall, you don't
18  recall.
19    THE WITNESS:  Yeah, I don't recall.
20  BY MR. KEMP:
21    Q   Okay.
22    A   That is not my title.
23    Q   But, obviously, when you went through and
24  fine-tuned it, you didn't take that out, did you?
25    A   No.

---

60

1    Q   Okay.  E-mail, so you have a firm e-mail
2  address, sw@wl-llp.com?
3    A   Yes.
4    Q   Is that still your e-mail today?
5    A   Yes.
6    Q   How long have you had that e-mail address?
7    A   The whole time I did work for them.
8    Q   And the extension, extension 200, where
9  physically would that ring?  Would that ring at your
10  house, or was that at a desk or office at the office?
11    A   It's a virtual phone.  I have it on my -- my
12  iPhone, so calls get transferred there.
13    Q   All right.  How long has that been the case?
14    A   That has been the case for maybe five -- four
15  or five years.
16        Before that, it would just go -- it would get
17  transferred into -- it would go to voice mail, and I
18  would -- I could receive the voice call -- the voice
19  mail messages as I called in and dialed a number.
20    Q   So you could retrieve voice mail messages?
21    A   Yes, yes.
22    Q   But then you said four or five years ago, you
23  got it where it would virtually -- it would ring through
24  to your cell phone?
25    A   Yes.

---

61

1    Q   Okay.  So if somebody calls -- just so I'm
2  clear, somebody calls the law office and dialed your
3  extension, it would ring through to your cell phone?
4    A   It rings at -- at the actual physical phone
5  and my cell phone.
6    Q   Okay.
7    A   So if it calls -- if there's a call on a
8  weekend or in the evening, if someone's having a problem
9  with computers, they can reach me anytime.
10    Q   Okay.  So there's a physical phone.  Just --
11  you know, just so I'm clear.
12        So if somebody dials the firm's number, is
13  there like a directory where they can get your extension
14  or they can just dial your extension?  Is that --
15    A   Yeah.
16    Q   Okay.
17    A   Yes.
18    Q   Okay.  And you say it rings at the office and
19  on your cell phone at the same time?
20    A   Yes.
21    Q   Where at the office would that be?  Is that a
22  desk that you have there or --
23    A   It just moved around wherever I was working.
24  I am working from home now, so I do have a phone at
25  home.  It's not hooked up, so it just goes directly to

---

Susan Watkins                                          Amy Buchanan v. Watkins & Letofsky, LLP

---

62

1  my -- my iPhone.
2      Q   Okay.  So under -- at the top of the form
3  under the -- under the heading of it, it says "Orange
4  County office" and "Las Vegas office."
5          And under there, it says fax to e-mail to
6  sw@wl-llp.com.
7      MR. WATKINS:  Where are you?
8      MR. KEMP:  At the top on the right-hand side under
9  "Las Vegas office."
10     MR. WATKINS:  Oh, Las Vegas.  Okay.
11     THE WITNESS:  Yes.
12  BY MR. KEMP:
13     Q   All right.  I was just trying to understand,
14  if somebody faxed something to that phone number, it
15  would go to your e-mail?  Is that what that means?
16     A   I created the account with my e-mail address.
17  So whenever someone faxes -- it's a virtual fax machine
18  so if anyone faxes, it goes to the paralegal in Vegas,
19  but a copy comes to me just in case that person wasn't
20  around.  I could forward it -- it was such a small
21  office, so if -- if an e-mail came in and someone wasn't
22  there to retrieve the e-mail, whoever the paralegal was
23  at that time, I had an extra copy of it.
24         But the account, I set up the account with my
25  e-mail address.

---

63

1      Q   Okay.  All right.
2      MR. KEMP:  All right.  So our next exhibit we
3  figured was 22?  Okay.  We'll make this Exhibit 22.
4      (Whereupon Exhibit 22 was marked for
5      identification.)
6  BY MR. KEMP:
7      Q   All right.  So Deposition Exhibit 22 is a
8  two-page document.  It's got WLLLP pages 1306 and 1307.
9          And these are e-mails from September 1st,
10  2017.  I think they're all September 1st -- oh, no.
11  There's one at the end that's from July 10th.
12         But these are e-mails that we've been -- that
13  were produced to us in this case, and it looks like this
14  is to do with getting Amy Buchanan, my client, paid
15  money.
16         Do you recognize these or what was going on
17  with this?
18     MR. WATKINS:  I guess the first question is do you
19  recognize the documents?
20     THE WITNESS:  I -- yes, I've -- I mean, I'm looking
21  at it, and it obviously came from me.  I don't -- I
22  don't know the specifics of how I got to any of those
23  numbers.
24  BY MR. KEMP:
25     Q   Okay.  So on here where it has -- and I'm just

---

64

1  looking at the top of the first page.
2          It says, "Amy, per our telephone discussion,
3  please disregard the calculations below and accept the
4  $1,338.59 check as partial payment until all
5  discrepancies are discussed and corrected.  Thanks for
6  your patience."
7          Did I read that correctly so far?
8      A   Yes.
9      Q   And then it says, "Susan Watkins, Accounting
10  and Billing Coordinator."
11         Do you see where it says that?
12     A   Yes.
13     Q   So was that your title then, accounting and
14  billing coordinator?
15     MR. WATKINS:  Vague and ambiguous as to "title."
16  Lacks foundation.
17         You can answer.
18     THE WITNESS:  That's -- that's the title I gave
19  myself.  It's changed.  Sometimes it says director.
20  Sometimes it says coordinator.
21         But at the time, yes, I was -- I was the only
22  person helping them in accounting and billing.
23  BY MR. KEMP:
24     Q   Okay.  Did you have business cards?
25     A   No.

---

65

1      Q   Have you ever had business cards for Watkins &
2  Letofsky?
3      A   Yes, but I never used -- I never used them.
4      Q   Okay.
5      A   I threw them out.
6      Q   All right.  When did you have those?
7      A   I don't remember.
8      Q   Can you estimate for me how long ago it was?
9      A   I don't remember.
10     Q   Okay.  Do you remember what it had your title
11  on the business card?
12     A   I don't.  I threw them out.  I didn't even use
13  them, so I threw them away, and I don't recall what the
14  title was.
15     Q   Did you buy those for yourself or did the firm
16  provide those to you?
17     A   I believe Nancy purchased them for me.
18     Q   Okay.  With respect to making these
19  determinations for Amy Buchanan and, you know, this --
20  this check for $1,338.59, did you have any direction or
21  input from Dan or Brian about how to go about
22  calculating that?
23     A   I don't remember if -- I think these were just
24  my calculations based on the time sheets that she
25  submitted.  I -- I -- I haven't read the whole thing, so

---



Susan Watkins                                    Amy Buchanan v. Watkins & Letofsky, LLP

66

1  I don't remember that far back.
2  Q   Well, take your time.
3      And particularly you might want to look at
4  the -- the reason I'm asking is there's this e-mail from
5  Dan on July 10th of 2017.  It's kind of at the end of
6  this that you were CC'd on.
7  A   Okay.
8      All right.  What is your question?
9  Q   So I was just wondering, did you get input
10 from Dan or Brian on exactly how to do this, or did you
11 just calculate it yourself?
12 A   There was a lot of confusion about her work
13 schedule, because it fluctuated quite a bit.
14     So on my part, when I was trying to calculate
15 her hours and whether she was over based on what she
16 submitted to me, and just because she submits a document
17 just like every other attorney, it gets reviewed by the
18 partners.
19     So when she submitted -- and I'm -- I didn't
20 know how -- at what frame -- I -- I mean, I must have
21 looked at that time frame, and I was trying to figure
22 out whether she met her billable requirement or not
23 based on her -- I mean, there was a time where it was
24 50 percent.  Then it was 75 percent.  Then it was
25 obviously 80.  It changed quite often.

67

1      So I was confused, so I did need input on --
2  on her hours, and I -- it sounds here like she was
3  saying she was due overtime.  So, obviously, I -- I'm
4  not the partner.  I didn't hire her.  I don't know what
5  was agreed between the two of them, so I did need input.
6  Q   Okay.  Between 2010 and 2018, the time that
7  you became -- you know, became a W-2 employee, during
8  that time frame, did you do any advertising or -- or
9  take any steps to try and get other business other than
10 working for Watkins & Letofsky?
11 A   Just through word of mouth.
12 Q   But you didn't do any advertising?
13 A   No.
14 MR. WATKINS:  Well, it's vague and ambiguous as to
15 "advertising."
16     But you can go --
17 THE WITNESS:  No, I did not put a publication out
18 or hire any kind of service for advertising.
19 BY MR. KEMP:
20 Q   Okay.  So you didn't put anything on
21 Craigslist or any listing your services with --
22 A   No.  I helped other friends, family friends
23 here and there, but I didn't -- I didn't have the time
24 to try to further advance my business.
25 Q   All right.  And when you say you helped them,

68

1  that you just helped them out?  They weren't paying you
2  for that?
3  A   No.  I could have charged them, but I didn't.
4  MR. KEMP:  Okay.  Let's take another quick
5  two-minute break.  I think we're about done.  I just
6  wanted to go over my notes one more time.
7      Okay?
8  MR. WATKINS:  Okay.
9      (Recess was taken at 11:46 a.m. until
10     11:53 a.m.)
11 MR. KEMP:  Let's go back on the record.
12 BY MR. KEMP:
13 Q   I'll remind you you're still under oath.
14     Okay?
15 A   Yes.
16 Q   Still a few things to wrap up.
17     I think you testified earlier, you stated that
18 you were taking a home office deduction on your taxes
19 during the 2010 to 2018 time frame; is that right?
20 A   Yes.
21 Q   Okay.  But you stopped doing that once you
22 became a W-2 employee?
23 A   Right.
24 Q   Okay.  All right.  And then I just got these,
25 and I understand Dan's, you know, had issues with his

69

1  health and so forth and been busy, but I just got these
2  disclosures after midnight last night, and I was going
3  through it a little bit this morning.
4      I haven't had a chance to look at everything,
5  but I wanted to ask about -- I'm going to show you this.
6  I can't make it an exhibit because I can't print it up.
7      But in the documents I've been provided, that
8  includes checks that you were paid.  And I'm just
9  showing you one example from September 21st, 2017.  It
10 says it's for August of 2017.  The check number is 3620,
11 and it's on Watkins & Letofsky, LLP, general account
12 through Union Bank.
13     Do you -- is that your signature on the check?
14 A  Yes, it is.
15 Q   So you would write the checks, and then you
16 were an authorized signer on the account to sign the
17 check for yourself?
18 A   Yes.
19 Q   Okay.  Who else in that time frame, 2017,
20 would have been authorized signers on the Watkins &
21 Letofsky general account?
22 A   Dan and Brian.
23 Q   So Dan and Brian and yourself?
24 A   Yes.
25 Q   Anybody else?



Susan Watkins                                           Amy Buchanan v. Watkins & Letofsky, LLP

---

**70**

1     A.  No.
2     Q.  Okay.  So Nancy Letofsky, she wasn't a signer
3  on it?
4     A.  No.
5     MR. KEMP:  All right.  Those are all the questions
6  I have.  Thanks.
7     MR. WATKINS:  I have none.
8     MR. KEMP:  Okay.
9     MR. WATKINS:  Well, I'm going to double-check.
10  Hold on one second.
11     MR. KEMP:  Okay.
12     MR. WATKINS:  I have none.  Thanks.
13     MR. KEMP:  Thanks for coming.  I appreciate it.
14     THE WITNESS:  You're welcome.
15        (Proceedings concluded at 11:56 a.m.)
16
17
18
19
20
21
22
23
24
25

---

**71**

1  STATE OF CALIFORNIA        )
2                            )  ss.
3  COUNTY OF ORANGE          )
4
5
6
7        I, the undersigned, say that I have read the
8  foregoing deposition, and I declare, under penalty of
9  perjury, that the foregoing is a true and correct
10  transcript of my testimony contained therein.
11        EXECUTED this _____ day of _____,
12  2023, at _____, California.
13
14
15
16        _____
                 SUSAN WATKINS
17
18
19
20
21
22
23
24
25

---

**72**

1  BE IT KNOWN that the foregoing proceedings were taken
2  before me; that the witness before testifying was duly
3  sworn to testify to the whole truth; that the foregoing
4  pages are a full, true and accurate record of the
5  proceedings, all done to the best of my skill and
6  ability; that the proceedings were taken down by me in
7  stenographic shorthand and thereafter reduced to print
8  under my direction.
9
10     I CERTIFY that I am in no way related to any
11  of the parties hereto, nor am I in any way
12  interested in the outcome thereof.
13
14     (  )  Review and signature requested.
15     (  )  Review and signature waived.
16     (x)  Review and signature neither requested
17  nor waived.
18
19     IN WITNESS WHEREOF, I have subscribed my name
20  this 22nd day of October, 2023.
21
22                    
23
24        Kayla Lotstein, California CSR No. 13916
25

---

**Archived:** Wednesday, October 23, 2019 5:00:30 PM
**From:** Susan Watkins
**Sent:** Fri, 1 Sep 2017 15:44:47
**To:** Amy Buchanan
**Cc:** Dan Watkins
**Subject:** Payroll Correction
**Importance:** Normal

---

Amy,

Per our telephone discussion, please disregard the calculations below and accept the $1,338.59 check as a partial payment until all discrepancies are discussed and corrected.

Thank you for your patience.

*Susan Watkins*
Accounting & Billing Coordinator

cid:image002.png@01D275C9.E556C130

**Orange County, California**
2900 S. Harbor Boulevard, Suite 240
Santa Ana, CA 92704
Toll Free: (866) 439-1295 | Office: (949) 476-9400
Fax (949) 476-9407

**Las Vegas, Nevada**
8215 S. Eastern Avenue, Suite 265
Las Vegas, NV 89123
Toll Free: (866) 439-1295 | Office (702) 901-7553
Fax (702) 974-1297

www.wl-llp.com

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies. To comply with IRS regulations, we advise you that any discussion of federal tax issues in this email was not intended or written to be used, and cannot be used by you, (i) to avoid any penalties imposed under the Internal Revenue Code or (ii) to promote, market or recommend to another party any transaction or matter addressed herein

**From:** Susan Watkins
**Sent:** Friday, September 01, 2017 2:18 PM
**To:** Dan Watkins; Amy Buchanan
**Subject:** RE: Payroll Correction

Hi Amy,

A check will be mailed today in the net amount of $1,338.59 for the supplement earnings calculated in your email below. I have attached the Paychex calculations for your reference; however, a paystub will be generated and mailed to your home.

We paid the $1,687.30 gross earnings you felt you were entitled to plus an additional 8.0 hours at a rate of $31.25 ($65,000 divided by 2080 8-Hour/day workhours)

**BUCHANAN, AMY**
**SUPPLEMENTAL WAGES DUE**



|  | Amount |
|---|---|
| Gross Earnings (Dec 2016 – May 2017) | $1,687.30 |
| Gross Earnings (09/21-09/23/17 = 8.0 Hours) | $250.00 |
| Total Gross Earnings | $1,937.30 |

| Insurance Calculation: | Amount | Allowance | Co-Pay | Notes |
|---|---|---|---|---|

WLLLP001306

| | | | | |
|---|---|---|---|---|
| Mar | $401.82 | $275.00 | $126.82 | |
| Apr | $401.82 | $275.00 | $126.82 | |
| May | $401.82 | $275.00 | $126.82 | |
| Jun | $401.82 | $275.00 | $126.82 | |
| Jul | $401.82 | $275.00 | $126.82 | |
| Total Due | | | $634.10 | |
| Total Paid | | ($318.22) | | 05/05/17 Charged $63.64; 05/19/17 Refunded $63.64 |
| Due from AEB | | | $315.88 | |

If you have any questions or concerns, please do not hesitate to contact either Dan or myself.

I hope you things are getting better for you and wish you the best.

Respectfully,

*Susan Watkins*
Accounting & Billing Coordinator

cid:image002.png@01D275C9.E556C130

**Orange County, California**
2900 S. Harbor Boulevard, Suite 240
Santa Ana, CA 92704
Toll Free: (866) 439-1295 | Office: (949) 476-9400
Fax (949) 476-9407

**Las Vegas, Nevada**
8215 S. Eastern Avenue, Suite 265
Las Vegas, NV 89123
Toll Free: (866) 439-1295 | Office: (702) 901-7553
Fax (702) 974-1297

www.wl-llp.com

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies. To comply with IRS regulations, we advise you that any discussion of federal tax issues in this email was not intended or written to be used, and cannot be used by you, (i) to avoid any penalties imposed under the Internal Revenue Code or (ii) to promote, market or recommend to another party any transaction or matter addressed herein.

**From:** Dan Watkins
**Sent:** Monday, July 10, 2017 10:19 PM
**To:** Amy Buchanan
**Cc:** Susan Watkins
**Subject:** RE: Payroll Correction

Amy –

Thank for the summary. We will review your billable time and issue a correction payment. To be clear, you are a salaried, exempt employee and overtime does not apply.

We will look at the total billable time against the minimum billable hours required. We initially went with a 50% salary to account for a limited schedule. The adjustment to 80% salary was intended to cover the additional time you were working with the expectation that you would work 4 days a week. To the extent that you worked more than the 50% or 80% time, whichever may apply, in any given month, we will cover the proportionate balance due.

I received your May billing on June 28, 2017. Thank you. With the attached revised billing for April we can now process your hours. If you have any additional time for May or June that you would like for us to consider please forward it as soon as possible. We cannot reconcile your time until we have all of your billing.

Thank you.

Dan

Daniel R. Watkins

WLLLP001307