# EXHIBIT 20

Deposition of Nancy Letofsky 10/9/23

# EXHIBIT 20

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

AMY BUCHANAN,              )
                           )
        Plaintiff,         )
                           )
   vs.                     ) Case No. 2:19-cv-
                           ) 00226-GMN-VCF
WATKINS & LETOFSKY, LLP, a Nevada )
Limited-Liability Partnership; DOES)
I-X; ROE BUSINESS ENTITIES I-X,    )
                           )
        Defendants.        )
_____)

DEPOSITION OF NANCY LETOFSKY

IRVINE, CALIFORNIA

MONDAY, OCTOBER 9, 2023

2:11 P.M.

Stenographically reported by:

Kayla Lotstein
California CSR No. 13916, CRR, RPR, CRC
Job No. 54526, Firm No. 116F



## Page 2

```
 1            UNITED STATES DISTRICT COURT
 2                  DISTRICT OF NEVADA
 3
 4   AMY BUCHANAN,            )
                              )
 5         Plaintiff,         )
                              )
 6   vs.                      ) Case No. 2:19-cv-
                              ) 00226-GMN-VCF
 7   WATKINS & LETOFSKY, LLP, a Nevada )
     Limited-Liability Partnership; DOES)
 8   I-X; ROE BUSINESS ENTITIES I-X,   )
                              )
 9         Defendants.        )
     _____)
10
11
12
13       DEPOSITION OF NANCY LETOFSKY taken on behalf
         of Plaintiff, at 2:11 p.m., MONDAY, OCTOBER 9,
14       2023, at 17752 Skypark Circle, Suite 100,
         Irvine, California, before Kayla Lotstein,
15       Certified Shorthand Reporter No. 13916 of the
         State of California, pursuant to Notice.
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1   APPEARANCES OF COUNSEL:
 2    FOR PLAINTIFF:
 3      KEMP & KEMP
        BY:  JAMES P. KEMP, ESQ.
 4      7435 West Azure Drive
        Suite 110
 5      Las Vegas, Nevada 89130
        jp@kemp-attorneys.com
 6      (702) 258-1183
 7
 8    FOR DEFENDANTS:
 9      WATKINS & LETOFSKY, LLP
        BY:  DANIEL R. WATKINS, ESQ.
10      8935 South Pecos Road
        Suite 22A
11      Henderson, Nevada 89074
        DW@wl-llp.com
12      (949) 476-9400
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              INDEX
 2   WITNESS:  NANCY LETOFSKY
 3              EXAMINATIONS
 4                              Page
 5   By Mr. Kemp                  6
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1            INDEX (CONTINUED)
 2
 3              EXHIBITS
 4             Page   Line
 5              (None)
 6
 7
 8       INFORMATION TO BE SUPPLIED
 9             Page   Line
10              (None)
11
12
13    QUESTIONS INSTRUCTED NOT TO ANSWER
14             Page   Line
15              (None)
16
17
18
19
20
21
22
23
24
25
```

**Page 6**

1    IRVINE, CALIFORNIA; MONDAY, OCTOBER 9, 2023
2              2:11 P.M.
3                * * *
4         NANCY LETOFSKY,
5   the Witness herein, having been first duly sworn,
6   testified as follows:
7              EXAMINATION
8   BY MR. KEMP:
9       Q   Would you please state your name and spell it
10  for the record.
11      A   Nancy, N-a-n-c-y, Letofsky, L-e, T as in Tom,
12  O, F as in Frank, s-k-y.
13      Q   All right.  My name is JP Kemp.  I represent
14  Amy Buchanan in this case against Watkins & Letofsky.
15          Have you ever had a deposition taken before?
16      A   I have not.
17      Q   All right.  Well, we'll go over all the ground
18  rules and what to expect and how it works.
19          The first thing is that the purpose of the
20  deposition is for us to find out information about the
21  case.  I'm going to be asking you some questions.
22          When I'm finished, Mr. Watkins might have some
23  questions for you, and depending if he does and what
24  those are, then I might have some follow-up for you.
25          Okay?

**Page 7**

1       A   Yes.
2       Q   That's the second rule.  We'll get to the
3   second rule in a moment.
4           The first rule is the oath.  The oath that
5   you've taken is the same oath that you would take if you
6   were testifying in a court before a judge and a jury.
7   It carries with it the same obligations to tell the
8   truth and the same penalties for perjury if you were to
9   not tell the truth.
10          Do you understand that?
11      A   Understood.
12      Q   Great.  The second rule is that I need all of
13  your answers to be out loud and in words, because the
14  court reporter's here taking down everything we say word
15  for word by means of stenography.
16          So nods of the head, shakes of the head,
17  "uh-huhs," "uh-uhs," none of that's going to come out
18  clearly on the record.  So we need to make sure
19  everything is verbal and out loud.
20      A   Okay.  Understood.
21      Q   Okay.  Good.
22          Along with that is another rule that she can
23  only take down one person at a time.  So if we're both
24  talking at the same time, it makes her job difficult or
25  impossible.

**Page 8**

1           And it's really normal in conversation with
2   people, you anticipate what they're going to say and you
3   start to talk before they've finished.  And that works
4   in a normal conversation, but it does not work in our
5   situation here where she's got to take everybody down.
6           So we want to make sure we help her out by not
7   talking over one another.
8           Okay?
9       A   Understood.
10      Q   Good.
11          Now, if any of my questions are not clear to
12  you, make sure that you ask me to repeat the question,
13  rephrase the question, to clarify the question for you
14  so you understand it.
15          Okay?
16      A   Okay.
17      Q   I want to make sure you understand the
18  question and give me your best answer.
19          All right?
20      A   Yes, understood.
21      Q   If you answer a question and you haven't asked
22  me to repeat it, rephrase it, clarify it in some way,
23  I'm going to have to assume that you've heard the
24  question, you've understood it, and you're giving me
25  your best answer.

**Page 9**

1           Okay?
2       A   Yes.
3       Q   All right.  At some point there may be
4   objections that are made, and we don't have a judge here
5   to rule on objections.  So the way that objections work
6   in a deposition is unless you are specifically
7   instructed to not answer something, you go ahead and
8   answer it.
9           So if I ask you a question, Mr. Letofsky -- or
10  Mr. Watkins says "Objection," you just go ahead and
11  answer the question unless he says "Don't answer that."
12          Okay?
13      A   So if Mr. Watkins says, "Objection" --
14      Q   Yeah.
15      A   -- then I still answer the question?
16      Q   You still answer, unless he says to not answer
17  it.
18      A   Understood.
19      Q   Okay.  That's -- the objections are on the
20  record.  The Court can look at it later and rule on it
21  at that point.
22          Okay?
23      A   Okay.
24      Q   All right.  Is there any reason at all that
25  you can't give me your best, most accurate testimony



10

1  today?
2     A    No reason.
3     Q    Do you have any medical conditions, take any
4  medications that would interfere with your ability to
5  understand and answer my questions?
6     A    I do not.  I have not taken any medications.
7     Q    Okay.  If you need to take a break, just let
8  me know.  Not an endurance contest, so --
9     A    Okay.
10    Q    I don't think we'll be that long today anyway,
11 but if you do need to take a break -- and I'll probably
12 take breaks along the way, but if you need one, just let
13 me know.
14         The only rule there is I'll need you to answer
15 any question that I have pending and possibly some brief
16 follow-up.
17         Okay?
18    A    Understood.
19    Q    All right.  Did you do anything to prepare for
20 the deposition today?
21    A    No.  Not really.
22    Q    Did you look at any documents to refresh your
23 memory or to get ready for today?
24    A    There was one document that I looked at.
25    Q    What was that?

11

1     A    It was some kind of a sheet about the
2  employees.
3     Q    Okay.  What kind of sheet about the employees?
4     A    That had their names.  The company information
5  sheet.
6     Q    Okay.  Let's see.
7          Did it look like this Exhibit 14?  Take a look
8  at it.
9     A    Something like this, yes.
10    Q    Okay.  We'll talk about that more later.
11    A    Okay.
12    Q    I just wanted to -- any other documents that
13 you looked at to prepare for today?
14    A    No.
15    Q    Other than counsel for the defendant, did you
16 speak to anybody about what your deposition testimony
17 would be here today?
18    A    I spoke to Dan, and he just --
19    Q    No, don't tell me what he said.
20    A    Okay.
21    Q    Just --
22    A    Yes.
23    Q    And when I said other, he's counsel for
24 Watkins & Letofsky, so --
25    A    Counsel.

12

1     Q    Right.  So that -- you -- you are employed
2  there.  That would be like privileged conversation.
3     A    Okay.
4     Q    So I'm not interested in finding out about
5  privileged communication, just whether or not you did
6  speak with him.  That's -- that's fine to tell me, but I
7  don't want to know what the substance is.
8          Okay?
9     A    Understood.
10    Q    Okay.  Other than Dan, anybody else that you
11 have spoken to about the case?
12    A    No.
13    Q    Okay.  All right.  By way of a little bit of
14 background information, what's your highest level of
15 education?
16    A    I got my liberal -- I -- I went to San Diego
17 State and got my cleared credential in liberal studies
18 to teach elementary education.
19    Q    I'm sorry.  That was like a -- was that a
20 degree?
21    A    Yes, in -- the degree was liberal studies.
22    Q    Okay.  And that was to -- for elementary
23 education?
24    A    Yes, K through 6.
25    Q    All right.  Where did you go to high school?

13

1     A    Laguna Beach High School.
2     Q    What year did you graduate?
3     A    1985.
4     Q    So other than high school and SDSU, do you
5  have any trade school, vocational training?
6          Some people go to truck driving school, some
7  people go to bartending school.  In Vegas, we have
8  people who go to dealing school.  Any vocational --
9     A    No.
10    Q    -- schools like that?
11    A    No.
12    Q    Okay.  And my understanding is you're married
13 to Brian Letofsky?
14    A    Yes.
15    Q    Okay.  How long have you and he been married?
16    A    Thirty-two years.
17    Q    You have children?
18    A    Yes.
19    Q    How many?
20    A    Three children.
21    Q    How old are they?
22    A    Thirty-one, 29, 24.
23    Q    Okay.  And are you employed?
24    A    Yes.
25    Q    How are you employed?

**Page 14**

1  A   I am a paralegal and office manager.
2  Q   Where at?
3  A   Watkins & Letofsky, LLP.
4  Q   Okay. How long have you been at Watkins &
5  Letofsky?
6      MR. WATKINS: Well, vague and ambiguous as "have
7  been at Watkins & Letofsky." In what capacity?
8      But you can answer.
9  BY MR. KEMP:
10  Q   Okay. Let's -- well, we can break it down.
11     You're currently an employee that receives a
12  W-2 form; is that right?
13  A   Currently, yes.
14  Q   Okay. How long have you been an employee
15  getting a W-2 form at Watkins & Letofsky?
16  A   I don't remember exactly.
17  Q   Okay. Do you have an estimate for me if you
18  don't remember exactly? Approximately, you know, what
19  year or how long ago, or any way you can quantify that
20  for me?
21  A   I don't remember. It's --
22  Q   Was it before the pandemic that you became a
23  W-2 employee?
24  A   It may have been around that time. I don't
25  remember.

**Page 15**

1  Q   I'm just trying to jog your memory. So, you
2  know, I understand you're telling me you don't remember.
3  I was just -- through any questions I can jog your
4  memory. So that's why I asked about the pandemic or --
5  okay.
6      Okay. So you don't remember exactly when you
7  became a W-2 employee. How long have you performed work
8  for Watkins & Letofsky?
9  A   Maybe 2008, 2009.
10  Q   All right. So 2008 or 2009, what did you
11  start doing? What kind of work were you doing for
12  Watkins & Letofsky at that point?
13  A   I did office manager work and law clerk work.
14  Q   Okay. And so, for the record, what's the
15  distinction between law clerk work and paralegal work?
16  A   That's a good question.
17     So, I did not go to paralegal school. When I
18  started, I was considered a law clerk or legal clerk.
19     My belief is that after you've worked as a law
20  clerk for a certain amount of years, you become a
21  paralegal even if you did not go to paralegal school.
22  Q   Just by virtue of working in a law office --
23  A   Correct.
24  Q   -- as kind of almost an apprenticeship type of
25  thing or --

**Page 16**

1  A   As far as I understand, correct.
2  Q   Okay. So at what point do you believe that
3  you became a paralegal as opposed to a law clerk?
4  A   I don't remember.
5  Q   Okay.
6  A   Somewhere in between when I started and today.
7  Q   Is there any difference in the kind of work
8  that you were doing as a law clerk as to when you would
9  have been considered a paralegal?
10  A   The only difference would be just how busy we
11  became.
12  Q   So the same type of work, but the volume just
13  increased?
14  A   Correct.
15  Q   All right. And when would you say the volume
16  increased?
17  A   It was gradual.
18  Q   All right. So specific to your role as a
19  paralegal, what kind of work do you do as paralegal now?
20  A   Now?
21  Q   Yeah.
22  A   So our main clients are insurance companies.
23  And when we get a new file from the insurance company,
24  there's a claim file that comes directly to me through a
25  portal, and I assign it a file number, and then there's

**Page 17**

1  many things I do with the file at that point.
2      Do you want me to describe them all?
3  Q   If you could just run through it briefly.
4  A   Okay. So I'll assign it a file number on our
5  end. Then I will assign it to an attorney.
6      I will evaluate the claim file to see what
7  direction we should go in. For example, let's say it's
8  a major company, a popular company. Perhaps we will
9  file a lawsuit right away, so I'll prepare that
10  complaint. Perhaps it is some kind of contractor that
11  works out of his or her home. I'll prepare a demand
12  letter.
13     Then let's say it's a product that failed, say
14  a microwave fire. I'll set up a communal fire
15  inspection if the loss had occurred recently. If not,
16  I'll set up a lab inspection with the engineer depending
17  on what kind of, you know, the electrical engineer,
18  mechanical engineer.
19     So I have to evaluate -- I evaluate the case
20  and decide what should be the next steps.
21  Q   Okay. All right. And has that process been
22  pretty much the same since you started back in
23  2008/2009?
24  A   No.
25  Q   How's it changed?



**18**

1  A   When I started out, we had a lot of auto
2  cases. So because the auto cases weren't as lucrative,
3  most of the cases I would just go right to preparing the
4  complaints. It became more extensive with product cases
5  and just the type of cases.
6  Q   Okay. But in terms of getting the case in
7  from the insurance company and going through it and
8  evaluating it, you'd say that's different now than it
9  was then?
10 A   It's pretty similar in that regard, yes.
11 Q   Okay. In terms of being an office manager,
12 what are your -- what's your role as an office manager?
13 A   Currently?
14 Q   Start currently. Sure.
15 A   When we have a new employee, I would give that
16 new employee paperwork to fill out and collect that.
17 Everything that's entailed with new paperwork.
18    I order supplies. If there's something wrong
19 with the copier, I'll contact the copy company so that
20 it can get fixed. If we need postage for the postage
21 meter, I will order that, and I order all the other
22 office supplies from Staples.
23 Q   Okay. Now, has your role as an office manager
24 changed since 2008/2009 when you started in terms of the
25 kind of work you do, the -- you know, ordering the

**19**

1  supplies and getting the postage and getting the copier
2  fixed and new employee paperwork?
3     Is that pretty much all the same as it was
4  when you started in 2008/2009?
5  A   Pretty much the same. Maybe busier.
6  Q   Okay. Prior to 2008/2009 when you go and take
7  on this office manager and law clerk work with Watkins &
8  Letofsky, what were you -- what were you doing for
9  employment before that?
10 A   I sold Avon.
11 Q   Okay. How long did you sell Avon for?
12 A   I don't remember, but maybe started in
13 possibly 2003, 2004, and I continued selling it as I was
14 working for Watkins & Letofsky.
15 Q   Okay. Do you still sell Avon today?
16 A   I do not.
17 Q   When did you stop?
18 A   I don't remember. I don't remember.
19 Q   Like about how many years ago?
20 A   If I had to guess, I would say 2020.
21 Q   Did the pandemic have anything to do with
22 that?
23 A   No.
24 Q   Okay. I'm sorry. How old are you now?
25 A   I am 56.

**20**

1  Q   So how old do you think you were when you
2  stopped selling Avon? Fifty-three?
3  A   Well, if I subtracted down to 2020, then I
4  would say I was 50 -- all right. I'm sorry. 2000 --
5  no -- yes.
6  Q   I'm --
7  A   Fifty-three. Yes, you are correct.
8  Q   My math is bad. Don't challenge me.
9  A   Yes. I believe I stopped selling Avon before
10 COVID started.
11 Q   Okay. How old were you when you became a W-2
12 employee? Maybe if we go at it that way.
13 A   I don't remember.
14 Q   Okay. All right. Do you -- do you have any
15 other sources of income, things that you do to make
16 money?
17 A   No.
18 Q   Okay. At this point it's just Watkins &
19 Letofsky?
20 A   Correct.
21 Q   And it pretty much has been since you stopped
22 selling Avon?
23 A   Correct.
24 Q   After 2008/2009, other than Avon, did you have
25 any other sources of income?

**21**

1  A   No.
2  Q   Have you ever worked as a paralegal or office
3  manager for any other law firms?
4  A   No.
5  Q   Have you ever worked as an office manager for
6  any other type of business?
7  A   No.
8  Q   Now, you're -- you have the education in
9  elementary, you know, to -- to teach elementary school,
10 I take it; right?
11 A   Yes.
12 Q   Did you ever teach elementary school?
13 A   No. I substituted for a few months before I
14 got pregnant.
15 Q   Okay. All right.
16    Who supervises your work as a paralegal at
17 Watkins & Letofsky?
18 A   I do.
19 Q   Okay. Is there an attorney that supervises
20 you or maybe more than one attorney that supervises your
21 work as a paralegal?
22 A   No. If I write a demand letter, I'll write it
23 for the attorney to sign, and at the bottom I'll put his
24 or her initials, and then my initials. And then I'll
25 prepare it and give it to the attorney, and they'll



**Page 22**

1 review it.
2    Q  Okay. But no other part of your paralegal
3 work does the attorney have to review or -- obviously,
4 if you're writing a complaint?
5    A  Anything that the attorney will be signing,
6 such as a complaint or a demand letter, they, of course,
7 have to review it before they sign it.
8    Q  Okay. Do you have interaction with clients?
9    A  No. No, not with the clients so much as the
10 engineers and the origin-and-cause experts and our
11 experts.
12    Q  Okay.
13    A  Well, I take that back. I will correspond
14 with the client as far as sending them a copy of the
15 demand letter, sending them a copy of the complaint.
16    Q  All right. With telephone calls or in-person
17 meetings?
18    A  E-mails.
19    Q  Just e-mails?
20      Is that "yes"?
21    A  Yes.
22    Q  It's going to happen. You know, that's the --
23 when I do that, I'm not trying to be smart with you.
24 I'm just trying to get a clear record.
25      Okay?

**Page 23**

1    A  Understood.
2    Q  All right. Do you work from home?
3    A  Sometimes.
4    Q  Do you have a dedicated, like, office or work
5 space at the Watkins & Letofsky offices?
6    A  Currently?
7    Q  Currently.
8    A  Yes.
9    Q  Okay. Have you always?
10    A  Yes.
11    Q  Okay. What -- what hours do you work?
12    A  It varies.
13    Q  Do you -- do you try to work, like, a full 40
14 hours per week?
15    A  It really just depends on the caseload and
16 what I have going on at home.
17    Q  Okay. Are you paid by the hour?
18    A  Yes.
19    Q  Have you always been paid by the hour as long
20 as you've been working?
21    A  Yes.
22    Q  Okay. You -- you might have answered this,
23 but is it -- how -- you work mostly from the office, but
24 sometimes at home? I'm just trying to get a --
25    A  What time period are you talking about?

**Page 24**

1    Q  Let's start with now.
2      MR. WATKINS: Well, it's a little vague and
3 ambiguous as to "home." I'm not trying to be difficult,
4 but they currently have three homes of sorts.
5 BY MR. KEMP:
6    Q  Well, remotely from outside of the office.
7 Let's put it that way.
8    A  It varies. We go on vacation and I work
9 remotely. I work remotely from my home in California.
10 I work remotely from my home in Arizona, and when I'm in
11 Las Vegas, I'll sometimes work remotely.
12    Q  Okay. I'm just trying to get a sense of how
13 much you work at home versus at the office or
14 remotely as --
15    A  It depends on what time period you're talking
16 about.
17    Q  Okay. Let's talk about the time period of
18 2008/2009 up until about 2018, that ten-year period.
19      MR. WATKINS: Still overbroad. Lacks foundation.
20 BY MR. KEMP:
21    Q  How much would you work from home or remotely
22 during that time period as opposed to working in the
23 office?
24      MR. WATKINS: Same objection.
25      THE WITNESS: From 2008 to 2019?

**Page 25**

1 BY MR. KEMP:
2    Q  2008 to 2018.
3    A  It would vary because my youngest son was
4 still in junior high school when I started, and I was
5 president of the PTA and did a lot of things with the
6 school. So I was always at their events, taking them to
7 practices, so I would have worked from home a lot more
8 back then.
9    Q  Okay. What year did your son graduate from
10 high school, the youngest one?
11    A  The youngest one graduated in 2017.
12    Q  All right. After he graduated from high
13 school, did you -- did that change how much you worked
14 at home versus how much you worked at the office or
15 remotely?
16    A  A little bit. I -- it's easy for me to work
17 from home, so it would just depend. Just go in the
18 office when I needed to.
19    Q  And of course, during the pandemic lots of
20 people worked more from home.
21      Was that true for you?
22    A  Yes.
23    Q  But now -- now you work -- well, you have
24 these three different locations that you go to, so how
25 much are you actually in the office at this point?

Page 26

1  A   I can't give you specific hours each week,
2  because it just varies.
3  Q   Okay. Well, would you say it's 50 percent of
4  the time?
5  MR. WATKINS: Calls for speculation. Lacks
6  foundation. Overbroad.
7  THE WITNESS: Every single week is different, so
8  there may be some weeks where I'm in there, you know,
9  80 percent of the time. There be may be another week
10 where I'm in there for 30 percent of the time.
11     I really just create my own schedule.
12 BY MR. KEMP:
13 Q   Okay. And that's always been true; right?
14 A   Yes.
15 Q   Okay. Even, you know, before you became a W-2
16 employee, before that and even now, you have flexibility
17 to work; right?
18 A   Correct.
19 Q   Okay. Have you ever hired any employees to be
20 employees of you rather than employees of the firm?
21 A   No.
22 Q   Have you ever had -- during the time that
23 you've been associated with Watkins & Letofsky going
24 back to 2008, have you ever had a business license for
25 you to run an independent business?

Page 27

1  A   No.
2  Q   And that would be from the state of -- from
3  the state or the county or municipality, no business
4  licenses?
5  A   No business licenses.
6  Q   Okay. Did you ever buy a policy of workers'
7  compensation insurance to cover yourself?
8  A   I don't know.
9  Q   And I'm talking about you for yourself rather
10 than Watkins & Letofsky covering you.
11 A   No.
12 Q   Do you have a -- a written agreement or
13 contract with Watkins & Letofsky as to what work you'll
14 perform and for, like, what compensation, so forth?
15 MR. WATKINS: Vague and ambiguous as to
16 "agreement." Compound.
17     But you can answer.
18 THE WITNESS: I don't know.
19 BY MR. KEMP:
20 Q   Do you have anything called an independent
21 contractor agreement?
22 A   I don't know. Not that I recall.
23 Q   Okay. You don't have any written employment
24 agreement with Watkins & Letofsky?
25 MR. WATKINS: Vague and ambiguous as to

Page 28

1  "agreement."
2  THE WITNESS: I don't recall.
3  BY MR. KEMP:
4  Q   Okay. Were you ever given anything in writing
5  as to what your job duties would be?
6  A   Not that I recall.
7  Q   Were you ever given anything in writing as to
8  what your compensation would be?
9  A   Not that I recall.
10 Q   When you say not that you recall, is it that
11 it might have happened and you don't remember it, or you
12 don't believe that it happened?
13 A   I don't remember.
14 Q   Okay. So when you -- when you came onboard
15 working with Watkins & Letofsky in 2008/2009 as an
16 office manager and a law clerk, you'd never worked as a
17 law clerk before?
18 A   That is correct.
19 Q   Who taught you how to be a law clerk?
20 A   I kind of just picked it up as I went along as
21 the work was needed.
22 Q   From whom?
23 A   Just being in the office setting.
24 Q   Okay. But who taught you these things?
25 MR. WATKINS: Asked and answered.

Page 29

1  BY MR. KEMP:
2  Q   I'm asking for the names of people that you
3  worked with that taught you these things along the
4  lines -- along the way.
5  MR. WATKINS: Assumes facts. Asked and answered.
6  THE WITNESS: It would be the attorneys that were
7  working at the firm at the time that I started.
8  BY MR. KEMP:
9  Q   They were employees of the firm?
10 MR. WATKINS: Lacks foundation.
11 THE WITNESS: It would be the attorneys.
12 BY MR. KEMP:
13 Q   Okay. Do you know what -- you were the office
14 manager and you were checking in all the new employees.
15     Were these attorneys people that you had done
16 the new employee paperwork for when they came onboard?
17 A   Besides my husband, Brian Letofsky, and
18 Mr. Watkins, yes.
19 Q   Okay.
20 A   I would have done all the paperwork for all of
21 the employees.
22 Q   Okay. And so they were employees of the firm
23 that you were learning things from?
24 MR. WATKINS: Lacks foundation.
25 THE WITNESS: They were people that worked for the

|  30  |  32  |
| --- | --- |

**Page 30**

1  firm.
2  BY MR. KEMP:
3    Q   Okay.  Were they employees?  Did you do the
4  new paperwork for them?  Did you get W-4s from them?
5  Did you have them fill out, you know, all of the
6  necessary forms?
7       Did you check the -- get their I-9s, do all
8  the immigration things?  Did you do all of those things
9  for these people to make them employees of Watkins &
10 Letofsky?
11      MR. WATKINS:  Assumes facts.  Calls for a legal
12 conclusion.  Lacks foundation.  Completely compound and
13 overbroad.
14      You can answer.
15      THE WITNESS:  I would have them fill out the
16 paperwork that was required by the law firm Watkins &
17 Letofsky.
18 BY MR. KEMP:
19   Q   To become employees?
20      MR. WATKINS:  Lacks foundation.
21      THE WITNESS:  I --
22      MR. WATKINS:  Calls for a legal conclusion.
23      THE WITNESS:  I had specific paperwork.  I would
24 have them sign it.
25 BY MR. KEMP:

**Page 31**

1    Q   Okay.  And who were some of those people?
2       MR. WATKINS:  Vague and ambiguous as to time.
3  Hugely overbroad.
4  BY MR. KEMP:
5    Q   No, the people that you learned -- you were a
6  law clerk for a number of years and then you became a
7  paralegal.
8       While you're a law clerk learning to become a
9  paralegal and you're learning from these attorneys, who
10 were they?  What were their names?
11   A   What year?
12   Q   From 2008 to 2018.  Anytime in that time
13 frame.
14      MR. WATKINS:  Overbroad.
15      THE WITNESS:  I would have to see a list of all the
16 attorneys, but could I guess at all the attorneys.  I --
17 BY MR. KEMP:
18   Q   I'm not asking you to guess.  I'm asking you
19 to tell me all the ones you remember working with.
20   A   I have worked with Brian Letofsky; Dan
21 Watkins; Juan Salas, S-a-l-a-s; Michael Long; Catherine
22 Song; Bethany Na, N-a; Christian Na, N-a; Brittany
23 Torbert --
24      MR. WATKINS:  Let me make sure you understand the
25 question.

**Page 32**

1       He wants to know who you worked with to learn
2  how to be a law clerk and trained you to be a law clerk.
3  Not just who you've worked with.
4       THE WITNESS:  I don't remember getting any specific
5  training.  It was just learning as I went along.
6  BY MR. KEMP:
7    Q   You learned it from all of these attorneys
8  that worked at the firm?
9       MR. WATKINS:  Vague and ambiguous as to "these."
10 Lacks foundation.  Calls for speculation.
11 BY MR. KEMP:
12   Q   The people that you've named, the attorneys
13 working at the firm?
14   A   These are all people that I worked with.
15   Q   Right.
16   A   When you're asking who I learned from, I don't
17 remember getting any specific training.  I was just --
18 just did my job.
19   Q   Okay.  So you had no experience coming into
20 this, and everything that you learned in terms of being
21 a law clerk or a paralegal you learned on the job at
22 Watkins & Letofsky?  Fair to say?
23   A   No, because my mom is a superior court justice
24 in Orange County, and I used to work at her law firm
25 when I was younger.

**Page 33**

1       MR. WATKINS:  Appellate court justice.
2       THE WITNESS:  Oh, what did I say?
3       MR. WATKINS:  Superior.
4       THE WITNESS:  She was a superior court justice.
5  She was.  Now she's an appellate court justice.  Thank
6  you.
7  BY MR. KEMP:
8    Q   Okay.
9    A   She was a superior court judge, yes.
10   Q   Correct.  Okay.
11   A   So my stepfather's an attorney.  My dad's an
12 attorney.  His girlfriend's an attorney.  So I have a
13 lot of experience with the law.
14   Q   So you did actually work for those people in
15 the past or just -- just from being around --
16   A   From my mother when she was an attorney, yes.
17   Q   Okay.  So you worked with your mother, then?
18   A   Yes.
19   Q   All right.  And --
20   A   When I was in high school.
21   Q   Okay.  When she was a judge at the -- at that
22 time?
23   A   No.  She was an attorney.
24   Q   An attorney at that time.  Okay.
25      All right.  And so you get to Watkins &



**34**

1  Letofsky, and you know everything you need to know to be
2  a law clerk?
3      MR. WATKINS:  Argumentative.
4      THE WITNESS:  No.  I learned as I went along.
5  BY MR. KEMP:
6      Q   Okay.  When you worked with your mother, was
7  she doing the same kind of legal work that Watkins &
8  Letofsky was doing, or was it a different practice area?
9      MR. WATKINS:  Vague and ambiguous as to "same kind
10 of legal work."
11     You can answer.
12     THE WITNESS:  She did civil law and personal
13 injury.
14 BY MR. KEMP:
15     Q   Okay.  And Watkins & Letofsky is doing the
16 same thing?
17     A   It varies.
18     Q   Okay.  All right.  When you worked for your
19 mother, did she pay you?
20     A   Not that I recall.
21     Q   So you weren't on her payroll as a W-2
22 employee when you --
23     A   No.  It was mainly maybe going in on the
24 weekends or summer vacation and helping her with ever --
25 whatever she needed.

**35**

1      Q   Okay.  And if I understood your earlier
2  testimony, prior to your working with Watkins &
3  Letofsky, you'd never worked for compensation for a law
4  firm before that?
5      A   Correct.
6      Q   Okay.  In addition to being paid by the hour,
7  were you reimbursed for any business expenses by
8  Watkins & Letofsky?
9      A   I don't know.
10     Q   Prior to your becoming a W-2 employee and when
11 you would work remotely, you would work on a computer, I
12 take it; right?
13     A   Yes.
14     Q   And was that your own computer or a computer
15 that was provided to you by Watkins & Letofsky?
16     A   It was my own computer.
17     Q   All right.  Did you have to -- strike that.
18 Let me -- let me ask it this way.
19     Was the work that you did for Watkins &
20 Letofsky -- and I'm now talking about the period before
21 you became a W-2 employee -- was that mostly done on
22 computer or was there, like, paper?
23     A   Mostly done on computer.
24     Q   Okay.  Did you have to buy any office
25 supplies, or were office supplies provided to you?

**36**

1      A   Sometimes I would buy office supplies, and I
2  would submit receipts.
3      Q   Okay.  And then they'd reimburse you for that?
4      A   Yes.
5      Q   Okay.  Did you -- did you look for any other
6  law firms to work for in the sense of you're working for
7  Watkins & Letofsky, but did you look to get other work
8  from other law firms too, or you were just working for
9  Watkins & Letofsky?
10     A   I did not look at other law firms to work.
11     Q   Okay.  Looking back at Exhibit 14 -- I don't
12 know if we had an extra copy of Exhibit 14 over there or
13 not.
14     MR. WATKINS:  Well, it's marked --
15     MR. KEMP:  It's marked from the last deposition.
16     MR. WATKINS:  No.
17     MR. KEMP:  Okay.  Well, I can show you my copy.
18 BY MR. KEMP:
19     Q   Do you -- did you have anything to do with the
20 creation of that document?
21     A   I don't know.  We've had many variations of
22 company information sheets throughout the years.
23     Q   Okay.  Well, have you worked on any of them?
24     A   Yes.
25     Q   Okay.  Who else might have worked on that to

**37**

1  produce it?
2      A   To produce this particular document?
3      Q   Who else works to produce those --
4      A   Typically, me.
5      Q   Okay.  All right.  And so you're listed down
6  there as the office manager and legal assistant, I
7  think; right?
8      A   So this was probably before I became a
9  paralegal, whatever.
10     Q   Okay.  So sometimes I've heard the term "legal
11 assistant" used sort of interchangeably with "legal
12 assistant/paralegal," you know, used interchangeably.
13     You're thinking that that's saying that your
14 legal assistant has actually some significance in what
15 you were doing, what duties you were --
16     A   At some point I just changed my signature
17 block to paralegal, so this must have been prior to
18 that.
19     Q   Okay.  So let's look at another one.  This is
20 Exhibit -- this was marked before as Exhibit 7.
21     A   Do you want this back?
22     Q   Yeah, let me have that back real quick.
23 That's -- yeah.
24     A   My gosh.
25     Q   So this was Exhibit 7 from the deposition

```
                                                         38
 1  exhibits before.  It's got a Bates stamp WLLLP001324.
 2        And these are e-mails -- it looks like it was
 3  an archived e-mail that was produced, but the original
 4  e-mails were in September and August of 2016, and it
 5  looks like it's e-mail between you and my client, Amy
 6  Buchanan.
 7        Do you remember Amy?
 8     A   Yes.
 9     Q   Okay.  So I noticed that -- where it says like
10  a signature block for e-mail, it says "Nancy Letofsky,
11  office manager and legal assistant," and this was in
12  2016.
13        When do you think that you changed your
14  signature block or your title to be a paralegal rather
15  than a legal assistant?
16     A   I do not remember.
17     Q   Okay.  So 2016, that was roughly seven years
18  ago.  Do you think it was -- well, does that help jog
19  your memory at all?  So seven years ago you had this as
20  legal assistant.  Now you're paralegal.
21        Does it help you at all to narrow it down
22  within that seven years, you know, when you would have
23  changed?
24        MR. WATKINS:  Assumes facts.  Lacks foundation.
25  Calls for speculation.

                                                         39
 1        THE WITNESS:  I don't remember.  I know in the last
 2  two or three years, I've definitely been a paralegal.
 3  BY MR. KEMP:
 4     Q   Okay.  So do you think it was after you became
 5  a W-2 employee that you changed it to paralegal?
 6     A   I do not remember.
 7     Q   On Exhibit -- 14, and I can show it to you
 8  again.  I'm just going to read it off here.
 9        There's somebody named Cecile.  I think it --
10  Ceci, C-e-c-i, Hagerty who is a paralegal.
11        Do you remember who that was?
12     A   Yes.
13     Q   All right.  Was Ceci an employee?
14     A   I do not know.
15        MR. WATKINS:  Lacks foundation.
16  BY MR. KEMP:
17     Q   Okay.  Was Ceci somebody that came to work at
18  Watkins & Letofsky after you were the office manager and
19  doing initial employee paperwork?
20     A   Yes.
21     Q   Do you remember doing the paperwork for Ceci?
22     A   I'm sure that I did, but I don't specifically
23  remember the interaction, but that would have been my
24  job.
25     Q   Okay.  Do you have any reason to think that

                                                         40
 1  she is not an employee?
 2        MR. WATKINS:  Lacks foundation.  Calls for
 3  speculation.
 4        THE WITNESS:  I do not know.
 5  BY MR. KEMP:
 6     Q   Okay.  Did you ever have anything to do with
 7  payroll?
 8     A   No.
 9     Q   All right.  Somebody named Liz Gallardo, a
10  paralegal.
11        Do you remember Liz?
12     A   I do.
13     Q   Did you do the initial employee paperwork for
14  Liz?
15     A   That would have been my job, but I don't
16  remember the specific interaction.
17     Q   Okay.  Have any reason to think that Liz
18  Gallardo was not a W-2 employee of the firm?
19        MR. WATKINS:  Lacks foundation.  Calls for
20  speculation.
21        THE WITNESS:  I do not know.
22  BY MR. KEMP:
23     Q   Okay.  So do you do work in the Las Vegas
24  office?
25     A   Sometimes.

                                                         41
 1     Q   Okay.  Like on what occasions would -- what do
 2  you do when you're -- on what occasions do you work in
 3  the Las Vegas office?
 4     A   Wherever I am physically doesn't have any
 5  impact on what I'm doing.
 6     Q   Okay.  So if you're in Las Vegas, you go and
 7  work there at that office?
 8     A   It's a desk.  So I'll either be at the condo
 9  working or I'll be at the desk at the Las Vegas office
10  doing the same work that I do anywhere that I am.
11     Q   Okay.  Does Cecile or Ceci Hagerty still work
12  for the firm?
13     A   No.
14     Q   Do you know when she left?
15     A   I don't remember.
16     Q   Somebody named Evie Dills, paralegal, is she
17  still there?
18     A   No.
19     Q   What about Liz Gallardo?
20     A   No.
21     Q   Do you know if you ever took a home office
22  deduction on your taxes?
23     A   I don't know.
24     Q   Okay.
25        MR. KEMP:  I'm getting really close to being done.
```



### Page 42

1  I'm going to go over my notes a little bit and go
2  through a couple things.
3       So rather than sit here on the record, let's
4  go ahead and take about a ten-minute break.  Okay?
5       THE WITNESS:  Okay.
6       MR. KEMP:  All right.  Thanks.
7       (Recess was taken at 3:02 p.m. until
8       3:14 p.m.)
9       MR. KEMP:  Let's go back on the record.
10 BY MR. KEMP:
11   Q   Reminder you're still under oath.
12       Okay?
13   A   Yes.
14   Q   All right.  So when you're doing your
15 paralegal work when you draft a complaint or demand
16 letter and you give it to the attorney to -- to look it
17 over, do they direct you to make any corrections or
18 changes?
19   A   No.
20   Q   No?  It's always perfect and never has to have
21 anything changed?
22   A   No.  The attorney will make the change.
23   Q   Okay.  They never send it back to you and have
24 you make any changes?
25   A   No.

### Page 43

1   Q   All right.  Are these all complaints and
2  demand letters that are very similar in terms of the
3  type of cases that they are -- well, I'll just ask you
4  that.
5       It seems like it's sort of a -- the impression
6  that I get is it's pretty much, you know, cookie-cutter
7  and one very much like the other.
8       Is that fair to say or not?
9       MR. WATKINS:  That assumes facts.  It's
10 argumentative as to "fair."  Lacks foundation.
11 BY MR. KEMP:
12   Q   Well, I'm not trying to argue with him.  I'm
13 just trying to understand.
14      MR. WATKINS:  Asking if something is fair is
15 argumentative in nature, but I'm not -- but anyway, go
16 ahead.  It's dissimilar.
17 BY MR. KEMP:
18   Q   Go ahead.
19   A   We have samples in our computer system, and
20 depending on the causes of action, I'll pull from that
21 sample.
22   Q   Okay.  The samples, are they just ones that
23 you've done before or ones that other people have done
24 before?
25   A   At the beginning they were ones that were done

### Page 44

1  before, and then I have revamped them as we've gone
2  along.
3   Q   Okay.  So what I'm -- what I'm -- what I'm
4  asking or trying to ask is are these all pretty much so
5  similar that you never need any direction from the
6  attorneys in order to be able to do them?
7       MR. WATKINS:  Oh, let's see here.
8       Yeah.  Just -- it -- I don't even know how to
9  answer that.  It's vague and ambiguous.  Lacks
10 foundation.  Assumes facts.
11      If you can, answer.
12      THE WITNESS:  I have a master sample complaint that
13 I use with many causes of action, and depending on what
14 causes of action I believe should be used for a
15 particular complaint, I will use those, and then prepare
16 the complaint, give it to the attorney.
17 BY MR. KEMP:
18   Q   And where do you get the facts?  I mean,
19 obviously, the complaint's got the law and all that, but
20 where do you get the facts from each of these cases?
21 Where does that come from?
22   A   The sample complaint.
23   Q   So I'm talking about so you'd get something
24 from an insurance company and they can't -- they aren't
25 all identical.  I mean, different people have different

### Page 45

1  facts.
2       And so does that come from the insurance
3  company, or do you talk with the client?  I mean, how
4  does that -- how do you get the factual basis for the
5  complaints?
6   A   Okay.  So I'll get information from the claim
7  file that we got from the client, and if there had been
8  lab testing, then I'll get that information from the
9  report that the expert wrote.
10  Q   Okay.  And are you always able to just do
11 these yourself, or do you sometimes have to speak with
12 the attorneys to get input from them on -- on how to
13 handle any of your cases?
14  A   I typically am able to do them myself.
15 Sometimes I'll ask the handling attorney if they want to
16 use particular causes of action if I'm unsure.
17  Q   Okay.  How many of these do you do in a week
18 or a month?  How many -- how many complaints -- well,
19 start with complaints.  Then I'll ask the same question
20 for demand letters.
21      How many complaints in a month are you
22 generally doing?
23  A   In a one-month period, maybe 10 to 25.
24  Q   Okay.  So that's pretty much almost like one
25 every business day?



```
                                                                           46
1     A   It can be.  Sometimes more, sometimes less.
2     Q   Okay.  Fair enough.
3         What about demand letters?  How many of those
4   are you doing in a month?
5     A   Are you talking about currently?
6     Q   Yeah, currently.
7     A   Currently, maybe five to ten a month, but I
8   also write a lot of other letters.  So two parts of my
9   main job are scheduling communal scene inspections and
10  lab testing, like destructive testing of product.  So
11  I'm writing letters to send out to defendants on those
12  matters.
13    Q   All right.  Communal seed?
14    A   Scene.
15    Q   Scene.  What does that mean?  I don't -- I
16  don't --
17    A   That means if our client gives us, for
18  example, a fire case that happened two weeks ago, then
19  we will invite any potential defendants to go see the
20  scene and document, photograph it before repairs begin.
21    Q   Okay.  Got it.
22        All right.  Now, going back to, you know,
23  before the pandemic in the 2015 to 2020 time frame, were
24  you doing a similar number of complaints and demand
25  letters, or was it less at that time?
```

```
                                                                           47
1     A   It varies.  Like I said before, we used to
2   have a lot of auto cases, and I did a lot more
3   complaints with the auto cases, and demand letters.
4     Q   Okay.  So back then, how many complaints were
5   you doing in a month?
6     A   During the time period of 2015 to 2020?
7     Q   Right.
8     A   It varied.  It could have been 20 to 40 in a
9   one-month period.
10    Q   So a lot more.
11        And the demand letters?  Were there fewer --
12  correspondingly fewer of those or --
13    A   There would have been more.
14    Q   More.  Okay?
15    A   With auto cases.
16    Q   Okay.  I'm going to show you these two
17  exhibits, 24 and 25.  This is information that we got
18  from -- from a subpoena to a bank.
19        Actually, do we have the actual -- we have the
20  actual exhibits.  Let me have those back while you look
21  at the actual exhibits.  So they're going to be in the
22  stack right here.
23    MR. WATKINS:  Hand me the stack.  Yeah.
24  BY MR. KEMP:
25    Q   So the first question I have is on
```

```
                                                                           48
1   Exhibit 4 -- 24.  It -- in the second column it has your
2   name.  Right above that is Jake Letofsky, and I
3   understand that's your son; is that right?
4     A   Yes.
5     Q   Does your son work for the firm?
6     A   He did work for the firm.
7     Q   Okay.  When did he work for the firm?
8     A   I don't recall the dates.
9     Q   Okay.  When did he -- do you remember
10  approximately how many years ago he started?
11    A   No.  He worked on and off different time
12  periods.  Summer, you know.
13    Q   Is that your -- is that your youngest child or
14  your oldest?
15    A   Middle.
16    Q   Middle.  Okay.
17        Somewhere I had the ages written down.  This
18  is the one that's 29?
19    A   Yes.
20    Q   Okay.  Do you remember approximately how old
21  he was the first time he --
22    A   It would have varied.  He worked at the law
23  office different periods of time.
24    Q   Okay.  When is the last time he would have
25  worked there?
```

```
                                                                           49
1     A   I don't remember.
2     Q   Does he work somewhere else now?
3     A   Yes.
4     Q   Where does he work now?
5     A   The City of Irvine.
6     Q   How long's he been working for the City of
7   Irvine?
8     MR. WATKINS:  This has nothing to do with the scope
9   of --
10    MR. KEMP:  I'm trying to jog her memory to see
11  if --
12    MR. WATKINS:  Still doesn't have anything to do
13  with the scope of discovery that's available.  Let's
14  just not waste a lot of time.
15        But you can answer.
16    THE WITNESS:  Can you repeat the question.
17  BY MR. KEMP:
18    Q   Yeah.  I'm just wondering, how long's he been
19  in the City of Irvine.  That will help us back in to how
20  long was he with the firm.
21    A   I think about a year and a half.
22    Q   Okay.  Did he go to work at the City of Irvine
23  from working at the firm?
24    A   No.
25    Q   He worked somewhere else in between?
```



```
                                              50
 1    A    No.  He was in school.
 2    Q    Okay.  So was he working at the firm while he
 3  was in school?
 4    A    Yes.
 5    Q    Okay.  Was it like summers and vacations and
 6  things like that?
 7    A    Different periods of time.
 8    Q    Okay.  So this is -- my understanding is this
 9  is from the payroll company that the firm uses.
10  Paychex, I think it's called.
11         Are you familiar with that name?
12    A    Yes.
13    Q    Okay.  When you, for lack of a better term,
14  onboard an employee, bring them in and have them do the
15  paperwork and all that, do you assign these ID numbers
16  or is that something that Paychex does?
17    A    I don't know what those are.
18    Q    Okay.  All right.  That's fine.  That's all
19  the questions I had on that.
20         Looking at Exhibit 7 here again.  I can show
21  it to you.  This appears that you were -- you asked Amy
22  Buchanan for a resignation letter.
23         This is on -- I'll just read it out and I can
24  show it to you.  This is Wednesday August 31st,
25  6:46 p.m., from you to Amy with a CC to Susan Watkins.
```

```
                                              51
 1         It says "Hi, Amy.  We will need a letter of
 2  resignation from you.  See attached information sheet.
 3  We hope your surgery is successful and your recovery
 4  works well.  What day are you having surgery?  Nancy."
 5         Look at that.  My question is did somebody --
 6  well, let me ask you, why were you telling Amy that you
 7  needed a resignation letter from her?
 8    A    I do not recall.
 9    Q    Okay.  Did somebody tell you you should get a
10  resignation letter from Amy?
11    A    I don't remember.
12    Q    All right.  And why would you be copying Susan
13  Watkins on this?
14    A    I don't remember.
15    Q    Okay.  All right.  I'll have that back.
16         Are you given any kind of performance
17  evaluations or reviews --
18    A    No.
19    Q    -- at your work?
20    A    No.
21    Q    Have you ever during your entire tenure
22  working at Watkins & Letofsky?
23    A    No.
24    Q    Have you ever received any written warnings
25  or, you know, discipline of any kind?
```

```
                                              52
 1    A    No.
 2    Q    Do you actually supervise any employees?
 3    A    Currently?
 4    Q    Currently.
 5    A    Yes.
 6    Q    How many employees do you supervise currently?
 7    A    One.  I have an assistant.
 8    Q    Okay.  How long have you had the assistant?
 9    A    Approximately one year.
10    Q    Okay.  Did you ever have an assistant before
11  that?
12    A    Yes.
13    Q    Okay.  When was that assistant working for
14  you?
15    A    Prior to this assistant.
16    Q    Okay.  Do you remember when they started?
17    A    I think he was there about six months.
18    Q    Okay.  Any before that?
19    A    One.
20    Q    And how long was that one there for?
21    A    I don't recall, but maybe less than a year.
22    Q    Okay.  When was -- so -- so was it about three
23  years ago the first time you had an assistant?  My
24  math --
25    A    Approximately.
```

```
                                              53
 1    Q    Okay.  Just for the record, what was your
 2  first assistant's name?
 3    A    Molly.
 4    Q    Molly what?
 5    A    Friel, F-r-i-e-l.
 6    Q    And your second assistant?
 7    A    Christian.  I don't recall his last name right
 8  now.
 9    Q    All right.  And currently?
10    A    Castro.  C-a-s-t-r-o.
11    Q    Christian Castro?  Is that yes?
12    A    Yes.
13    Q    Okay.  And your current one?
14    A    Jonnie Mahl, M-a-h-l.
15    Q    Okay.  But never before with those three did
16  you ever have an assistant working under you?
17    A    Correct.
18    Q    Okay.
19         MR. KEMP:  I don't think I have any other questions
20  at this time.
21         MR. WATKINS:  All right.
22         MR. KEMP:  I would note that I did get documents
23  overnight that I haven't had a chance to completely go
24  through.  There's a chance that we may -- don't run off
25  with those.
```



**54**

1 MR. WATKINS: Trying.
2 MR. KEMP: There's a chance we may have to
3 reconvene the deposition. I don't expect that to
4 happen, but because I haven't had a chance to look at
5 all the documents yet, we'll adjourn the deposition,
6 leave it open for now.
7     But thanks for coming today. Appreciate it.
8 MR. WATKINS: Thank you. No questions. We're off
9 the record.
10    (A discussion was held off the record.)
11 THE STENOGRAPHER: Counsel, for the record, would
12 you like to order a certified copy?
13 MR. WATKINS: Yes, one searchable PDF for each. I
14 don't need any printed versions.
15 THE STENOGRAPHER: For all three depositions today;
16 correct?
17 MR. WATKINS: Please.
18    (Proceedings adjourned at 3:33 p.m.)
19
20
21
22
23
24
25

**55**

1 STATE OF CALIFORNIA     )
2                         ) ss.
3 COUNTY OF ORANGE        )
4
5
6
7     I, the undersigned, say that I have read the
8 foregoing deposition, and I declare, under penalty of
9 perjury, that the foregoing is a true and correct
10 transcript of my testimony contained therein.
11     EXECUTED this _____ day of _____,
12 2023, at _____, California.
13
14
15
16    _____
          NANCY LETOFSKY
17
18
19
20
21
22
23
24
25

**56**

1 BE IT KNOWN that the foregoing proceedings were taken
2 before me; that the witness before testifying was duly
3 sworn to testify to the whole truth; that the foregoing
4 pages are a full, true and accurate record of the
5 proceedings, all done to the best of my skill and
6 ability; that the proceedings were taken down by me in
7 stenographic shorthand and thereafter reduced to print
8 under my direction.
9
10    I CERTIFY that I am in no way related to any
11    of the parties hereto, nor am I in any way
12    interested in the outcome thereof.
13
14    ( )  Review and signature requested.
15    ( )  Review and signature waived.
16    (x)  Review and signature neither requested
17    nor waived.
18
19    IN WITNESS WHEREOF, I have subscribed my name
20    this 22nd day of OCTOBER, 2023.
21
22    
23
24         Kayla Lotstein, California CSR No. 13916
25